IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

NORTHERN DIVISION

NO. 5:05-HC-461-D

RECEIVED
JUL 0 5 2005
FRED L. BORCH III, CLERK
US DISTRICT COURT, EDNC

FILED
JUL 0 5 2005
FRED L. BORCH III, CLERK
US DISTRICT COURT, EDNC
BY_____ DEP. CLK

WADE LARRY COLE,

      Petitioner,

      v.

MARVIN POLK, Warden,
Central Prison
Raleigh, North Carolina

      Respondent.

## PETITION FOR WRIT OF HABEAS CORPUS

## **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................1

HISTORY OF THE CASE ..........................................................................3

STATEMENT OF THE FACTS ...................................................................8

STANDARD OF REVIEW ........................................................................11

REASONS WHY PETITION FOR WRIT OF HABEAS CORPUS
SHOULD BE GRANTED .........................................................................13

    I.     PETITIONER' SENTENCE OF DEATH VIOLATES
         THE EIGHTH AMENDMENT AS INTERPRETED IN ATKINS v.
         VIRGINIA.................................................................................13

         A. Evidence Presented By The Defense And By The State
            Demonstrated That Wade Cole Has Been Significantly Impaired
            In All Areas Of Adaptive Behavior Since His Childhood ...........19

         B. Wade Cole Was Diagnosed As Having Significantly
            Subaverage General Intellectual Functioning At The Time Of
            The Commission Of The Crime...................................................47

         C. All Of The Evidence Presented At The Hearing Supported
            A Finding That Wade Cole's Disability Originated Before
            Age 18 ........................................................................................54

         D. A Denial Of All Appellate Review In State Court Violates
            Fundamental Due Process Protections..........................................57

         E. Wade Cole Is Mentally Retarded Under Atkins v. Virginia
            Rendering His Death Sentence Cruel And Unusual .....................59

    II.    A JURY'S ACQUITTAL OF A DEFENDANT ON A CRIMINAL
         CHARGE PRECLUDES USE OF THE UNDERLYING
         CONDUCT AS THE BASIS FOR SUBMISSION OF AN
         AGGRAVATING FACTOR IN A CAPITAL SENTENCING
         PROCEEDING...........................................................................60

    III.   TRIAL COUNSEL'S FAILURE TO MOTION PRE-TRIAL TO
         DISMISS THE CHARGE OF INVOLUNTARY
         MANSLAUGHTER CONSTITUTES INEFFECTIVE
         ASSISTANCE OF COUNSEL. .........................................................82

IV.   THE COMBINATION OF THE DEMOGRAPHICS OF CAMDEN COUNTY AND THE CIRCUMSTANCES OF THE TRIAL MADE IT IMPOSSIBLE TO DRAW AN IMPARTIAL JURY FROM A FAIR CROSS SECTION OF THE COMMUNITY ..............................92

V.   RACIAL DISCRIMINATION IN THE SELECTION OF THE GRAND JURY VIOLATED DUE PROCESS .....................................112

VI.   TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO SEEK FUNDS FOR A NEUROPSYCHOLOGIST TO EXAMINE WADE COLE AND FOR FAILING TO PRESENT A NEUROPSYCHOLOGIST WHO COULD TESTIMONY TO BRAIN DAMAGE ............................................................................120

VII.   TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT ALL OF THE READILY AVAILABLE MITIGATING EVIDENCE ...................................................................................133

VIII.  MR. COLE'S COUNSEL FAILED TO PRESENT A DIMINISHED CAPACITY DEFENSE TO PREMEDITATED AND DELIBERATE MURDER BASED ON LACK OF MENTAL CAPACITY AND FAILED TO PROPERLY PREPARE THE EXPERT WHO TESTIFIED TO DIMINISHED CAPACITY BASED ON VOLUNTARY INTOXICATION, CONSTITUTING INEFFECTIVE ASSISTANCE OF COUNSEL .................................140

IX.   PROSPECTIVE JURORS WHO ADMIT TO HAVING FORMED AN OPINION ABOUT THE DEFENDANT'S GUILT MUST BE EXCUSED FOR CAUSE UNDER THE PROTECTIONS OF THE DUE PROCESS CLAUSE AND THE SIXTH AMENDMENT.........149

X.   THE TRIAL COURT'S INSTRUCTION DEFINING THE AGGRAVATING CIRCUMSTANCE THAT THE CAPITAL MURDER WAS PART OF A COURSE OF CONDUCT INCLUDING DEFENDANT'S COMMISSION OF A CRIME OF VIOLENCE AGAINST ANOTHER PERSON WAS UNDULY VAGUE. .............................................................................153

XI.   LIMITING THE CAUSES OF THE MITIGATING CIRCUMSTANCE OF IMPAIRED CAPACITY TO SPECIFIED CAUSES THAT OMITTED CAUSES SUPPORTED BY UNCONTRADICTED EVIDENCE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS ...........................................155

XII.  WADE COLE'S JURY DETERMINED THE MURDER WAS
      "ESPECIALLY HEINOUS, ATROCIOUS, OR CRUEL" BASED
      UPON UNCONSTITUTIONALLY VAGUE INSTRUCTIONS
      WHICH FAILED TO DISTINGUISH DEATH-ELIGIBLE
      MURDERS FROM MURDERS WHICH ARE NOT DEATH-
      ELIGIBLE ....................................................................................158

XIII. THE TRIAL COURT'S CAPITAL SENTENCING JURY
      INSTRUCTIONS, WHICH DEFINED DEFENDANT'S BURDEN
      OF PERSUASION TO PROVE MITIGATING
      CIRCUMSTANCES AS EVIDENCE THAT "SATISFIES" EACH
      JUROR VIOLATED DUE PROCESS AND THE EIGHTH AND
      FOURTEENTH AMENDMENTS BECAUSE THAT DEFINITION
      DID NOT ADEQUATELY GUIDE THE JURY'S DISCRETION
      ABOUT THE REQUISITE DEGREE OF PROOF ............................165

XIV. ALLOWING THE JURY TO REFUSE TO GIVE EFFECT TO
      MITIGATING EVIDENCE IF THE JURY DEEMED THE
      EVIDENCE NOT TO HAVE MITIGATING VALUE VIOLATED
      DUE PROCESS AND THE EIGHTH AND FOURTEENTH
      AMENDMENT ................................................................................170

XV.  BY MAKING OPTIONAL THE JURORS' CONSIDERATION OF
      MITIGATION THEY HAD PREVIOUSLY FOUND, THE TRIAL
      COURT VIOLATED THE EIGHTH AND FOURTEENTH
      AMENDMENTS................................................................................174

XVI. THE TRIAL COURT'S IMPOSITION OF JUDGMENTS AND
      IMPOSITION OF A DEATH SENTENCE FOR FIRST-DEGREE
      MURDER VIOLATED DEFENDANT'S RIGHTS UNDER THE
      FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS
      TO THE UNITED STATES CONSTITUTION ..................................176

XVII. THE TRIAL COURT ERRED BY SENTENCING DEFENDANT
      TO DEATH BECAUSE THE DEATH PENALTY IS
      INHERENTLY CRUEL AND UNUSUAL THE NORTH
      CAROLINA CAPITAL SENTENCING SCHEME IS
      UNCONSTITUTIONALLY VAGUE AND OVERBROAD; AND
      THE DEATH SENTENCE IN THIS CASE WAS NOT
      SUPPORTED BY THE EVIDENCE, WAS
      DISPROPORTIONATE, AND WAS IMPOSED UNDER THE
      ARBITRARY INFLUENCE OF PASSION, PREJUDICE, AND
      OTHER ARBITRARY FACTOR........................................................180

PRAYER FOR RELIEF ........................................................................180

CERTIFICATE OF SERVICE .............................................................182

DECLARATION ................................................................................183

APPENDIX  [separate volume]

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

NORTHERN DIVISION

NO. _____

|  |  |
|---|---|
| WADE LARRY COLE, | |
| Petitioner, | |
| v. | PETITION FOR WRIT OF |
| MARVIN POLK, Warden, | HABEAS CORPUS |
| Central Prison | |
| Raleigh, North Carolina | |
| Respondent. | |

NOW COMES Petitioner, Wade Larry Cole, (hereinafter "Mr. Cole," "Wade Cole," or "petitioner"), by his undersigned counsel, and represents to the Court that he is illegally detained, under sentence of death, in the custody, control and confinement of the Respondent and his agents and employees of the North Carolina Central Prison, located in Raleigh, North Carolina, and that his confinement and sentence of death are in violation of the Constitution of the United States. Petitioner seeks relief pursuant to 28 U.S.C. § 2254.:

## INTRODUCTION

Wade Larry Cole is entitled to a writ of habeas corpus for a number of compelling reasons.

Wade Cole is mentally retarded under *Atkins v. Virginia*, 536 U.S. 304 (2002). Even though he was afforded a hearing, the State court plainly misapprehended or

misstated the record and ignored evidence presented by Mr. Cole. The evidence showed that under any standard Wade Cole is mentally retarded. At the time of the commission of the crime, Mr. Cole was diagnosed at a state run mental health institution as being mentally retarded. Four state-employed psychiatrists signed off on the diagnosis of mental retardation based on testing done by a staff psychologist, interviews with his family members and observations of Mr. Cole's behavior during a three-month stay at Dorothea Dix Hospital. Under *Atkins v. Virginia*, the lesser culpability of the mentally retarded offender renders execution of Mr. Cole unconstitutional.

Wade Cole is African-American. The victims of his crime were African-American, yet in his two trials every one of the twenty-eight jurors was white. In addition in the twenty years prior to Mr. Cole's indictment, out of twenty-nine grand jury foremen, only one was African-American.

Wade Cole was acquitted of the murder of Hattie Graham by the jurors in his first trial. Contrary to elementary principles of double jeopardy, the second jury was instructed that it could decide that Mr. Cole murdered Hattie Graham.

Wade Cole was prohibited from proving that he suffers from organic brain damage in post-conviction because he was poor. The procedures for funding indigent defendants in North Carolina at the time of his first Motion for Appropriate Relief were unconstitutionally arbitrary. Mr. Cole's attorneys filed three separate motions seeking funds for a psychologist. All three motions were denied even though the requests were supported by affidavits and letters from mental health professionals. After North Carolina's legislature changed the way indigent funding was administered, Mr. Cole was

granted the necessary funds. Mr. Cole was examined by a neuropsychologist who found indications of organic brain damage. The State court denied Mr. Cole a hearing on this issue.

Wade Cole's trial counsel were constitutionally ineffective for failing to investigate reasonable areas of mitigation, by failing to present any family members to the jury and by failing to present a diminished capacity defense to first degree murder.

Wade Cole's trial court refused to remove for cause a prospective juror who admitted to having formed an opinion as to Mr. Cole's guilt. His trial attorneys were later refused an additional peremptory challenge.

The trial court's instruction on the aggravating factors were unconstitutional.

The instructions on mitigating factors were constitutionally inadequate in guiding the jury's decision making.

The trial court gave an improper instruction on the mitigating factor impaired capacity.

The imposition of the judgment violated Wade Cole's constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

Wade Cole is mentally retarded, suffers from brain damage and was denied the basic constitutional protections embedded in the Due Process Clause, guarantees of due process and the right to effective assistance of counsel.

## HISTORY OF THE CASE

1. On June 27, 1988, the Camden County Grand Jury returned a bill of indictment charging defendant Wade Larry Cole with one count of murder in the death of

his common law wife Theresa Graham. On October 17, 1988, the Grand Jury returned a bill of indictment charging Wade Larry Cole with one count of murder in the death of Theresa Graham's mother, Hattie Graham. The cases came on for joint trial upon pleas of not guilty at the July 17, 1989 Special Criminal Session of the Superior Court of Camden County, the Honorable Donald W. Stephens presiding.

2.  The jury on July 26, 1989 returned verdicts finding Mr. Cole guilty of first-degree murder with respect to Theresa Graham, acquitting Mr. Cole of murder with respect to Hattie Graham and instead finding him guilty of involuntary manslaughter. On August 2, 1989, the jury returned a verdict of death. The trial court sentenced Mr. Cole to death for first-degree murder and to a consecutive term of 10 years imprisonment for involuntary manslaughter.

3.  On appeal, the Supreme Court of North Carolina awarded Wade Cole a new trial. *State v. Cole*, 331 N.C. 272, 415 S.E.2d 716 (1992). Attorneys Lennie Hughes and O.C. Abbott were again appointed to represent Cole. Defendant-petitioner moved for change of venue on July 21, 1992. On May 19, 1993, the Honorable Quentin Sumner held a pretrial hearing on defendant-petitioner's motion in Chowan County by consent of all parties. Judge Sumner ordered that the case be tried in Chowan County, but jurors drawn from Camden County. On June 28, 1993, the State moved for rehearing on the venue issue. The Honorable William C. Griffin, Jr. heard the state's motion in a pretrial hearing on August 23, 1993. Judge Griffin granted the state's motion to move the trial physically back to Camden County and denied Defendant's request for the jury pool to be drawn

from a different county. On July 1, 1993, Lennie Hughes, filed a Motion to Withdraw on the basis of his relationship to the judge then assigned to hear the trial. The judge in question recused himself from the case, mooting the issue. On August 23, 1993 the Honorable William C. Griffin, Jr. heard pre-trial motions in Pasquotank County by consent of all parties.

4. The case was scheduled to be called for retrial at the 27 September 1993 Special Session of Criminal Superior Court in Camden County. On September 27, 1993, Judge Griffen continued the case indefinitely because the State had failed to comply with an order issued by Judge Thomas S. Watts on August 13, 1993 to reproduce all photographs in its possession relating to the above-captioned case. In November, the State reset the case for the 11 April 1994 session of Camden Superior Court. In January 1994, the State took the case off of the calendar because the assistant district attorney who had tried the case was no longer with the district attorney's office. On May 23, 1994, Lennie Hughes and O. C. Abbott filed a Motion to Withdraw. The motion alleged that the client-attorney relationship had broken down to the point that they were concerned about their own safety. The matter came on to be heard in Gates County on May 24, 1994 before the Honorable James C. Davis. Judge Davis denied the motion.

5. The cases came on for trial at the May 31, 1994 Criminal Session of the Superior Court of Camden Count, the Honorable James A. Beatty, Jr., presiding. Following jury selection and the presentation of evidence, the jury on June 9, 1994 returned verdicts finding defendant guilty of first degree murder and involuntary

manslaughter. Following additional evidence in the penalty phase, the jury on June 13, 1994 returned a sentence recommendation of death. On June 13, 1994, Mr. Cole was sentenced to death for first-degree murder and to a concurrent term of two years imprisonment for involuntary manslaughter.

6.   On June 13, 1996, the North Carolina Supreme Court affirmed Mr. Cole's convictions and sentence. *State v. Cole*, 343 N.C. 399, 471 S.E.2d 362 (1996)  The United States Supreme Court denied certiorari review on January 6, 1997. *Cole v. North Carolina*, 519 U.S. 1064, 117 S.Ct. 703 (1997)

7.   On January 23, 1997 the Honorable John R. Parker, entered an order appointing counsel which provided that William F. W. Massengale and. Marilyn G. Ozer, both of Chapel Hill, be appointed to represent Mr. Cole in post-conviction proceedings. Defendant-petitioner filed a Motion for Appropriate Relief on December 2, 1997.  The State responded on July 7, 1998 with a Brief In Support Of Motion For Summary Denial Of Defendant's Motion For Appropriate Relief. On July 14, 1998 defendant filed his Amended Motion for Appropriate Relief.  On September 1, 1998 defendant filed Motion For Appropriate Relief Second Amendment.  On September 23, 1999 defendant filed a Motion For Appropriate Relief Third Amendment.  An evidentiary hearing was held beginning November 15, 1999.  An Order denying defendant-petitioner's claims was filed on August 31, 2001.

8. On 31 October 2001, Mr. Cole petitioned the Supreme Court of North Carolina for certiorari review. The North Carolina Supreme Court denied the Petition for Writ of Certiorari on 28 February 2002.

9. At the time of the enactment of N.C. Gen. Stat. § 15A-2005, Petitioner was in post-conviction. Petitioner filed a Motion for Imposition Of Life Sentence pursuant to N.C. Gen. Stat. § 15A-2006 on 18 January 2002. An evidentiary hearing was held on 22 and 23 May 2003 in Pasquotank County, by consent of the parties, the Honorable J. Richard Parker presiding. On 19 August 2003 Petitioner's motion was denied. On 22 December 2003, Mr. Cole petitioned the Supreme Court of North Carolina for certiorari review. On 28 July 2004, Mr. Cole motioned to be allowed to file a supplement to his petition for certiorari. On 12 August 2004, The North Carolina Supreme Court granted Petitioner's motion to supplement his petition, but denied the Petition for Writ of Certiorari.

10. On 10 September 2004, as soon as possible after he had been granted funds for a neuropsychologist and the testing had been completed, Mr. Cole filed this Motion for Appropriate Relief in the Camden Superior Court on September 10, 2004. The State responded on January 20, 2005. The Superior Court's Order denying this motion was filed in Camden County on February 7, 2005

11. Mr. Cole had been denied funding for a neuropsychologist during his first Motion for Appropriate Relief, which was filed in 1997. In 2000 the North Carolina legislature changed the procedures for funding indigent defense. Mr. Cole reapplied for

funding and was able to retain a neuropsychologist who diagnosed brain damage. As the factual predicate for this claim could not have been discovered through the exercise of reasonable diligence during the first Motion for Appropriate Relief, Mr. Cole filed a motion under N.C. Gen. Stat. § 15A-1419 (c)(3). The State court denied this motion without granting a hearing. On May 4, 2005 Petitioner filed a petition for writ of certiorari with the North Carolina Supreme Court. This motion was denied on 1 July 2005.

## STATEMENT OF THE FACTS

12.    On the afternoon of June 22, 1988, Wade Cole returned to Camden, after driving the logging truck all day and missing lunch. He sat for awhile in his car drinking wine and smoking a reefer. When he entered the house, he and Theresa started arguing over dinner. The argument became violent. Hattie Graham called 9-1-1. Wade Cole was arrested and taken to the Camden County jail. Wade Cole's boss came to the jail and bailed him out. Wade left the jail, drove to Elizabeth City and purchased a bottle of Irish Rose. He parked his car and drank down the bottle.

13.    Wade telephoned Theresa Graham. He thought he heard noises in the background, indicating that she was with another man. Drunk and paranoid, Wade Cole drove back to Camden. He entered the house in a rage armed with a shotgun. Wade shot Theresa twice, dragged her out of bed and began stabbing her with a knife. Hattie Graham tried to pull Wade away from Theresa, but was cut by the knife when Cole pushed her away. Wade pulled Theresa out to the porch where he continued the stabbing and left her

dead or dying. Hattie Graham called 911, received a call back, but died from an irregular heart beat before the deputy arrived. Wade Cole was first tried for these deaths in 1989. The jury was presented with verdict sheets for each victim: 1) for Theresa Graham the jury was instructed to find whether the defendant was guilty of first degree murder, second degree murder or not guilty; 2) for Hattie Graham the jury was instructed to find whether the defendant was guilty of second degree murder, involuntary manslaughter or not guilty. The jury found Wade Cole guilty of the first degree murder of Theresa Graham. The jury acquitted Cole of the murder of Hattie Graham. The jury found him guilty of involuntary manslaughter of Hattie Graham. Cole was sentenced to death.

14. In October 1988, within a few months of the crime, Wade Cole was ordered to Dorothea Dix Hospital for a competency evaluation. Mr. Cole stayed at Dix for several weeks during October and November 1988. He was readmitted for a continuation of the evaluation in March 1989. In all, Mr. Cole spent approximately three months under the constant observation of Dorothea Dix staff. Four psychiatrists and a psychologist signed off on the discharge summary which included a diagnosis of mild mental retardation.

15. Dr. Cabe Lynn, the attending psychiatrist, ordered a battery of psychological tests which were administered by Dorothy Humphrey, a Dix staff psychologist. Dr. Lynn conducted a mental status examination, ordered a number of laboratory tests and considered background information, including interviews with Wade's mother. (HTp. 210). Dorothy Humphrey administered the Wechsler Adult Intelligence Scale (WAIS-R), the Wide Range Achievement test, projective drawing, Bender-Gestalt and incomplete

sentence blank. Based on her scoring of the WAIS-R, she determined that Wade was suffering from mild mental retardation, with a full score of 68. Dorothy Humphrey's report states that Wade had made a concerted effort on the test and that the score was valid.

16.   After the North Carolina Supreme Court denied the petition for certiorari filed by Mr. Cole based on the Superior Court's denial of his mental retardation claim, post-conviction counsel filed a request for funding for neurological testing with the Indigent Defense Services. IDS requires that defense counsel "make at least as specific an application to retain experts as would be required by a fair but exacting trial judge applying G.S. 7A-450(a) and *Ake v. Oklahoma* and its progeny." (Rules of the Commission of Indigent Defense Services 2D.1) Indigent Defense Services granted Mr. Cole's request for neurological testing. Dr. Claudia Coleman conducted neurological testing. Dr. Coleman concluded that: "The overall neuropsychological test results showed impairment in several areas of neurocognitive functioning. . . .This pattern supported superimposed acquired brain impairment and clearly indicated significant compromise in the frontal and pre-frontal areas of the cerebral cortex." Mr. Cole suffered from "long-standing brain impairment with significant frontal lobe deficits." She explained that "neuropsychological deficits reflect actual brain dysfunction and impairment, not mental illness." The report concluded that "Mr. Cole's frontal lobe dysfunction was a critical factor impairing his ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law."

17. The jury was not presented with evidence of brain defects because trial counsel had not investigated the possibility of neurological dysfunction. Instead the jury was only asked if Mr. Cole's capacity to appreciate the criminality of his conduct or to conform his conduct with the requirements of the law was impaired by either alcohol or drugs or both. The jury did not find this statutory mitigating factor to exist

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 [AEDPA] amended the statutes governing federal habeas corpus relief to impose new restrictions on federal habeas relief for state prisoners. As amended by the AEDPA, 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court has interpreted 28 U.S.C. § 2254(d)(1) as giving independent meaning to both the "contrary to" and "unreasonable application" clauses. *Williams v. Taylor*, 529 U.S. 362, 404 (2000). A state court decision is "contrary to" Supreme Court precedent if it 1) arrives at a conclusion that contradicts that reached by the Supreme Court on a question of law; or 2) confronts facts that are materially indistinguishable from those of relevant Supreme Court precedent and arrives at an opposite result. *Id.* at 405. A

decision is an "unreasonable application" of clearly established Supreme Court law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.The writ may issue only if either the state court adjudication resulted in a decision that (1) was contrary to clearly established Federal law, as determined by the Supreme Court of the United States, or (2) involved an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States. The Court went on to note that "contrary to" means the state court arrived at a conclusion opposite to that reached by the United States Supreme Court on a set of materially indistinguishable facts. "Unreasonable application" meant a federal habeas court may grant the writ if the state court identified the correct governing legal principle from the Court's decisions but unreasonably applied that principle to the facts of the prisoner's case. Where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable. *Wiggins v. Taylor*, 539 U.S. 510, 528 (2003). "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Miller v. Cockrell*, 537 U.S. 322, 340 (2003).

### REASONS WHY PETITION FOR WRIT OF HABEAS CORPUS SHOULD BE GRANTED

I.    **PETITIONER'S SENTENCE OF DEATH VIOLATES THE EIGHTH AMENDMENT AS INTERPRETED IN ATKINS V. VIRGINIA**

18.    Wade Cole presented overwhelming evidence of his mental retardation at the time of the commission of the crime. At the evidentiary hearing in state court, Mr. Cole offered substantial proof of each of the three elements of the definition of mental retardation set out in North Carolina's statutes. N.C. Gen. Stat. §15A-2005. Testifying for the defense were two psychologists, two of Wade Cole's elementary school teachers, two family members, and a lifelong friend and educator. In addition to submitted affidavits from Mr. Cole's high school coach and a psychologist formerly employed at Dorothea Dix Hospital.

19.    With regard to the first element, significantly subaverage intellectual functioning, the evidence at the hearing showed that Wade Cole was given extensive psychological testing at the State mental hospital, Dorothea Dix, within weeks of the crime, after which four psychiatrists signed off on a diagnosis of mental retardation. This diagnosis was based in part on an IQ score of 68 on the Weschler Adult Intelligence Scale Revised or WAIS-R, a standardized, scientifically-recognized and individually-administered intelligence test.

20.    With regard to the second element of the definition, significant deficits in adaptive functioning, Wade Cole presented testimony from one of the nation's leading

experts on mental retardation. Based on a thorough evaluation of Mr. Cole, this expert concluded that Petitioner had significant deficits in all 10 areas of adaptive functioning. The State presented no expert testimony on adaptive functioning.

21.    With regard to the third element of the definition, manifestation of mental retardation before the age 18, Mr. Cole's expert and lay witnesses, including family members and educators, all testified that his intellectual limitations were evident in childhood. Wade Cole attended segregated schools in Elizabeth City. Hearing testimony confirmed that special classes for mentally retarded African American students were not available in the schools that Mr. Cole attended.

22.    The order of the hearing court denying Petitioner's motion sets out 43 findings of fact, most of which are no longer than a single sentence.  In its order, the court below did not resolve conflicts in the evidence, as required by North Carolina case law and statute. The order of the State court denying Petitioner's motion does not include specific findings of fact on any of the ten areas of adaptive functioning. The order does not acknowledge that Wade Cole was given extensive psychological testing at Dorothea Dix, within weeks of the crime, after which four State-employed psychiatrists signed off on a diagnosis of mental retardation. The Order fails to note that Dr. Brown's testimony is based solely on an IQ test done six years after the crime and does not include any evaluation of adaptive functioning. The order fails to acknowledge that Dr. Brown's opinion does not meet the criteria set out in the North Carolina statute on mental retardation. The Order does not acknowledge that Dr. Greg Olley, one of the nation's

leading experts in mental retardation, found Wade Cole to be mentally retarded based on interviews with people who had known Cole most of his life and an extensive review of past records, transcripts, previous psychological testing and mitigation reports. Dr. Olley tested the two individuals who had known Wade Cole for the longest period of time using a nationally recognized test for scoring adaptive behavior. Petitioner put on several teachers, relatives and long time neighbors who supported Dr. Olley's testimony. The State's only evidence was an affidavit of Dr. Brown based on tests down in preparation for trial in 1994 and the testimony of a relative of the victims.

23.   A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence: "The standard is demanding but not insatiable . . .deference does not by definition preclude relief." *Miller-El v. Dretke*, 125 S.Ct. 2317, 2005 U.S. LEXIS 4658, 20, *quoting Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The State court's failure to discuss the evidence in relation to North Carolina's statutory definition or in relation to the Supreme Court opinion in *Atkins v. Virginia*, 536 U.S. 304 (2002), along with the court's failure to make any findings of fact on several of the areas of adaptive functioning or to resolve conflicts in the evidence render its decision unreasonable. The State court's factual premise was unreasonable by clear and convincing evidence.

## State Court Disposition Of This Claim

24.   Petitioner presented this claim in his Motion for Appropriate Relief filed in the Superior Court of Camden County, North Carolina, on 18 January 2002. In an opinion dated 19 August 2003, the Superior Court of Camden County denied Petitioner's Motion for Appropriate Relief. On 22 December 2003, Petitioner raised this claim in a timely filed Petition for Writ of Certiorari to the Supreme Court of North Carolina. The Petition was denied on 12 August 2004. The State Court's denial of this claim was contrary to or an unreasonable application of decisions by the United States Supreme Court.

## Facts Supporting Petitioner's Claim

25.   Wade Larry Cole was born into segregated poverty in 1950's eastern North Carolina. His mother, illiterate and possibly retarded, could only identify his birthday as pea-picking season. Wade's school was segregated. No special education classes or teachers were available. Wade repeated grades or was socially promoted until he left school. Wade then spent most of his days sitting in a car in front of his mother's house. His mother and girlfriend provided for his needs. Wade's work experience was pathetic, except for his last job, obtained for him by his brother and kept for him by his brother's contacts, constant presence and coaching. He had no social life. He belonged to no organizations. Wade could not cook for himself. His girlfriend even combed his hair.

26.   Within weeks of the crime, Cole was ordered to Dorothea Dix for a competency evaluation. Cole stayed at Dix for several weeks during October and November 1988. He was readmitted for a continuation of the evaluation in March 1989.

In all Cole spent approximately three months under the constant observation of Dorothea Dix staff. Four psychiatrists and a psychologist signed off on the discharge summary which included a diagnosis of mild mental retardation. The Dorothea Dix psychological examinations were done within weeks of the crime and a full scale WAIS-R IQ of 68 was recorded. At the time of the commission of the crime Wade Larry Cole was diagnosed as mentally retarded by state-employed psychiatrists. (See Appendices 1 and 2, Discharge Summaries from Dorothea Dix Hospital; Appendix 3, Affidavit of Dorothy Humphries,[1]).

27. Petitioner filed a Motion for Imposition Of Life Sentence pursuant to N.C. Gen. Stat. § 15A-2006 on 18 January 2002. Dr. Greg Olley was retained to do an evaluation. Dr. Olley is a psychologist and Associate Director at the Clinical Center for the Study of Development and Learning in the School of Medicine at the University of North Carolina at Chapel Hill. The center is designated under federal law in the developmental disabilities assistance bill of rights act which selects centers in each state to serve the function of being a resource to that state in mental retardation and developmental disabilities. Dr. Olley is a fellow in the American Association on Mental Retardation. Individuals are chosen as fellows based on significant contributions to the field of mental retardation. (2003 Tp. 25)[2]

28. Dr. Greg Olley testified at the evidentiary hearing that Wade Cole met the North Carolina standard for mental retardation under N.C. Gen. Stat. 15A-2005 and the

---

[1] Dorothy Humphrey was prevented from attending the evidentiary hearing by illness. Instead her affidavit was introduced and stipulated to by the State. 2003 Tp. 21.
[2] References to the evidentiary hearing held in 1999 will be cited as "1999 Tp. ___"; references to the evidentiary hearing held in 2003 will be cited as "2003 Tp. ___".

constitutional standard for retardation under *Atkins v. Virgina*, 536 U.S. 304 (2002). (2003 Tp. 38) Dr. Olley testified that Cole's IQ at the time of the crime was a full scale WAIS-R score of 68 based on testing done at Dorothea Dix. Interviews and testing of people who knew Cole throughout his life led to the conclusion that Cole displayed significant limitations in several areas of adaptive behavior.

29.  A valid diagnosis of mental retardation must be based on each of three criteria reflecting intellectual functioning level, adaptive skill level, and chronological age at onset. MENTAL RETARDATION, DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS, p. 25, 9th Ed. (1992) (hereinafter MENTAL RETARDATION).

30.  The first criteria, intellectual functioning level, is derived from a standardized intelligence test. A diagnosis of mental retardation is made on the basis of an IQ of approximately 70 or 75 or below. *Id.*

31.  The second criteria is a professional assessment of adaptive skills. From the early formal concept of mental retardation to the present time, adaptive behavior has been used as the distinguishing factor to diagnose mental retardation. Individuals are diagnosed as mentally retarded based on their inability to fulfill everyday requirements that are age appropriate either in school or responsibilities for adulthood. Adaptive behaviors are everyday living skills such as getting dressed, going to school, preparing a meal, or cleaning the house. They are skills that a person learns in the process of adapting to his or her surroundings.

A.   Evidence Presented By The Defense And By The State Demonstrated That Wade Cole Has Been Significantly Impaired In All Areas Of Adaptive Behavior Since His Childhood

32.   A valid determination of a person's adaptive skill level requires assessment based on an appropriately normed and standardized instrument. *Id.* Use of a standardized test is essential in order to be sure that the same thing is measured the same way each time, making the scores comparable. A standardized test demonstrates validity, because it actually measures what it portends to measure. Individuals are asked questions from many areas of adaptive behavior. The answers are then evaluated to yield a standardized score similar to the IQ test.

33.   A conclusion and recommendation on the diagnosis of mental retardation can only be made on the basis of diverse information, such as "that derived from interviews with people acquainted with the person (including the family) and from observations of the person's behavior." MENTAL RETARDATION at 44.

34.   These tests should be supplemented with other kinds of information about the person's history such as school records, interviews with teachers, employers and others who know some aspect of the person's day to day functioning. (2003 Tpp. 33-35).

35.   An IQ test score standing alone is not an acceptable approach to assessment for mental retardation. MENTAL RETARDATION at 44. In fact even with a low IQ score a person may not be diagnosed as mentally retarded unless he has significant limitations in at least two areas of adaptive behavior. MENTAL RETARDATION at 13-14, 49.

36. Dr. Olley reviewed all of the available records for Wade Cole, including school records and reports of previous evaluations. He reviewed affidavits and interviewed numerous people, including teachers, neighbors and family members. Dr. Olley also interviewed Wade Cole.

37. Dr. Olley administered the SIB-R to two individuals who had known Wade Cole over the longest period of time, Mr. Coles brother Rufus Cole and a neighbor, Shirley Simpson.

38. The Scales of Independent Behavior-Revised (SIB-R), the Vineland Adaptive Behavior Scales, the AAMR Behavior Scales (ABS) and the Inventory for Client and Agency Planning (ICAP)) are the most widely used behavior assessments in the United States.

39. The Scales of Independent Behavior (SIB-R) assessment tool is distinguished by several features. It contains a behavior problem scale in addition to its adaptive behavior assessment and provides a unique score which reflects independence based on adaptive and maladaptive behavior combined. The SIB-R is a comprehensive, norm-referenced assessment of adaptive and maladaptive behavior.. It is acknowledged as an appropriate test to assess adaptive behavior by the AAMR's Classification Manual. MENTAL RETARDATION at 42. The SIB-R is especially useful when assessing an adult, because it has norms that extend beyond adolescence, from three months to over eighty years. It may be administered either as a questionnaire or as a carefully structured interview, with special materials to aid the interview process.

a. **Dr. Olley And Numerous Lay Witnesses Testified That Wade Cole Was Significantly Impaired In Numerous Areas Of Adaptive Behavior.**

40. On the basis of his interviews and the results of the SIB-R tests, Dr. Olley concluded that Wade Cole was significantly impaired in several areas of adaptive behavior: "[O]verall looking at the scores on the Scales of Independent Behavior and the information that came from other people who knew Mr. Cole that they were all congruent with significantly subaverage adaptive behavior." (2003 Tp. 58) Dr. Olley's conclusion was corroborated by the testimony of lay witnesses who knew Wade Cole.

COMMUNICATION

41. Communication skills include the ability to comprehend and express information through spoken or written words or nonsymbolic behaviors such as facial expressions and body movements. Higher levels of communication skills such as writing a letter are also addressed in functional academics. MENTAL RETARDATION at 40. Dr. Olley explained that this area includes an individual's ability to listen to instructions that include more than one step, remember the instructions in sequence and then carry them out. More abstract communication skills include the ability to solve a problem and be able to explain the solution. Individuals who Dr. Olley interviewed told him that Wade Cole generally had to be told things more than once, even if the directions were straightforward. All of the individuals he talked with told him Wade Cole had to be given instructions more than once or had to be physically shown how to accomplish a task. Dr. Olley summarized that "it was clear that Mr. Cole has struggled to be able to

communicate effectively." He diagnosed Mr. Cole as significantly impaired in the area of communication skills. (2003 Tpp. 40-41).

42.   Wade Cole's kindergarten teacher, Jane Brickhouse, testified that Wade could do a simple task, "[b]ut if it had any degree of difficulty, he had problems." (2003 Tp. 18-19).

43.   Shirley Simpson was uniquely qualified to testify to Wade Cole's adaptive behaviors. Mrs. Simpson had lived next door to Wade Cole from the time he was a child until he was arrested. Professionally, at the time Mrs. Simpson testified she was the executive director of Elizabeth City's Opportunities Industrialization Center (OIC). As director Ms. Simpson works with mentally handicapped, troubled youth and other individuals to help them become productive members of the community. Before she became the director of OIC, Mrs. Simpson taught at the College of the Albemarle. (2003 Tpp. 131-132) On the topic of communication skills, Ms. Simpson testified that in the twenty-five years that she lived next door to Wade Cole she never knew him to hold a conversation. (2003 Tpp. 137-138).

44.   Barbara Bowser Lamb was the only witness called by the State at the hearing on mental retardation. Ms. Lamb was related to both victims. She testified that she never heard Wade Cole talk about complicated subjects such as what was in the newspaper. Ms. Lamb said that she never saw Wade Cole talk with his brother Ernest Cole, who lived in the same house as Wade for years. (2003 Tpp. 262-263)

FUNCTIONAL ACADEMICS

45.   The area of functional academics includes cognitive abilities and skills related to learning at school that also have direct application to life, such as writing, reading, basic math, geography and social studies. MENTAL RETARDATION at 41. Dr. Olley explained that functional academics included situations such as being able to anticipate how much money is needed and budget accordingly, be able to maintain a bank account and anticipate future expenses. (2003 Tp. 52)

46.   Dr. Olley testified that Wade Cole's teachers reported that Wade was socially promoted. He did not really achieve the standard to pass from grade to grade but the teachers saw no purpose in retaining him indefinitely. (2003 Tp. 53)

47.   Although Wade attended school for at least nine years, when he was admitted to Central Prison the test administrator found that Wade's skills were at the second grade level: "Wade claims to have completed the 9th grade, and educational achievement testing indicates a 2.8 grade level equivalent with reading at 2.0, spelling 3.3. and arithmetic 3.3., all substantially below his claimed amount of formal education." (Appendix 4, Initial Psychological Report, Central Prsion) Wade's school record shows that he flunked first grade and was forced to repeat it.[3]  During his second year of first grade Wade did better, receiving B's and C's. Consistent with the Central Prison testing, after second grade the majority of Wade's grades were D's and F's.[4]

---

[3] Wade also repeated eighth grade.
[4] A certified copy of Wade Cole's school record is attached hereto.

48. The Dorothea Dix Psychological Assessment reports that Wade Cole was given reading and writing achievement tests and that his scores on these tests placed him in the mildly retarded range. (Dorothea Dix Psychological Assessment, Appendix 3)

49. Wade Cole's first grade teacher, Jane Brickhouse, testified that the elementary school had no special classes for slow children, so the teachers would divide their own classes into ability groups. Wade was in her slow group. (2003 Tpp. 8, 14) Wade was not successful learning first grade work. At the end of his first grade year, he still did not know the alphabet. Ms. Brickhouse held him back for a second year in first grade. (2003 Tp. 20).

50. Helen Sutton, Wade Cole's sixth grade teacher and friend of the family, testified that Wade had trouble reading and could not write well. Mrs. Sutton stated that she passed Wade because his capabilities were so low, retaining him would not have helped academically and would have hurt him socially. (2003 Tp. 122)

51. Shirley Simpson stated that Wade Cole could not spell the name of the street that he had lived on for thirty years. The street name was "Martin." (2003 Tp. 140) Mrs. Simpson testified that as Wade could not write legibly, add or subtract in her opinion he could not have kept a checkbook. (2003 Tp. 139) Mrs. Simpson explained that Wade Cole's mother could not read. When notes were sent home from school concerning Wade, Mrs. Simpson would read them to his mother. Based on this knowledge of his academic difficulties, she believed that Wade was mentally retarded. (2003 Tp. 152-153).

52. The State's witness never saw Wade Cole reading a newspaper, but she knew that he looked at pornography in his car. (2003 Tpp. 260-261)

SELF-CARE

53. Self-care skills involve toileting, eating, dressing, hygiene and grooming. MENTAL RETARDATION at 40. Dr. Olley testified that people familiar with Wade Cole told him Wade could not plan ahead to wear appropriate clothing and that he was not concerned with personal hygiene. Based on his interviews and the results of the SIB-R tests, Dr. Olley found Mr. Cole deficient in this area. (2003 Tp. 43).

54. Wade Cole's older brother, Rufus Cole, reported that even as an adult, Wade would come out of the house in the winter with short sleeve shirts on and wouldn't wear raincoats. (2003 Tp. 168) Juanita Cole, Wade's sister-in-law, agreed that Wade could not dress himself properly either for the weather or for a special occasion. (2003 Tp. 195). The State's witness, Barbara Lamb, testified that Wade Cole's girlfriend had to comb his hair, because he would not do it by himself. She said that Wade Cole did not take care of himself and sometimes had a body odor from not bathing. (2003 Tpp. 256-257)

HOME-LIVING

55. Home living is the adaptive skill area related to functioning within a home, including clothing care, housekeeping, property maintenance, food preparation and cooking, planning and budgeting for shopping, home safety, and daily scheduling. MENTAL RETARDATION at 40. Dr. Olley explained that the cut-off point of two standard

deviations below the mean was arrived at in part because research demonstrated that at that point individuals find it difficult to live independently. Because of this difficulty, people with mild mental retardation compensate by finding ways for other people to help them out. In Wade Cole's case he was dependent on his mother and on his girl friend to maintain a home. He never developed any domestic skills, and, therefore, was significantly impaired in this adaptive skill area. (2003 Tpp. 44-45)

56.   Wade Cole's brother Rufus testified that their mother cooked for Wade. He did not think that Wade could cook a meal. (2003 Tpp. 169-170). His sister-in-law agreed, stating that she never saw Wade cook for himself. (2003 Tpp. 192-193).

57.   The State's witness, Barbara Lamb, testified that she never saw Mr. Cole take care of the house or make himself anything to eat. She stated that his girlfriend did all the grocery shopping and bought all the clothes. (2003 Tpp. 254-255, 266, 270)

SOCIAL SKILLS

58.   The social skills area relates "to social exchanges with other individuals, including initiating, interacting, and terminating interaction with others; receiving and responding to pertinent situational cues; recognizing feelings; providing positive and negative feedback; regulating one's own behavior; being aware of peers and peer acceptance; gauging the amount and type of interaction with others; assisting others; forming and fostering of friendships and love; coping with demands from others; making choices; sharing; understanding honesty and fairness; controlling impulses; conforming

conduct to laws; violating rules and laws; and displaying appropriate socio-sexual behavior." MENTAL RETARDATION at 40. These are the types of skills that most people learn in childhood. Mentally retarded individuals are vulnerable to exploitation because they are not sophisticated about social interaction. Dr. Olley explained that when he interviewed individuals who knew Wade Cole he was interested in finding out whether other people had been able to take advantage of Wade.

59. Dr. Olley testified that Wade's teachers reported that other children made fun of Wade at school because of his deficiencies. When he started school he would play with other children on the playground, but "as he got further along in school and school became more difficult and he fell behind that it was more difficult for him to maintain age appropriate social relationships. . . .He didn't have eye contact. He didn't have the usual social amenities to recognize people and say hit to them." People would convince Wade to loan them money, but then not pay it back. Based on his interviews, Dr. Olley concluded that Wade was significantly impaired in social skills. (2003 Tp. 47)

60. Shirley Simpson testified that one of the similarities she saw between Wade Cole and her mentally retarded clients was that he was withdrawn: "I think he did not mingle simply because I think he felt incompetent or that he wasn't on the same level or he didn't know as much as the other guys." When she first met Wade Cole he was a shy and withdrawn little child: "There were a lot of kids in the neighborhood. He didn't do a lot of mingling. He basically stayed in the yard, stayed close to his mom." (2003 Tpp. 130, 155). As an adult, Wade continued to be withdraw and spent his time sitting on the

front porch or in his car: "You would always see him—it was so obvious that everybody knew what time of night you went or came in a community, you knew that was Wade. If you saw someone sitting in the car, that was Wade, or saw someone on the porch, it was him." (2003 Tp. 132)

61. Rufus Cole testified that Wade, both as a child and as an adult, did not socialize: "Wade would be mostly to the house sitting on the porch most of the time." (2003 Tp. 169).

62. Juanita Cole agreed that most of the time Wade just sat on the porch or in his car. When Wade was a child she recalled that "he would be distanced from the other children." She stated that "lots of people" took advantage of Wade: "They laugh at him, they say—they can get anything out of him. If he got a dollar or couple of dollars they can get it out of him some kind of way. He will let them have it. That's just the way he were." (2003 Tpp. 193, 194-195).

COMMUNITY USE

63. Community use encompasses skills related to being able to participate in the resources of the community; knowing your way around the community; using community transportation, community services such as the library; attending church; attending theaters; and visiting other cultural places and events. MENTAL RETARDATION at 40.. Dr. Olley explained that mildly retarded individuals can learn routes by repetition to find their way around, but could not use a map or telephone book to find what they needed. Based

on his interviews and testing, Dr. Olley found Wade Cole to be significantly impaired in this area. (2003 Tpp. 48-49)

64.     Shirley Simpson testified that if Wade Cole were in a strange town he could not find a place using a map. He could not plan for a trip. "Wade appeared to be slow and we accepted that. Everybody accepted that in the neighborhood, you know, that he was slow." Mrs. Simpson thought that if you told Wade to the Post Office and ask the lady to give him ten stamps, he could do that. "But to go through the process of sending a certified letter, no." To her knowledge Wade did not attend church, belong to clubs or participate in any community activity. (2003 Tpp. 136-137, 139)

65.     Wade Cole's brother, Rufus, taught him to drive and tried to teach him routes. He testified: "Wade has always been slow. If you'd ask him a question he would have to almost think before he could give the answer. He'd say, Oh, yeah, okay.'" Rufus Cole explained the reading a map and figuring out directions from a map were skills beyond Wade's abilities. (2003 Tpp. 166-167)

66.     Rufus testified that Wade did not go to church and was not active in any organization. (2003 Tp. 170) Juanita Cole agreed that Wade did not belong to any church or clubs. (2003 Tp. 195) Barbara Lamb testified that even though other members of the household went to church, Wade did not go with them. (2003 Tp. 252).

SELF DIRECTION

67. Self-direction includes "skills related to making choices; learning and following a schedule; initiating activities appropriate to the setting, conditions, schedule, and personal interests; completing necessary or required tasks; seeking assistance when needed; resolving problems confronted in familiar and novel situations; and demonstrating appropriate assertiveness and self-advocacy skills." MENTAL RETARDATION at 40.

68. Dr. Olley testified that the core of self-direction is "independence, the extent to which a person can make decisions and solve problems on his own." People that Dr. Olley talked with and the results of the SIB-R consistently indicated that Wade Cole relied heavily on other people and when it was necessary for him to make decisions that he didn't use his own experience but that he looked to others to help him. He found Wade Cole to be significantly impaired in self-direction. (2003 Tpp. 49-50)

69. Shirley Simpson remembered that Wade's mother and brothers always needed to direct him. If someone would come up and ask Wade a question, he would send them to his mother. (2003 Tp. 138). Mrs. Simpson thought that Wade could come up with a goal, but he would not be able to formulate a plan to reach the goal: "what to do or how to get from A to B, I don't think he could do that." (2003 Tp. 139)

70. Juanita Cole recalled that when she asked Wade what was he going to do, "he'd say, 'I don't know. I'll just sit on the porch.' He loved to sit on the porch." (2003 Tp. 193)

HEALTH AND SAFETY

71.    Health and safety includes skills related to maintenance of one's health in terms of eating; visiting doctors and dentists for treatment and prevention; sexuality; physical fitness; basic safety (e.g. following rules and laws, using seat belts, crossing streets, interacting with strangers, seeking assistance); and personal habits. MENTAL RETARDATION at 40.

72.    From his interviews and review of records, Dr. Olley learned that Wade Cole had never seen dentist before he was arrested and never sought routine medical care. (2003 Tp. 51) Based on interviews with individuals who had known Wade all of his life, Dr. Olley concluded that he was significantly subaverage in the category of health and safety.

73.    Wade Cole testified at his 1994 trial. He reported that on the day of the incident he was driving an 18-wheeler logging truck and was experiencing brake trouble. His solution was to stop at a service station and have the brakes disconnected to stop them from locking. Thus he spent the rest of the day driving an 18-wheeler without functioning brakes. (1994 Trial Tpp. 1962-1963).

LEISURE SKILLS

74.    The leisure skills area includes developing a variety of leisure and recreational interests: "Skills include choosing and self-initiating interests, using and enjoying home and community leisure and recreational activities alone and with others, playing socially

with others, taking turns, terminating or refusing leisure or recreational activities, extending one's duration of participation and expanding one's repertoire of interests, awareness, and skills." MENTAL RETARDATION at 41.

75.   The witnesses all agreed that Wade Cole did almost nothing with his leisure time. Dr. Olley summarized: "I asked Mr. Cole and I asked other people who knew him what he did in his leisure time and people were hard-pressed to think of anything. Mr. Cole told me that he liked to play pool, although he wasn't very good at playing pool, tht he liked to watch television. Other people, quite honestly, couldn't think of anything that he did. That in fact reported—Ms. Simpson, the next-door neighbor, reported that it was amazing how long he could sit and do nothing and didn't seem to need to have an activity to occupy him." (2003 Tp. 54)

76.   Mrs. Simpson testified that she never saw Wade engage in sports or hobbies. She remembered him sitting in his car or on the front porch. (2003 Tp. 142) Wade's brother Rufus agreed that Wade "would mostly to the house sitting on the porch most of the time." (2003 Tp. 169). Juanita Cole had the same memory: "I guess he would get out. But when I goes over there, most of the time every time I come over there he always either sitting on the porch or sitting in the car." (2003 Tpp. 193-194).

WORK SKILLS

77.  Work skills includes holding a job and displaying specific job skills such as appropriate behavior, completion of tasks, awareness of schedules, money management and taking criticism. MENTAL RETARDATION at 41.

78.  Wade Cole did not have a steady job until he was 36. That job was driving a logging truck for the same man who employed his older brother Rufus. Rufus saw to it that Wade was hired and the he got to the job on time. (2003 Tp. 165) He rode with Wade until he had learned the routes by heart: "I carried him with me riding, showed him how to shift the gears then I would let him drive, all right, then he go by the next morning and I thought he'd got in the truck and gone but it was still sitting there. He looked at it about a week before he got in it." Rufus explained that he would do the complicated operations for his brother: "I would load my truck and I'd pull it aside and I'd back his truck in up under the loader because I'd run loaders and everything and I'd load him up and he'd follow me to the mill." When asked how long it took him to learn the route, Rufus replied that he was not sure that he ever learned it: "I don't think he went by himself. We went together, always carried two loads." (2003 Tp. 163).

79.  Dr. Olley explained that mentally retarded individuals can hold jobs, if the job is at the person's ability level and it has a predictable routine. (2003 Tp. 56) In his interviews with people who knew Wade, Dr. Olley learned that Wade could not hold jobs for very long and the jobs that he had were of a very unskilled nature. The job he held the longest was driving the truck. Wade Cole was able to retain that job because of his brother's assistance and his employer's sympathy. Dr. Olley reported that he asked Wade

how he learned to back up the truck. Mr. Cole told him that he didn't do that, he would continually drive ahead. Thus, he and his brother found ways to accommodate for the more difficult tasks, to lower them to Wade Cole's ability level. (2003 Tpp. 56-57).

80. Wade was not able to keep any other job for any length of time. When Dr. Olley asked why these jobs ended, he was told that either Wade was fired because he was not a dependable employee or he just walked off the job. (2003 Tp. 58).

81. Dr. Olley concluded that Wade Cole had a significant impairment in work skills. (2000 Tp. 58).

82. Mrs. Simpson remembered Wade's last job with the logging company, but testified that before that he had not been able to keep a job. She remembered that he worked in the potato field and cabbage field, but the employers wouldn't let him stay. (2003 Tpp. 133-134)

### b. The Affidavit Of The State's Expert Indicates That He Did Not Perform The Mandatory Tests For Gauging Adaptive Skills.

83. The State put on only one witness at the hearing on mental retardation, Barbara Lamb, the cousin and niece of the victims. Instead of calling an expert witness, the State introduced the affidavit of Dr. Robert Brown, the psychologist at the 1994 trial.

84. According to his affidavit, Dr. Brown did not re-evaluate Wade Cole's mental status under the criteria mandated by N.C. Gen. Stat. § 15A-2005 or the American Association of Mental Retardation standards. (Affidavit of Dr. Robert Brown, Attached hereto as Appendix 6).

85. Dr. Brown's affidavit does not indicate that he conducted any of the standardized, normed tests for evaluating adaptive behavior or considered any of the areas of adaptive functioning. Probably because Dr. Brown did not conduct these tests, his affidavit does not include any findings on the ten areas of adaptive behavior listed in the AAMR standards or the North Carolina statute on mental retardation.

86. In accordance with the statute and the AAMR standards, which are listed in *Atkins v. Virginia*, an assessment of adaptive behavior is a mandatory prong of an evaluation for mental retardation.

87. Psychological testing and diagnosis is based on the "four pillars of assessment": norm-referenced tests, interviews, observations, and informal assessment. Jerome M. Satterler, ASSESSMENT OF CHILDREN, p.3 (3d Ed., 1999). Dr. Brown did not perform any norm-referenced tests on adaptive behavior and did not interview people who had known Wade Cole as a child to assess his adaptive behavior. Thus his conclusion that Wade Cole was not mentally retarded does not meet the most basic standards of the mental health community.

88. Thus, as the State put on no expert evaluation of adaptive behavior it is clear that Petitioner's evidence at the hearing proved by a preponderance of the evidence that he was significantly impaired in at least two areas of adaptive functioning, as required by the North Carolina statute and by the AAMR standards listed in *Atkins v. Virginia*.

**c.** **The State's Only Witness Gave Strong Testimony In Support Of Significant Limitations In Self-Care And Health And Safety.**

89.   The State's only witness was Barbara Lamb. Mrs. Lamb was the cousin of the murder victims, Theresa Graham, and the niece of the manslaughter victim, Hattie Graham. (2003 Tp. 248)

90.   Mrs. Lamb did not know Wade Cole before the age of eighteen. According to her testimony, she had only known since the 1970's. By this testimony, Mr. Cole would have been approximately 25 years old when she first met him.

91.   Ms. Lamb testified that she only knew Wade Cole in the environment of the Camden home that was owned by Hattie Graham. (2003 Tp. 250) She did know that Wade spent his days at the Elizabeth City house. (2003 Tp. 265)

92.   Mrs. Lamb testified that she had conversations with Wade, but not about complex subjects such as the news. (2003 Tpp. 250, 261, 270)

93.   Ms. Lamb testified that Wade Cole was able to drive them to a store north of Camden in Virginia, but noted that it was a trip that was made frequently and she did not know how Mr. Cole was taught the route. (2003 Tpp. 254, 269)

94.   Mrs. Lamb testified that Theresa did all of the shopping for clothes and groceries and did all of the food preparation (2003 Tpp. 255, 270)

95.   Mrs. Lamb testified that she never saw Wade take care of anything in the Camden house. (2003 Tp. 266)

96. Mrs. Lamb testified that Wade Cole was exceedingly deficient in hygiene. She stated that he had a body odor from not bathing and that he did not care for his own hair. Theresa Graham would "usually comb" his hair for him. (2003 Tpp. 256-257).

97. Mrs. Lamb testified that Wade Cole gave Theresa Graham a car, but admitted that she had no knowledge of how the car was acquired. When asked if she knew that Mr. Cole's boss had given him the car and was deducting money from Wade's paycheck for him, Mrs. Lamb said she did not know. (2003 Tpp. 259, 269)

98. Mrs. Lamb testified that the only book or magazine she ever saw Wade look at was pornography. She stated that she had seen him look at a newspaper, but never heard him comment on anything in the paper. (2003 Tp. 260-61)

99. Mrs. Lamb testified that she had seen Wade Cole helping his son Rod with his homework. She did not explain how someone who had only second grade skills in reading and math could help a boy in fourth or fifth grade with his homework. In fact she testified that she did not hear them: "I just saw him helping him with it. I don't exactly know what he said to him or how he did it but he was helping Rod with—I believe it was math." (2003 Tp. 263-264)

100. Mrs. Lamb testified that she had not been contacted by a psychologist for the State, had not been interviewed by a psychologist and had not taken an SIB-R exam. (2003 Tpp. 270-271)

101. Mrs. Lamb testified that she wanted Wade Cole to be executed. (2003 Tp. 271).

### d. The State Court's Order Did Not Address The Prong Of Adaptive Behaviors Required By Both North Carolina Statutes And Atkins v. Virginia

102. In *Atkins v. Virginia*, the United States Supreme Court relied on the standards of the American Association of Mental Retardation and American Psychiatric Association's definitions of mental retardation. Both of these organizations conclude that a significantly subaverage functioning in at least two of the adaptive skill areas, combined with onset before age 18 and subaverage intellectual functioning define mental retardation. *Atkins* at 308, fn 3. North Carolina's statute also follows these definitions, requiring the defendant under the adaptive functioning prong to show by a preponderance of the evidence that he has significant deficits in only two of the ten areas of adaptive functioning.

103. The American Association of Mental Retardation revised its definition after the Supreme Court's opinion in *Atkins* was issued. MENTAL RETARDATION, DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS, 19th Ed. (2002) (hereinafter MENTAL RETARDATION, 10TH ED.). The latest AAMR manual emphasizes its earlier conclusion that a diagnosis of mental retardation can be based in part on subaverage performance in any of the adaptive behavior areas. "[A] generalized deficit is assumed even if the score on only one dimension meets the operational criteria of being two or more standard deviations below the mean." *Id.* at 74. Because of the overlapping between the skills

listed in the ten separate adaptive behavior areas listed in the 9th Ed., the new AAMR manual has consolidated adaptive behavior into three areas: conceptual, social, and practical. *Id.*

104. This Court must review Petitioner's mental retardation claim *de novo* because, the State court failed to make any findings that relate to three of the areas of adaptive functioning: self-care, self-direction, and health and safety, thereby violating the principle that conclusions of law must be supported by findings of fact that address all of the evidence relevant to that conclusion.

105. The State court below simply concluded that Wade Cole had failed to prove by a preponderance of the evidence that "[t]here were significant limitations in adaptive functioning." It is not possible to tell from the order whether the court below concluded that Mr. Cole had significant deficits in one or no areas of adaptive functioning. However, because he has to show significant deficits in only two areas, the failure of the court to address three areas in any way is a fatal flaw.

106. Mentally retarded individuals can have strengths in some areas, while at the same time demonstrating weaknesses in other areas. MENTAL RETARDATION at 39. At the hearing, Dr. Olley explained that "particularly for a person with mild mental retardation. . . it wouldn't be unusual to have some of these ten areas that would not be significantly sub-average." (2003 Tp. 39)

107. Wade Cole presented substantial evidence as to each of the three areas of adaptive functioning ignored in the lower court's order. As to self direction, uncontested

testimony showed that Wade relied heavily upon other people to make decisions, solve problems and tell him where to go. (2003 Tpp. 50, 139, 193, 196, 254) Based on the administration of the SIB-R test, Dr. Olley testified that Wade had significant limitations in this area, and no State witness contested this conclusion.

108. Concerning self-care, it was the State's witness, Barbara Lamb, ironically, who provided the most dramatic example of how Wade was significantly below normal in the self-care category:

| | |
|---|---|
| Q. [by the State]: | Did you observe as you were around him any difficulties in hygiene or personal care? |
| A. | Sometime. |
| Q. | All right. Could you just elaborate what you mean by that? |
| A. | sometime he would have a body odor sometime. |
| Q. | Just from not bathing, perhaps? |
| A. | Uh-huh. |
| Q. | Anything else you recall or remember about his care of himself? |
| A. | His hair. Tressa usually combed it, braided it for him. |

(HTp. 256) Thus, even in his thirties, Wade did not bathe himself regularly and had his girlfriend comb his hair. Barbara Lamb also testified that Theresa Graham did everything to take care of the Camden home and cooked the meals. (HTp. 266, 270) Defense witnesses testified that Wade did not dress properly, depended on others for all of his clothing, food and housekeeping needs and displayed deficient socio-sexual behavior. (HTpp. 41, 42, 141, 148-49, 168-69, 192, 194-96, 199, 202) As with self-direction, Dr.

Olley's administration of the SIB-R showed that Petitioner had significant limitations in this area of adaptive functioning.

109. As to the last area left unaddressed by the State court, health and safety, there was also substantial evidence of Wade Cole's significant limitations. Mr. Cole had never seen a dentist before he was imprisoned and never received routine medical care. (2003 Tp. 51) On the day of the crime, Wade was driving an 18-wheeler without brakes and seemed unaware of the safety implications. (1994 Tp. 1963, HTp. 114) There was no testimony indicating that Wade used healthcare providers, understood the importance of preventive healthcare or understood basic safety considerations. Dr. Olley also testified that, based on his review and administration of the SIB-R, Wade had significant limitations in health and safety.

110. Even with regard to those areas of adaptive functioning the State court did appear to consider, the findings are hopelessly inadequate. Consider the area of functional academics. There are four findings of fact that bear on this adaptive skill area. Findings of Fact numbers 25 and 26 refer to the fact that Petitioner was educated in the public schools of Pasquotank County and that his first grade teacher described him as a "slow learner." Finding of Fact number 29 refers to the testimony of Petitioner's sixth grade to the effect that "she had difficulty distinguishing between whether he was incapable of doing academic work or was refusing to do the required work." And Finding of Fact number 43 refers to testimony that Petitioner "at times" would help his son with his homework.

111. There is no mention anywhere in the State order of the extensive testimony supporting the Dr. Olley's conclusion that Wade Cole has significant deficits in this area. Among other things, Wade's school records and the testimony at the hearing showed that Petitioner failed first and eighth grades and did not finish school but dropped out in 10th grade. (Appendix 5) When Wade first started school, he did not know his alphabet or colors. His first grade teacher testified that Wade was almost unique in this latter disability. By the end of first grade, Wade still did not know alphabet. (2003 Tpp. 10, 14, 20) Other testimony showed that Wade could not use a checkbook or a map, could not add and subtract, and could not write legibly. (2003 Tpp. 139-40; 167-69; 261) He never learned to spell the name of the street where he lived for almost 40 years, "Martin Street". Achievement tests at Dorothea Dix and at Central Prison showed that at the time of the crime, when Wade Cole was 36 years old, he still could only read at the second grade level.

112. It is also significant that Wade Cole attended an all-black, segregated school where there were no special education classes. His teachers testified that they believed that Wade would have been placed in special education classes if they had been available to African-American children.[5] (2003 Tpp. 8, 16, 120, 133, 152)

---

[5] The fact that Petitioner attended separate and unequal schools throughout his childhood is relevant to the State court's Finding of Fact number 16, referring to the fact that Petitioner was never given a standardized intelligence test before the age of 18. Recognizing North Carolina's history of denying equal opportunity in education to black children, the General Assembly imposed no requirement of such a test before the age of 18. Instead § 15A-2005 calls for evidence that mental retardation was manifested before the age of 18.

113. The State court did not consider the on-point testimony from Ms. Sutton, the sixth grade teacher whose testimony Finding of Fact number 29 is based on. Ms. Sutton clearly testified that Wade had trouble reading and could not write very well. Ms. Sutton testified that she passed Wade because she understood that he couldn't do any better work. In addition, Ms. Sutton told the court below, "I think a lot of times it's because he did not know and that caused him not to want to answer or do what he was asked to do." (2003 Tp. 124) Perhaps most significantly, Ms. Sutton testified, "[A]ccording to the work that he did with me, I would classify him as a poor learner, even being retarded, to tell the truth." (2003 Tpp. 120-21)

114. The State court findings of fact also fail to include the copious evidence supporting Dr. Olley's conclusion that Wade Cole is significantly impaired in communication skills. Dr. Olley's opinion was based on the SIB-R scores, on interviews with people who had known Wade and reports. Communication skills incorporates both expressive communication and receptive communication. Expressive communication involves using language effectively. Receptive communication relates to being able to understand complicated instructions, such as a task requiring four steps or using an abstract principle to solve a problem. (2003 Tp. 40) Dr. Olley stated that Wade was "described as a loner, someone who didn't talk much, had to pull words out of him." (2003 Tp. 40) People consistently reported that Cole struggled to communicate effectively: "You had to tell him things more than once or had to show him how to do things because explaining often wasn't sufficient." (2003 Tp. 41) Testimony from other defense and state witnesses buttressed this opinion. Ms. Jane Brickhouse, Cole's first

grade teacher, noted that Wade could understand a simple task, "[b]ut if it had any degree of difficulty, he had problems." (2003 Tp. 19) Shirley Simpson lived next to Wade Cole from the time Wade was approximately ten years old until the time of the crime. (2003 Tp. 145-46) Ms. Simpson testified that even as an adult Wade could not carry on a conversation: "It was, "Hey, Wade, how are you doing? And he would say hi." (2003 Tp. 137) She noted that in the twenty-five years she had lived next to Wade she never knew him to hold a conversation. (2003 Tp. 138) Ms. Simpson added that you could say something to Wade and it would "take a while to get answers and then sometimes you wouldn't get an answer." (2003 Tp. 155) Paul Winslow, a high school coach, told Dr. Olley that it was even difficult to get Wade Cole to say hello if you passed him in the hall. (2003 Tp. 46) Barbara Lamb, the first cousin of the victim, was the State's only witness. She testified that she had never heard Wade comment on anything he had seen in the newspaper and his conversation was limited to the weather or things in general. (2003 Tpp. 261, 270).

> e.   A Diagnosis Of Mental Retardation Does Not Preclude A Finding Of Strengths In Some Areas Of Adaptive Behavior

115. Evidence at the hearing showed that Wade Cole liked to work on cars and he was able to drive trucks. Wade was even able to drive an 18-wheeler, as long as he was driving forward and had his brother's assistance.

116. The State court's findings of fact include the facts that Mr. Cole was employed by Meiggs Logging Company to drive an 18-wheeler; that he held a

commercial driver's license; and that he enjoyed fixing cars. Findings of Fact # 33, # 35 and # 42.

117. The findings of fact do not include his brother's testimony which showed that Rufus Cole was employed by Meiggs Logging Company most of his adult life, starting at age 14; that Rufus convinced Mr. Meiggs to hire Wade Cole; that Wade would not have been kept on, if Rufus had not been there; that he taught Wade how to drive the truck by riding with him; that Wade Cole could not master reverse gear and instead drove in a circle; that Wade did not drive the routes alone, but always went in tandem with another truck; and that Wade could not use a map to learn a route on his own. (2003 Tpp. 57, 161-166).

118. Rufus Cole also explained that he would make sure that Wade Cole got to the job on time: "Some mornings he would be around to my momma's house sleeping in the car and I'd wake him up and I'd tell him, 'Let's go.'" (2003 Tp. 187)

119. The State did not put on any evidence to counter the testimony of Rufus Cole.

120. Dr. Olley testified that he worked professionally with mentally retarded individuals and among these individuals some of them could drive. One woman drove from Greensboro to Raleigh and was able to navigate the bypass and the beltline. (2003 Tp. 110-111) He testified that many people with mild mental retardation are able to obtain a driver's license. (2003 Tp. 32)

121. The AAMR manual is very explicit in its instruction that a diagnosis of mental retardation does not preclude the individual demonstrating strengths in one or more areas:

> Assumption 3: "Within an individual, limitations often coexist with strengths." This means that people with mental retardation are complex human beings who likely have certain gifts as well as limitations. Like all people, they often do some things better than other things. Individuals may have capabilities and strengths that are independent of their mental retardation. These may include strengths in social or physical capabilities, strengths in some adaptive skill areas, or strengths in one aspect of an adaptive skill in which they otherwise show an overall limitation.

MENTAL RETARDATION, 10th Ed. p. 8.

122. The Fourth Circuit has found facts very similar to those presented in Wade Cole's case to be sufficient to establish mental retardation under the Eight Amendment. *Walker v. True*, 399 F.3d 315, (4th Cir. 2005). Walker's projected testimony and school records showed that he had deficiencies in language, reading and writing; an inability to handle money; a low frustration tolerance; need for special education for learning disabilities as well as emotional disturbance; and problems holding jobs, paying bills and transportation. *Id.* at 321.

123. The United States Supreme Court has clearly held that State court rulings based on an unreasonable determination of the facts do not deserve deference: "The standard is demanding but not insatiable; as we said the last time this case was here, 'deference does not by definition preclude relief." *Miller-E v. Dretke*, 125 S.Ct. 2317, 2005 LEXIS 4658, 20 (2005), *quoting Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)

124. In this case, the State court's rulings are based on an egregiously unreasonable determination of the facts in the areas of functional academics and communication skills. Combined with the fact that the State court made no findings of fact on three other areas, this Court must find the State court order to be unreasonable. As *Atkins v. Virginia* depends on the accepted definition of mental retardation including a diagnosis of substantial impairment in one or two areas of adaptive functioning, this Court must review Wade Cole's claim that he is mentally retarded and cannot be executed without violating the Eighth Amendment *de novo*.

**B.** **Wade Cole Was Diagnosed As Having Significantly Subaverage General Intellectual Functioning At The Time Of The Commission Of The Crime**

125. Wade Larry Cole was conclusively evaluated and diagnosed as mentally retarded by professionals working at a North Carolina state mental health facility in October 1988, just four months after the crime. The State provided no evidence indicating that the October 1988 full scale test score of 68 was not valid and conclusive as to Wade Cole's mental condition at the time of the crime. Instead the State relied on an affidavit of Dr. Robert Brown, which summarized Dr. Brown's memory of a subsequent WAIS-R administered six years after the crime. (Appendix 6)

126. Dr. James Hilkey, formerly chief psychologist at FMC Butner and now in private practice, testified at the hearing that Wade Cole was sent to Dorothea Dix in October 1988 for evaluation of his competency to stand trial. Dr. Cabe Lynn, the attending psychiatrist, ordered a battery of psychological tests which were administered

by Dorothy Humphrey, a Dix staff psychologist.[6] Dr. Lynn conducted a mental status examination, ordered a number of laboratory tests and considered background information, including interviews with Wade Cole's mother. (HTp. 210). Ms. Humphrey administered the Wechsler Adult Intelligence Scale (WAIS-R), the Wide Range Achievement test, projective drawing, Bender-Gestalt and incomplete sentence blank. Based on her scoring of the WAIS-R, Ms. Humphrey determined that Mr. Cole was suffering from mild mental retardation, with a full score of 68. Ms. Humphrey's report states that Wade Cole had made a concerted effort on the test and that the score was valid. (HTp. 212; 1988 Dorothea Dix psychological assessment is attached hereto as Appendix 3). Three psychiatrists at Dorothea Dix agreed with the diagnosis of mental retardation. (Appendix 3 at p. 4)

127. The State court order contains no explanation of why this WAIS-R score, administered at the time of the crime, in a state run facility by state employees is not the valid, controlling IQ score for the purposes of analysis under *Atkins v. Virginia* and the North Carolina statute.

128. Dr. Hilkey explained that the validity of the Dix IQ score is supported by the other tests Ms. Humphrey administered: "The Achievement Tests that she administered were consistent with IQ scores in the range scored by Mr. Cole on that day. Her examination of drawings that she gave Mr. Cole to do were consistent with people in low cognitive intellectual range." (2003 Tp. 212) Dr. Hilkey also explained that formal

---

[6] Dorothy Humphrey was prevented from attending the evidentiary hearing by illness. Instead her affidavit

evaluations at forensic hospitals are sometimes done by the attending physician in conjunction with other colleagues. In Wade Cole's case three psychiatrists conferred with Dr. Lynn. (2003 Tp. 214; Dorothea Dix discharge summaries attached hereto as Appendices 1 and 2) Dr. Hilkey concluded that he had no reason to doubt the credibiility of the Dorothea Dix diagnosis of mental retardation: "It was most proximal. My review of the administration appears to meet standards. There were collateral tests that are consistent with the performance on that IQ Test. This test was reviewed by the attending psychiatrist, reviewed in a session by three board certified psychiatrists, all who concurred with Dr. Lynn's opinion that Mr. Cole was suffering from a number of diagnoses, as I have already referenced, Mild mental retardation, adjustment disorder with depressed mood, passive aggressive personality and alcohol abuse." (2003 Tp. 220)

129. Dr. Olley testified that the Dorothy Dix diagnosis of mental retardation was valid. Dr. Olley explained that malingering on an intelligence evaluation is not possible because a "diagnosis for mental retardation involves looking at the individual's history. So you can't fake your whole life." (2003 Tpp. 64-65) Dr. Olley also noted that Wade Cole was evaluated upon admission to Central Prison and although his Beta score at that time of 60 would not be a sufficient basis alone for a diagnosis of mental retardation, the Central Prison score and the Dorothea Dix score were congruent. (2003 Tp. 67): Dr. Olley concluded: "Based upon this test, which is from my information a validly administered test that was administered near the time of the crime, that his functioning

---

was introduced and stipulated to by the State. 2003 Tp. 21, Affidavit attached hereto as Appendix ___

level was in the range of mental retardation by the criteria of adaptive behavior and IQ score." (2003 Tpp. 65-66)

130.   The State provided no evidence indicating that the October 1988 full scale test score of 68 was not valid and conclusive as to Wade Cole's mental condition at the time of the crime. Instead the State relied on an affidavit of Dr. Robert Brown, attached hereto, which summarized Dr. Brown's memory of a WAIS-R administered six years after the crime.

131.   Subsequent to the evaluation at Dorothea Dix Hospital, Petitioner took other IQ tests.  On July 25, 2989, nine months after he received a score of 68 on the WAIS-R at Dix, Dr. Margaret Emmanuelson, an expert retained by defense counsel during Petitioner's first trial, administered nine of the eleven subtests of the WAIS-R to Defendant.   Dr. Emmanuelson administered only part of the test, but she improperly reported a "full-scale score" of 79.   Dr. Emmanuelson failed to give Petitioner the vocabulary subset, one of the most critical subtests for evaluating intelligence. (2003 Tp. 68).

132.   In 1994, six years after the crime, a psychologist retained by the defense for the second trial, Dr. Brian Grover, gave Petitioner another WAIS-R test.  Mr. Cole's score on this third test was 83.  Based on this test, Dr. Robert Brown, a psychiatrist, testified at trial that Petitioner was not mentally retarded but had borderline intelligence. Dr. Brown did not testify at the hearing. His affidavit recapitulated his trial testimony. His

trial testimony was based on an evaluation which did not meet the criteria mandated by N.C. Gen. Stat. § 15A-2005

133. Dr. Olley and Dr. Hilkey testified that the WAIS-R IQ tests administered after the 1988 Dorothea Dix evaluation did not meet the criteria of North Carolina's statute or the AAMR standards. The test administered by Dr. Emmanuelson in 1989 was invalid for two reasons: 1) it was administered improperly; 2) giving the same IQ test within a short time allows the individual being tested to learn the test.

134. The Dorothea Dix testing was done in October 1988. Less than a year later, in July, 1989, Dr. Margaret Emmanuelson administered the same WAIS-R. Dr. Olley reviewed Dr. Emmanuelson's testimony, test scoring and reports. He stated that this test was not valid for several reasons. The first reason was that the test was not appropriate, because it was administered only nine months after the same test had been given: "That is, the person is familiar with the test because he took it not long ago and research has shown that repeated administrations of the same tests inflate the scores." As it is not common practice to administer the same test within nine months, he concluded that there was "a serious question to its validity." (2003 Tp. 67) The second reason that the test results were not valid was that Dr. Emmanuelson only gave parts of the test. Dr. Olley explained that all eleven subtests are supposed to be administered in order to obtain a valid score. Dr. Emanuelson only administered nine of the eleven and did not give any explanation for omitting two of the tests. Dr. Olley noted that one of the omitted tests was vocabulary: "That is something that is on virtually all IQ tests in some form or another

because it correlates most highly with all measures of general intelligence." Dr. Olley concluded: "And without that information I would not consider this to be a valid administration." (2003 Tp. 68)

135. Dr. Hilkey testified that "the most prominent" problem with Dr. Emmanuelson's evaluation was that she was called in at the eleventh hour: "As a consequence, I think there were some short cuts taken." He concluded that the administration of the 1989 WAIS-R "was not according to standardized procedure. (2003 Tp. 217)

136. Dr. Hilkey concluded that of the three WAIS-R tests given, the Dorothea Dix evaluation was the best reflection of Mr. Cole's intellectual functioning at the time of the crime because it was the most proximal. (2003 Tp. 236)

137. Dr. Brown's affidavit shows that he did not consider the time lapse between the crime and the 1994 IQ test and the effect of six years of mental health counseling and medication at Central Prison. Evidence suggest that large changes in environment can induce changes in IQ. "The Natural History of Change in Intellectual Performance: Who Changes? How Much? Is It Meaningful?", Terrie E. Moffitt, Avashalom Caspi, Allan R. Harkness and Phil A. Silva, J. CHILD-PSYCHOLOGY AND PSYCHIATRY, Vol. 34, p. 459 (1993).

138. Dr. Brown's affidavit also gives no indication that he considered the Flynn Effect, which posits that IQ scores rise over time and that IQ tests that are not "re-

normed" to adjust for rising IQ levels will overstate a testee's IQ. Most of the members of the standardization sample for the WAIS-R were selected and tested by the end of 1978. James R. Flynn, "WAIS-III And WISC-III IQ Gains In The United States From 1972-1995: How To Compensate For Obsolete Norms," Perceptual and Motor Skills, p. 1234 (1998). Thus, a WAIS-R given in 1994 was 16 years after the standardization was done, resulting in substantially inflated scores.

139. The Fourth Circuit has held that the Flynn Effect, combined with the standard error of measurement, could render an IQ score higher than 70 "two standard deviations below the mean," and that this must be considered by the hearing court. *Walker v. True*, 399 F.3d 315, 327 (4th Cir. 2005).

140. The State Court order does not address the differences between the IQ tests and includes no findings of fact on Dr. Olley's and Dr. Hilkey's testimony discounting the validity of the subsequent tests.

141. Psychologists who have studied variations in IQ test results have concluded that the difficult in arriving at a reliable psychometric assessment, suggests that relatively more emphasis should be placed on actual adaptive skills when assigning a diagnostic label to mentally retarded persons. Jeri J. Goldman, "Differential WAIS/WAIS-R IQ Discrepancies Among Institutionalized Mentally Retarded Person," AMERICAN JOURNAL OF MENTAL DEFICIENCY 1987, Vol. 9, p. 635.

142. The Fourth Circuit has held that when a court is charged with deciding mental retardation it must consider evidence which discounts later, higher scores:

The district court, without much explanation, did not consider the Flynn Effect or the measurement error, stating that such evidence "does not provide a legal basis for ignoring Walker's WAIS test scores." J.A. 266. But, as the Virginia statute makes clear, the relevant question is whether Walker scored two standard deviations below the mean, a question which is directly addressed by Walker's expert opinion as to the Flynn Effect. Thus, not only did the district court resolve a factual dispute against Walker—contrary to the claims in his petition and where the facts remained materially disputed—it also refused to consider relevant evidence, namely the Flynn Effect evidence.

*Walke*, 399 F.3d at 322-323.

143. The State court order in Wade Cole's case made no findings of facts on Dr. James Hilkey's testimony. The State's court order made no findings of facts on Dr. Greg Olley's testimony concerning the validity of the 1988 WAIS-R and the problems with the subsequent tests. Thus, as in Walker it is clear the State court refused to consider relevant evidence.

### C.   All Of The Evidence Presented At The Hearing Supported A Finding That Wade Cole's Disability Originated Before Age 18

144. Wade Cole attended segregated schools from 1958 until 1969. Only his last year of school, 1970, was in an integrated school. Because of this the schools he attended did not have separate classes for mentally challenged children. His teachers who testified at the hearing and his neighbor, Shirley Simpson, who had taught in these schools and knew Wade as a child, all agreed that if special classes had been available, Wade Cole would have been placed in them. (2003 Tpp. 8, 16, 120, 133, 152)

145. The segregated schools also did not have the services of a psychologist. Because of this the only intelligence tests Wade was given were group tests administered

which were not administered by a psychologist. These tests cannot be used for a diagnosis of mental retardation. North Carolina's statute requires that the intelligence test be administered individually by a licensed psychiatrist or psychologist. N.C. Gen. Stat. 15A-2005 (2).

146. Shirley Simpson, who taught in Elizabeth City schools in the 1960's, explained that the only classifying of students in the segregated schools was slow, medium and high. The only mental health disability that was recognized was the aggressive, abusive type. Mrs. Simpson stated that social promotion was common. (2003 Tp. 132)

147. Wade Cole did present copious evidence that his mental retardation was evident from the time that he started school. Jane S. Brickhouse, Wade's first grade teacher testified that he was one of her slowest students and she would have had him placed in a special class if that had been a possibility. Ms. Brickhouse made home visits and realized that Wade's mental retardation may have come from his mother, who also seemed to be retarded. (2003 Tp. 9) She noted specifically that Wade did not know his alphabet by the end of first grade. She testified that that was very unusual by the end of first grade. (2003 Tp. 20) Mrs. Brickhouse explained that Wade Cole was only capable of very elementary skills such as placing blocks in the block box. (2003 Tpp. 19).

148. Helen Sutton, Wade's sixth grade teacher, testified that there were no special classes in Elizabeth City's segregated schools. "When they gave you a classroom, it was yours, no help." (2003 Tp. 119) She remembered that Wade was on the slow side: "Well,

according to the work that he did with me, I would classify him as a poor learner, even being retarded, to tell the truth." (2003 Tp. 120) Mrs. Sutton testified that Wade had trouble reading and writing in sixth grade. (2003 Tp. 121) She only passed him for social reasons: "Usually when you work with a child as much as nine months and you know—you have an idea. In fact you know about what he can do, his capabilities, so keeping him back would not have helped him. He would have probably been worse knowing that his classmates went on to the seventh grade and he would still be in the sixth." (2003 Tp. 122)

149. Wade's school records show that he was required to do first and eighth grade twice. His grades are predominately "D's" in sixth grade, except for one "F" and a "C-". His high school grades are all "D's" and "F's". Wade Cole dropped out of school in tenth grade. (School record, Appendix 5).

150. Shirley. Simpson testified that she had known Wade Cole since he "was a little fellow." (2003 Tp. 130). She reported that Wade basically "stayed in the yard, stayed close to his mom." She believed that Wade's mother realized that he was slow: "She was very much concerned about Wade being withdrawn, not mingling and going out like most of the young guys in the community. I think she realized that he was what we term back then—now today we got different terminologies, we just called it slow because thy didn't label it nor did categorize it in the mental health term like they do today. But I think she knew that he was slow." (2003 Tpp. 130-131)

151. Mrs. Simpson know works with mentally and economically disadvantaged individuals. She testified that she believed Wade Cole was retarded by comparing him with her clients who she knew had been diagnosed as mentally retarded. "You could say something to him and it would take you a while to get answers and then sometimes you wouldn't get an answer." (2003 Tp. 155)

152. Mrs. Simpson read the school reports that were sent home with Wade, because his mother was illiterate. From reading these reports, Mrs. Simpson believed that Wade was retarded. (2003 Tpp. 152-153).

153. Juanita Cole first new Wade when he was a little boy. She remembers him as being exceptionally slow. "I mean that he couldn't function. He was sort of like he couldn't function like the other little boys." (2003 Tp. 191)

154. Thus, all of the evidence went to show that Wade's teachers, neighbors and families considered him to be exceptionally slow from an early age. His school record supports the conclusion that Wade Cole's disability began in childhood.

### D.  A Denial Of All Appellate Review In State Court Violates Fundamental Due Process Protections

155. Wade Larry Cole's case was in post-conviction in October 2001 when N.C. Gen. Stat. 15A-2005 became law. Because of this his proceedings are governed by N.C. Gen. Stat. 15A-2006 instead of 15A-2005. N. C. Gen. Stat. § 15A-2006 arbitrarily denies equal due process protections to those capital defendants who were in postconviction in 2001. Specifically, Wade Larry Cole has been denied the automatic right to direct appeal

that would be available to a defendant who was pre-trial in 2001. Thus, if Wade Cole's hearing had been held before his trial, he would have had an automatic right to direct appeal on the mental retardation issue. Instead whether Wade Cole is mentally retarded under our statutes and *Atkins v. Virginia* was never reviewed by any court..

156. While the Fourteenth Amendment does not require that a State shall provide for an appellate review in criminal cases, where such an appeal is provided for the proceedings in the appellate tribunal are to be regarded as part of the process of law. *McKane v. Durston*, 153 U.S. 684, 687-88 (1894); *Wainwright v. Torna*, 455 U.S. 586, 587-88 (1982); *Frank v. Mangum*, 237 U.S. 309, 327 (1915) The United States Supreme Court has held that equal protection rights attach in proceedings before appellate courts. In *Griffin v. Illinois*, 351 U.S. 12, 18 (1956), the Court stated that at all stages of appellate review "the Due Process and Equal Protection Clauses protect persons . . from invidious discriminations." *see also Dowd v. Cook*, 340 U.S. 206 (1951) (it was a denial of equal protection to disallow prisoner's appeal when a warden prevented a prisoner from filing an appeal in a timely manner); *Cochran v. Kansas*, 316 U.S. 255, 257 (1942). In *Jackson v. Indiana*, 406 U.S. 715 (1972), the Supreme Court held that a state, by subjecting criminal defendants to standards more lenient for commitment through mental health proceedings and more stringent for release from confinement, when such standards were compared with those generally applicable to persons not charged with criminal offenses denied the criminal defendants equal protection of the laws required by the Fourteenth Amendment.

157. Thus by providing a right of appeal to capital defendants concerning mental retardation if there cases were pre-appeal before 2001, but denying this right to capital defendants post-conviction in 2001, North Carolina denied Wade Cole equal protection and due process of law.

### E. Wade Cole Is Mentally Retarded Under Atkins v. Virginia Rendering His Death Sentence Cruel And Unusual

158. *Atkins v. Virginia* holds that execution of the mentally retarded is a violation of a individuals right to freedom from cruel and unusual punishment. 536 U.S. at 321 The *Atkins* Court warned that because of the characteristics of mental retardation there is a danger that the strength of procedural safeguards "that our capital jurisprudence steadfastly guards" would be undermined. *Id.* at 317 Justice Stevens explained:

> Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. . . .Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Id.* at 318

159. All of the testimony at the evidentiary hearing indicated that Wade Larry Cole suffered from these characteristics which render capital punishment a violation of the Eighth Amendment. He clearly demonstrated a diminished capacity to understand and process information throughout his life. Cole's communication skills were borderline to non-existent. He never showed an ability to reason logically or control impulses. In

*Atkins*, the Supreme Court expressed grave concern that mentally retarded defendants "face a special risk of wrongful execution." 536 U.S. at 321.

160. The Supreme Court has interpreted 28 U.S.C. § 2254(d)(1) as giving independent meaning to both the "contrary to" and "unreasonable application" clauses. *Williams v. Taylor*, 529 U.S. 362, 404 (2000). A state court decision is "contrary to" Supreme Court precedent if it 1) arrives at a conclusion that contradicts that reached by the Supreme Court on a question of law; or 2) confronts facts that are materially indistinguishable from those of relevant Supreme Court precedent and arrives at an opposite result. *Id.* at 405. A decision is an "unreasonable application" of clearly established Supreme Court law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

161. The evidence at Wade Cole's hearing on mental retardation shows by clear and convincing evidence that the State court's order concluding that Wade Cole is not mentally retarded is an "unreasonable application" of clearly established Supreme Court law. As the State court order in this case reaches a conclusion that contradicts that reached by the Supreme Court in *Atkins v. Virginia*, confronts facts that are materially indistinguishable and arrives at an opposite conclusion, this Court must grant a writ of habeas corpus. Wade Cole death sentence must be vacated.

II.     **A JURY'S ACQUITTAL OF A DEFENDANT ON A CRIMINAL CHARGE PRECLUDES USE OF THE UNDERLYING CONDUCT AS THE BASIS FOR**

## SUBMISSION OF AN AGGRAVATING FACTOR IN A CAPITAL SENTENCING PROCEEDING

162.  In his Motion for Appropriate Relief Wade Cole raised as his third claim the trial court's submission to the jury of the aggravating factor course of conduct based. Mr. Cole's claim was based on a violation of his constitutional protection against double jeopardy. In his first trial, the jurors found Wade Cole not guilty of the intentional murder of Hattie Graham. This should have precluded a second jury of finding any element which encompassed the intentional murder of Hattie Graham. Despite this bedrock law, the second trial court submitted to the jury an aggravating factor which required the jury to find the element of the intentional murder of Hattie Graham.

163.  Wade Cole broke into the home where his common law wife Theresa Graham lived with her mother Hattie Graham. Wade believed that Theresa was having an affair with another man. He entered the house in a rage fueled by paranoiac delusions and shot Theresa twice, He then dragged her out of bed and began stabbing her with a knife. Hattie Graham, Theresa's mother, tried to pull Wade away from Theresa. She was cut by the knife when Cole pushed her away. Wade pulled Theresa out to the porch where he continued the stabbing and left her dead or dying.  Hattie Graham called 911, received a call back, but died from an irregular heart beat before the deputy arrived.  Wade Cole was first tried for these deaths in 1989. The jury was presented with verdict sheets for each victim: 1) for Theresa Graham the jury was instructed to find whether the defendant was guilty of first degree murder, second degree murder or not guilty; 2) for Hattie Graham the jury was instructed to find whether the defendant was guilty of second degree murder,

involuntary manslaughter or not guilty. The jury found Wade Cole guilty of the first degree murder of Theresa Graham. The jury acquitted Cole of the murder of Hattie Graham. (See attached verdict sheet, Appendix 7) The jury found him guilty of involuntary manslaughter of Hattie Graham. On appeal the North Carolina Supreme Court awarded Wade Cole a new trial based on the trial court's *ex parte* communication with a juror. At the second trial, double jeopardy precluded trying Cole for the murder of Hattie Graham and should have precluded the second jury from considering the element of the intentional murder of Hattie Graham.

164. Despite the first jury's verdict that Cole had not intentionally harmed Hattie Graham, the course of conduct aggravator was submitted to the second jury. This aggravator depended on the jurors finding that Wade Cole had intentionally stabbed Mrs. Graham. Just as the State was precluded in the second trial from re-trying Wade Cole for the murder of Hattie Graham because of double jeopardy, it was also precluded from arguing to the sentencing jury that the course of conduct aggravator existed based on Cole intentionally stabbing Hattie Cole with a deadly weapon causing her death. Course of conduct can only be submitted based on a pattern of intentional acts of violence. Thus, submitting the course of conduct aggravator in this case based on Mrs. Graham's death violated the constitutional double jeopardy preclusion of re-trying a criminal defendant on a charge of which he has been acquitted. Wade Cole was acquitted of intentionally stabbing Hattie Cole by the first jury. Despite this clear issue preclusion, the State submitted the course of conduct aggravator based on intentionally stabbing Hattie Graham with a knife. The jury found this aggravator.

## State Court Disposition Of This Claim

165. Petitioner presented this claim in his Motion for Appropriate Relief filed in the Superior Court of Camden County, North Carolina, on 2 December 1997. In an opinion dated 31 August 2001, the Superior Court of Camden County denied Petitioner's Motion for Appropriate Relief. On 31 October 2001, Petitioner raised this claim in a timely filed Petition for Writ of Certiorari to the Supreme Court of North Carolina. The Petition was denied on 28 February 2002. The State Court's denial of this claim was contrary to or an unreasonable application of decisions by the United States Supreme Court.

## Facts Supporting Petitioner's Claim

166. All of the trial evidence tended to show that Wade Larry Cole entered the house psychotically delusional and enraged with Theresa Graham. Once inside the house he shot Theresa Graham twice and then began stabbing her with a knife. When Hattie Graham attempted to pull Theresa Graham away from Cole, she was cut with the knife. After Cole left the house, Hattie Graham dialed 911 and informed the operator that her daughter had been murdered by Wade. The 911 operator called a deputy sheriff, who placed a call to the house. Hattie Graham answered the return call. The deputy sheriff testified that during the course of their conversation, Mrs. Graham seemed to calm down. Between the time of the conversation and the time the deputy arrived at the house, Hattie Graham died.

167. The first jury was instructed that it could find second degree murder or involuntary manslaughter as to the death of Hattie Graham. The differences in the judge's instructions between second degree murder and involuntary manslaughter were: 1) that to find second degree murder the injury must be fatal and 2) that the injury was inflicted with malice. Involuntary could be found if the assault inflicted a non-fatal physical injury and was without malice. (1989 trial, Volume III, pp. 140-145) The trial court defined malice in part as: "that condition of the mind which prompts a person to take the life of another intentionally or to intentionally inflict serious bodily harm which proximately results in another's death without any legal justification, just cause, or excuse."

168. North Carolina's statutory and case law as applied to the above facts is clear. Involuntary manslaughter cannot encompass assault with a deadly weapon inflicting serious injury, if there is any intent to injure. An assault with a deadly weapon that is the proximate cause of death is viewed under the law (and, of course, in practical terms) as inflicting serious injury. The victim has died. The fact that the injury caused by the weapon alone--without some other intervening factor—would not have caused death is irrelevant. *See*, *State v. Atkinson*, 298 N.C. 673, 259 S.E.2d 858 (1979) (victim died of a heart attack after being hit with a baseball bat, first degree murder conviction upheld); *State v. Jones*, 290 N.C. 292, 225 S.E.2d 549 (1976) (victim was injured by shotgun pellets and died from an allergy to antibiotics, first degree murder conviction upheld).

169. Thus, if Hattie Graham died because Wade Cole intentionally stabbed her with a knife, the element of malice in second degree murder is established. "The mandatory

presumption "is simply a way of stating <u>our legal rule that in the absence of evidence of</u> <u>mitigating or justifying factors all killings accomplished through the intentional use of a</u> <u>deadly weapon are deemed to be malicious</u> and unlawful." *State v. Reynolds*, 307 N.C. 184, 190-191, 297 S.E.2d 532, 536 (1982) (*quoting State v. Hankerson*, 288 N.C. 632, 651, 220 S.E.2d 575, 589 (1975) (*emphasis added*). Therefore, under North Carolina case law malice and thus second degree murder would have been established, if a jury had found that Hattie Graham died as the result of an intentional stabbing.

170. In order for the jury to have found consistent with North Carolina law that Wade Larry Cole was not guilty of second degree murder, the jury must have decided that Hattie Graham died of an irregular heart beat precipitated by the situation and/or the pushing away and accidental cutting of Mrs. Graham and not by the intentional use of deadly force. If the jurors had decided that Hattie Graham had been intentionally stabbed, they would of necessity have found that the injury was serious (she was dead) and that the assault which caused the death was malicious because it was intentionally committed with a deadly weapon. If the jurors had found these elements, the verdict would have had to have been second degree murder. As the jury found Wade not guilty of second degree murder they must have found her death not to be the result of malice or an intentional stabbing.

171. The contrasting guilt phase closing arguments of defense and state counsel after presentation of evidence in the first trial underlines the basis of the jury's decision. Mr. O.C. Abbot argued for the defense that Mrs. Graham was accidentally cut by the

knife when she attempted to pull Theresa away from Wade. In contrast, Mr. Parrish argued for the State that Wade Cole intentionally stabbed Hattie Graham with the knife.

O.C. Abbott for the Defendant

> Everything [Wade Cole] did—again, all animosity, all anger, all frustration, all, whatever emotions he was experiencing was directed, concentrated on Theresa Graham. William said that Wade had her down on the floor, and Hattie came up to the side behind him and was trying to pull him off. And said, Wade with a knife in his hand makes a backup movement like this (indicates). I think he illustrated like this, if I remember what he did correctly, like this.

> And that Hattie fell down. Again, is that any malice shown in a backward pushing like this (indicates)? Even though the knife was in his hand was that any malice? Did he intend to kill her when he did this: Kept right on doing what he was doing to Theresa, never went towards Hattie at any time was the evidence as I understand it.

> (1989 Trial, Vol. III, p. 63)

Frank Parrish for the State

> The defendant is also charged with the second degree murder of Hattie Graham. And when we come to second degree murder, we take away the elements of a specific intent to kill. We take away the element of premeditation and deliberation.

> And we are left with an unlawful and intentional killing of a human being with malice. And what are we talking about when we talk about intentions? An act which results in death which is intentionally committed. In other words, in reaching back like this (indicates) in stabbing with the left hand, Hattie Graham because she is getting in his way, he intends—he intends to stab her. From the evidence he intended to stab her. From William Bowser's testimony, he intended to stab her. And her death followed from his stabbing her because of what? Because she intervened or attempted to intervene while he was engaged in the slaughter of her daughter.

> (1989 Trial, Vol. III, p. 95) (*emphasis added*)

172. The key difference between the State and the defense arguments is that Mr. Abbott argues that the cutting was an accident, while Mr. Parrish argues that the cuts were the result of an intentional stabbing. After hearing these opposing arguments, the jury came back with a verdict of not guilty to second degree murder, guilty of involuntary manslaughter. It is beyond question that the first jury decided that the injuries to Mrs. Graham were not intentional.

173. The question of whether Wade Cole intentionally stabbed Hattie Graham was not addressed by the North Carolina Supreme Court in the direct appeal of the first trial. The North Carolina court awarded Cole a new trial. *State v. Cole*, 331 N.C. 272, 415 S.E.2d 716 (1992). The only other assignment of error which the Court discussed was the issue of whether the assault on Hattie Graham could be found to be a proximate cause of her death, as there was some question as to whether the fatal arrhythmia might have occurred without external causation. The North Carolina court found that the pathologist's testimony that the defendant's assault was a precipitating factor of the cardiac episode was sufficient to support proximate cause. *Id.* at 277

174. The posture of the case when called for retrial in 1994 was that Wade Cole could be retried for the first degree murder of Theresa Graham, but not for the murder of Hattie Graham. It was accepted that double jeopardy prohibited trying Wade Cole again for the murder of Hattie Graham. What apparently was not considered was what else double jeopardy prohibited in re-trial. The trial court submitted the aggravating circumstance, course of conduct, based on predicate facts that were constitutionally

precluded by the first jury's verdict and the prosecutor argued a version of the facts similarly precluded by the first jury's verdict.

> Whether Hattie Graham Was Intentionally Stabbed Was An Issue Of Ultimate Fact Decided By The First Jury And That Jury's Acquittal Of An Intentional Crime Precluded The Second Jury From Sentencing Based On The Identical Ultimate Fact

175. "When an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). In *Ashe*, the defendant had been tried for the robbery of one of six victims. After he was acquitted of the robbery of the first victim, he was tried on the same facts before another jury for robbery of another of the victims. The State in its brief to the United States Supreme Court argued: "No doubt the prosecutor felt the state had a provable case on the first charge and, when he lost, he did what every good attorney would do—he refined his presentation in light of the turn of events at the first trial." The United States Supreme Court responded: "But this is precisely what the constitutional guarantee forbids." *Id.* at 447. In the instant case the 1989 jury had acquitted Wade Cole of intentional murder. Unable to re-try Wade Cole for the murder of Hattie Graham, the prosecutor "refined his presentation" and submitted the same set of facts to persuade the sentencing jury that the crime against Hattie Graham was part of an intentional scheme—which of necessity would require the jury to find that Hattie Graham's death was the result of an intentional stabbing. Submitting course of conduct to the sentencing jurors at the second trial violated defendant-petitioner's constitutional right to be protected from being twice put in jeopardy of life or limb for the same offense under *Ashe v. Swenson*.

176. The North Carolina capital sentencing aggravator course of conduct requires a pattern of intentional acts. The North Carolina Supreme Court has repeatedly instructed that submission of N.C. Gen. Stat. 15A-2000 (e)(11) is only proper:

> when there is evidence that the victim's murder and other violent crimes were part of a pattern of <u>intentional acts</u> establishing that there existed in defendant's mind a plan, scheme, or design involving both the murder of the victim and other crimes of violence.

*State v. Cummings*, 353 N.C. 281, 302, 543 S.E.2d 849, 861-62 (2001) (*emphasis added*); *see also, State v. Gregory*, 340 N.C. 365, 414, 459 S.E.2d 638, 666 (1995); *State v. Cummings*, 332 N.C. 487, 508, 422 S.E.2d 692, 704 (1992). The first jury acquitted Wade Cole of intentionally harming Hattie Graham. Accidentally wounding Mrs. Graham with a knife cannot be used to support an aggravator which requires a "pattern of intentional acts.

177. The United States Supreme Court addressed the issue of collateral estoppel in sentencing in *Schiro v. Farley*, 510 U.S. 222 (1994). In *Schiro*, the defendant had allegedly raped a woman, then beat and strangled her to death, so that she could not be a witness. The jurors in Indiana were given ten verdict forms each of which provided a space for the jurors to record agreement with a proposed verdict. The only way to record disagreement was to leave the space blank. The jurors left nine forms blank and checked only one. The blank forms rejected lesser offenses, not responsible by reason of insanity, three which would have found the defendant guilty but mentally ill, one finding him not guilty of anything, and two counts of murder. The only checked form was guilty on Count II, murder while committing rape. The defendant appealed on the basis that not

convicting him on Count I operated as an acquittal of intentional murder and that collateral estoppel prohibited the use of the intentional murder aggravating circumstance for sentencing purposes. The Supreme Court found that the issue was not properly before the Court because leaving the forms blank was ambiguous, not a clear acquittal. In reaching this decision, the Court explained that its prior decision, *Ashe v. Swenson*, 397 U.S. 436 (1970) held that the Double Jeopardy Clause incorporates the doctrine of collateral estoppel in criminal proceedings: "Collateral estoppel, or, in modern usage, issue preclusion, "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Schiro*, 510 U.S. at 232, *quoting Ashe*, 397 U.S. at 443. The Supreme Court stated that it would not address the issue of whether collateral estoppel could bar the use of the "intentional" murder aggravating circumstance, because leaving the intentional murder verdict form blank was not sufficient proof that the jury had acquitted him of intentional murder. Therefore the issue of acquittal of intentional murder was not properly before the court. *Schiro* at 232. The dissent, however, assumed that if the issue had been before the Court there would be no question that collateral estoppel would apply under *Ashe*.

> Even though the Court has held that the Constitution does not preclude a judge from overriding a jury's recommendation of a life sentence. . .<u>an egregious violation of the collateral estoppel principles embedded in the Double Jeopardy Clause occurs if the judge can base a capital sentence on a factual predicate that the jury has rejected.</u> . . . Having failed to convict Schiro of intentional murder after a full trial, the State plainly could not retry him for that offense after the jury was discharged. An estoppel that would bar a retrial should equally foreclose a death sentence predicated on a postverdict reexamination of the central issue resolved by the jury against the State.

*Schiro* at 243 (Stevens, J. and Blackmun, J. *dissenting*) (*citation omitted*) (*emphasis added*).

178. The Constitutional guarantees afforded to defendants in a capital sentencing proceeding were explained by *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *Apprendi* instructed that any fact which increases the maximum punishment that may be imposed on a defendant constitutes an element and must be found by a jury beyond a reasonable doubt. Id. at 482-484, 490. Based on this understanding, the Supreme Court's decision in *Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003), erased whatever doubt might have remained as to the application of the due process clause in capital sentencing:

> We can think of no principled reason to distinguish, in this context, between what constitutes an offense for purposes of the Sixth Amendment's jury-trial guarantee and what constitutes an "offense" for purposes of the Fifth Amendment's Double Jeopardy Clause. Cf . Monge v. California, 524 U.S. 721, 738, 141 L. Ed. 2d 615, 118 S. Ct. 2246 (1998) (SCALIA, J., dissenting) ("The fundamental distinction between facts that are elements of a criminal offense and facts that go only to the sentence" not only "delimits the boundaries of . . . important constitutional rights, like the Sixth Amendment right to trial by jury," but also "provides the foundation for our entire double jeopardy jurisprudence").

*Id.* at 111-112. It is clear that the element that the first jury found did not exist, could not be submitted to the second jury as an aggravating factor, since an aggravating factor is an "element" for purposes of the double jeopardy clause.

179. Just as it would be egregious error for a judge to base a capital sentence on a factual predicate that a jury has rejected, a second jury cannot find an aggravating factor based on a factual predicate that a previous jury has rejected in acquitting a defendant of murder. That, however, is exactly what was done in the instant case. The first jury had

been presented with two alternative versions of the death of Hattie Graham. In support of second degree murder, the State argued that Cole had intentionally stabbed her and that the stabbing was a proximate cause of her death. The defense argued that Hattie Graham was accidentally cut when Cole pushed her away from him. The State agreed that if the stabbing was not intentional the proper verdict was involuntary manslaughter: "And you will also be considering in connection with the death of Hattie Graham another form of homicide the law recognizes, voluntary [sic] manslaughter, which is simply the unlawful killing of a human being without any malice, premeditation, or deliberation. It has also been said that it is the unintentional killing of a human being. Now, you will have to consider whether this is or is not an intentional act." (1989 Trial, Vol. III, p. 96) Thus the "factual predicate" rejected by the first jury, and barred from consideration by the second jury, was the intentional stabbing of Hattie Graham.

180. The submission of course of conduct based on the intentional stabbing of Hattie Graham is exactly the "egregious violation of the collateral estoppel principles embedded in the Double Jeopardy Clause" decried in *Schiro v. Farley*. The first jury had acquitted Wade Cole of murder. According to the instructions, the jury would have found Cole guilty of murder if it had found that he had intentionally stabbed Hattie Graham with a deadly weapon causing her death. Despite this acquittal, the second Trial Court submitted the aggravating circumstance based on Cole's allegedly intentionally stabbing Hattie Graham with a knife. By submitting based on the factual predicate which the first jury had rejected in acquitting Cole of murder, the Trial Court violated Wade Cole's Fifth Amendment protection against Double Jeopardy

181. Under 28 U.S.C. § 2254(d)(1) A state court decision is "contrary to" Supreme Court precedent if it 1) arrives at a conclusion that contradicts that reached by the Supreme Court on a question of law; or 2) confronts facts that are materially indistinguishable from those of relevant Supreme Court precedent and arrives at an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

182. As shown above the State court is "contrary to" the double jeopardy Supreme Court precedent in *Ashe v. Swenson*, 397 U.S. 436, 443 (1970) and *Schiro v. Farley*, 510 U.S. 222 (1994).

183. The State court asserts that the aggravating circumstance course of conduct can be submitted to the jury even if the defendant has not been charged with the underlying crime. (2001 Order, p. 99) This misses the point of double jeopardy. If a defendant has not been charged with a crime, a jury has not deliberated on the existence of the elements necessary to find the defendant guilty. It is only after a jury has conducted these deliberations and decided that the elements do not exist that the protections of double jeopardy arise.

184. The State court decision is also contrary to established Supreme Court law because it "confronts facts that are materially indistinguishable from those of relevant Supreme Court precedent and arrives at an opposite result." The State court asserts that the ultimate fact that Wade Cole's jury found was course of conduct, not intentional murder. This is contrary to Supreme Court jurisprudence concerning "ultimate fact." In *Ashe,* the defendant was charged with robbing one of six men at a poker game. The

evidence that Ashe was actually one of the robbers was weak, and the jury acquitted him. In a subsequent trial for the robbery of another of the six poker players, this time with stronger identification evidence, Ashe was convicted. The Supreme Court overturned the conviction as barred by the collateral estoppel component of double jeopardy, concluding that the "single rationally conceivable issue in dispute [in the first trial] was whether the petitioner had been one of the robbers. And the jury by its verdict found that he had not." 397 U.S. at 445. In *Ashe*, the ultimate fact was not that the crime of murder had been committed, but that the element of identity of the murderer had been decided: "the acquittal verdict could only have meant that the jury was unable to conclude beyond a reasonable doubt that the defendant was one of the bandits." *Ashe* at 445. A second trial was prohibited because "to have convicted the defendant in the second trial, the second jury had to have reached a directly contrary conclusion." *Id*. Ashe explained: "Once a jury had determined upon conflicting testimony that there was at least a reasonable doubt that the petitioner was one of the robbers, the State could not present the same or different identification evidence in a second prosecution for the robbery of Knight in the hope that a different jury might find that evidence more convincing." *Id*.

185. In Wade Cole's case the "single rationally conceivable issue in dispute [in the first trial]" was whether Wade Cole had intentionally stabbed Hattie Graham or if it had been accidental. And as in Ashe, the jury found that it was not intentional. Submitting course of conduct in the second trial based on an intentional stabbing would require the second jury, as in Ashe, to come to a directly contrary conclusion.

186. Thus, the State court's reasoning that the first jury had not decided the ultimate fact is contrary to established Supreme Court law because it "confronts facts that are materially indistinguishable from those of relevant Supreme Court precedent and arrives at an opposite result."

The Appellate Counsel Was Ineffective<br>For Failing To Raise The Double Jeopardy Issue

187. Appellate counsel did not assign error or brief this issue. In addition to the substantive claim, Petitioner alleged ineffective assistance of appellate counsel as to double jeopardy claim.

188. The right to appellate counsel is firmly established. *Evitts v Lucey*, 469 U.S. 387 (1985) *Strickland v. Washington*, 466 U.S. 668 (1984) established the standard for ineffective assistance of counsel. Under *Strickland*, the Defendant-Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694 In *State v. Braswell*, 312 N.C. 553, 562-63, 324 S.E.2d 241, 248 (1985), In terms of appellate counsel the first prong question would be whether appellate counsel had failed to raise a significant and obvious issue. If the issue which was not raised may have resulted in a reversal of the conviction, or an order for a new trial or new sentencing, the failure was prejudicial. Counsel is not required to raise every "colorable" issue. *Jones v. Barnes*, 463 U.S. 745, 754 (1986) Appellate counsel may make a strategic decision to omit meritorious claims in order to avoid burying issues in a legal jungle. *Griffin v. Aiken*, 775 F.2d 1226, 1235 (4th Cir. 1985) The Griffin court noted that it is not ineffective if "appellate counsel made

an informed decision based on reasonable professional judgment not to pursue particular issues on appeal." *Id.*

189. Despite the rigorous *Strickland* standard, a petitioner may establish inadequate performance by appellate counsel by showing that counsel omitted significant and obvious issues. *see, e.g. Jackson v. Leonard*, 162 F.3d 8, 85 (2nd Cir. 1998) (failure to raise double jeopardy); *Griffin v. United States*, 598 A.2d 1174 (1991) (failure to raise double jeopardy); *Brown v. United States*, 167 F.3d 109 (2nd Cir. 1999) (failure to raise an issue on appeal concerning an obviously deficient instruction on reasonable doubt); *Lucas v. O'Dea*, 169 F.3d 1028 (6th Cir. 1999) (habeas procedural default based on failure to raise co-defendant issue on appeal was excused due to ineffective assistance of appellate counsel); *Roe v. Delo*, 160 F.3d 416 (8th Cir. 1998) (appellate counsel ineffective for failing to request plain error review of erroneous first degree murder conviction); *Banks v. Reynolds*, 54 F.3d 1508 (10th Cir. 1995) (appellate counsel ineffective for failing to raise Brady claim, or ineffectiveness of trial counsel claim when prosecution failed to disclose exculpatory material); *Freeman v. Lane*, 962 F.2d 1252 (7th Cir. 1991) (appellate counsel's performance was objectively unreasonable and deficient when he failed to raise on direct appeal issue of whether prosecutor improperly commented on defendant's failure to testify); *Davis v. Kramer*, 167 F.3d 494 (9th Cir. 1999) (appellate counsel ineffective under AEDPA for failing to file proper Anders brief on three arguable issues: ineffective assistance of trial counsel, insufficiency of the evidence, and an erroneous jury charge).

190. Courts have found ineffective assistance of counsel for failure to raise double jeopardy claims. In *Jackson v. Leonardo*, 162 F.3d 81 (2nd Cir. 1998) the defendant was convicted of robbery in the first degree and criminal use of a firearm. The two crimes each rested on the same factual predicate—a firearm was brandished during the robbery. Jackson's trial attorney did not object on double jeopardy grounds to the indictment. Appellate counsel also failed to raise the issue. On habeas the district court denied his claims, but issued a certificate of appealability. The Second Circuit found that the double jeopardy claim was procedurally barred as such, but could be raised as ineffective assistance of counsel. 162 F.3d at 84. The Court found that: "appellate counsel's failure to raise a well-established, straightforward, and obvious double jeopardy claim constitutes ineffective performance." *Id.* at 85. Discussing the Jones standard of appellate counsel choosing between claims, the Court found that this was "not a case in which an appellate attorney had several possible arguments to make, one of which was very strong and the others quite weak, and chose to focus on the strong argument rather than allow the weaker ones to dilute its strength." *Id.* Instead, the Court surmised that appellate counsel had merely overlooked the relevant case.

191. As in the double jeopardy issue in *Jackson*, collateral estoppel or issue preclusion is a "well-established, straightforward, and obvious double jeopardy claim." The basis of the claim was established almost thirty years ago by *Ashe v. Swenson*, 397 U.S. 436, (1970): "When an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443.

192. Failure to raise this claim was not the product of a strategic decision. Appellate counsel provided an affidavit which states: "My omission of that argument did not result from a strategic decision. Rather, I did not make that argument because it did not occur to me, because I did not think of that argument, during the second appeal."[7] Even if counsel had maintained that it was a strategic decision, a comparison of the issues raised with the issue omitted does not support that premise. Counsel's arguments concerning the verdict on Hattie Graham and course of conduct were based on insufficiency of evidence. After the first trial, counsel had argued that the evidence was insufficient to support proximate cause in the death of Hattie Graham. Counsel argued this despite the pathologist's testimony that the stress of the events coupled with the blunt force injuries precipitated the coronary event. (Defendant's Brief pp. 44-51; attached hereto as Appendix 8) After the second trial, counsel added the argument that there was insufficient evidence of culpable negligence to support the verdict because there was no indication that Cole knew that Hattie Graham had a heart condition. (Defendant's Brief pp. 53-57; attached hereto as Appendix 9) As the Court had already found a sufficient nexus between the assault and Mrs. Graham's death, the probability of overruling its own prior decision in the case was slight. As the jury only had to find involuntary manslaughter on one prong, even if the Court had ruled that the evidence of negligence was insufficient, the verdict would have stood. Counsel's first argument on course of conduct rested on his involuntary manslaughter argument—there was insufficient

---

[7] At the close of the evidentiary hearing, the Honorable Jerry R. Tillett instructed the parties to provide further material concerning the double jeopardy issue. As part of this response, Petitioner provided

evidence of course of conduct, because there was insufficient evidence to support the underlying verdict. Clearly this was no more likely to succeed than the insufficiency arguments on involuntary manslaughter. Counsel also argued that the assault with the knife was intentional, despite the first jury's acquittal of Wade Cole on the charge of murder

193. The collateral estoppel issue was significantly stronger than the insufficiency arguments. Collateral estoppel is a legal argument based on well-established principles. Testimony and arguments from the first and second trial provided firm support for the argument. The North Carolina Supreme Court had already found in *State v. Williams* that a trial court had a duty to prohibit *ex mero motu* a prosecutor from arguing precluded material before a jury. Appellate counsel's affidavit clearly states that omitting collateral estoppel was not a strategic decision. (See Affidavit of Ben Dowling Sendor, Appendix 11) His affirmation is supported by the fact that this issue was stronger than issues that were raised. Thus *Strickland's* first prong, whether counsel's representation fell below an objective standard of reasonableness as defined by professional norms was met in that appellate counsel failed to raise a significant and obvious issue and had no strategic reason for this failure. (See Affidavit of James Glover, Appendix 10).

194. The second Strickland prong—the error committed was so serious that a reasonable probability exists that the trial result would have been different absent the error—can be shown on the appellate level if raising the issue may have resulted in an

affidavits from the appellate counsel and from James Glover, an attorney who this court has recognized to

order for a new trial or new sentencing. The North Carolina Supreme Court has held that

when a sentence is based on an inappropriate aggravating factor, the defendant should

receive a new sentencing hearing. In *State v. Reese*, 319 N. 110, 353 S.E.2d 352 (1987),

the defendant was sentenced to death for first degree murder. On appeal the Supreme

Court found that as the defendant was not properly convicted of premeditated and

deliberate murder, the underlying felony in the felony murder conviction could not also

be used in aggravation: "It follows, therefore, that the jury should not have considered

this aggravating factor in making its sentencing recommendation. Defendant is therefore

entitled to a new sentencing hearing without the submission of this aggravating factor."

*Id.* at 146, 353 S.E.2d at 372. The Court cited to *State v. Ahearn*, 307 N.C. 584, 300

S.E.2d 689 (1983) in support of the new sentencing hearing. *Ahearn* was the first

opportunity for the North Carolina Supreme Court to discuss the policies, purposes and

implementation of the then new "Fair Sentencing Act." As part of this review the court

set out what should happen in a case if a aggravation finding was made in error:

> It is only the sentencing judge who is in a position to re-evaluate the
> severity of the sentence imposed in light of the adjustment. For these
> reasons, we hold that in every case in which it is found that the judge erred
> in a finding or findings in aggravation and imposed a sentence beyond the
> presumptive term, the case must be remanded for a new sentencing
> hearing.

*Ahearn* at 602, 300 S.E.2d at 701. Thus the standard policy under *Reese* and *Ahearn* of

the North Carolina Supreme Court is to remand for a new sentencing when an aggravator

has been found to have been submitted in error. In *State v. Larry*, 345 N.C. 497, 481

S.E.2d 907 (1997), the North Carolina Supreme Court found that although an aggravator

---

be an expert in appellate law. Both of these affidavits are attached hereto.

had been submitted in error, the overwhelming weight of the evidence supporting the remaining five aggravating circumstances rendered the submission of one incorrect aggravator to be harmless error. *Id.* at 526, 481 S.E.2d at 924. The Court did not overrule *Ahearn*. Presumably, in *Larry* the Court felt that with five out of six aggravators remaining there was little question of "tipping the scales."

out of six aggravators remaining there was little question of "tipping the scales."

195. The instant case is more similar to the facts in *Reese*. The sentencing jury only found two aggravators. Wiping out one of the aggravators would leave only one, not five as in *Larry*. The one aggravator that would be removed, course of conduct, was argued to the jury to be in effect the intentional murder of a second person. Collateral estoppel should have precluded that argument. If it had been properly precluded, the State would have been left at most with an accidental cutting and a simple assault. It is impossible for an appellate court to guess the difference in weight between a murder and a simple assault, but certainly the difference is great. Significantly, one or more of the jurors had found ten of the eleven submitted mitigating circumstances to exist. Thus in the instant case there was substantial mitigation to balance against the aggravators. This is a case in which the *Ahearn* principle—that appellate courts cannot reweigh, but must remand for resentencing—is applicable. Thus, the second prong of Strickland has been met—there is a reasonable probability that the result of the appeal would have been different absent the error.

196. Appellate counsel's failure to assign error, brief or argue the issue of collateral estoppel in Wade Larry Cole's appeal to the North Carolina Supreme Court constitutes ineffective assistance of counsel. Under federal constitutional provisions and federal and state case law applicable at the time of the direct appeal, the prosecution should have been precluded from re-litigating the issue of the intentional stabbing of Hattie Graham inflicting serious injury. If this had been precluded, the course of conduct aggravator could not have been submitted to the jury based on the death of Hattie Graham by stabbing. As only one other aggravator was submitted and ten of eleven submitted mitigating circumstances were found by the sentencing jury, the unconstitutional submission of course of conduct based on a precluded facts would have required a new sentencing hearing. Appellate counsel's performance was below objective standards and prejudiced his client.

### III    TRIAL COUNSEL'S FAILURE TO MOTION PRE-TRIAL TO DISMISS THE CHARGE OF INVOLUNTARY MANSLAUGHTER CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL.

197. The evidence at Wade Cole's first trial failed to establish the elements of involuntary manslaughter. In order for a jury to find Wade Cole guilty of involuntary manslaughter, they would have had to conclude that Hattie Graham's death was proximately caused by one of the following: (1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission. *State v. Greene*, 314 N.C. 649, 336 S.E.2d 87, 88 (1985). Trial counsel should have

motioned before the first trial began to dismiss the charge of involuntary manslaughter of Hattie Graham.

## State Court Disposition Of This Claim

198. Petitioner presented the claim in his Motion for Appropriate Relief filed in the Superior Court of Camden County, North Carolina, on 2 December 1997. In an opinion dated 31 August 2001, the Superior Court of Camden County denied Petitioner's Motion for Appropriate Relief. On 31 October 2001, Petitioner raised this claim in a timely filed Petition for Writ of Certiorari to the Supreme Court of North Carolina. The Petition was denied on 28 February 2002. The State Court's denial of this claim was contrary to or an unreasonable application of decisions by the United States Supreme Court.

## Facts Supporting Petitioner's Claim

199. On June 27, 1988, the Camden County Grand Jury returned a bill of indictment charging defendant Wade Larry Cole with one count of murder in the death of his common law wife Theresa Graham. On October 17, 1988, the Grand Jury returned a bill of indictment charging Wade Larry Cole with one count of murder in the death of Theresa Graham's mother, Hattie Graham. The first trial was held in July 1989. On July 26, 1989 the jury returned verdicts finding Mr. Cole guilty of first-degree murder with respect to Theresa Graham and involuntary manslaughter with respect to Hattie Graham. On August 2, 1989, the jury returned a verdict of death. The trial court sentenced Mr. Cole to death for first-degree murder and to a consecutive term of 10 years imprisonment for involuntary manslaughter. Mr. Cole entered a notice of appeal. On appeal, the North

Carolina Supreme Court awarded defendant-petitioner a new trial. *State v. Cole*, 331 N.C. 272, 415 S.E.2d 716 (1992).

200. In his first trial, Wade Cole's jury was instructed that defendant "has been accused of second degree murder of Hattie Graham." (1989 Trial Tp. 140) It was further instructed that it could find Wade Cole guilty of second degree murder, guilty of involuntary manslaughter or not guilty. The jury found Cole guilty of involuntary manslaughter, acquitting him of intentional murder of Hattie Graham. In the second trial, the State could not charge Petitioner with the murder of Hattie Graham because of the double jeopardy bar. Instead the State prosecuted on involuntary manslaughter.

201. Under North Carolina law, the first type of involuntary manslaughter case is one involving an unlawful act not amounting to a felony nor naturally dangerous to human life. Stabbing another person with a knife causing serious bodily injury is both a felony as well as being "naturally dangerous to human life." In North Carolina, a felony assault is one where a deadly weapon is used and serious injury results from the assault. *State v. Owens*, 65 N.C. App. 107, 308 S.E.2d 494 (1983).

202. In the instant case, the evidence put on by the State supports only felony assault. William Bowser, the nephew of Theresa Graham testified as follows:

> A. And he got a knife and came back, started stabbing her and that's when Hattie tried to pull him off her and he turned around and stabbed her.

> Mr. Abbott:  Objection. Motion to Strike.

> The Court:  Overruled. Motion denied.

Q. You said he turned around and stabbed Hattie?

A. Uh-huh. (Tpp. 1650-1651)

Rod Graham, the son of Wade Cole and Theresa Graham offered a similar version of the scene:

Q. Did Miss Hattie do anything?

A. She tried to help. She tried to stop it at one point.

Q. What did Wade do then?

A. He stabbed her.

Q. Did you see where he stabbed her?

A. Stabbed her in the side or in the front, I guess, in the stomach somewhere.

Q. After that, did you see any blood on Miss Hattie?

A. There was blood everywhere.

Q. After Miss Hattie tried to stop Wade, what happened, Rod, what did Wade do?

A. He turned around and stabbed her.

Q. Stabbed who, Miss Hattie?

A. Uh-huh. (Tpp. 1702-1703)

203. The pathologist also testified that it was Mrs. Graham's injuries that proximately caused her death: "In my opinion, Hattie Graham died as a result of a cardiac arrhythmia, abnormal heart rhythm precipitated by stress with the underlying severe coronary disease being a major factor. . . . The stress of receiving blunt force injury blows. (Tpp. 1784-1785)

204. In their closing arguments the prosecutor's stressed that it was the stabbing of Hattie Graham that caused her death:

> [W]as death or serious injury a foreseeable result of assaulting Hattie Graham with a knife? Was that a foreseeable result? Would you expect someone to die or to suffer serious injury as a result of being stabbed with a knife? (Tp. 2170)

> He turned and stabbed her. He intentionally stabbed Hattie Graham. Did he intend that that stab wound kill her? Probably not. He was too busy murdering Theresa. He only wanted to get Hattie away from him, but he intentionally stab [sic] her and her death followed. And what was her cause of death, according to Dr. Butts? The autopsy report, that she died of cardiac arrhythmia, she had a bad heart. She had a preexisting condition, but she died because of that stab wound. That stab wound caused her heart to go, Dr. Butts said. (Tpp. 2242-2243)

205. The prosecutor then described several cases to the jury. (Tpp. 2243-2244) All except one of the cases presented to the jury were murder cases, not involuntary manslaughter: *State v. Atkinson*, 298 N.C. 673, 259 S.E.2d 858 (1979) (victim dies of heart failure after being hit with a baseball bat; defendant convicted of first degree murder); *State v. Jones*, 290 N.C. 292, 225 S.E.2d 549 (1976) (victim is shot and then dies in hospital when given an antibiotic that he is allergic to; defendant is convicted of first degree murder); and *State v. Cummings & Cummings*, 301 N.C. 374, 271 S.E.2d 277 (1980) (victim dies by suffocating on his own vomit; drunk knocked down and left on his back; defendants convicted of involuntary). The third example affirms that involuntary manslaughter is the proper verdict when there is no intentional felony involved.

206. The assault on Hattie Graham, as presented by the State, was felonious under North Carolina law because a deadly weapon was used and because serious injury

resulted from that assault. The State's evidence and argument were that Hattie Graham died as a result of being stabbed with a deadly weapon. Therefore, according to the State's case, the actions of Petitioner constituted a felonious assault, not a mere assault.

207. The second type of involuntary manslaughter case is one involving a culpably negligent act or omission. Culpable negligence in the criminal law means "something more than actionable negligence in the law of torts. It imports wantonness, recklessness or other conduct." *State v. Everhart*, 291 N.C. 700, 702, 231 S.E.2d 604, 607 (1977). The State alleged that Petitioner intentionally stabbed Hattie Graham. Under the State's case, Wade Cole committed a felonious assault under N.C. Gen. Stat. § 14-32(b). Furthermore, the State alleged that the Petitioner knew what he was doing, taking the facts of this case out of negligence. Because the State alleged that Mr. Cole acted intentionally, this is clearly not a culpable negligence case

208. Under North Carolina law, intentionally stabbing a person cannot be found to be involuntary manslaughter under the theory that it was the intentional, willful, or wanton violation of a "safety" statute or ordinance, proximately resulting in death. *State v. Wilkerson*, 295 N.C. 559, 582, 247 S.E.2d 905, 916-17 (1978). The concept of "safety" statutes arises in negligence law and has been defined both by our courts and by treatises. The purpose was to raise the standard of care in specific negligence actions. Typical examples of "safety" statutes include dog control ordinances, child protection statutes and traffic laws. The Restatement, Torts 2d explains that a court may find a violation of a statute to be negligence per se if the purpose of the legislative enactment or

administrative regulation "is found to be exclusively or in part (a) to protect a class of persons which includes the one whose interest is invaded, and (b) to protect the particular interest which is invaded, and (c) to protect that interest against the kind of harm which has resulted, and (d) to protect that interest against the particular hazard from which the harm results." Restatement, Torts 2d, Section 286. North Carolina courts have utilized this theory to protect identifiable classes of citizens from specific harms. For example, a concrete company was found to be negligent when a twenty ton truck collapsed a bridge whose weight limit was eighteen tons for a truck and trailer, *Byers v. Standard Concrete Products Co.*, 268 N.C. 518, 521, 151 S.E.2d 38, 40 (1977). The North Carolina Supreme Court explained: "[T]he general rule in North Carolina is that violation of a statute or ordinance that imposes upon a person a specific duty for the protection of other constitutes negligence per se. The basis of the rule seems to be that the statute prescribes the standard of care, and the standard fixed by the Legislature is absolute." *Id.* Thus the purpose of finding that violation of a safety statute is negligence per se is to impose upon a tortfeasor a standard of care higher than the common law rule of ordinary care. "The violator is liable if injury or damage results, <u>irrespective of how careful or prudent he has been in other respects</u>. No person is at liberty to adopt other methods and precautions which in his opinion are equally or more efficacious to avoid injury." *Carr v. Muirrows Transfer, Inc.*, 262 N.C. 550, 554, 138 S.E.2d 238, 231 (1964) (*emphasis added*). While it makes sense to find violation of a traffic ordinance, such as speeding, to be negligence per se, stabbing a person makes no sense. Without the negligence per se rule, a driver could reasonably argue that although he was driving over the speed limit, the road was

straight, the day was clear and there were no other vehicles in sight, so he was not being negligent. On the other hand, it would be ridiculous to argue that someone was stabbing a person in a manner that was "careful or prudent in other respects"

209. Submitting a charge of involuntary manslaughter when the evidence supports only murder and not involuntary manslaughter had been found to be erroneous by North Carolina courts ten years before Wade Cole's second trial began.

210. In *State v. Ataei-Kachuei*, 68 N.C. App. 209, 314 S.E.2d 751 (1984), *cert denied* 311 N.C. 763, 321 S.E.2d 146 (1984), the defendant was robbed by an employee, gave chase and fired three times into the automobile in which the robber was trying to escape. One bullet passed through the victim's lung and heart, killing him. Defendant told the police that he had grabbed a gun before chasing after the robber in order to protect himself and his wife. The defendant was tried for first degree murder, but the jury was charged on first degree, second degree, voluntary manslaughter and involuntary manslaughter. The Court of Appeals found charging on involuntary manslaughter to be prejudicial error:

> Since defendant was tried for first-degree murder, it was appropriate for the court to permit the jury to consider the lesser included offenses of second degree murder and voluntary manslaughter--but under the circumstances recorded here involuntary manslaughter was not a lesser included offense of the first-degree murder that he was charged with committing. *State v. Carson*, 51 N.C. App. 144, 275 S.E.2d 221 (1981). "Involuntary manslaughter is the unintentional killing of a human being without malice, proximately caused by (1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission." *State v. Redfern*, 291 N.C. 319, 321, 230 S.E.2d 152, 143 (1976). So far as we can determine, the

> record contains no evidence which tends to show that Becker died as
> the result of an unlawful act not amounting to a felony or as the result
> of an unlawful act that was not naturally dangerous to human life.
> Thus, it was error to permit the jury to consider an involuntary
> manslaughter verdict.

*State v. Ataei-Kachuei*, 68 N.C. App. at 215, 314 S.E.2d at 754. Similarly in the

Wade Cole's case the State alleged that Mr. Cole's acts were intentional. Stabbing a

victim with a knife resulting in death does not support an involuntary manslaughter

conviction under North Carolina case law or statutes.

211. As *State v. Ataei-Kachuei* was decided in 1984 and the law on the elements of

involuntary manslaughter was clearly established, Wade Cole's trial counsel should have

been aware that he could not be charged, tried or convicted of involuntary manslaughter.

As Mr. Cole had already been acquitted of murder, the State could not have tried him on

murder charges. Without murder or involuntary manslaughter charges available, the jury

would only be deciding guilt on one of the deaths.

212. The fact that the jury would be deciding guilt on only one death in the guilt

phase would also affect the penalty phase, because removing the death of Hattie Graham

from the jury's consideration would of necessity change the weighing process. There is

without question "a reasonable probability that, absent the errors, the sentencer . . . would

have concluded that the balance of aggravating and mitigating circumstances did not

warrant death." *Strickland v. Washington*, 466 U.S. 668, 686, 695 (1984)

213. Trial counsel's failure to make a pre-trial motion to the trial court to dismiss

the charge of involuntary manslaughter constitutes constitutionally deficient performance

by counsel, and resulted in prejudice to Mr. Cole under *Strickland v. Washington*, thus violating Mr. Cole's right to effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

214. Ineffective assistance of counsel claims must be measured by the standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland* the United States Supreme Court adopted a two-part test to be applied on a case-by-case basis. The first inquiry is "whether counsel's assistance was reasonable considering all the circumstances." *Id* at 688. The second prong is whether counsel's inadequacies were prejudicial to the defendant. *Id*. at 693. *Strickland* explains that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686.

215. The first prong of *Strickland* is met in Mr. Cole's case. The failure to motion the court to dismiss one of two charges against their defendant when the law was clearly established cannot be found to be "reasonable considering all the circumstances.

216. *Strickland's* second prong requires courts to find whether "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland* at 686. In the instant case, the charges against Cole related to Hattie Graham would have been dismissed under long-standing North Carolina precedent and statutes.

217. The failure of trial counsel to make a pre-trial motion to dismiss one of the two charges against the defendant fell outside the range of reasonably competent professional assistance to which criminal defendants are entitled under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Except for this deficient performance Wade Cole would not have been found guilty of the death of Hattie Graham.

218. If the sentencing jury had only found one guilty verdict in the guilt phase, the balancing of aggravators and mitigators in the sentencing phase would have been significantly influenced. Petitioner need only show that this change would have swayed one juror in Wade Cole's favor: "So we proceed, as we must, under the North Carolina statutory scheme, and in doing so further recognize that a North Carolina court may not impose death if a single juror votes in favor of life imprisonment. . . . . Accordingly, we must now assess whether we can say "with fair assurance," *Kotteakos, 328 U.S. at 765*, that not a single resolute juror would have voted for a life sentence." *Allen v. Lee*, 366 F.3d 319, 335 (4th Cir. 2004).

219. Under the *Strickland* standards of ineffective assistance and the prejudice standard outlined in *Allen v. Lee*, Wade Cole received prejudicial ineffective assistance of counsel.

**IV.     THE COMBINATION OF THE DEMOGRAPHICS OF CAMDEN COUNTY AND THE CIRCUMSTANCES OF THE TRIAL MADE IT IMPOSSIBLE TO DRAW AN IMPARTIAL JURY FROM A FAIR CROSS SECTION OF THE COMMUNITY**

220. In 1994 the total population of Camden County was 6,372. Twenty-five percent or 1,613 were black. (Camden County statistics, attached hereto as Appendix 12) The population is insular and cohesive. An article in the Raleigh News and Observer concerning Camden County characterized it as a small county in which families have lived for generations: "About 6,000 people have lived in Camden County--a stretch of land nearly swallowed up by the Great Dismal Swamp--for most of this century. And the things that have changed, have not always been good. Little farmers have been swallowed whole by much bigger farms. Seventy percent of the residents have to go outside the county to work. But everyone still knows just about everyone else." *The News and Observer*, Sunday, March 2, 1997, p. 6E (*emphasis added*) The county has only one public high school. This school has a little over 300 students. *Id.*

221. As a result of these characteristics not one African-American sat on either of Wade Cole's trials. Out of the 28 jurors who deliberated in Wade, all 28 were white. Of the 19 black jurors interviewed during voir dire, not one was selected.

### State Court Disposition Of This Claim

222. Petitioner raised this claim as a denial of his request for change of venue on direct review. The Supreme Court of North Carolina denied the claim on the merits. *State v. Cole,* 343 N.C. 399, 471 S.E.2d 362 (1996). The State Court's denial of this claim was contrary to or an unreasonable application of decisions by the United States Supreme Court.

223. Petitioner presented the claim as a due process violation based on the impossibility of drawing an impartial jury from a fair cross-section of the community in

his Motion for Appropriate Relief filed in the Superior Court of Camden County, North Carolina, on 2 December 1997. In an opinion dated 31 August 2001, the Superior Court of Camden County denied Petitioner's Motion for Appropriate Relief. On 31 October 2001, Petitioner raised this claim in a timely filed Petition for Writ of Certiorari to the Supreme Court of North Carolina. The Petition was denied on 28 February 2002. The State Court's denial of this claim was contrary to or an unreasonable application of decisions by the United States Supreme Court.

## Facts Supporting Petitioner's Claim

224. Hattie Graham was a matriarch of the black community. She was active in a black church organization called Thunder School Union whose goal is to bring together all of the black churches in Camden. Because of this Hattie and her daughter Theresa would attend services at various black churches. The son of Theresa Graham and Wade Cole attended Camden county schools and Theresa at one time worked in a county school.

225. Jury *voir dire* in Wade Cole's trials verified the impossibility of drawing an impartial jury from a "fair cross section" of the community. In Wade Cole's first trial in 1989 almost all potential black jurors testified to connections to the victims and/or the defendant. William Sawyer testified that he knew both Theresa and Hattie Graham through church activities. (1989 JVD Tpp. 171, 322) Tammy Gallop testified that she knew both Theresa and Hattie Graham because they were relatives of hers. Ms. Gallop stated that she had heard the matter discussed by family. (1989 JVD Tpp. 195, 201)

Linda Walston testified that her mother and stepfather were Earl and Mrs. Meiggs, Wade Cole's employer, and that she had discussed the case with them. (1989 JVD Tp. 285) Sylvia Holley knew Theresa and Hattie Graham from living in Camden County, from school and from social work. The morning after the murder, Ms. Holley's director told her that she had been called during the night concerning Rod and Assunta Graham. (1989 JVD Tp. 394) Flora Elliott testified that she knew both Theresa and Hattie Graham through a mutual cousin Angela Bowser and that she had heard all of the details for the crime. (1989 JVD Tp. 395, 419-421) Leverta Mercer testified that "the family was talking what they thought they knew. . . . All that I heard was that Mr. Cole had killed my uncle's niece and her mother had a heart attack from it. . . .That he had went to the house and they had picked him up. His boss man got him out of jail. He went back and he stabbed her, that's all I heard." (1989 JVD Tpp. 425-26) Donnell Thornton stated that he knew both Hattie and Theresa Graham: "Well, we was distant kin. It's way down the line, and I knew her, you know, by going to school--I went to school with her. . . . And we used to work in the fields together when I was younger." (1989 JVD Tp. 433) Clifton Johnson testified that he had known the defendant, Wade Larry Cole, for a long time, considered him to be a close personal friend and that he hung around with Wade's brothers. Johnson testified that he "heard a lot of people talking about it." (1989 JVD Tpp. 635-36, 650-51) Donna Stiles stated that she was a native of Camden County and knew both Theresa and Hattie Graham: "I'm a distant cousin, and we went to church together. I went to school with Theresa and worked with Theresa." (1989 JVD Tpp. 637, 648) Malachi Wilson stated that he had lived in Camden County for about nineteen years and had seen Wade

Cole "around the county." He testified that he had heard something about the case: "Some of the boys I work with. I don't know exactly which ones it was. Some of the colored boys I work with. They was in there talking generally about this and I just happened to be in there." (1989 JVD Tpp. 710, 785) Charles Mercer stated that he probably knew William Bowser. (1989 JVD Tp. 880) Patricia Chesson testified that she knew the Grahams: "I knew Theresa from school, but I didn't know her mother. My parents knew her, but I didn't." (1989 JVD Tp. 1006) Catherine Griffin stated that she knew Theresa and Hattie Graham: "I didn't know them personally, but by being a missionary speaker they had me to their church one Sunday to speak for them and Ms. Graham, Theresa, we were aides at the same school." (1989 JVD Tp. 1009) No black jurors served on the jury panel which convicted and sentenced Wade Cole in 1989.

226. The second trial jury *voir dire* replicated the first, resulting in a second totally segregated jury. Seventy-nine percent of prospective black jurors knew one or both of the victims and/or defendant. Earl Christian was excused because he "knew the boy that done it and one was related to my cousin." (Tpp. 10, 771) Wildred Abbot was excused because he knew both of the victims. He called Theresa Graham his niece because "my daddy partly raised her daddy." Theresa Graham went to school with one of his daughters. (Tp. 278) Yolanda White was excused because she had a relative who had been "locked up" with Wade Cole. (Tp. 311) Melvin Harris was excused because he grew up in the same neighborhood as the defendant. (Tp. 312) Johnny Jennings knew "the whole family, I knew all of them. I knew all of them." (Tp. 314) Calvin Whitehurst knew "some of the people that--I know the lady's nephew and nieces and stuff, I go to

school with them and they had talked to me about it and stuff when I was in school." (Tp. 496) Minnie Lamb knew the Grahams: "Ms. Graham and her daughter was a member of my father's congregation and she also was the landlord--not the landlord but the tenant in my father's house on the farm." (Tp. 529) Maggie Whitehurst "went to school with Theresa Graham and I just knew her mother just by going to school with her." (Tp. 562) Calvin Dwight Harris knew the defendant and went to school with his son. (Tp. 595) Winfred Poole was a cousin of Theresa and Hattie Graham. (Tp. 616) Johnny Butts knew Wade Cole, Theresa Graham and Hattie Graham. (Tp. 647) Evelyn Thornton Harris knew all the parties: "I worked with Theresa Graham five years at Don Juan and I know Hattie by going to church." She thought her knowledge would effect her verdict "[b]ecause I know--I know he did it because I'm close to his son, very close. . . . his son live right down there by me for a while and he told me everything that happened and I know all about it." (Tp. 679) Marguerite Harris knew two of Wade Cole's brothers, by "living in the neighborhood." (Tp. 667) Marsette Gregory knew all about the situation: "I went to school with the nephew, they stayed there in the house and my sister was best friends with Theresa Graham's sister and I rode the school bus there, me and Theresa's nephew, yeah, nephew---first cousin. . . Willy Raytonston." (Tp. 915) Leslie M. Ethridge stated that he had talked with his uncle about the case, that his uncle was a good friend of Hattie Graham and that his uncle had personal knowledge of the case. (Tp. 1075) Angela Johnston knew all Hattie Graham, Theresa Graham and her children. (Tp. 1311) Marvin Abbot new the Grahams: "I guess I know them--well, I knew their daddy--knew her

daddy." (Tp. 1372) Miles Watson knew Hattie and Theresa Graham. His daughter went to school with Theresa. (Tp. 1408)

227. Before the second trial, Wade Cole made a pretrial motion for a change of venue. Initially, the trial court ordered that the trial be moved to Chowan County, but that the jurors be chosen from Camden County. Subsequently the trial court ordered that the trial be held in Camden County and that the jurors be chosen from Camden County. During pretrial hearings, defense counsel twice told the trial court that one reason a change of venue was necessary was that so many potential black jurors in small, rural Camden County knew the victims and/or defendant and knew about the case, that it would be difficult to select a jury that included any black people. Defense counsel informed the trial court that this situation had resulted in no black jurors in Mr. Cole's first trial. Unfortunately, defense counsel's prophecy came true: during jury selection in this trial all black jurors who were not struck for cause due to their opposition to the death penalty or for reasons of health, knew the victims and/or defendant and knew about the case and, for that reason, were struck for cause or were struck peremptorily by one of the parties. As a result, in this trial -- as in the first trial -- the jury contained no African-American people. When that trend became clear during jury selection, defense counsel moved for a mistrial. The trial court denied the motion. The trial court erred by denying Mr. Cole's pretrial motion for a change of venue and by denying Mr. Cole's subsequent motion for a mistrial

228. The relevant procedural facts are as follows: On July 21, 1992, Petitioner made a written, pretrial motion for a change of venue. (Attached hereto as Appendix 13). The written motion alleged that prejudice due to pretrial publicity would prevent a fair and impartial trial in Camden County and in the First District. On May 17, 1993, the Honorable Quentin Sumner held a pretrial hearing on defendant's motion for a change of venue. During the hearing defendant asserted two reasons for a change of venue: pretrial publicity would prevent a fair and impartial trial in Camden County and the first trial in this case showed that the facilities in the Camden County Courthouse were inadequate for a trial of this scale. (Gray Tpp. 5-16) As part of the allegation concerning pretrial publicity, defense counsel told Judge Sumner about a special pretrial publicity problem in this case: no black people served on the jury in the first trial because many prospective black jurors were excused on the ground that they knew about the case, they had formed an opinion about defendant's guilt, or they were related to one of the victims. (Gray Tp. 25) At the end of the hearing, Judge Sumner ruled that the trial would be moved to Chowan County, but that the jury would be selected from Camden County. (Gray Tp. 28) On May 24, 1993, Judge Sumner filed a written order, dated May 19, 1993, setting forth this ruling. (Attached hereto as Appendix 14)

229. The question of venue arose again when the state filed a written Motion for Rehearing on June 28, 1993. The state pointed out in its motion that the trial in this case was scheduled to be held in Chowan County at the same time that the trial in a high

publicity case, State v. Elizabeth Kelly[8], was scheduled in Chowan County, and that the Chowan County Courthouse has only one courtroom. In light of this conflict, the state requested that the trial in this case be moved back to Camden County before a Camden County jury. The Honorable William C. Griffin, Jr. heard the state's motion in a pretrial hearing on August 23, 1993. Again, during that hearing, defense counsel observed that no black people served on the jury in defendant's first trial. (Faison Tp. 15) Judge Griffin declined to reopen the question of whether defendant could receive a fair and impartial trial in Camden County, noting that Judge Sumner had already ruled on that point. (Faison Tpp. 12-16) Judge Griffin granted that state's motion to change venue back to Camden County before a Camden County jury. (Faison Tp. 16

230. During jury selection, defense counsel's concerns about prejudice among black prospective jurors were borne out. As of the time defense counsel made a motion for a mistrial, 16 black prospective jurors had been interviewed by the trial court and counsel: Delores Harris (Trial Tpp. 23, 167-68), Wilfred Abbott (Trial Tpp. 23, 276), Yolanda White (Trial Tpp. 236, 313), Melvin Harris (Trial Tpp. 236, 311, 313), Johnny Jennings, Sr. (Trial Tpp. 236, 313-14), Calvin Whitehurst (Trial Tpp. 236, 494-95), Minnie G. Lamb (Trial Tpp. 528-29), Amanda Eason (Trial Tp. 530), Maggie Whitehurst (Trial Tp. 561), Calvin Harris (Trial Tp. 594); Winfred Poole (Trial Tp. 615), Johnny Butts (Trial Tp. 647), Marguerite Harris (Trial Tp. 663-64), Evelyn Harris (Trial Tp. 678), Rhudine Turner (Trial Tpp. 729-30), and Earl Christian (Trial Tpp. 770-71).

---

[8] This case was known as the Little Rascals case and was followed closely by the media.

231. Of those 16 prospective jurors, 13 knew one or both of the victims and/or defendant or or one of their relatives: Wilfred Abbott (Trial Tpp. 277-79), Yolanda White (Trial Tpp. 309-10)_, Melvin Harris (Trial Tpp. 311-12), Johnny Jennings, Sr. (Trial Tp. 315), Calvin Whitehurst (Trial Tp. 496), Minnie G. Lamb (Trial Tp. 529), Maggie Whitehurst (Trial Tpp. 561-65), Calvin Harris (Trial Tp. 595), Winfred Poole (Trial Tp. 616), Johnny Butts (Trial Tpp. 647-49), Marguerite Harris (Trial Tpp. 666-67), Evelyn Harris (Trial Tpp. 678-80), and Earl Christian (Trial Tp. 771). Of those 13 who knew one or both of the victims and/or defendant, 9 were struck for cause by the trial court because of their familiarity with one or both of the victims and/or defendant or their relatives and their knowledge or opinions about the case: Wilfred Abbott (Trial Tp. 280), Yolanda White (Trial Tp. 311), Melvin Harris (Trial Tp. 312), Calvin Whitehurst (Trial Tp. 498), Minnie G. Lamb (Trial Tp. 530), Calvin Harris (Trial Tp. 595), Winfred Poole (Trial Tp. 617), Evelyn Harris (Trial Tp. 680), and Earl Christian (Trial Tp. 772). Of the 13 who knew one or both of the victims and/or defendant, 3 were struck for cause because of their opposition to the death penalty: Johnny Jennings, Sr. (Trial Tp. 321), Maggie Whitehurst (Trial Tp. 575), and Marguerite Harris (Trial Tp. 677). Of those 13 prospective jurors, 1 was struck peremptorily by the state: Johnny Butts (Trial Tp. 663). The 3 black prospective jurors who did not know either of the victims or defendant or any relatives of the victims or defendant were struck for cause for other reasons: Melvin Harris was excused for cause due to his opposition to the death penalty (Trial Tp. 187), and Amanda Eason and Rhudine Turner were excused for cause due to health problems (Trial Tpp. 536, 737)

232. In light of these facts, defense counsel moved for a mistrial during jury selection. (Trial Tp. 803) The following colloquy occurred between defense counsel (Mr. Hughes) and the trial court:

> THE COURT: What's the basis of your motion?
>
> MR. HUGHES: Basis of my motion, that of all the jurors that have appeared in this first pool, the defense has yet to have an opportunity to even question a black juror.
>
> THE COURT: At whose hands or fault are you laying that at this point? The Court inquired as to all jurors on some cause basis, either they knew the defendant or they indicated they could not return a verdict of punishment -- of capital punishment in this case. What do you say the fault is?
>
> MR. HUGHES: I say the fault is, in the majority of the cases the State has moved to challenge for cause and accepted by the Court, one black juror was excused by the State. It seems to me that a fair and impartial jury based on a cross-section of the Camden County community is not being presented and Mr. Cole is not being presented and Mr. Cole is being denied --
>
> THE COURT: Are you saying the cross-section -- cross-section argument would relate to whether or not any black jurors come into the courtroom. Are you saying that just because all of the jurors have been excused for cause on an appropriate basis, that's grounds for a mistrial?
>
> MR. HUGHES: I think the fact that of all the jurors that have been presented to this Court and the defendant has not had the opportunity to ask a single question of a single black juror, there has been a systematic exclusion by some reason --
>
> THE COURT: Are you saying the Court is systematically excluding them?

MR. HUGHES: No, sir, I'm not saying the Court is systematically excluding them. By some reason they are being systematically excluded.

THE COURT: Well, the reason appears on the record, Mr. Hughes. I don't think anybody has not told why they couldn't serve on this jury, the Court has considered that excuse and has found in its discretion that their ability to sit on this case would be substantially impaired by the opinion they expressed.

MR. HUGHES: With the exception of Mr. Butts that was excused by the State.

THE COURT: I don't recall Mr. Butts specifically right now but the State did exercise a peremptory challenge, there was no objection made to that challenge as it was made. There was not a Batson issue. If it was, it was not raised and even if it were raised, the Court does not see any prima facie showing that affect racial prejudice at this point. Anything further?

MR. HUGHES: No, sir.

THE COURT: Your motion for mistrial is denied.

(Trial Tpp. 804-05)

233. The pattern of exclusion of black prospective jurors because of their knowledge of the parties and the case continued during the remainder of the jury selection. After the trial court denied defendant's motion for a mistrial, 3 more black prospective jurors were interviewed: Marsette Gregory (Trial Tp. 914), Leslie Ethridge (Trial Tp. 1072), and Alvin Lawrence Aydlett (Trial Tp. 1189)._ Of those 3 prospective jurors, 2 knew the victims and/or defendant: Marsette Gregory (Trial Tp. 915) and Leslie Ethridge (Trial Tp. 1072-77, 1085-91). Ms. Gregory said that she would not want to serve on the jury due to her prior knowledge about the case (Trial Tp. 953; Mr. Ethridge

said that in his opinion, defendant had committed the crimes (Trial Tp. 1094), and at one point he acknowledged that he had expressed an opinion that defendant was guilty (Trial Tp. 1091). However, the trial court did not excuse either Ms. Gregory or Mr. Ethridge for cause; defendant exercised peremptory challenges against both of them. (Trial Tpp. 953, 1108) The other black juror who did not know the victims or defendant (Alvin Lawrence Aydlett, Trial Tpp. 1189-90), was struck peremptorily by the state. (Trial Tp. 1207).

234. By the end of jury selection, a total of 19 black prospective jurors had been interviewed. Of those 19 prospective jurors, 15 knew one or both of the victims and/or defendant or relatives of the victims or defendant. Of those 15 prospective jurors, 9 were struck by the trial court for cause because of their familiarity with one or both of the victims and/or defendant and their opinion or knowledge about the case. Of those 15 prospective jurors, 3 were struck for cause due to their opposition to the death penalty. Of those 15 prospective jurors, 1 was struck peremptorily by the state and 2 were struck peremptorily by defendant. Of the 19 prospective black jurors, only 4 did not know either of the victims or defendant. Of those 4, one was struck for cause due to opposition to the death penalty, 2 were struck for cause due to health problems, and 1 was struck peremptorily by the state.

235. At the evidentiary hearing on the motion for appropriate relief, Chris Wilson, an African American resident of Camden County, testified that the African American "community is small, so mainly everybody know everybody and, yes, most of the black community were very close." (HTp. 274) He further testified that the victims in this case,

Theresa and Hattie Graham, were well known in the African American community: "I would expect that everybody in the African American community knew them." (HTp. 276-77)

236. In short, as noted above, the concerns expressed by defense counsel during both pretrial hearings about venue were prophetic. In Camden County, a rural, sparsely populated county, the familiarity of so many black people with one or both of the victims and/or defendant meant that it was reasonably likely that no black people would serve on the jury. Defense counsel told the hearing courts that this problem had arisen in defendant's first trial. A simple solution was available: change venue or use a special venire from another county. The hearing courts refused to grant this relief and decided instead to try the case before a Camden County jury.

### The Combination Of The Victim's Participation In The Community And The Closeness Of The Black Population In Camden County Vitiated Due Process In Wade Cole's Trials

237. The North Carolina Supreme Court has recognized that in a small county it is possible for the population to be so "infected with prejudice" against a defendant that a trial that comports with due process is impossible. *State v. Jerrett*, 309 N.C. 239, 307 S.E.2d 330 (1993). The victims in J

238. In support of its holding in *Jerrett*, the North Carolina court relied on United States Supreme Court precedent, *Sheppard v. Maxwell*, 384 U.S. 333 (1966), for the proposition that in cases in which a majority of the population knows about the crime, the defendant need not demonstrate prejudice:

In *Sheppard*, the Court viewed the totality of the circumstances and concluded that under the facts of that case, there was such a probability that prejudice would result that defendant was denied due process. It is clear that the totality of the circumstances in this case mandate a similar conclusion. . . . .The evidence at the pretrial hearing, standing alone, was sufficient to reveal a reasonable likelihood that defendant could not receive a fair trial in Allegheny County due to the deep-seated prejudice against him. In so concluding, we think it extremely significant to note that here, the crime occurred in <u>a small, rural and closely-knit county where the entire county was, in effect, a neighborhood.</u>

*State v. Jerrett*, 309 N.C. at 256, 307 S.E.2d at 348. In *State v. Hill* this Court explained that the notable features in *Jerrett* were: "that the crime occurred in a county with a population of 9,587 people; that the voir dire indicated that approximately one-third of the prospective jurors knew the victim, some member of the victim's family, or any of several witnesses for the State; and that the jury was examined collectively on voir dire. *State v. Hill*, 347 N.C. 275, 287, 493 S.E.2d 264, 271 (1997)

239. The due process consideration in Wade Cole's second trial tracks the *Jerrett* conditions: the crime occurred in a county with a population even smaller than that of Allegheny; almost all of the prospective black jurors knew the victim, some member of the victims' family, or any of several witnesses for the State; the jury was at times examined in groups and because of the physical limitations of the old Camden Courthouse, the prospective jurors were forced into close quarters. The glaring difference between *Jerrett* and the instant case is that Allegheny County is for practical purposes all white, allowing the "entire county" to be "a neighborhood." In the instant case, it is the entire black portion of the county that is "a neighborhood." In Allegheny County, one-third of the prospective jurors knew the victim or other witnesses--in the instant case,

almost every single black prospective juror knew either the victim or the defendant or was actually kin. In Allegheny County it was the white community that knew about the case, in Camden County it is the black community. The only way to distinguish the two cases is to find that it is all right to disenfranchise all of the black citizens, as long as non-black citizens can be found to sit on the jury. But this is clearly erroneous. The North Carolina Supreme Court held over one hundred years ago that racial discrimination is inherently wrong:

> It is incomprehensible that while all white persons entitled to jury trials have only white jurors selected by the authorities to pass upon their conduct and their rights, and the negro has no such privilege, the negro can be said to have equal protection with the white man. How can the forcing of a negro to submit to a criminal trial by a jury drawn from a list from which has been excluded the whole of his race purely and simply because of color, although possessed of the requisite qualifications prescribed by the law, be defended? Is not such a proceeding a denial to him of equal legal protection[?] There can be but one answer, and that is that it is an unlawful discrimination. *State v. Peoples*, 131 N.C. 784, 42 S.E. 814, 816 (1902)

It is incomprehensible that while a county whose white population is infected by prejudice mandates change of venue, if a similar situation exists in a county's black population, there is no due process violation

240. The controlling United States Supreme Court case is also over one hundred years old, but the harm of segregated juries still concerns the Court in 2005. Juries from which one race has been excluded violate due process: "It is well known that prejudicies often exist against particular classes in the community, which sway the judgment of jurors, and which, therefore, operate in some cases to deny to persons of those classes the full enjoyment of that protection which others enjoy." *Miller-El v. Dretke*, 125 S.Ct.

2317, 2005 U.S. LEXIS 4658, 14-15 (2005), *quoting Strauder v. West Virginia*, 100 U.S. 303, 309 (1880). *Miller* explains that: "Defendants are harmed, of course, when racial discrimination in jury selection compromises the right of trial by impartial jury. . ." *Miller-El*, at 15, citing to *Strauder* at 308.

241. Wade Cole contends that the pretrial hearing courts erred by denying defendant's motion for a change of venue, and that the trial court erred by denying defendant's motion for a mistrial, because the familiarity of black prospective jurors with one or both of the victims and/or defendant meant that black people were, in fact, systematically excluded from the jury in this case. In this case, African-American people were excluded from serving on the jury as effectively and as systematically as if they had been struck for cause or struck peremptorily on the basis of race, or as if they had been excluded from the jury pool because of racial bias in the selection of the pool. The familiarity of prospective black jurors with one or both of the victims and/or defendant acted like a thumb on the scales of fair jury selection. The use of procedures designed to summon a fair cross-section of Camden County residents eligible for jury service goes for naught if it is reasonably likely that, because of such familiarity, black prospective jurors will be struck for cause in such numbers as to prevent any black people from serving on the jury. When the trial court asked Mr. Hughes who was at fault in causing this exclusion, the correct answer would have been the pretrial hearing courts, which denied defendant's motion for a change of venue despite defense counsel's observation that no black people had served in the jury in the first trial because of their familiarity with one or both victims and/or defendant. Although a defendant does not have a right to have even

one black person serve on the jury, he does have a right, under the Sixth and Eighth Amendments and the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution to a jury selection process that is free of built-in, systematic, and arbitrary procedures that are reasonably likely to prevent any black people from serving on the jury. Furthermore under N.C. Gen. Stat. § 15A-957, defendant had a right to a change of venue due to prejudicial pretrial publicity among a cognizable group -- black prospective jurors -- within the pool of available jurors in Camden County.

242. In addition, assuming for the sake of argument that the fair cross-section requirement does not apply to the selection of petit juries, it is still important to recognize that the predictable exclusion of black people from the jury in this case conflicted with the three values identified by the Supreme Court of the United States as the underlying values of the fair cross-section requirement: "(1) 'guard[ing]  against the exercise of arbitrary power' and ensuring that the 'commonsense judgment of the community' will act as 'a hedge against the overzealous or mistaken prosecutor,' (2) preserving 'public confidence in the fairness of the criminal justice system' and (3) implementing the belief that 'sharing in the administration of justice is a phase of civic responsibility.'" *Lockhart v. McCree*, 476 U.S. 162, 174-75, 90 L.Ed.2d 137, 148-49 (1986), *quoting Taylor v. Louisiana, supra*, 419 U.S. at 530-31, 42 L.Ed.2d at 698.

243. Finally, black residents of North Carolina and all residents of North Carolina - - not just the black prospective jurors who were struck for cause or peremptorily because

of their familiarity with the victims or Mr. Cole -- had a right under the Equal Protection

Clause of the Fourteenth Amendment not to have black people excluded from jury service

in this case due to jury selection procedures and venue decisions that systematically and

arbitrarily excluded black people from serving on the jury. As the Supreme Court

explained in *Powers v. Ohio*, 499 U.S. 400, 411, 113 L.Ed.2d 411, 425 (1991), the entire

community has an interest in preventing racially discriminatory jury selection procedures

in order to preserve the integrity of the criminal justice system. Just as the Equal

Protection Clause prohibits the exclusion of jurors belonging to a cognizable racial group

(including African-Americans) from jury service due to racially motivated peremptory

challenges, so black people have a right not to be excluded from jury service due to any

jury selection procedure that is reasonably likely to exclude black people in particular.

The venue decisions in this case virtually guaranteed that no black jurors would serve on

the jury for Mr. Cole's trial. The trial could have been just as fair to the state as well as to

Mr. Cole if the jurors had been chosen from another county.

244. A state court decision is "contrary to" Supreme Court precedent if it 1) arrives

at a conclusion that contradicts that reached by the Supreme Court on a question of law;

or 2) confronts facts that are materially indistinguishable from those of relevant Supreme

Court precedent and arrives at an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405

(2000). A decision is an "unreasonable application" of clearly established Supreme Court

law if a state court "identifies the correct governing legal principle from [the Supreme

Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's

case." *Id.* at 413. The State court decisions in this case are contrary to one hundred years

of United States Supreme Court cases: *Strauder v. West Virginia*, 100 U.S. 303, 309 (1880); *Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Taylor v. Louisiana,* 419 U.S. 522 (1975); *Lockhart v. McCree*, 476 U.S. 162 (1986); and *Powers v. Ohio*, 499 U.S. 400 (1991).

245. In this case, 15 out of the 19 prospective black jurors -- 79% of the prospective black jurors -- knew one or both of the victims and/or defendant; 9 of those 15 prospective jurors were excused for cause on that basis and because of their resulting knowledge and views about the case; and 3 others were excused peremptorily by the state or defendant on the obvious basis of their familiarity with the victims and/or defendant and the case. The record shows that if defendant had been tried before a jury chosen from another county, in which black people would be far less likely to have known one or both of the victims or defendant, there would have been a predictably greater chance that black people would not have been arbitrarily and systematically excluded from serving on the jury. The hearing courts' denial of defendant's motion for a change of venue, and the trial court's denial of the motion for a mistrial, violated defendant's right against the arbitrary and systematic exclusion of black people from his jury. In light of these violations, this Court should grant Wade Cole's petition for a writ of habeas corpus.

246. In the alternative, Mr. Cole is entitled to a new trial based on ineffective assistance of counsel. Trial counsel motioned for a change of venue before the second trial, but they did not: 1) provide to the hearing court the jury voir dire transcript from the first trial which would have clearly demonstrated the depth of the kinship between black

citizens in Camden; 2) they did not provide testimony from black residents which would have offered proof of the cohesive nature of the black community in Camden; 3) they did not provide affidavits from black residents that would have offered proof of the impossibility of impaneling a jury which would include any black citizens. Trial counsel's failure to offer proof of the extensive kinship and other cohesive ties in the black Camden community to the hearing court, constitutes constitutionally deficient performance by counsel, and resulted in prejudice to Mr. Cole under *Strickland v. Washington*, 466 U.S. 668 (1984), thus violating Mr. Cole's right to effective assistance of counsel under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Except for the deficient performance of trial counsel it cannot be said that Wade Cole's change of venue motion would not have been granted, allowing him to be tried before a jury drawn from a fair cross section of the population. Except for the deficient performance of appellate counsel it cannot be said that Wade Cole would not have been granted a new trial because of the constitutional violations under *Jerrett*.

## V.    RACIAL DISCRIMINATION IN THE SELECTION OF THE GRAND JURY VIOLATED DUE PROCESS

247.   Camden County is has a small population with approximately 25 % Afridcan-American citizens. Yet in violation of due process and equal protection, in the sixteen year period prior to the two grand juries which passed the bills of indictment against the Petitioner, twenty-seven out of twenty-eight foremen were white and only one was African-American. (1999 Tpp. 488-493). The selection of grand jury foreman in Camden County in the period before and during the indictments in the instant case demonstrated a

prima facie case of racial discrimination.

## State Court Disposition Of This Claim

248. Petitioner presented the claim in his Motion for Appropriate Relief filed in the Superior Court of Camden County, North Carolina, on 2 December 1997. In an opinion dated 31 August 2001, the Superior Court of Camden County denied Petitioner's Motion for Appropriate Relief. On 31 October 2001, Petitioner raised this claim in a timely filed Petition for Writ of Certiorari to the Supreme Court of North Carolina. The Petition was denied on 28 February 2002. The State Court's denial of this claim was contrary to or an unreasonable application of decisions by the United States Supreme Court.

## Facts Supporting Petitioner's Claim

249. The July prior to the indictment in the instant case, the North Carolina Supreme Court rendered an opinion in a case from Northampton County, which is in the contiguous judicial district, concerning allegations of racial discrimination in the selection of grand jury foremen. *State v. Cofield*, 320 N.C. 297, 357 S.E.2d 622 (1987) The issues were "(1) whether racial discrimination in selection of the grand jury foreman involved in this case would vitiate defendant's indictment and conviction, and (2) whether defendant has made out a prima facie case of such discrimination in the proceedings against him." *Id.* at 320 N.C. 299, 257 S.E.2d 623. Basing its decision on both federal and state constitutional law, the North Carolina Supreme Court answered both questions affirmatively.

250. Before calling this case for trial on July 17, 1989, the Honorable Donald W. Stephens informed the potential jurors that as this was the first term of Superior Court in Camden County after July 1st, it would be necessary to first select nine new members of the grand jury. He then announced that as "the Supreme Court has recently set out some guidelines, and it's a little bit more complicated in selecting a foreman than it used to be" the process would take longer than before. (July 17, 1989, Grand Jury Selection Tp. 1). Both of Wade Cole's trial counsel should have been present to hear this announcement.

251. Even without the announcement by the presiding judge, the Cofield decision should have been fresh in the trial attorneys' minds because Northampton County is in the same area of North Carolina as Camden County.

252. The *Cofield* record showed that in Northampton County only one grand jury foreman out of thirty had been Afro-American over a period of twenty years. The North Carolina Supreme Court found that as Northampton's population was over half Afro-American, the figures made out a prima facie case of racial bias in the selection of the grand jury foreman.

253. The Court held that such a violation was a fundamental constitutional violation:

> "Article I, section 26 does more than protect individuals from unequal treatment. The people of North Carolina have declared in this provision that they will not tolerate the corruption of their juries by racism, sexism and similar forms of irrational prejudice. They have recognized that the judicial system of a democratic society must operate evenhandedly if it is to command the respect and support of

> those subject to its jurisdiction. It must also be *perceived* to operate
> evenhandedly. Racial discrimination in the selection of grand and
> petiti jurors deprives both an aggrieved defendant and other members
> of his race of the perception that he has received equal treatment at the
> bar of justice." *Id.* at 302, 257 S.E.2d 625

254. The Court emphasized the importance of the selection of the grand jury foreman: "The foreman, by his very title, is distinguished from other members of the grand jury. As the titular head of the grand jury, the foreman is first among equals, both in the eyes of his fellow jurors and in the eyes of the public." The Court concluded that racial discrimination in the selection of the foreman was unconstitutional irrespective of whether there was discrimination in selection of the grand jury. *Id.* at 303, 257 S.E.2d 626.

255. The Court then held that the violation was structural and no prejudice to the particular defendant need be shown: "The effect of racial discrimination on the outcome of the proceedings is immaterial. Our state constitutional guarantees against racial discrimination in jury service are intended to protect values other than the reliability of the outcome of the proceedings. . . . Thus, if racial discrimination in the selection of the foreman can be demonstrated in this case, the proceedings against defendant were fatally flawed." *Id.* at 304, 257 S.E.2d 626-27

256. The North Carolina Supreme Court then stated that although its decision could stand on adequate and independent state grounds, it also found "that defendant's rights under the Equal Protection Clause of the Fourteenth Amendment are coextensive with his separate and independent equal protection rights under Article I, sections 19 and 26 of the

North Carolina Constitution." *Id.* at 305, 257 S.E.2d at 627. The North Carolina Supreme Court cited to *Rose v. Mitchell*, 443 U.S. 545 (1979) in which Justice Blackmun stated in dicta that the Court "assume[d] without deciding that discrimination with regard to the selection of only the foreman requires that a subsequent conviction be set aside, just as if the discrimination proved had tainted the selection of the entire grand jury venire." 443 U.S. at 551-52 n.4.

257. The *Cofield* Court then set out what a defendant needed to present in order to make out a prima facie case: (1) that the selection procedure itself was not racially neutral, or (2) that a substantial period in the past relatively few blacks have served in the position of foreman even though a substantial number have been selected to serve as members of grand juries.

258. The Northampton process was found to be discriminatory because while the county was approximately sixty-one percent black and thirty-nine percent white, only one black person had been appointed grand jury foreman out of the thirty-three persons who had served as a grand jury foreman. The Court added that the state may rebut a defendant's prima facie case by offering evidence that the process used in selecting the grand jury foreman was in fact racially neutral.

259. On remand a new trial judge made findings of fact that allowed our Supreme Court to establish a prospective rule for analysis of bias in the selection of grand jury foreman. *State v. Cofield*, 324 N.C. 452, 379 S.E.2d 834 (1989, *Cofield II*) *Cofield* II

requires the State to prove the trial judge considered all grand jurors and that his selection be made on racially neutral basis. *Id.* at 324 N.C. at 461, 379 S.E.2d at 839.

260. The procedure to be followed outlined in *Cofield* II is prospective only, but the holding of *Cofield* I that selecting a grand jury foreman in a racially discriminatory manner is a structural error in violation of both the state and federal constitutions was not held to be prospective.

261. The population of Camden County was approximately 6,000 at the time of the 1990 census. Roughly a quarter of the population was Afro-American. In the sixteen year period prior to the two grand juries which passed the bills of indictment against the Petitioner, twenty-seven out of twenty-eight foremen were white and only one was African-American. (1999 Tpp. 488-493) During this period the grand jury foremen was usually nominated by a committee made up of a sheriff, a clerk, and a local lawyer. This committee would make a recommendation to the presiding judge, who would appoint that person. 1999 Tp. 121); *also see*, Appendix 15, List of Grand Jury Foremen April 1972 to February 1989) (Appendix 16, Affidavit of Ann Spivey.)

262. Thus, the selection of grand jury foreman in Camden County in the period before and during the indictments in the instant case demonstrated a prima facie case of racial discrimination: (1) that the selection procedure itself was not racially neutral, and (2) that over a substantial period in the past relatively few blacks have served in the position of foreman.

263. The Sixth Amendment guarantees criminal defendants "a speedy and public trial, by an impartial jury. . . ." To achieve an impartial jury, the panels from which grand and petit jurors are chosen must be drawn from a "fair cross section" of the community. *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975); *Atwell v. Blackburn*, 800 F.2d 502 (5th Cir. 1986) (fair cross section requirement applies to grand as well as petit jury panels); *Machetti v. Linahan*, 679 F.2d 236, 239 (11th Cir. 1982) (same). If racial discrimination occurs in the selection process of the grand or petit jury, the conviction must be reversed notwithstanding "overwhelming" evidence of guilt. *Vasquez v. Hillery*, 474 U.S. 254 (1986).

264. The Court in Vasquez, outlined the long series of United States Supreme Court cases all holding that equal protection applies to the racial composition of grand juries and this error cannot be found harmless:

> In 1880, this Court reversed a state conviction on the ground that the indictment charging the offense had been issued by a grand jury from which blacks had been excluded. We reasoned that deliberate exclusion of blacks "is practically a brand upon them, affixed by the law, an assertion of their inferiority, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others." *Strauder v. West Virginia*, 100 U.S. 303, 308 (1880). Thereafter, the Court has repeatedly rejected all arguments that a conviction may stand despite racial discrimination in the selection of the grand jury. *See, e. g., Neal v. Delaware*, 103 U.S. 370, 396 (1881); *Bush v. Kentucky*, 107 U.S. 110 (1883); *Gibson v. Mississippi*, 162 U.S. 565 (1896); *Carter v. Texas*, 177 U.S. 442 (1900); *Rogers v. Alabama*, 192 U.S. 226 (1904); *Pierre v. Louisiana*, 306 U.S. 354 (1939); *Smith v. Texas*, 311 U.S. 128 (1940); *Hill v. Texas, supra; Cassell v. Texas*, 339 U.S. 282 (1950); *Reece v. Georgia*, 350 U.S. 85 (1955); Eubanks v. Louisiana, 356 U.S. 584 (1958); *Arnold v. North Carolina*, 376 U.S. 773 (1964); *Alexander v. Louisiana*, 405 U.S. 625 (1972). Only six years ago, the Court explicitly addressed the question whether this unbroken line of case law should be reconsidered in favor of a harmless-

error standard, and determined that it should not. *Rose v. Mitchell*, 443 U.S. 545 (1979). We reaffirmed our conviction that discrimination on the basis of race in the selection of grand jurors "strikes at the fundamental values of our judicial system and our society as a whole," and that the criminal defendant's right to equal protection of the laws has been denied when he is indicted by a grand jury from which members of a racial group purposefully have been excluded. *Id.*, at 556.

*Vasquez* at 260-262.

265. Unbiased selection of jurors is central to our constitution. This was reaffirmed by the Supreme Court in *Miller-El v. Dretke* this term: "[F]or more than a century, this Court consistently and repeatedly has reaffirmed that racial discrimination by the State in jury selection offends the Equal Protection Clause." *Miller-El* at 16, *quoting Georgia v. McCollum*, 505 U.S. 42, 44 (1992); and *citing* to: *Strauder v. West Virginia*, 100 U.S. 303, 308, 310 (1880); *Norris v. Alabama*, 294 U.S. 587, 596 (1935); *Swain v. Alabama*, 380 U.S. 202, 223-224 (1965); Batson v. Kentucky, 476 U.S. 79, 84 (1986); and Powers v. Ohio, 499 U.S. 400, 404 (1991).

266. A state court decision is "contrary to" Supreme Court precedent if it 1) arrives at a conclusion that contradicts that reached by the Supreme Court on a question of law; or 2) confronts facts that are materially indistinguishable from those of relevant Supreme Court precedent and arrives at an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A decision is an "unreasonable application" of clearly established Supreme Court law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's

case." *Id.* at 413. The State court decisions in this case are contrary to the long line of cases, beginning in 1880 and most recently in June 2005 cited above.

267. In the alternative, Petitioner raises this claim as ineffective assistance of counsel. According to their testimony neither attorney in Cole's case was aware of the *Cofield* decision. (1999 Tpp. 122, 295)  This was especially egregious, because the trial judge actually highlighted the *Cofield* decision in the presence of both attorneys immediately before the trial commenced. The judge informed the potential jurors that as this was the first term of Superior Court in Camden County after July 1st, it would be necessary to select nine new members of the grand jury. He then announced that "the Supreme Court has recently set out some guidelines, and it's a little bit more complicated in selecting a foreman than it used to be" the process would take longer than before. (July 17, 1989, Grand Jury Selection Tp. 1)  Not challenging the racial discriminatory manner of selecting the foreman of the grand juries which indicted Cole, allowed petitioner-defendant's constitutional rights to be violated. Trial counsel's failure to raise the issue, fell outside the range of reasonably competent professional assistance to which criminal defendants are entitled under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  Except for this deficient performance it cannot be said that the indictments in the instant case would not have been quashed.

## VI. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO SEEK FUNDS FOR A NEUROPSYCHOLOGIST TO EXAMINE WADE COLE AND FOR FAILING TO PRESENT A NEUROPSYCHOLOGIST WHO COULD TESTIMONY TO BRAIN DAMAGE

268. Wade Larry Cole suffers from long-standing brain impairment with significant

frontal lobe deficits which impaired his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. His trial attorneys did not present evidence of this organic deficit to the jury. Despite plentiful indications that Mr. Cole was not functioning normally and that this dysfunctional behavior could be due to a damaged brain, the trial attorneys did not seek neurological testing. As the result of the funding in 2004, which was unavailable in 1999, neurological testing was performed. The superior court below denied his claim based on Mr. Cole's failure to present these experts in his original MAR, despite the evidence that he was unable to support the claim in his prior motion because he was given no funds to retain a psychologist. Preclusion based on poverty is manifestly unconstitutional.

## State Court Disposition Of This Claim

269. Petitioner presented the claim of ineffective assistance for failure to request funds for a neuropsychologist in his Motion for Appropriate Relief heard in the Superior Court of Camden County, North Carolina, in November 1999. In an opinion dated 31 August 2001, the Superior Court of Camden County denied Petitioner's Motion for Appropriate Relief. On 31 October 2001, Petitioner raised this claim in a timely filed Petition for Writ of Certiorari to the Supreme Court of North Carolina. The Petition was denied on 28 February 2002.

270. Petitioner raised the claim of ineffective assistance of counsel for failure to present evidence of Wade Cole's brain damage to the sentencing jury in a Motion for Appropriate relief filed 9 September 2004. In an opinion dated 7 February 2005, the Superior Court of Camden County denied this claim. On 4 May 2005, Petitioner raised

this claim in a timely filed Petition for Writ of Certiorari to the Supreme Court of North Carolina. The Petition was denied on 1 July 2005.

271. The State Court's denial of these claims was contrary to or an unreasonable application of decisions by the United States Supreme Court.

## Facts Supporting Petitioner's Claim

272. Wade Larry Cole was rendered unconscious by a car accident when he was a young teenager, leaving him with frequent intense headaches and dizziness. This fact was noted by Dorothea Dix Hospital in Mr. Cole's medical records. Other disturbing facts concerning Mr. Cole's mental health that trial counsel either knew or should have known, included a history of childhood "spells"; a history of impulsivity; lack of comprehension concerning his actions; alcohol abuse since childhood; and memory disturbance; and questions concerning Wade Cole's prenatal and neonatal status. Despite these red flags, the trial attorneys did not request neurological testing. "Loss of consciousness and amnesia are two important clinical signs frequently associated with traumatic brain injury." ASSESSMENT OF CHILDREN, Jerome M. Sattler, p. 687 (1992).

273. A complete neurological examination requires extensive and sophisticated testing which was not performed by any of the mental health experts hired by trial counsel to examine Wade Cole. The recommended tests include: a clinical history, a mental status examination, a study of cranial nerves, motor functions (including tone, strength, and reflexes, coordination, sensory functions, and gait. Recommended laboratory tests include a CT scan (computerized tomography) to locate tumors and hemorrhages, PET scan

(positron emission tomography) for more precise measurement of blood flow and metabolism in specific regions of the brain, MRI scan (magnetic resonance imaging) to show contrasts on soft tissue to investigate tumors or tissue pathology, and EEGs (electoencephalograms). The examination should include measures of sensory perceptual functions, motor functions relating to speed and strength, psychomotor problem solving, language and communication skills, and other cognitive and intellectual skills. ASSESSMENT OF CHILDREN at pp. 688-689.

274. Post-conviction counsel filed three separate motions for funding for psychological and neurological testing in May 1997, August 1997 and November 1999. All three motions were denied. (Attached hereto, as Appendices 17, 18 and 19). Mr. Cole was granted no funds for mental health examination prior to his Motion for Appropriate Relief hearing in 1999.

275. While the petition for certiorari on the denial of the 1999 MAR was pending in the North Carolina Supreme Court, the North Carolina legislature passed NC Gen. Stat. §§ 15A-2005, 2006 allowing Mr. Cole to file an MAR based on mental retardation. The psychologists who examined Mr. Cole for retardation found him to be retarded, based on IQ tests given to Mr. Cole at the time of the crime and on adaptive skills testing done in 2003. Funding was not given for neurological testing, as this was not pertinent to the limited claim allowed by 15A-2005.

276. After the North Carolina Supreme Court denied the petition for certiorari filed by Mr. Cole based on the Superior Court's denial of his mental retardation claim, post-

conviction counsel filed a request for funding for neurological testing with the Indigent Defense Services. IDS requires that defense counsel "make at least as specific an application to retain experts as would be required by a fair but exacting trial judge applying G.S. 7A-450(a) and *Ake v. Oklahoma* and its progeny." (Rules of the Commission of Indigent Defense Services 2D.1) Indigent Defense Services granted Mr. Cole's request for neurological testing.

277. Dr. Claudia Coleman conducted neurological testing on September 2, 2004. The tests included the Wechsler Memory Scale, California Verbal Learning Test, Trails A and B, Stroop Color and Word Test, spatial Relations Test, Controlled Oral Word Assoication Test, Boston Naming Test, Wisconsin Card Sort Test, Short Form Booklet Category Test, Rey 15-Item Test Scoring, and Test of Memory Malingering. (Appendix, 20, Dr. Coleman affidavit, ¶11).

278. Dr. Coleman reported that on the test to rule out malingering, Mr. Cole's score reflected "good effort without exaggeration or faking of memory difficulties These findings indicated that the neuropsychological test results were valid and were reflective of Mr. Cole's actual cognitive abilities." (Dr. Coleman affidavit, ¶ 16

279. Dr. Coleman concluded that: "The overall neuropsychological test results showed impairment in several areas of neurocognitive functioning. . . .This pattern supported superimposed acquired brain impairment and clearly indicated significant compromise in the frontal and pre-frontal areas of the cerebral cortex." (Dr. Coleman affidavit ¶ 21).

280. In the opinion of Dr. Coleman, Mr. Cole suffered from "long-standing brain impairment with significant frontal lobe deficits." She explained that "neuropsychological deficits reflect actual brain dysfunction and impairment, not mental illness." (Dr. Coleman affidavit ¶ 23)

281. Dr. Coleman concluded that "Mr. Cole's frontal lobe dysfunction was a critical factor impairing his ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law." (Dr. Coleman affidavit ¶ 24) She stated that "Evidence of brain dysfunction as opposed solely to a combination mental illness and voluntary intoxication would have significantly lessened Mr. Cole's culpability, particularly with regard to control of behavior at the time of the offenses." (Dr. Coleman affidavit ¶ 25)

282. The jury was not presented with evidence of brain defects because trial counsel had not investigated the possibility of neurological dysfunction. Instead the jury was only asked if Mr. Cole's capacity to appreciate the criminality of his conduct or to conform his conduct with the requirements of the law was impaired by either alcohol or drugs or both. The jury did not find this statutory mitigating factor to exist. (Issues and Recommendations, Appendix 21).

### The Decision Of The Trial Attorneys Not To Seek Neurological Testing Must Be Found Ineffective Under The Standards Of *Wiggins v. Smith* And *Strickland v. Washington*

283. Under 28 U.S.C. § 2254, Wade Cole's right to federal habeas relief depends on showing that the state court's resolution of his claim of ineffective assistance of

counsel under *Strickland v. Washington, supra,* "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1). An "unreasonable application" occurs when a state court "'identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith,* supra, at 520, 156 L. Ed. 2d 471, 123 S. Ct. 2527 (*quoting Williams v. Taylor,* 529 U.S. 362, 413, 146 L. Ed. 2d 389, 120 S. Ct. 1495 (2000) (opinion of O'Connor, J.)). That is, "the state court's decision must have been [not only] incorrect or erroneous [but] objectively unreasonable." *Wiggins v. Smith,* supra, at 520-521, 156 L. Ed. 2d 471, 123 S. Ct. 2527 (*quoting Williams v. Taylor, supra,* at 409, 146 L. Ed. 2d 389, 120 S. Ct. 1495 (internal quotation marks omitted)

284. The United States Supreme Court reaffirmed the above holdings in *Rompilla v. Beard,* 125 S. Ct. 2456, 2005 U.S. LEXIS 4846 (2005). *Rompilla* does not make new law, but is an application of *Strickland v. Washington. Rompilla,* 2005 U.S. LEXIS at 8.

285. The facts in *Rompilla* are analogous to those in Wade Cole's case. Rompilla's trial counsel spoke with five members of his family and testified that they had developed a good relationship with the family. *Rompilla,* at 15. Trial counsel also retained three mental health witnesses to look into Rompilla's mental state as of the time of the offense and his competency to stand trial. *Id.* at 16. Postconviction counsel raised a number of likely avenues that trial counsel "could fruitfully have followed in building a mitigation case." Trial counsel knew that Rompilla had been drinking heavily at the time of his

offense and one of the mental health experts reported a history of alcohol abuse, but trial counsel did not seek a history to support this mitigating circumstance. *Id.* at 16-17. The State of Pennsylvania argued that Rompilla's trial counsel had done enough, that "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." Pennsylvania further argued that the information trial counsel had already gathered "gave them sound reason to think it would have been pointless to spend time and money on the additional investigation." *Id.* at 17-18

286. The United States Supreme Court found Rompilla's lawyers to be ineffective for failing to examine a prior criminal file. The Court based this decision in part on the American Bar Associations standards for capital counsel:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of the facts constituting guilt or the accused's stated desire to plead guilty.

*Id.* at 24, quoting 1 ABA Standards for Criminal Justice 4-4.1 (2nd ed. 1982 Supp.) n.6.

287. As in *Rompilla*, Wade Cole's trial counsel had hired mental health experts, but these experts were not neuropsychologists and no neuropsychological testing was done. This was despite obvious signs of brain damage. At the 1999 hearing, one of Mr. Cole's counsel asserted that he did not pursue further testing because Wade Cole told him he was okay. (1999 Tpp. 210-211). It defies common sense that an attorney would rely on the word of a mentally retarded client for diagnosis of mental illness in any case, but in a

situation in which Dorothea Dix found significant illness, as in *Rompilla*, failure to investigate an obvious avenue for mitigation constitutes ineffective assistance of counsel.

288. In *Wiggins v. Smith*, 539 U.S. 510, 524 (2003), the Supreme Court instructed that whether an attorney's investigation is reasonable is based on compliance with "prevailing professional norms," such as guidelines developed by the American Bar Association for capital cases. *Wiggins v. Smith*, at 524. The ABA guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Id.*, quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (*emphasis in opinion*)

289. *Wiggins* also holds that the reasonableness of the scope of the investigation can be determined in light of what counsel had already discovered. *Wiggins* at 524.. In Mr. Cole's case there were plentiful indications that Mr. Cole should be examined for possible neurological damage, yet counsel failed to seek funding for this investigation. The indications of possible neurological damage included:

    a.    Mr. Cole had suffered a head injury in a car accident that had left him unconscious. This information was included in the Dorothea Dix hospital report.

    b.    Mr. Cole's mother was in her forties when she became pregnant with Wade. He was the sixth of live births. His birth was at home. Mr. Cole's brothers reported that Wade Cole behaved strangely from a very young

age.

c.      Mr. Cole's behavior in jail immediately after the crime raised mental health concerns. He was seen by a mental health clinic in jail and was transferred to Central Prison for safekeeping on August 13, 1988, where he was medicated. (Dorothea Dix Discharge Summary).

d.      On October 11, 1989, trial counsel signed an affidavit stating that in his opinion Mr. Cole might not be mentally competent to know the difference between right and wrong, or able to understand the probable consequences of his acts.

e.      Mr. Cole was hospitalized at Dorothea Dix for approximately three months. At the end of the hospitalization, Dr. Cabe Lynn was still unable to provide an opinion as to the cause of Mr. Cole's memory loss.

f.      The Dorothea Dix records show conclusively that the battery of tests needed to diagnose neurological deficits were not performed on Wade Cole.

g.      The Dorothea Dix records conclusively shown that neither an MRI or a CAT scan were performed on Wade Cole.

h.      Trial counsel were aware that professionals at Dorothea Dix could not agree on the cause or extent of Mr. Cole's mental impairment. On May 25, 1989, trial counsel filed a motion to extend Mr. Cole's time at Dorothea Dix because Dr. Lynn had "requested additional time in order that his findings can be reviewed and in order that the Defendant can be further

examined by other psychiatrists on the staff at Dorothea Dix Hospital." (Motion To Extend Recommitment to State Hospital, para. 7, attached hereto as Appendix 22). Apparently Dr. Rollins overruled Dr. Lynn and discharged Mr. Cole on May 22, 1989, without further testing.

    i.    The excessively violent nature of the crime indicated a brain disorder that was not accounted for by the Dorothea Dix records.

290. In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's failures prejudiced his defense. A "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

291. Studies have shown that juries are less likely to impose the death penalty where the defendant suffers from an "organic" brain disorder. *Brewer v. Aiken*, 935 F.2d 850 (7th Cir. 1991); see also, Scott E. Sundby, "The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony," 83 Va.L. Rev. 1109, 1165 n. 118 (1997) (discussing a study showing that a group of mock jurors were less likely to accept schizophrenia than they were to accept organic brain disorder as a basis for an insanity defense.)

292. *Williams v. Taylor*, 592 U.S. 362 (2000), instructs that reviewing courts must evaluate the totality of the available mitigation evidence both that adduced at trial, and the

evidence adduced in the habeas proceeding—in reweighing it against the evidence in aggravation. *Williams* at 397-98. Thus, the question is whether the failure to present evidence of neurological damage in light of the tendency to give more weight to organic problems, when added to the other mental health evidence before the jury, "undermines confidence" in the result reached by the sentencing jury

293.  Petitioner need only show that the evidence of neurological deficits could have swayed one juror in Wade Cole's favor: "So we proceed, as we must, under the North Carolina statutory scheme, and in doing so further recognize that a North Carolina court may not impose death if a single juror votes in favor of life imprisonment. . . . . Accordingly, we must now assess whether we can say "with fair assurance," *Kotteakos, 328 U.S. at 765*, that not a single resolute juror would have voted for a life sentence." *Allen v. Lee*, 366 F.3d 319, 335 (4th Cir. 2004).

294.  Considering the demonstrated propensity of jurors in this case to find mitigating factors based on mental illness, it cannot be found that "not a single resolute juror would have voted for a life sentence."

295.  Trial counsel clearly were not in compliance with prevailing professional norms under *Wiggins* and *Strickland*. There can be no question that they failed to attempt to discover *all reasonably available* mitigating evidence. If trial counsel had pursued neurological testing, Mr. Cole would have been able to present to the jury evidence of an organic cause for his inability to conform his conduct to the requirements of the law. Given the nature of the stabbing in this case, it was crucial for the defense to be able to

explain to the jurors that damage to the frontal lobes, combined with severe mental illness and related disabilities, all tragically combined to lay havoc to Mr. Cole's control and reasoning that night.

296. Trial counsel's failure to present evidence of neurological damage, when added to the other mental heath evidence before Mr. Cole's jury, "undermines confidence" in the result reached by the sentencing jury, requiring a new trial under the standards of *Strickland v. Washington* as explained by *Williams v. Taylor*, Wiggins v. *Smith* and *Rompilla v. Beard.*

297. The state granted Petitioner funds for a clinical evaluation of Wade Cole. Dr. Coleman was able to interview Mr. Cole, review his records and perform neuropsychological tests. Petitioner has not been granted funding by any court to have the tests performed that require laboratory techniques. Recommended laboratory tests include a CT scan (computerized tomography) to locate tumors and hemorrhages, PET scan (positron emission tomography) for more precise measurement of blood flow and metabolism in specific regions of the brain, MRI scan (magnetic resonance imaging) to show contrasts on soft tissue to investigate tumors or tissue pathology, and EEGs (electoencephalograms).

298. Petitioner requests this court to grant funds for these tests to be performed before ruling on this issue.

## VII. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO PRESENT ALL OF THE READILY AVAILABLE MITIGATING EVIDENCE

299. Prior to Cole's second trial, Gretchen Engel of the North Carolina's Center For Death Penalty Litigation, spent a tremendous amount of time preparing mitigation materials to assist Cole's trial counsel. Ms. Engel provided Cole's counsel with typed interviews of many potential witnesses. After interviewing relatives and acquaintances, she was able to produce a detailed time line of petitioner Cole and his family. (Appendix 23) Trial counsel did not interview the prospective mitigation witnesses and failed to present them to the jury.

### State Court Disposition Of This Claim

300. Petitioner presented this claim of ineffective assistance in his Motion for Appropriate Relief heard in the Superior Court of Camden County, North Carolina, in November 1999. In an opinion dated 31 August 2001, the Superior Court of Camden County denied Petitioner's Motion for Appropriate Relief. On 31 October 2001, Petitioner raised this claim in a timely filed Petition for Writ of Certiorari to the Supreme Court of North Carolina. The Petition was denied on 28 February 2002. The State Court's denial of this claims was contrary to or an unreasonable application of decisions by the United States Supreme Court.

### Facts Supporting Petitioner's Claim

301. Ms. Engel interviewed the petitioner's brother Ernest with whom Wade Cole and Theresa Graham's children were living. Ernest Cole and his wife adopted Wade

Cole's children after he was incarcerated. Ernest Cole told Ms. Engel that he would be willing to testify for his brother. If he had been called to testify, Ernest Cole could have explained to the jury that Wade Cole had suffered from mental disabilities from childhood. Ernest Cole could have told the jurors that mental illness ran in his family. (Interview with Ernest Cole, Appendix 24)

302. Ms. Engle supplied defense counsel with interview's of Cole's brother Rufus and his wife Patsy. Neither of these witnesses testified, although Patsy was subpoenaed. (Interview notes, Appendix 25). Rufus Cole could have given the jury a very sympathetic portrait of their family. He would have told the jurors that their first cousin is James Carlton Cole, district court judge for Perquimans County, North Carolina, and that Judge Cole's wife is Janice Cole, at one time United States Attorney for the Eastern District of North Carolina. (1999 Tp. 318). Rufus would have told the jury that their family came to Virginia from England and that their grandfather had thought of writing a book about the family history. (1999 Tp. 319). Rufus would have countered guilt phase testimony by explaining that Wade Cole had bought things for Theresa Graham and had done things with his son, Rod. (1999 Tpp. 320-321).

303. Patsy Cole would have testified that she met her husband, Rufus Cole, when Wade was still a baby. She would have told the jurors that Wade was very good to his mother. Patsy could have told the jurors about when Wade and Theresa first met and how he was dressed for the prom. (1999 Tp. 334).

304. Both Rufus and Patsy Cole could have presented sympathetic testimony concerning Wade's mental disabilities. Rufus could have told the jury about Wade's inability to hold a job until he convinced Bill Meiggs to hire him. He could have told the jurors that he cared so much for his brother that after he got him the job, he made sure he got there on time; that he rode with him for the first week, trying to teach him to drive the 18-wheeler; that he would do the complicated parts for his brother, such as loading the truck; and that he would drive in tandem with his brother, so that he would not get lost. (2003 Tpp. 161-163). Rufus would have told the jurors that Wade couldn't dress himself correctly, wearing short sleeves in the winter. (2003 Tp. 168). Patsy Cole would have told the jurors that Wade was slow and couldn't function like the other boys: "He would go out maybe to like play ball, basketball or something like that but he would always be to himself but he would get out there and—they would ask him to come play with them but Wade always had a slow—slow getting around." (2003 Tpp. 191, 193) Patsy would have told the jurors that even at age 36, Wade Cole was still living at home with his mother and depended on her to cook: "Now Wade, he would go out but then he would come back home. He will stay some nights but he always come back home. He wouldn't go off and stay a week or maybe two weeks, couple of days and he'd come back home." (2003 Tp. 192) Patsy would have explained that when Wade did have a job and made money, the money would go to Theresa: "Tressa would come over and they would meet at the bank. So he would get in the car with her and they all go on off. So by Monday or when he come in over the weekend by Monday or—Monday or maybe Tuesday he don't have no money." (2003 Tp. 194)

305. Cole's older sister, Rose, was interviewed by Ms. Engle. Rose had memories of her brother that would have been useful in mitigation, but she was never contacted by Cole's lawyers. The same was true of Connie Lumbsden, Cole's nephew, and Carolyn Johnson, Connie's sister. (Appendix 26)

306. Shirley Simpson, who had been Wade Cole's neighbor since he was a child and is now the Executive Director of the Elizabeth City OIC, would have told the jury an exceptionally sympathetic story about Wade's childhood and his relationship with his mother: "I knew Wade as a little fellow, withdrawn, appeared to be shy but never had anything to say much to anybody. There was a lot of kids in the neighborhood. He didn't do a lot of mingling. He basically stayed in the yard, stayed close to his mom." (2003 Tp. 130) Ms. Simpson could have described Wade's difficulties, stemming from his mental disabilities: "Even as an adult he didn't do a lot of mingling. Three-fourths of his time, if he was not at work he would sit on the porch or sit in his vehicle." (2003 Tp. 132) "He didn't keep [jobs] very long. I know during this—the summer months during the field time I know he's gone in the potato field, gone in the cabbage field, those types of things. Of course he would work but they wouldn't let him stay." (2003 Tp. 134). (also see, Interview with Shirley Simpson, Appendix 27)

307. A.C. Robinson, a member of the Elizabeth City Town Council, could have testified as a witness who knew Cole's history. Ms. Simpson was placed under subpoena, but not called. Robinson arrived late and did not testify.

Failing To Call Any Family Members At The Sentencing Phase Must Be Found
Ineffective Under The Standards Of *Strickland v. Washington, Williams v.*

*Taylor, Wiggins v. Smith and Rompilla v. Beard*

308. Under 28 U.S.C. § 2254, Wade Cole's right to federal habeas relief depends on showing that the state court's resolution of his claim of ineffective assistance of counsel under Strickland v. Washington, supra, "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1). An "unreasonable application" occurs when a state court "'identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, supra, at 520, 156 L. Ed. 2d 471, 123 S. Ct. 2527 (*quoting Williams v. Taylor*, 529 U.S. 362, 413, 146 L. Ed. 2d 389, 120 S. Ct. 1495 (2000) (opinion of O'Connor, J.)). That is, "the state court's decision must have been [not only] incorrect or erroneous [but] objectively unreasonable." *Wiggins v. Smit*h, supra, at 520-521, 156 L. Ed. 2d 471, 123 S. Ct. 2527 (*quoting Williams v. Taylor, supra*, at 409, 146 L. Ed. 2d 389, 120 S. Ct. 1495 (internal quotation marks omitted)

309. In *Wiggins v. Smith*, 156 L.Ed.2d 471 (2003), the United States Supreme Court overturned a Fourth Circuit decision. *Wiggins* held that the fact that some investigation had been done does not establish that counsel were effective. Instead the depth and scope of counsel's investigation must be reviewed for adequacy. 156 L. Ed. 2d at 485. The decision in *Wiggins* did not establish new law, but was a reaffirmation and explanation of *Strickland v. Washington. Id.* at 484-85, *citing Strickland v. Washington*, 466 U.S. 668 (1984). *Wiggins* emphasized that in order to meet the "objective standard of reasonableness" a limited investigation is not enough. *Id.* at 484. Instead, reviewing

courts are to focus on whether the investigation supporting the strategic decision "was itself reasonable." *Id.* at 485-486. The *Wiggins* Court explained that based on the limited investigation that the defense counsel had done, they should have known that more was required: "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." *Id.* at 487 The state court in *Wiggins* "appear[ed] to have assumed that because counsel had *some* information with respect to Wiggins' background- the information in the PSI and the DSS records- they were in a position to make a tactical choice not to present a mitigation defense." 156 L. Ed. 2d at 488 (emphasis in the original). The United States Supreme Court rejected the state court's holding as "unreasonable." According to the Court,

> In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.

*Wiggins*, 156 L. Ed. 2d at 488.

310. *Wiggins v. Smith* corrects the misinterpretation of Supreme Court law by many circuit courts on the correct standard for assessing an acceptable investigation. The circuit courts had held that as long as an attorney does some investigation he is not ineffective. *Wiggins* found these holdings to be incorrect: "*Strickland* does not establish that an investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court  must consider the reasonableness of the investigation said to support that strategy." *Wiggins* at 488, citing *Strickland*, 466 U.S. at 691. According to

the Supreme Court, the question is whether, in light of the investigation already done, should counsel have ended or continued the investigation:

> Counsel's investigation into Wiggins' background did not reflect reasonable professional judgment. Their decision to end their investigation when they did was neither consistent with the professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered in the social services records—evidence that would have led a reasonably competent attorney to investigate further.

*Wiggins* at 492.

311.  When deciding the prejudice to a defendant in a capital sentencing, the Fourth Circuit directs that this Court must find that if trial counsel had presented the family members and neighbors that were available to testify and whose testimony would have presented many dimensions of Wade Coles's life and disabilities that had not otherwise been presented to the jury, not one single juror would have voted for life:

> Accordingly, we recognize that the *Brecht-Kotteakos* standard must be somewhat modified when applied in circumstances like those at issue here -- the sentencing phase of a capital case. In this context, that standard requires a reviewing court to determine whether it can say "with fair assurance" that an error did not "substantially sway" the response of the jury to the question put before it, *i.e.*, should the defendant receive the death penalty. *Kotteakos, 328 U.S. at 765*. Moreover, in this context a reviewing court must undertake the *Brecht* analysis mindful of the Supreme Court's recognition that an appellate court faces certain difficulties when "determining sentencing questions in the first instance." *See Clemons v. Mississippi, 494 U.S. 738, 754, 108 L. Ed. 2d 725, 110 S. Ct. 1441 (1990); accord Caldwell v. Mississippi, 472 U.S. 320, 330, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985)*. . . .

> So we proceed, as we must, under the North Carolina statutory scheme, and in doing so further recognize that a North Carolina court may not impose death if a single juror votes in favor of life imprisonment. Indeed, "if the jury cannot, within a reasonable time, unanimously agree to its sentence recommendation, the judge shall impose a sentence of life imprisonment . . . ." *N.C. Gen. Stat. § 15A-2000(b)*. Accordingly, we must

> now assess whether we can say "with fair assurance," *Kotteakos, 328 U.S.*
> *at 765*, that not a single resolute juror would have voted for a life sentence.

*Allen v. Lee*, 366 F.3d 319, 344-45 (2004). This Court cannot find "with fair assurance" that "not a single resolute juror would have voted for a life sentence," if jurors had heard from Wade Cole's family and friends.

312.    The fact that no family members spoke on Wade Cole's behalf must have been devastating to the jury's perspective of the petitioner. Two jailers were called, a psychologist, Cole's first grade teacher and a friend from his teens. The fact that numerous others had been interviewed and were prepared to testify and that if they had testified they would have presented a sympathetic portrait of Wade Cole is ample evidence that trial counsel's failure to call all the available mitigating witnesses, particularly members of the defendant-petitioner's family, constitutes ineffective assistance of counsel under *Strickland v. Washington, Wiggins v. Smith and Rompilla v. Beard.*

313.    As the State court decision is clearly contrary to established United States Supreme Court opinions, Mr. Cole should be granted a writ of habeas corpus.

> ### VIII.    MR. COLE'S COUNSEL FAILED TO PRESENT A DIMINISHED CAPACITY DEFENSE TO PREMEDITATED AND DELIBERATE MURDER BASED ON LACK OF MENTAL CAPACITY AND FAILED TO PROPERLY PREPARE THE EXPERT WHO TESTIFIED TO DIMINISHED CAPACITY BASED ON VOLUNTARY INTOXICATION, CONSTITUTING INEFFECTIVE ASSISTANCE OF COUNSEL

314.    Wade Larry Cole's only defense to premeditated and deliberate murder was

lack of mental capacity. This defense could have been based both on lack of mental capacity to form a specific intent and on voluntary intoxication. An expert witness was available to the defense who testified in the sentencing phase of Cole's first trial and would have testified in the second trial to Cole's inability to form the requisite specific intent. The expert who did testify to voluntary intoxication was not given adequate background information to testify to the range of intoxication, even though the information was readily available: he was not told Cole's weight and height at the time of the incident; he was not told the type of alcohol Cole was drinking, even though the bottle was, at least at the time of the first trial, in the possession of the State.

## State Court Disposition Of This Claim

315. Petitioner presented this claim of ineffective assistance in his Motion for Appropriate Relief heard in the Superior Court of Camden County, North Carolina, in November 1999. In an opinion dated 31 August 2001, the Superior Court of Camden County denied Petitioner's Motion for Appropriate Relief. On 31 October 2001, Petitioner raised this claim in a timely filed Petition for Writ of Certiorari to the Supreme Court of North Carolina. The Petition was denied on 28 February 2002. The State Court's denial of this claims was contrary to or an unreasonable application of decisions by the United States Supreme Court.

## Facts Supporting Petitioner's Claim

316. Ms. Engel interviewed the petitioner's brother Ernest with whom Wade Cole and Theresa Graham's children were living. Ernest Cole and his wife adopted Wade

Cole's children after he was incarcerated. Ernest Cole told Ms. Engel that he would be willing to testify for his brother. He was never contacted by Cole's counsel. If he had been called to testify, Ernest Cole could have explained to the jury that Wade Cole had suffered from mental disabilities from childhood. Ernest Cole could have told the jurors that mental illness ran in his family. (Interview with Ernest Cole, Appendix 24; Affidavit of Rufus Cole, Appendix 28; Statement of Ernest Cole, Appendix 29)

317. Dr. Margaret Emanuelson testified in the sentencing phase of the first trial. In response to defendant's question "Did you form an opinion satisfactory to yourself as to the condition of his mind at the time of this incident?" Dr. Emanuelson stated: "At the time of--the killing of Theresa Graham? Yes, sir. I think it was exactly what he said, he just lost it. He went completely out of control. He lost all contact with reality. And then he became completely psychotic, that he was not able to control his actions and that he was not really aware of what was going on." (1989 Sentencing Tp. 71) Dr. Emanuelson testified that Wade Cole was schizophrenia paranoid type, indicating "his total lack of control over his emotions and his mental functioning in dealing with reality." (1989 Sentencing Tpp. 33-35) She also diagnosed Mr. Cole as suffering from alcohol dependence or addiction, cannabis dependence, and as being borderline mentally retarded with an average mental age of seven or eight. (1989 Sentencing Tp. 35).

318. Dr. Emanuelson, if called to testify during the guilt phase of Wade Cole's second trial, "could have, consistent with the results of [her] examination, rendered an opinion in lay terms that tended to show that at the time of the murder of Theresa

Graham, defendant had a mental condition which could have been found to negate the capacity to premeditate and deliberate." She would have testified, if asked, "that defendant did not have the capacity to make or carry out plans; defendant was under the influence of a mental or emotional disturbance; and that the defendant lacked the capacity to form the specific intent to kill." (Appendix 30, Affidavit of Dr. Emanuelson ¶ 9)

319. In preparation for the second trial, trial counsel obtained a copy of an Institute of Government publication, "The Diminished Capacity Defense." (Appendix 31) Although trial counsel had obtained this treatise, they did not prepare a defense based on mental condition. (Appendix 32, Affidavit of Lennie Hughes ¶ 10; 1999 Tpp. 153-154)

320. The Institute of Government treatise explains that under the controlling North Carolina Supreme Court case, *State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988), Dr. Emanuelson's testimony would have been admissible to show that defendant lacked the mental capacity to form the state of mind for first-degree murder. Such evidence was directly relevant in determining "the presence or absence of an element of the offense with which [the defendant] was charged." *Id.* at 249, 367 S.E.2d at 643.

321. The treatise also explained that the North Carolina court has recognized that state of mind defenses are not mutually exclusive: "They may coexist in the same case and be considered, jointly and severally, by the jury." *State v. Silvers*, 323 N.C. 646, 658, 374 S.E.2d 858, 866 (1989) The North Carolina court has allowed a combination of voluntary intoxication, insanity, and diminished capacity evidence all in the same case. "The Diminished Capacity Defense" p. 3, citing *State v. Baldwin*, 330 N.C. 446, 412

S.E.2d 31 (1992) (duress, voluntary intoxication, and diminished capacity defenses presented); *State v. Hedgepeth*, 330 N.C. 446, 409 S.E.2d 309 (1991) (voluntary intoxication and diminished capacity); *State v. Silvers*, 323 N.C. at 657-58, 374 S.E.2d at 865-66 (insanity and voluntary intoxication); *State v. Rose*, 323 N.C. 455, 373 S.E.2d 426 (1988) (insanity and diminished capacity).

322. Trial counsel did put on evidence of voluntary intoxication. Through Dr. Brian Grover, the defense sought to introduce testimony concerning the range of defendant's blood alcohol content at the time of the alleged offenses. The trial court ruled that Dr. Grover would not be able to testify about Mr. Cole's blood alcohol content at the time of the alleged offenses because uncertainty about the amount and alcohol content of the wine Mr. Cole had consumed made Dr. Grover's opinion speculative. On appeal the North Carolina Supreme Court affirmed the trial court's ruling: "Dr. Grover testified that he based his estimation of defendant's blood-alcohol level on information received from defendant and standard considerations such as defendant's weight. However, defendant testified that he did not know the quantity of liquor he consumed or the percentage of alcohol in the liquor. There was also uncertainty concerning defendant's actual weight at the time of the homicides. Furthermore, Dr. Grover used the average rate of metabolism in his calculations, rather than defendant's actual rate of metabolism. . . . .Accordingly, we conclude that there was an inadequate basis for Dr. Grover's opinion concerning defendant's blood-alcohol level and that the trial judge properly excluded this testimony." *State v. Cole*, 343 N.C. at 417-18, 471 S.E.2d at 371.

323. The information that Dr. Grover was lacking was all readily available to defense counsel. At the beginning of the first trial, the State, in response to a Brady motion, informed the defense that it had in its possession the alcohol bottle taken from defendant's car.

> Mr. Parish:   Your Honor, additionally if I can just pursuant to the defendant's Brady motion—I would say the sheriff's department also has possession of and we learned this Friday, a bottle of wine .
>
> The Court:   Do you know where it was seized and how they gained possession of it?
>
> Mr. Parish:   I'm not clear of the details—my belief would be that it was seized at time of defendant's arrest.

(1989 Jury Voir Dire Tpp. 85-86). Wade Cole has stated that this was the bottle he was drinking from immediately before the murder. (Appendix 33, Notes of Interview with Wade Cole, paragraph 5).

324. Wade Cole was sent to Central Prison in Raleigh in August 1988, only a few weeks after the incident. He had been transferred there at the suggestion of Samuel Jones, Unit Director of the Albemarle Mental Health Center, who had diagnosed Cole as suicidal. At Central, Cole was treated with antidepressant medications. (Tpp. 2291-99) Cole could not have been given prescription medications without a medical evaluation and physical. Medical records were available to defense counsel from a time very close to the incident that would have contained Cole's weight and height.

325. Thus, defense counsel had been informed that the State had in its possession the bottle it had seized from Cole at the time of the incident. This bottle would have been

evidence of the exact type and proof of alcohol Cole drank the night of the incident. The law enforcement officer who had seized the bottle could have testified to whether it was empty at the time of seizure. In addition, Cole's weight and height, was ascertainable from medical records taken very close to the time of the incident. The medical records would also have aided Dr. Grover in establishing Cole's metabolism. This information, if supplied to Dr. Grover, would have allowed him to testify to Cole's range of alcohol intoxication at the time of the incident. (The wine bottle has not been available to post-conviction counsel. District Attorney Frank Parrish has stated that he cannot locate the bottle. The Camden Sheriff's department does not have any evidence from the Wade Larry Cole trial. Frank Parrish has not offered an explanation of how this crucial evidence was lost. (Appendix 34, Statement of Nicole Becton and Kevin Zolat; Appendix 35, Statement of Chief Deputy Sheriff Tony E. Perry)

### Failing To Adequately Prepare A Dimished Capacity Defense Constittues Ineffective Assistance Of Counsel Under *Strickland v. Washington, Williams v. Taylor, Wiggins v. Smith and Rompilla v. Beard*

326. Under 28 U.S.C. § 2254, Wade Cole's right to federal habeas relief depends on showing that the state court's resolution of his claim of ineffective assistance of counsel under *Strickland v. Washington*, supra, "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1). An "unreasonable application" occurs when a state court "'identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, supra, at 520, 156 L. Ed. 2d 471, 123 S. Ct. 2527

(*quoting Williams v. Taylor*, 529 U.S. 362, 413, 146 L. Ed. 2d 389, 120 S. Ct. 1495 (2000) (opinion of O'Connor, J.)). That is, "the state court's decision must have been [not only] incorrect or erroneous [but] objectively unreasonable." *Wiggins v. Smith*, supra, at 520-521, 156 L. Ed. 2d 471, 123 S. Ct. 2527 (*quoting Williams v. Taylor, supra*, at 409, 146 L. Ed. 2d 389, 120 S. Ct. 1495 (internal quotation marks omitted)

327. The Supreme Court in *Rompilla v. Beard, supra,* explained that when there is a critical question which must be apparent to the defense it is incumbent upon them to explore that avenue. Rompilla at 2005 U.S. LEXIS 18. As in *Rompilla*, there is no question that the trial attorneys in Wade Cole's case were on notice that his only possible defense was diminished capacity. Wade's son and his son's cousin were witnesses to the offense. Wade had also confessed. The investigation that had been done should have alerted trial counsel to the unquestioned fact that Wade was extremely inebriated on the night of the offense and that he suffered from mental disabilities. The Supreme Court stated in *Rompilla*: "With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case in aggravation." *Id.* at 22. Using the same logic, it is difficult to see how Wade Cole's counsel could have failed to see the importance of fully developing a case for diminished capacity.

328. In *Wiggins v. Smith*, *supra*, the United States Supreme Court held that the fact that some investigation had been done does not establish that counsel were effective.

Instead the depth and scope of counsel's investigation must be reviewed for adequacy. 156 L. Ed. 2d at 485. The *Wiggins* Court explained that based on the limited investigation that the defense counsel had done, they should have known that more was required: "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." *Id.* at 487 As in Wiggins, any competent attorney would have realized that it crucial to investigate fully diminished capacity and to utilize such readily available information as the wine bottle and Wade Cole's extensive mental health records. According to the *Wiggins* Court,

> In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.

*Wiggins*, 156 L. Ed. 2d at 488. Without question, under the reasoning of Wiggins, Wade Cole's trial counsel were ineffective for failing to present evidence of diminished capacity.

329. The Fourth Circuit in *Allen v. Lee*, 366 F.3d 319 (4th Cir. 2004), restated the standard for determining prejudice in a capital sentencing: "If a court "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Allen* at 335, quoting *Kotteakos v. United States*, 328 U.S. 750, 765 ((1946). Given that trial counsel failed to present adequate evidence that was readily available of the only defense Wade Cole had available, their ineffective assistance must be found to be prejudicial.

330. Under the standards of *Strickland v. Washington, Wiggins v. Smith, Williams v. Taylor and Rompilla v. Beard,* Wade Cole should be granted a writ of habeas corpus.

### IX. PROSPECTIVE JURORS WHO ADMIT TO HAVING FORMED AN OPINION ABOUT THE DEFENDANT'S GUILT MUST BE EXCUSED FOR CAUSE UNDER THE PROTECTIONS OF THE DUE PROCESS CLAUSE AND THE SIXTH AMENDMENT.

331. A prospective juror who has formed or expressed an opinion as to the guilt or innocence of a party, or is unable to render a fair and impartial verdict for any other cause, should be dismissed for cause in accordance with a defendant's right to a fair trial before an impartial jury, a right secured by the Sixth Amendment and by the Due Process Clause of the Fourteenth Amendment. Prospective juror Leslie Ethridge explicitly stated during jury selection that he had formed and expressed the belief that Mr. Cole had committed the alleged crimes and that Mr. Cole was guilty. Although he subsequently tried to hedge on that view, his initial statements about Mr. Cole's guilt were so clear and specific that he should have been excused for cause. The trial court's denial of Wade Cole's challenge for cause to Mr. Ethridge constituted reversible error.

### State Court Disposition Of This Claim

332. Petitioner raised this claim on direct review. The Supreme Court of North Carolina denied the claim on the merits. *State v. Cole,* 343 N.C. 399, 471 S.E.2d 362 (1996). The State Court's denial of this claim was contrary to or an unreasonable application of decisions by the United States Supreme Court.

### Facts Supporting Petitioner's Claim

333. At the beginning of the voir dire examination of Mr. Ethridge, Mr. Ethridge said that he knew Theresa, Hattie, and Rod Graham and William Bowser (Trial Tp. 1073, 1076-77), and that his uncle was a good friend of both victims. (Trial Tp. 1075) Then, defense counsel, Mr. Hughes, questioned him in more detail about his views about the case. At Trial Tp. 1091, Mr. Ethridge stated without equivocation that he had previously expressed the opinion that Mr. Cole was guilty of the alleged crimes. Then he changed his answer and denied that he had expressed such an opinion. (Trial Tp. 1092) Defense counsel Hughes then probed Mr. Ethridge's views in yet more detail, asking what Mr. Ethridge had heard about the events of June 23, 1988. (Trial Tp. 1092, lines 13-19) Mr. Ethridge answered, "Well, I heard that he murdered Theresa and I guess in the process, her mother, I don't know, I guess she couldn't take it." (Trial Tp. 1092, lines 20-22) Mr. Ethridge then denied that the allegations he had heard would not affect his consideration of the case. (Trial Tp. 1093, lines 2-9) Then Mr. Ethridge stated explicitly that he believed that defendant did commit the alleged crimes: "Well, as far as doing it, yes, he did it." (Trial 1094, lines 11-12). When Mr. Hughes asked Mr. Ethridge whether he could erase that belief from his memory, Mr. Ethridge stated, "No, I don't think anybody can erase the fact that he did it." (Trial Tp. 1094, lines 13-19) Once again, Mr. Ethridge then confirmed that he had formed an opinion that Mr. Cole had committed the alleged crimes on the basis of what Mr. Ethridge had already heard. (Trial Tp. 1094, lines 20-23) However, then under questioning by the trial court -- and after the trial court told Mr. Ethridge about the presumption of innocence and the state's burden of persuasion (Trial Tp. 1095) -- Mr. Ethridge changed his position and said that he had not formed an

opinion about Mr. Cole's guilt or innocence, after all. (Trial Tp. 1095, line 22) Mr. Ethridge then flip-flopped again and again, stating that he had not formed an opinion about Mr. Cole's guilt (Trial Tp. 1096, 19-24), then stating that he believed that Mr. Cole did commit the alleged crimes. (Trial Tp. 1097, lines 6-9), and then stating that he was not certain whether Mr. Cole had committed the alleged crimes. (Trial Tp. 1100, line 3 - Tp. 1101, line 4) Mr. Ethridge said, in conclusory fashion, that his personal knowledge about the case would not prevent him from rendering a fair and impartial verdict. (Trial Tp. 1095, line 23 - Tp. 1096, line 10, Tp. 1097, lines 10-13, Tp. 1097, line 25 - Tp. 1098, line 2, Tp. 1101, line 18 - Tp. 1102, line 17).

334. The trial court denied defendant's motion to excuse Mr. Ethridge for cause because of his statements about Mr. Cole's guilt. (Trial Tp. 1101) The trial court denied the challenge. (Trial Tp. 1102, line 18) Subsequently, defense counsel excused Mr. Ethridge through a peremptory challenge. (Trial Tp. 1108) Defendant subsequently exhausted all of his peremptory challenges and the trial court denied his request for an additional peremptory strike and his motion to reconsider the denial of the motion to strike Mr. Ethridge for cause. (Trial Tp. 1259-69).

335. The trial court's denial of defendant's motion to challenge Mr. Ethridge for cause was erroneous. When he was fresh to the process of jury selection, Mr. Ethridge was refreshingly forthright, acknowledging that he had expressed the view that Mr. Cole was guilty. He supported his view with relatively detailed statements about the facts alleged offenses: he said that Mr. Cole murdered Theresa and that Hattie Graham

"couldn't take it." (Trial Tp. 1092, lines 20-22) He candidly said that he could not erase from his memory his belief that Mr. Cole had committed these alleged offenses. These statements show that Mr. Ethridge had formed and expressed an opinion that Mr. Cole was guilty and, therefore, that Mr. Ethridge should have been excused for cause. Although he subsequently flip-flopped repeatedly, the record shows that he equivocated only when he felt pressured or suspected of bias by one of the attorneys or the trial court. In particular, the trial court's well-intentioned lecture about the presumption of innocence and the burden of persuasion gave Mr. Ethridge the cue that he was expected to deny that he had formed an opinion. Mr. Ethridge's candid and realistic statement that nobody could erase from memory the information he had learned and beliefs he had formed about Mr. Cole's guilt is far more persuasive than his conclusory statements that his knowledge about the case would not prevent him from rendering a fair and impartial verdict. Mr. Ethridge's claim that he could set aside his opinion is utterly incredible in light of his clear statements of his opinion and his admission that he could not erase his opinions from his memory.

336. The constitutional standard of fairness requires that a defendant have "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). The Supreme Court observed in *Murphy v. Florida*, 421 U.S. 794, 800 (1975), "the juror's assurances that his is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" In this case, Mr. Ethridge's own, clear statements that he had expressed an opinion that Mr. Cole was guilty and that he

could not erase his knowledge about the case from his memory raised a compelling presumption of Mr. Ethridge's bias against Mr. Cole

**X.      THE TRIAL COURT'S INSTRUCTION DEFINING THE AGGRAVATING CIRCUMSTANCE THAT THE CAPITAL MURDER WAS PART OF A COURSE OF CONDUCT INCLUDING DEFENDANT'S COMMISSION OF A CRIME OF VIOLENCE AGAINST ANOTHER PERSON WAS UNDULY VAGUE.**

337. During the penalty phase jury instructions, the trial court defined the "violent course of conduct" aggravating circumstance (N.C. Gen. Stat. § 15A-2000(e)(11)) in the skeletal, circular fashion suggested by N.C.P Crim. -- 150.10(11)(1995): "A murder is part of a course of conduct, if you find from the evidence beyond a reasonable doubt that in addition to killing Theresa Graham, the defendant on or about June 23rd, 1988 was engaged in a course of conduct which involved the commission of another crime of violence against another person and that this same other crime was included in the same course of conduct in which the killing of the victim, Theresa Graham, was also a part." (Trial Tpp. 2422-23) The instruction said nothing more than that two acts are part of the same course of conduct if they are part of the same course of conduct. This instruction was so vague that it offered no guidance whatsoever to the jury about the meaning of the circumstance.

### State Court Disposition Of This Claim

338. Petitioner raised this claim on direct review. The Supreme Court of North Carolina denied the claim on the merits. *State v. Cole,* 343 N.C. 399, 471 S.E.2d 362

(1996). The State Court's denial of this claim was contrary to or an unreasonable application of decisions by the United States Supreme Court.

## Facts Supporting Petitioner's Claim

339. In *State v. Williams*, 305 N.C. 656, 684-85, 292 S.E.2d 243, 260, *cert. denied*, 459 U.S. 1056 (1982), the North Carolina court held that the "violent course of conduct" aggravating circumstance is not unduly vague, relying on observations by the Supreme Court of the United States that, like other aggravating circumstances, it has a common sense core of meaning that jurors should be able to understand and apply "'when they are given appropriate instructions by the trial court.'[citation omitted]"(*emphasis added*). In *Williams*, and again in *State v. Cummings*, 332 N.C. 487, 422 S.E.2d 692 (1992), the North Carolina Supreme Court approved jury instructions that defined a course of conduct as "a pattern of intentional acts" showing in the defendant's mind "a plan, scheme, or design involving" the capital murder and a crime(s) of violence against another victim(s). In *Cummings*, the court mentioned other factors in addition to "a plan, scheme, or design" that might support the finding of a course of conduct, such as common modus operandi or motivation..

340. The virtue of the instructions approved in *Williams* and *Cummings* is that they give the jury guidance in understanding the meaning of this aggravating circumstance by identifying specific criteria of a course of conduct. In contrast, the jury instruction given by the trial court in this case tells the jury nothing at all about the meaning of the circumstance. Even when an aggravating circumstance has a common sense core of

meaning, the Eighth and Fourteenth Amendments require trial courts to give jury instructions that provide clear definitions of aggravating circumstances in order to avoid arbitrary and capricious capital sentencing verdicts. *See Jurek v. Texas*, 428 U.S. 262, 279, (1976) (White, J., concurring); *State v. Williams, supra*, 305 N.C. at 684-85, 292 S.E.2d at 260. The vague jury instructions used in this case to define the "violent course of conduct" aggravator are so vague that they violate the Eighth and Fourteenth Amendments.

### XI. LIMITING THE CAUSES OF THE MITIGATING CIRCUMSTANCE OF IMPAIRED CAPACITY TO SPECIFIED CAUSES THAT OMITTED CAUSES SUPPORTED BY UNCONTRADICTED EVIDENCE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS

341. During the penalty phase charge conference, defense counsel requested the submission of the statutory mitigating circumstance that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. N.C. Gen. Stat. § 15A-2000(f)(6). Defense counsel asked the trial court to submit this circumstance on the basis of impairment due to alcohol or drugs or both and on the basis of defendant's delusional paranoid disorder. (Trial Tp. 2364) However, the trial court agreed to submit this circumstance to the jurors only on the basis of impairment due to alcohol and/or drugs. (Trial Tp. 2373) and the trial court limited this circumstance in this way in its instructions to the jurors. (Trial Tpp. 2439-31) The jurors unanimously rejected this circumstance. The evidence, particularly the testimony of Dr. Robert Stanley Brown, Jr., clearly supported submission of this circumstance on the

basis of defendant's mental illness as well as on the basis of alcohol and/or drugs. The trial court committed reversible error by limiting the scope of this mitigating circumstance in its jury instructions. (Trial Tpp. 2422-23).

## State Court Disposition Of This Claim

342. Petitioner raised this claim on direct review. The Supreme Court of North Carolina denied the claim on the merits. *State v. Cole,* 343 N.C. 399, 471 S.E.2d 362 (1996). The State Court's denial of this claim was contrary to or an unreasonable application of decisions by the United States Supreme Court.

## Facts Supporting Petitioner's Claim

343. Dr. Brown and Dr. Brian V. Grover testified about Wade Cole's mental condition at the time of the alleged offenses. Both of them testified about Mr. Cole's substance abuse. In addition, Dr. Brown gave uncontradicted testimony showing that defendant suffers from a delusional paranoid disorder. It is clear that under North Carolina law mental illness, such as defendant's disorder, qualifies as a basis for finding impaired capacity under (f)(6). *State v. Johnson*, 298 N.C. 47, 257 S.E.2d 597 (1979). By omitting mental illness as a possible ground of impaired capacity, the trial court precluded the jury from considering the full scope of this statutory mitigating circumstance. Such preclusion violates the Eighth and Fourteenth Amendments. Eddings v. Oklahoma, 455 U.S. 104, 71 L.Ed.2d 1 (1982); Lockett v. Ohio, 438 U.S. 596, 57 L.Ed.2d 972 (1978).

344. The trial court's error is not harmless beyond a reasonable doubt, even though one or more jurors found that defendant committed the capital murder under the influence of a mental or emotional disturbance, namely delusional paranoia disorder/jealousy type (N.C. Gen. Stat. § 15A-2000(f)(2)). (Rp. 108) First, it is impossible to tell from the record how many jurors found (f)(2), and how many jurors did not find (f)(2) but would have found (f)(6) based on the same evidence of mental illness. Second, each statutory mitigating factor is a discrete factor with its own meaning and effect. *State v. Greene*, 329 N.C. 771, 776, 408 S.E.2d 185, 187 (1991); *State v. Stager*, 329 N.C. 278, 406 S.E.2d 876 (1991). "It would not be inconsistent for one or more jurors, considering the same evidence in support of both circumstances, to find that defendant was mentally or emotionally disturbed but that his capacity to appreciate his conduct's criminality or to conform his conduct to the law was not impaired." *Green*, 329 N.C. at 776, 408 S.E.2d at 187.

345. When deciding the prejudice to a defendant in a capital sentencing, the Fourth Circuit directs that this Court must find that without the violation of Wade Cole's right to have the sentencing jurors instructed in accordance with all of the evidence presented at sentencing, not one juror would have voted for life:

> Accordingly, we recognize that the *Brecht-Kotteakos* standard must be somewhat modified when applied in circumstances like those at issue here -- the sentencing phase of a capital case. In this context, that standard requires a reviewing court to determine whether it can say "with fair assurance" that an error did not "substantially sway" the response of the jury to the question put before it, *i.e.*, should the defendant receive the death penalty. *Kotteakos, 328 U.S. at 765*. Moreover, in this context a reviewing court must undertake the *Brecht* analysis mindful of the Supreme Court's recognition that an appellate court faces certain

difficulties when "determining sentencing questions in the first instance."
*See Clemons v. Mississippi, 494 U.S. 738, 754, 108 L. Ed. 2d 725, 110 S.
Ct. 1441 (1990); accord Caldwell v. Mississippi, 472 U.S. 320, 330, 86 L.
Ed. 2d 231, 105 S. Ct. 2633 (1985)....*

So we proceed, as we must, under the North Carolina statutory scheme,
and in doing so further recognize that a North Carolina court may not
impose death if a single juror votes in favor of life imprisonment. Indeed,
"if the jury cannot, within a reasonable time, unanimously agree to its
sentence recommendation, the judge shall impose a sentence of life
imprisonment . . . ." *N.C. Gen. Stat. § 15A-2000(b).* Accordingly, we must
now assess whether we can say "with fair assurance," *Kotteakos, 328 U.S.
at 765,* that not a single resolute juror would have voted for a life sentence.

*Allen v. Lee*, 366 F.3d 319, 344-45 (2004). This Court cannot find "with fair assurance"

that "not a single resolute juror would have voted for a life sentence," if jurors had been

instructed that they could find this statutory mitigator on the basis of defendant's

delusional paranoid disorder.

346. Failing to instruct the jurors that they could use the uncontradicted evidence of

Wade Cole's psychological delusions when they considered whether he was under the

influence of a mental or emotional disturbance violates due process under the Fifth,

Eighth and Fourteenth Amendments. This Court should grant Petitioner's writ of habeas

corpus.

> **XII.   WADE COLE'S JURY DETERMINED THE MURDER
> WAS "ESPECIALLY HEINOUS, ATROCIOUS, OR
> CRUEL" BASED UPON UNCONSTITUTIONALLY
> VAGUE INSTRUCTIONS WHICH FAILED TO
> DISTINGUISH DEATH-ELIGIBLE MURDERS FROM
> MURDERS WHICH ARE NOT DEATH-ELIGIBLE.**

347. Wade Cole was sentenced to die based in part on a jury finding of the

aggravating circumstance that the murder was "especially heinous, atrocious, or cruel."

The trial court's instruction on this aggravating circumstance did not adequately guide the jury in distinguishing death-eligible from non-death-eligible murders, as is required under United States Supreme Court decisions.

## State Court Disposition Of This Claim

348. Petitioner raised this claim on direct review. The Supreme Court of North Carolina denied the claim on the merits. *State v. Cole,* 343 N.C. 399, 471 S.E.2d 362 (1996). The State Court's denial of this claim was contrary to or an unreasonable application of decisions by the United States Supreme Court.

## Facts Supporting Petitioner's Claim

349. The trial court, adhering to North Carolina practice, instructed on the "especially heinous, atrocious or cruel" aggravating circumstance using the Pattern Jury Instruction uniformly used in capital sentencing hearings in North Carolina, N.C.P.I. Crim. 150.10, as follows.

> In the context of this aggravating circumstance, heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and violent, and cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others. However, I instruct you that it is not enough that the murder be heinous, atrocious or cruel as those terms have just been defined. This murder must have been especially heinous, atrocious or cruel, and not every murder is especially so.

> For this murder to have been especially heinous, atrocious or cruel, any brutality which was involved in it must have exceeded that which is normally present in any killing or this murder must have been a conscienceless or pitiless crime which was unnecessarily tortuous to the victim.

(Trial Tpp. 2137-38)

350. It is well-settled that "the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." *Maynard v. Cartwright*, supra, 486 U.S. at 362, 100 L.Ed.2d at 380. Stated more concretely, the Eighth Amendment mandates that "[a] capital sentencing scheme must . . . provide a 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.'" *Godfrey*, 446 U.S. at 428 (*quoting Furman v. Georgia*, 408 U.S. 238, 313, 33 L.Ed.2d 346 (1972); (White, J., concurring)); *accord Lewis v. Jeffers*, 497 U.S. 764, 775, 111 L.Ed.2d 606 (1990)

351. A state may rely on the presence of certain aggravating circumstances to accomplish this "constitutionally necessary narrowing function." *Pulley v. Harris*, 465 U.S. 37, 50, 79 L.Ed.2d 29 (1984). To achieve this purpose, however, such circumstances must "genuinely narrow the class of persons eligible for the death penalty and . . . reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877, 77 L.Ed.2d 235 (1983). Given the constitutionally required narrowing function of aggravating circumstances, and in order to ensure that they in fact minimize the risk of arbitrary and capricious imposition of capital punishment, an aggravating circumstance must furnish the sentencer with "clear and objective standards" that provide "specific and detailed guidance." *Jeffers*, 497 U.S. at 774, 111 L.Ed.2d at 618-19; *see Gregg v. Georgia*, 428 U.S. 153, 198, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida*, 428 U.S. 242,

253, 49 L.Ed.2d 913 (1976). This requirement must be particularly carefully honored when a jury is the sentencer:

> When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face. That is the import of our holdings in Maynard and Godfrey.

*Walton v. Arizona*, 497 U.S. 639, 653, 111 L.Ed.2d 511 (1990).

352. North Carolina's "especially heinous, atrocious, or cruel" aggravating circumstance fails to provide such guidance to the sentencing jury. The statutory provision for aggravating circumstance in this case simply states as follows: "The capital felony was especially heinous, atrocious, or cruel." N.C. Gen. Stat. § 15A-2000(e)(9). "[T]here is no serious argument that ... [these words are] not facially vague." *Walton*, 497 U.S. at 654, 111 L.Ed.2d at 529.

353. The question becomes, therefore, whether the trial court's instruction gives constitutionally sufficient definition and clarity to the phrase "especially heinous, atrocious or cruel." If not, defendant's death sentence is unconstitutional.

354. The initial portion of the instruction is infirm under *Shell v. Mississippi*, where this Court found unconstitutional a similar attempt to give meaning to "especially heinous, atrocious, or cruel." The instruction in *Shell* read, in pertinent part:

> Heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with indifference to, or even enjoyment of the suffering of others.

*Shell*, 498 U.S. at 2, 112 L.Ed.2d 1.

355. There are only two differences between the instruction given at defendant's sentencing hearing and the one invalidated by this Court in *Shell*. First, the trial court here instructed the jury that, in order to be especially heinous, atrocious, or cruel, the "brutality" involved must have exceeded that which is normally involved in a killing. Second, the trial court instructed that the murder must have been "conscienceless or pitiless." These additions are not sufficient to narrow the circumstances under which a jury could find this aggravating circumstance to exist.

356. There are several problems with instructing the jury that an especially heinous, atrocious, or cruel murder is one that involves more brutality than that normally involved in any killing. First, the instruction does not define the term "brutality." The term "brutality," standing alone, does nothing to guide the jury's sentencing discretion. On the contrary, it is often used interchangeably with terms such as "atrocious" or "cruel." See Webster's New International Dictionary (Second Edition); (defining "atrocious" as "[s]avagely brutal; outrageously cruel or wicked"); American Heritage Dictionary (Second College Edition); (defining "brutal" as "characteristic of a brute; cruel; harsh; crude"); Roget's Thesaurus (1991 Edition); (using "inhuman" as the lead synonym for "brutal"). The jury in this case doubtless viewed "brutal" as yet another broadly pejorative term, such as "heinous", which this Court has found to be constitutionally inadequate.

357. Nor does use of the clause "exceeded that which is normally present in any killing" to modify "brutality" provide adequate limitation. Jurors are provided no uniform frame of reference to compare this with other murders, no way to know what level of brutality is "normally present" in first degree murders. Cf., *Arave v. Creech, supra* (sentencing judge, unlike jury, presumed to know and apply any existing narrowing construction). "A person of ordinary sensibility could fairly characterize almost every murder as" brutal. *Godfrey v. Georgia, supra*, 446 U.S. at 429, 64 L.Ed.2d 398. "Excessive" brutality is no more valid as a limiting instruction than is "especially" heinous.

358. Moreover, the instruction on its face does not limit the comparison to other murders, but to other "killing[s]", which could be understood by lay jurors to encompass even unintentional homicides, thus absurdly broadening the scope of qualifying "brutality." The Eighth Amendment requires an aggravating circumstance to "genuinely narrow the class of persons eligible for the death penalty." *Zant v. Stephens, supra*, 462 U.S. 862, 877, 77 L.Ed.2d 235. If a limiting instruction on heinous, atrocious, and cruel permits a jury to compare acts in different cases, it must, at a minimum, allow this assessment to include only first degree murders and not all killings. Otherwise, the aggravating circumstance fails in its constitutional narrowing role.

359. The second distinction between the instruction given here and the one invalidated in *Shell* is the addition of the language that "the murder must have been a conscienceless or pitiless crime which was unnecessarily tortuous to the victim." This

language, however, is such that, in the words of *Godfrey*, it could be seen by a "person of ordinary sensibility (to) fairly characterize almost every murder." Therefore, it does not sufficiently guide the jury, and is unconstitutionally vague. Just as a juror may believe that any first degree murder is "heinous," he or she may well believe that anyone capable of first degree murderer is without conscience or pity. Accordingly, this phrase does nothing to limit the "especially heinous, atrocious or cruel" aggravating circumstance.

360. Finally, the instruction used in defendant's sentencing hearing contains several disjunctives. That is, the jury was to consider whether the killing was heinous, atrocious or cruel; whether it was wicked or shockingly evil; whether it showed indifference to or enjoyment of suffering  whether it was conscienceless or pitiless. If any of these terms are unconstitutionally vague, the aggravating circumstance itself does not pass constitutional muster. The constitutionally adequate definition of one term does not save the aggravating circumstance as a whole. *See Griffin v. United States*, 502 U.S. 46, 116 L.Ed.2d 371 (1991); (general verdict may not be sustained where jury given option of relying upon a legally inadequate theory); *see also, Shell v. Mississippi, supra* ("It has long been settled that when a case is submitted to the jury on alternative theories the unconstitutionality of any of the theories requires that the conviction [or verdict] be set aside."). *Accord, Leary v. United States*, 395 U.S. 6, 23 L.Ed.2d 57 (1969). *See also, Boyde v. California*, 494 U.S. 370, 108 L.Ed.2d 316 (1990) (acknowledging application of this principle in context of capital sentencing by a jury).

361. In sum, the instructions given defendant's jury failed to limit the unconstitutionally vague aggravating circumstance in violation of the Eighth Amendment. The instructions purporting to explain this circumstance were constitutionally deficient under *Godfrey, Cartwright*, and *Shell*. This Court should grant Wade Cole's petition for habeas corpus in light of *Godfrey v. Georgia*, 446 U.S. 420, 64 L.Ed.2d 398 (1980), *Maynard v. Cartwright*, 486 U.S. 356, 100 L.Ed.2d 372 (1988), and *Shell v. Mississippi*, 498 U.S. 1, 112 L.Ed.2d 1 (1990).

### XIII. THE TRIAL COURT'S CAPITAL SENTENCING JURY INSTRUCTIONS, WHICH DEFINED DEFENDANT'S BURDEN OF PERSUASION TO PROVE MITIGATING CIRCUMSTANCES AS EVIDENCE THAT "SATISFIES" EACH JUROR VIOLATED DUE PROCESS AND THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE THAT DEFINITION DID NOT ADEQUATELY GUIDE THE JURY'S DISCRETION ABOUT THE REQUISITE DEGREE OF PROOF.

362. The trial court's use of the vague words "satisfy you" to explain the burden of proof on mitigation violated due process and the Eighth and Fourteenth Amendment requirements of guided discretion for capital sentencing juries.

### State Court Disposition Of This Claim

363. Petitioner raised this claim on direct review. The Supreme Court of North Carolina denied the claim on the merits. *State v. Cole,* 343 N.C. 399, 471 S.E.2d 362 (1996). The State Court's denial of this claim was contrary to or an unreasonable application of decisions by the United States Supreme Court.

### Facts Supporting Petitioner's Claim

364. The Supreme Court has explained, there are two constitutionally relevant functions of a capital sentencing decision: (1) the narrowing of the class of defendants convicted of first-degree murder to identify the subset of defendants who are eligible for the death penalty; and (2) the selection, from that class, of defendants for whom death is the appropriate punishment. *Tuilaepa v. California*, 129 L.Ed.2d 750 (1994). The issue here involves the second function: the selection, from the class of death-eligible defendants, of those defendants for whom capital punishment is appropriate.

365. North Carolina has established a three-step procedure for the selection function. In North Carolina, once the narrowing function is performed by the sentencing jury's finding of whether one or more aggravating circumstances exist, the jury then begins the selection function by making findings about the existence of mitigating circumstances. For this step, North Carolina law imposes on a defendant the burden of persuasion to prove the existence of mitigating circumstances. Then the jury makes a finding about the relative weight of aggravating and mitigating circumstances. Finally, the jury makes a finding about whether the aggravating circumstances are sufficiently substantial, in light of mitigating circumstances found, to call for the death penalty.

366. The trial court instructed the capital sentencing jury as follows concerning defendant's burden of persuasion on mitigating circumstances:

> I instruct you that the defendant has the burden of persuading you that a given mitigating circumstance exist[s.] The existence of any mitigating circumstance must be established by a preponderance of the evidence. That is, the evidence taken as a whole must satisfy you not beyond a reasonable doubt, but simply satisfy you that any mitigating circumstance exists. If the evidence satisfies any one of you that a mitigating

circumstance exists, you would indicate that finding on the issues and recommendation form.

(Trial Tp. 2425; Rp. 80)  Defendant did not object to this instruction.

367.  The court's use of the vague words "satisfy you" to explain the burden of proof on mitigation violated due process and the Eighth and Fourteenth Amendment requirements of guided discretion for capital sentencing juries.  "When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process."  *Walton v. Arizona,* 497 U.S. 639, 653, 111 L.Ed.2d 511, 528 (1990).  The propriety of such jury instructions depends on whether the instructions adequately guide the jurors' discretion.  That is, jury instructions must provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not."  *Furman v. Georgia,* 408 U.S. 238, 313, 33 L.Ed.2d 346, 392 (1972) (White, J., concurring).  Jury instructions that do not provide adequate guidance violate due process and the Eighth and Fourteenth Amendments because, as this Court explained in Furman, they create a genuine risk that the death penalty will be imposed arbitrarily and capriciously.  As the Court emphasized in *Gregg v. Georgia,* 428 U.S. 153, 49 L.Ed.2d 859 (1976).

> [W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."

*Id.* at 189, 49 L.Ed.2d at 883 (opinion of Stewart, Powell, and Stevens, JJ.); *accord Maynard v. Cartwright,* 486 U.S. 356, 362, 100 L.Ed.2d 372, 380 (1988); *Godfrey v. Georgia,* 446 U.S. 420, 427, 64 L.Ed.2d 406 (1980).

368. The problem here is that the jury instructions used in this case (and the pattern jury instructions regularly used in North Carolina capital cases) define "preponderance of the evidence" as evidence that "satisfies" each juror that a given mitigating circumstance exists. It is the use of the highly subjective term "satisfaction" to define the legal term "preponderance of the evidence" that made the burden of proof unconstitutionally vague, that made it a standardless standard in this case.

369. North Carolina's three-step selection procedure, which requires jury findings at each step, is not itself required by the Eighth and Fourteenth Amendments. *See Gregg. v. Georgia, supra.* However, due process and the Eighth Amendment require that once a state law requires sentencing juries to make findings about mitigation and about the weight of aggravation and mitigation, state law must provide adequate clear guidance to juries about how to make those findings. *Tuilaepa v. California, supra; Penry v. Lynaugh,* 492 U.S. 302, 106 L.Ed.2d 256 (1989); *Profitt v. Florida,* 428 U.S. 242, 49 L.Ed.2d 913 (1976). As the U.S. Supreme Court explained in *Tuilaepa,* "[w]e have held, under certain sentencing schemes, that a vague propositional factor used in the sentencing decision creates an unacceptable risk of randomness, the mark of the arbitrary and capricious sentencing process prohibited by *Furman v. Georgia (citation omitted)*." 129 L.Ed.2d at 761.

370. The term "satisfy" is a standardless standard. It does not define the amount of evidence needed to prove mitigation and it increases the possibility that a juror may wrongly reject a mitigating circumstance because the juror harbors hostility toward

mitigation generally or toward a particular category of mitigation, without regard to the sufficiency of the evidence of mitigation. This problem is particularly serious for statutory mitigating circumstances. Although North Carolina law deems such circumstances to have mitigating value as a matter of law, no instruction informed the jurors of that rule in this case. The silence of the instructions on that issue, combined with the use of the term "satisfy," could easily have led one or more jurors to reject statutory mitigating factors here because of subjective and arbitrary hostility toward such factors rather than for lack of evidentiary proof.

371. Each juror in this case was permitted to determine the burden of proof he or she would apply to the mitigating evidence, subject only to the restriction that the standard would be lower than proof beyond a reasonable doubt. Although the weight of mitigation is a matter for individual jurors to determine, *Eddings v. Oklahoma*, 455 U.S. 104, 114, 71 L.Ed.2d 1, 11 (1982), the evidentiary standard jurors are to apply to the question of whether mitigation exists is a matter of law concerning which the court must instruct. The court violated the Petitioner's right to have a clear, objective standard applied

372. In summary, the use of the term "satisfy" to define the burden of persuasion for mitigating circumstances turned the jury's determination of mitigation into a wholly subjective process. The use of this vague, standardless standard violated due process and the Eight and Fourteenth Amendments.

### XIV. ALLOWING THE JURY TO REFUSE TO GIVE EFFECT TO MITIGATING EVIDENCE IF THE JURY DEEMED THE EVIDENCE NOT TO HAVE MITIGATING VALUE VIOLATED DUE PROCESS AND THE EIGHTH AND FOURTEENTH AMENDMENTS

373. The trial court instructed the sentencing jury that each juror could ignore nonstatutory mitigating evidence that was factually established if the juror deemed the evidence not to have mitigating value. The court applied this instruction to the seven enumerated nonstatutory mitigating circumstances submitted to the jury. (Trial Tpp. 2431-36) All of those seven circumstances were factually supported by substantial evidence. Petitioner did not object to this instruction. This instruction was plain error that violated the Eighth and Fourteenth Amendments to the United States Constitution by permitting jurors to ignore mitigating evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 71 L.Ed.2d 1 (1982); *Penry v. Lynaugh*, 492 U.S. 302, 319, 106 L.Ed.2d 256, 278 (1992). The instruction also violated the Eighth and Fourteenth Amendments by denying defendant the constitutionally required, individual consideration of his background and character and of the crime. *Lockett v. Ohio*, 438 U.S. 586, 605, 57 L.Ed.2d 973 (1978)..

### State Court Disposition Of This Claim

374. Petitioner raised this claim on direct review. The Supreme Court of North Carolina denied the claim on the merits. *State v. Cole,* 343 N.C. 399, 471 S.E.2d 362 (1996). The State Court's denial of this claim was contrary to or an unreasonable application of decisions by the United States Supreme Court.

### Facts Supporting Petitioner's Claim

375. The trial court submitted eight nonstatutory mitigating circumstances to the sentencing jury. Seven of these factors were individually enumerated; the eighth factor was the "catch-all" factor provided by N.C. Gen. Stat. § 15A-2000(f)(9). These factors have mitigating value and are well-recognized in various judicial decisions and statutory compilations (e.g., defendant's for good character, defendant's pretrial acknowledgment of wrongdoing, defendant's remorse). Indeed, the trial court's decision to submit them to the jury indicates that they have mitigating value. Because of their inherent mitigating content, the sentencer is not free to reject them, if factually proved, merely because the sentencer deemed them not to be mitigating as a matter of law.

376. The Supreme Court stated in *Eddings*,

> Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence . . . . The sentencer . . . may determine the weight to be given relevant mitigating evidence. But [it] may not give it no weight by excluding such evidence from [its] consideration.

*Eddings*, 455 U.S. at 113-14, 71 L.Ed.2d 10-11. In *Eddings*, the judge, who was the sentencer, announced he was not going to consider the youthful capital defendant's "troubled childhood" in deciding the appropriate sentence. He then imposed a sentence of death. The trial judge's decision, as the sentencer in a capital case, violated existing constitutional doctrine. *Id.*

377. In much the same fashion, the challenged jury instructions in this case permitted the jury to reject inherently mitigating evidence because the jury deemed the

evidence not to be mitigating. These instructions led to the very result rejected in *Eddings*.

378. The sentencer in a capital case must be permitted to consider any relevant mitigating factor. *See Lockett v. Ohio, supra*. *Eddings* extended this principle to preclude a sentencer from refusing to consider relevant mitigating evidence on the grounds that it did not deem the evidence to have mitigating value. "*Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must be able to consider and give an effect to that evidence in imposing sentence." *Penry*, 492 U.S. at 319, 106 L.Ed.2d at 278 (*emphasis added*); cf. *Hitchcock v. Dugger*, 481 U.S. 393, 95 L.Ed.2d 347 (1987). Only if the sentencer is allowed to consider this evidence and give it some effect can this Court confidently be assured that defendant was treated as a unique human being in light of his individualized circumstances as required by the Eighth Amendment. *Penry*, 492 U.S. at 319, 106 L.Ed.2d at 278-79. In North Carolina, the jury, as the capital sentencer, can only consider and give effect to mitigating evidence if it has been found as a mitigating circumstance. Permitting the sentencer not to find relevant mitigating evidence as a mitigating circumstance solely on the basis that the jury does not unanimously find that it has mitigating value violates *Eddings*. "The Constitution requires states to allow consideration of mitigating evidence in capital cases. Any barrier to such consideration must therefore fall." *McKoy v. North Carolina*, 494 U.S. 433, 442, 108 L.Ed.2d 369, 380 (1990). Consideration of such evidence can take place only in the two-step weighing process of Issues Three and Four in the North Carolina scheme. "It is no answer, of

course, that the jury is permitted to 'consider' mitigating evidence when it decides collectively, under Issue Two, whether any mitigating circumstances exist." Id

379. The trial court made a preliminary determination that, as a matter of law, the submitted nonstatutory mitigating circumstances had some mitigating value. Otherwise, it would not have submitted them to the jury. The jury, as the sentencer should not then have been free to reject them simply because it deemed the circumstances of no mitigating value. While the jury in North Carolina remains free to give whatever weight it deems appropriate to any mitigating factor it finds, it cannot constitutionally remain free to reject the circumstances and remove them from the consideration of each individual juror. Otherwise, the penalty imposed does not "reflect a reasoned moral response to defendant's character, background, and crime." *See California v. Brown*, 479 U.S. 538, 545, 93 L.Ed.2d 934, 942 (1987) (O'Connor, J., *concurring*) (*emphasis in original*).

380. The Ninth Circuit has addressed this issue. *Smith v. McCormick*, 914 F.2d 1153, 1163-69 (9th Cir. 1990). In *Smith*, the sentencer refused to consider evidence of good character and desire for rehabilitation. These factors were rejected, not for an absence of evidential support, but for their lack of mitigating character since they "did not excuse defendant's conduct." *Id.* at 1164. The constitutional defect in this process involved the failure to give consideration to relevant "mitigating evidence simply because it fell below a certain weight." *Id.* at 1165. The sentencer simply cannot, consistent with the Eighth Amendment, "exclud[e] from consideration any relevant mitigating evidence."

Id. at 1169. *See also Jeffers v. Lewis*, 974 F.2d 1075, 1078-79 (9th Cir. 1992) (constitutional error for sentencing court to fail to consider and weigh nonstatutory mitigating evidence of impairment that fell below the level of impairment to satisfy statutory mitigating factor).

381. The state cannot show that the trial court's error was harmless beyond a reasonable doubt. Even as to nonstatutory factors for which the jury answered "yes," there is no way to determine how many jurors found these factors and how many rejected them only because they decided the factors did not have mitigating value. Petitioner need only show a constitutionally correct jury instruction could have swayed one juror in Wade Cole's favor: "So we proceed, as we must, under the North Carolina statutory scheme, and in doing so further recognize that a North Carolina court may not impose death if a single juror votes in favor of life imprisonment. . . . . Accordingly, we must now assess whether we can say "with fair assurance," *Kotteakos, 328 U.S. at 765*, that not a single resolute juror would have voted for a life sentence." *Allen v. Lee*, 366 F.3d 319, 335 (4th Cir. 2004).

## XV. BY MAKING OPTIONAL THE JURORS' CONSIDERATION OF MITIGATION THEY HAD PREVIOUSLY FOUND, THE TRIAL COURT VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS

382. In *Penry v. Lynaugh*, 492 U.S. 302, 106 L.Ed.2d 256 (1989), and *Eddings v. Oklahoma*, 455 U.S. 104, 71 L.Ed.2d 1 (1982), this Court stated that the sentences in a capital case "may not refuse to consider, any relevant mitigating evidence offered by the defendant as the basis for a sentence less than death." *Penry v. Lynaugh, supra*, 492 U.S.

at 318, 106 L.Ed.2d at 277 (emphasis added) *Eddings v. Oklahoma, supra*, 455 U.S. at 114, 71 L.Ed.2d at 11 (plurality opinion) (capital sentencer may not refuse to consider, as a matter of law, any relevant mitigating evidence).   In North Carolina, constitutional consideration occurs during the two-step weighing process. In this case, the trial court's instructions on the jury's consideration of mitigating circumstances provided that each juror "may" consider mitigating circumstances that the juror had previously found to exist.   By making optional the jurors' consideration of mitigation they had previously found, the trial court violated the Eighth and Fourteenth Amendments as explained in *Penry* and *Eddings*.   That is, the trial court's instructions allowed the jurors to refuse to consider and give effect in the weighing process to mitigating circumstances they had found.

## State Court Disposition Of This Claim

383.  Petitioner raised this claim on direct review. The Supreme Court of North Carolina denied the claim on the merits. *State v. Cole,* 343 N.C. 399, 471 S.E.2d 362 (1996). The State Court's denial of this claim was contrary to or an unreasonable application of decisions by the United States Supreme Court.

## Facts Supporting Petitioner's Claim

384.  This issue arose in the sentencing phase jury instructions on both steps in the two-step weighing process:  Issues Three and Four.  In pertinent part, the jury instructions on Issue Three were:

> Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is or are insufficient to outweigh the aggravating circumstance or circumstances found? If you find from the evidence one or more mitigating circumstances, you <u>must</u> weigh the aggravating circumstances against the mitigating circumstances. When deciding this issue, that is issue number three, each juror <u>may</u> consider any mitigating circumstance or circumstances that the juror determined to exist by a preponderance of the evidence in issue number two.

(Trial Tpp. 2438; Rp. 93) (*emphasis added*).

385. In pertinent part, the jury instructions on Issue Four were:

> Do you unanimously find beyond a reasonable doubt that the aggravating circumstance or circumstances you found is or are sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by one or more of you? In deciding this issue, you are not to consider the aggravating circumstances alone. You <u>must</u> consider them in connection with any mitigating circumstances found by one or more of you. When making this comparison, each individual juror <u>may</u> consider any mitigating circumstance or circumstances that that juror determined to exist by a preponderance of the evidence.

(Trial Tpp. 2439-40; Rpp. 94-95) (*emphasis added*).

386. There is a reasonable likelihood that a rational juror would interpret "may" in the ordinary sense of giving the juror an option to ignore mitigating factors to which a juror is hostile in the weighing process. Thus, at a minimum, there is a reasonable likelihood that the jurors would have interpreted the term "may" in a way that would violate the Eighth and Fourteenth Amendments' requirements to give effect to mitigating evidence. *Boyde v. California*, 494 U.S. 370, 108 L.Ed.2d 316 (1990)

**XVI. THE TRIAL COURT'S IMPOSITION OF JUDGMENTS AND IMPOSITION OF A DEATH SENTENCE FOR FIRST-DEGREE MURDER VIOLATED DEFENDANT'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND**

## FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

387.  The indictment in this case concerning Theresa Graham was insufficient to charge the offense of first-degree murder because the indictment failed to allege all the essential elements of first-degree murder.  Additionally, this indictment was insufficient to charge the offense of capital first-degree murder, punishable by life in prison, to a capital murder, punishable by death.  These deficiencies in the indictment left the trial court without jurisdiction to adjudicate the applicant guilty of first-degree murder and, additionally, without jurisdiction to impose a death sentence*ded*) The county has only one public high school. This school has a little over 300 students. *Id.*

### State Court Disposition Of This Claim

388.  Petitioner presented the claim in his Motion for Appropriate Relief filed in the Superior Court of Camden County, North Carolina, on 2 December 1997. In an opinion dated 31 August 2001, the Superior Court of Camden County denied Petitioner's Motion for Appropriate Relief. On 31 October 2001, Petitioner raised this claim in a timely filed Petition for Writ of Certiorari to the Supreme Court of North Carolina. The Petition was denied on 28 February 2002. The State Court's denial of this claim was contrary to or an unreasonable application of decisions by the United States Supreme Court.

### Facts Supporting Petitioner's Claim

389.  Petitioner was purportedly indicted for first-degree murder on June 27, 1988 for the death of Theresa Graham.   The indictment alleges that Wade Larry Cole "unlawfully, willfully and feloniously and of malice aforethought did kill and murder

Theresa Graham." (Attachment 36) this bill of indictment complies with N.C. Gen. Stat. § 15-144 which purports to establish a "short form" indictment for first-degree murder.

390. In as series of cases, the United States Supreme Court has found that enumerated aggravating factors operate as the functional equivalent of an element of a greater offense. As such, refusing to specifically notify a defendant of the aggravating factors that the State intends to use to enhance the sentence—in the indictment, in discovery or at the start of trial—is a clear violation of Defendant's constitutional rights to notice of the charge against him, due process, effective assistance of counsel and freedom from cruel or unusual punishment

391. The United States Supreme Court has issued a series of opinions concerning whether factors which the prosecution intends to use to enhance a sentence are elements of the crime. *Ring v. Arizona*, 122 S.Ct. 2428 (2002); *Harris v. United States*, 122 S.Ct. 2406 (2002), *Jones v. United States*, 526 U.S. 227 (1999) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000) While the actual holding in *Ring* is that a defendant is entitled to a jury trial as to factors which establish death eligibility, the explicit basis for that holding is that Arizona's aggravating factors in its death penalty scheme were elements of the capital eligible offense. The Supreme Court explained in both *Ring* and *Harris* that facts which increase the maximum penalty faced by the defendant create a new, "greater offense." In *Harris*, 122 S.Ct. at 2414-19, the Court noted repeatedly that any fact which increases the maximum possible penalty above that authorized by the findings implicit in the jury's verdict of guilt has historically been, and is still, an element of the offense. *See*

*id.* at 2419 ("Read together, *McMillan v. Pennsylvania*, 477 U.S. 79 (1986) and *Apprendi* mean that those facts setting the outer limits of a sentence and of the judicial power to impose it are elements of the crime for constitutional analysis") *Harris*, 122 S.Ct. at 2418 (*quoting Apprendi*, 530 U.S. at 483, no. 10) ("The judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury. Put simply, facts that expose a defendant to a punishment greater than that otherwise legally prescribed were by definition 'elements' of a separate legal offense"'): *Harris*, 112 S.Ct. at 2416 (the principle "by which history determined what facts were elements . . defined elements as 'fact[s] legally essential to the punishment to be inflicted"') (*quoting United States v. Reese*, 92 U.S. 214, 232 (1876) (Clifford, J., dissenting)). It is simply impossible to argue after *Ring* and *Harris* that the facts underlying the State's aggravating factors are not elements of the offense, since, without question, they "are facts that expose [this] defendant to a punishment greater than that otherwise legally prescribed. . .," i.e., the death penalty.

392. Additionally the Trial Court's failure to dismiss the indictment rendered its subsequent imposition of the death sentence void because the Trial Court lacked jurisdiction. This lack of jurisdiction arose from an indictment that failed to allege the elements of first-degree murder, failed to allege the basis for the defendant's death eligibility and failed to allege the aggravating circumstances.

393. The use of the short form indictment in the instant case was clearly prejudicial to defendant and in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

**XVII. THE TRIAL COURT ERRED BY SENTENCING DEFENDANT TO DEATH BECAUSE THE DEATH PENALTY IS INHERENTLY CRUEL AND UNUSUAL THE NORTH CAROLINA CAPITAL SENTENCING SCHEME IS UNCONSTITUTIONALLY VAGUE AND OVERBROAD; AND THE DEATH SENTENCE IN THIS CASE WAS NOT SUPPORTED BY THE EVIDENCE, WAS DISPROPORTIONATE, AND WAS IMPOSED UNDER THE ARBITRARY INFLUENCE OF PASSION, PREJUDICE, AND OTHER ARBITRARY FACTORS**

394. Petitioner contends that the death penalty is inherently cruel and unusual and the North Carolina capital sentencing scheme, N.C. Gen. Stat. § 15A-2000, is vague and overbroad. The statute also permits juries to make excessively subjective sentencing determinations. The statute is applied arbitrarily and pursuant to a pattern of discrimination on the basis of race and sex of defendants and victims and on the basis of defendants' poverty. In addition, the death penalty is disproportionate in this case.

**State Court Disposition Of This Claim**

395. Petitioner raised this claim on direct review. The Supreme Court of North Carolina denied the claim on the merits. *State v. Cole,* 343 N.C. 399, 471 S.E.2d 362 (1996). The State Court's denial of this claim was contrary to or an unreasonable application of decisions by the United States Supreme Court.

**PRAYER FOR RELIEF**

WHEREFORE, the Petitioner respectfully prays that the Court:

Wherefore, Petitioner asks this Court to:

1.    Grant him an evidentiary hearing on all issues where a hearing is indicated, to allow him a full and fair opportunity to present the facts which support his claims;

2.    Issue a writ of habeas corpus to have Petitioner brought before the Court to the end that he may be discharged from his unconstitutional confinement and restraint;

3.    Issue a writ of habeas corpus to have Petitioner brought before the Court to the end that he may be relieved of his unconstitutional sentence of death; and

4.    Grant such other relief as may be appropriate and to dispose of the matter as law and justice require.

Respectfully submitted this the 5th day of July 2005.

William F. W. Massengale
NC State Bar #: 12191
211 North Columbia Street
Chapel Hill, NC 27514
(919) 967-8555
redwood@nc.rr.com
Bar. No. 12191

Marilyn G. Ozer
NC State Bar # 18360
211 North Columbia Street
Chapel Hill, N.C. 27514
(919) 967-8555
redwood@nc.rr.com
Bar. No. 18360

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this Petition for Writ of Habeas Corpus has been duly served upon Special Deputy Attorney General A. Danielle Marquis, attorney for the State, by first class mail to:

> A. Danielle Marquis
> Special Deputy Attorney General
> PO Box 629
> Raleigh, North Carolina 27602-0629

This the 5th day of July, 2005.

Marilyn G. Ozer

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

NORTHERN DIVISION

No. _____

| WADE LARRY COLE, | |
|---|---|
| Petitioner, | |
| v. | DECLARATIONS |
| MARVIN POLK, Warden, Central Prison Raleigh, North Carolina | |
| Respondent. | |

I, Marilyn G. Ozer, counsel for the Petitioner, declare under penalty of perjury that the foregoing petition for Writ of Habeas Corpus is true and correct to the best of my knowledge.

Executed this the _5th_ day of July, 2005.

_____
Marilyn G. Ozer

Sworn to and subscribed before me,

_Wm. Massengill_,

a notary public, on this the _5th_

of July, 2005.

My commission expires: _11/09/05_

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

NORTHERN DIVISION

No. _____

WADE LARRY COLE,

    Petitioner,

    v.

MARVIN POLK, Warden,
Central Prison
Raleigh, North Carolina

    Respondent.

DECLARATIONS

I, Marilyn G. Ozer, counsel for the Petitioner, declare under penalty of perjury that the foregoing petition for Writ of Habeas Corpus is true and correct to the best of my knowledge.

Executed this the _5th_ day of July, 2005.

_William F. W. Massengale_
William F. W. Massengale

Sworn to and subscribed before me,

_____
a notary public, on this the _____
of July, 2005.

My commission expires: _02-05-2007_

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

NORTHERN DIVISION

NO. _____

| | |
|---|---|
| WADE LARRY COLE, | |
| Petitioner, | |
| v. | PETITION FOR WRIT OF |
| MARVIN POLK, Warden, Central Prison Raleigh, North Carolina | HABEAS CORPUS |
| Respondent. | |

# **APPENDIX**

# INDEX TO APPENDIX

| Appendix Number | Document Title |
|---|---|
| 1 | Dorothea Dix Discharge Summary, November 11, 1988 |
| 2 | Dorothea Dix Discharge Summary, May 22, 1989 |
| 3 | Dorothea Dix Psychological Report done by Dorothy Humprhey Affidavit of Dorothy Humphrey |
| 4 | Initial Psychological Report of Central Prison |
| 5 | School Records |
| 6 | Affidavit of Dr. Robert Brown |
| 7 | Verdict Sheet, 1989 Trial, Involuntary Manslaughter |
| 8 | Defendant's Brief pp. 44-51 |
| 9 | Defendant's Brief pp. 53-57 |
| 10 | Affidavit of James R. Glover |
| 11 | Affidavit of Benjamin Dowling Sendor |
| 12 | Camden County Population Statistics |
| 13 | Pretrial Motion For Change Of Venue, July 1992 |
| 14 | Order On Change Of Venue, Judge Sumner |
| 15 | List of Grand Jury Foremen April 1972 to February 1989 |
| 16 | Affidavit Ann D. Spivey |
| 17 | Motion for a Mental Health Expert, May 12, 1997 |
| 18 | Motion for Funds for Neuropsychologist, August 27, 1997 |
| 19 | Renewed Motion for Neuropsychologist, November 15, 1999 |
| 20 | Affidavit of Dr. Claudia Coleman |
| 21 | Issues And Recommendations |
| 22 | Motion To Extend Recommitment to State Hospital |
| 23 | Timeline Prepared For Trial Counsel |
| 24 | Interview with Ernest Cole, August 1993 |
| 25 | Notes of Interview with Rufus and Patsy Cole |
| 26 | Notes of Interview with Carolyn Johnson and Connie Lumsden |
| 27 | Interview with Shirley Simpson |
| 28 | Affidavit of Rufus Cole |
| 29 | Statement of Ernest Cole |
| 30 | Affidavit of Dr. Emmanuelson |
| 31 | IOG treatise on Diminished Capacity Defense |
| 32 | Affidavit of Lennie Hughes |
| 33 | Interview notes with Wade Cole |
| 34 | Statement of Nicole Becton and Kevin Zola |
| 35 | Statement of Chief Deputy Sheriff Tony E. Perry |
| 36 | Short Form Murder Indictment |

# APPENDIX 1


# DOROTHEA DIX DISCHARGE SUMMARY
# NOVEMBER 11, 1988

NORTH CAROLINA DIVISION OF
MENTAL HEALTH/MENTAL RETARDATION/
SUBSTANCE ABUSE SERVICES

Dorothea Dix Hospital
Raleigh, North Carolina

DDH          Spr.      For.

39-66-94     COLE, WADE LARRY
Bapt. NMS    COO 10-21-88
03-27-51     CAMDEN

Court No:    88-CRS-202

---

FORENSIC PSYCHIATRIC HISTORY/EVALUATION/LEGAL
ASSESSMENT/DISCHARGE SUMMARY & AFTERCARE PLAN
*Dr. Lynn is not available
for court on Wednesdays, nor
on 2/20, 2/21, and 2/22/89.

Date of Admission:          October 21, 1988

Date of Discharge:          *November 11, 1988*

Correspondent:              Sarah Cole, Mother
                            307 Shepherd Street
                            Elizabeth City, NC 27909

Identifying Data:           This is a 37 year old, single, black male admitted
                            ferom Camden County on 10/21/88 for evaluation
                            of competency to stand trial on charges of first
degree murder.  Patient has had no previous hospital admissions.  Patient's attorney
is Lennie Hughes, P. O. Box 561, Elizabeth City, NC 27907 and O. C. Abbott, P. O. Box
69, Elizabeth City, NC 27907.  Mr. Lennie Hughes' phone no. is: 335-5471.

Data Basic to Opinions:     This report is based on interviews with the patient,
                            physical exam, lab work, observation of ward behav-
                            ior, and psychological testing.  The forensic case
analyst, Ms. Amy Taylor, contacted and presented data from the patient's attorney,
patient's mother, the Central Prison, the detective, District Attorney, and the county
jail.

Mental Status:              The chief complaint is "I don't have any memory
                            for the crime."  This is an obese, black male.
                            He is cooperative and pleasant.  He has a normal
rate and flow of speech.  He was not depressed and had normal affect.  He thought that
he might be suicidal, however.  Organization of thinking was normal.  There were no
loose associations or flight of ideas.  He says he hears a voice at times telling him
to kill everyboyd and to kill himself.  There were no delusions.  Insofar as his concen-
tration is concerned, it takes him a long time to answer questions.  He was oriented
to the month and to the day of the week.  His memory was poor for the crime period.
It seemed like he had some spotty memory.  The impression was to rule out malingering.

Physical Examination:       He denied allergies.  The Aims showed no abnormal
                            movements.  Physical exam was within normal limits
                            except for obesity.

Laboratory Data:            The following lab work is negative or within normal
                            limits: CBC, urinalysis, HIV, VDRL, chemistry pro-
                            file, thyroid panel, hepatitis screen, chest and
skull x-rays and EEG.

Psychological Testing:      Tests administered: Wechsler Adult Intelligence
                            Scale-Revised, Projective Drawings, Bender Gestalt,
                            and Incomplete Sentence Blanks.

Form No. DMH 1-20-82                                              DISCHARGE SUMMARY

COLE, WADE LARRY - 39-66-94

## FORENSIC PSYCHIATRIC HISTORY/EVALUATION/LEGAL
## ASSESSMENT/DISCHARGE SUMMARY & AFTERCARE PLAN

November 9, 1988 - Page 2

Mr. Cole is a 37 year old, left-handed, single, black male charged with first degree
murder. When seen for the first time on 10/31/88 he was pleasant but seemed unable
to remember simple facts, such as how far he went in school, whether or not he married
in the name of the victim or the alleged crime. He didn't know that he was charged
with murder. He admitted to drinking most everyday and to smoking reefers. He
described himself as easy-going a lot of times but also as a person who holds things
in until he starts drinking and then he said he gets violent. Slosson Intelligence
Test was begun with Mr. Cole but it was unclear whether or not he was putting forth
his best effort. He complained of a headache and feeling dizzy. Since time was
limited, the assessment was postponed until 10/31. At that time Mr. Cole administered
the WAIS-R. With this test he appeared to be really trying. He explained that he
wasn't feeling well before and that was why he wasn't thinking. On the WAIS-R he
earned a verbal, performance, and full-scale I.Q.'s of 71, 67, and 68 respectively,
placing him in the upper range of mild mental retardation. His reading score on the
Wide-Range Achievement Test and his written responses of Incomplete Sentences appear
consistent with this level of functioning. There are no obvious signs of organicity
in his test data. (Although Mr. Cole did not appear to be malingering on the psycho-
logical tests, his claimed vagueness of memory for some of the events in his life
seemed suspect.)

Mr. Cole was interviewed again on 11/4, at which time he was able to relate events
in his life with more certainty and said that he was beginning to remember more about
the alleged crime.

By his own admission Mr. Cole appears to be a person who holds feelings in until he
starts drinking, at which time he may express his impulses quite directly. Test data
suggest that he is functioning in the upper range of mild mental retardation. There
are no obvious signs of organicity.

Past History:                          In talking with the patient, we did not talk of
                                       the specifics of the alleged crime and his attorney
                                       had told us not to talk with him about this. The
patient says that he is charged with a crime which happened in June. He said he had
been drinking wine and a half joint of reefer. At this point my mind was not clear.
The patient says at times he has been hearing real voices. He tried to kill himself
in jail. He has had bad nightmares in jail. They said I killed two people, the girl
I was going with and her mother." He drinks a pint of wine everyday. He smokes
reefers. He denies other illegal drugs. He says he went through the ninth or tenth
grade and was not in Special Classes. He dropped out as he couldn't pass. He was
expelled for fights and playing hooky. He has four brothers and two sisters. His
father died and his mother is living. His mother's sister has mental problems and
is in Cherry Hospital. He has smoked pot since he was 18 years of age. He says he
is violent sometimes when he is drinking.

DHS 1-20-82                                              DISCHARGE SUMMARY

NORTH CAROLINA DIVISION OF
MENTAL HEALTH/MENTAL RETARDATION/
SUBSTANCE ABUSE SERVICES                COLE, WADE LARRY

Dorothea Dix Hospital
Raleigh, North Carolina

FORENSIC PSYCHIATRIC HISTORY/EVALUATION/LEGAL
ASSESSMENT/DISCHARGE SUMMARY & AFTERCARE PLAN
November 9, 1988 - Page 3

In contact with the patient's attorney, he says the patient is charged with two counts
of first degree murder. His girlfriend was shot in the mouth and knee and then stabbed
100 times. The girlfriend's mother supposedly witnessed her daughter's death and she
had a heart attack and died. She did have a small knife wound on her breast. The
mother died of a heart attack after calling the police. There was a 14 year old boy
and a 12 year old son of the victim in the house. Apparently, the patient and the
victim had been arguing and she had him arrested for assault and he called her after
he got out of jail. The patient never made a statement to the police. The patient
was arrested two or three hours later in Elizabeth City. There was no breathalyzer
done at the time of the arrest.

In contact with Central Prison, the patient was transferred there August 13, 1988 for
safekeeping. Diagnosis was deferred. On the admission note it said that he had sui-
cidal ideation. He was sent because he was depressed and wanted to commit suicide.
He was placed on Sinequan 50 mg. twice a day and 75 mg. q h.s. He did have nightmares
and possibly heard voices. He was quick to admit to seeing things. There was no suspi-
ciousness or fearfulness noted. He was oriented times three.

The Camden County Sheriff's Department was contacted. According to them, he is charged
with two counts of first degree murder. The date of the offense is 6/23/88.
Supposedly, after the incident he drank three-fourths of a fifth of wine. He was not
violent at the time of the arrest and he was arrested two to three hours after the
incident. The shooting occurred inside the house in the early morning hours about
1:30 a.m. The mother was stabbed in the center of the sternum during the conflict
with the patient and his girlfriend. She had a heart attack. She called for help.
The two children were in shock. The daughter died on the front porch. The mother
died sitting on the couch. He was arrested at 9:45 p.m. early in the evening. The
first officer asked him if his girlfriend was dead. He did give a statement at the
time of the arrest. He has had a previous record for assault.

In contact with the county jail, he was no real problem in the jail. He was real quiet.
The mental health clinic saw him and they were concerned that he was having nightmares
and couldn't sleep. They were thinking that he was saving his medication in jail about
a week or ten days before he was sent to Dorothea Dix Hospital. On 6/22/88 he had
been arrested earlier on an assualt charge and was carried away from the victim's house.

The District Attorney was contacted. According to him, the girlfriend was shot twice
and stabbed over 100 times. The mother of the girlfriend died from a heart attack.

The patient's mother was contacted. According to her, the patient is easy to get along
with. He is nice and kind. He has never had problems with his temper. She has seven
living children. He was close to his siblings when they were growing up. The father
died when the patient was 10 years of age. His mother is 82 years of age now and in
good health. She did not know about him drinking. He got along with his girlfriend
as far as his mother knew.

NORTH CAROLINA DIVISION OF
MENTAL HEALTH/MENTAL RETARDATION/
SUBSTANCE ABUSE SERVICES

COLE, WADE LARRY  - 39-66-94

Dorothea Dix Hospital
Raleigh, North Carolina

FORENSIC PSYCHIATRIC HISTORY/EVALUATION/LEGAL
ASSESSMENT/DISCHARGE SUMMARY & AFTERCARE PLAN

November 9, 1988 - Page 4

Course in Hospital:      The patient was admitted and because of the history
                         of depression he was started on Sinequan 50 mg.
                         q a.m. and 100 mg. q h.s. on 10/31/88.  The patient
was vaguely suicidal during his hospitalization and he was kept on suicide precautions.
He was no behavioral problem.  There were no signs of psychosis.  There were no signs
of confusion.  The patient's attorney did tell him not to talk of the alleged crime.
The patient seemed to be anxious at times.  On 10/31/88 we discontinued the close sui-
cide precautions.  After being on the Sinequan he said he was sleeping better and on
11/8/88 we did change the Sinequan to 150 mg. q h.s.  It seemed like his memory did
improve.  Patient is discharged slightly improved over his condition on admission.

Principal and Primary Diagnosis:   Axis II: Passive-Aggressive Personality    301.84
Additional Diagnoses:              Axis I:  Alcohol abuse                      305.00
                                   Axis I:  Adjustment Disorder with Depressed
                                                Mood                          309.00
                                   Axis II: Mild Mental Retardation            317.00
                                   Axis III: Obesity

Opinions and Analysis:      The patient is competent to return to stand trial
                            in that he understands the nature of the charges,
                            is able to cooperate with his attorney, and is
able to help in formulating a defense.

Patient is responsible for his actions at the time of the alleged crime and knew right
from wrong.

Medications:                Sinequan 150 mg. q h.s. and he is given a one month
                            supply.

Recommendations:            It is recommended that the patient be returned
                            to Camden County and is able to stand trial.


Amy Taylor/11-8-88                           C. W. Lynn, M. D./11-8-88
Forensic Case Analyst                        Forensic Psychiatrist

AT/ew/11-9-88

cc: Presiding Judge, Camden County, Camden, NC
    Lennie Hughes, Attorney, P. O. Box 561, Elizabeth City, NC 27907
    O. C. Abbott, Attorney, P. O. Box 69, Elizabeth City, NC 27907
    Herschel P. Williams, Jr., District Attorney, 202 E. Colonial Avenue, Elizabeth
    City, NC 27909
    Wade Larry Cole, Client

Form No. DMH 1-20-82                                    DISCHARGE SUMMARY

# APPENDIX 2

# DOROTHEA DIX DISCHARGE SUMMARY
# MAY 22, 1989

NORTH CARO A DIVISION C.
MENTAL HEALTH/MENTAL RETARDATION/
SUBSTANCE ABUSE SERVICES

Dorothea Dix Hospital
Raleigh, North Carolina

**PSYCHIATRIC HISTORY/EVALUATION AND
DISCHARGE SUMMARY/AFTERCARE PLAN
AND LEGAL ASSESSMENT**

May 22, 1989

DDH          SPR          FOR

39-66-94     COLE, WADE LARRY
BAPT NSM     COO  03-01-89
03-27-51     CAMDEN

CF# 88-CRS-202

CONFIDENTIAL AND PRIVILEGED
For Professional purpose only
Not for Publication · Not to be used
Against the Patient's Interests
Redisclosure Prohibited by
Law without Client Consent

Date of Admission:          03-01-89

Date of Discharge:

Correspondent:          Sarah Cole, Mother
                        307 Shepherd Street
                        Elizabeth City, NC 27909
                        Phone No.: (919) 335-0336

**IDENTIFYING DATA:**          This is a 38 year old black single male admitted from
                        Camden County on 3-1-89, for evaluation of competency to
stand trial on charges of First Degree Murder. He has had a previous Dorothea Dix
Hospital admission, being admitted on October 21, 1988 and discharged on November 11,
1988. He was admitted, at that time, for evaluation of competency to stand trial on
these same charges. His attorneys are Lennie Hughes, PO Box 561, Elizabeth City, NC
27907-0561, phone no.: 335-5471; and O. C. Abbott, PO Box 69, Elizabeth City, NC
27907-0069.

**DATA BASIC TO OPINIONS:**          This report is based on interviews with the patient,
                        physical exam, lab work, observation of ward behavior, and
review of the patient's old chart. The Forensic Case Analyst, Ms. Amy Taylor,
contacted and presented data from the patient's attorney and the county jail.

**MENTAL STATUS:**          The patient's chief complaint was, "I haven't been here
                        before." This is an obese black male who is cooperative.
He has normal speech and normal mood. There are no suicidal feelings. There were no
loose associations or flight of ideas. There were no hallucinations. There were no
delusions. He has a long pause before answering, if he answers at all. He was
oriented times three. His memory, on admission, was of him not remembering anything.
He did not remember what type of work he had done before he came into the hospital.
He did remember going through the eighth grade. He could do money math. He did not
know what his charges were, and he did not remember being here before. The impression
was possible memory loss to rule out malingering.

**PHYSICAL EXAM:**          He denied allergies. The AIMS showed no abnormal movements.
                        The physical exam was essentially within normal limits.

**LAB WORK:**          The following lab work is negative or within normal limits:
                        urinalysis, CBC, thyroid panel, chemistry profile. Chest
x-ray was not repeated.

Dorothea Dix Hospital
Raleigh, North Carolina

COLE, WADE LARRY
39-66-94

**PSYCHIATRIC HISTORY/EVALUATION AND
DISCHARGE SUMMARY/AFTERCARE PLAN
AND LEGAL ASSESSMENT**

May 22, 1989
page 2

**PAST HISTORY:**  In interview with the patient on 3-1-89, he indicated that he knew where he is at this time. He stated that his lawyer sent him here. He denied having been here before. He denied knowing what he is charged with.

During an interview on 3-14-89, with the patient's attorney and the Forensic Case Analyst, Ms. Amy Taylor, and the patient present only, the patient stated that he had been living with his girlfriend in Camden County. They have a son, 11 or 12 years of age, and a daughter 2 years of age. The patient gave a very detailed description of how to get to the house and also gave a detailed description of the inside of the house. The patient stated that he drives a truck, hauling wood. He has been employed at the same place for two years. The patient does have a habit of drinking a bottle of wine and some marijuana after work, sitting in his car. The patient had been working on the day of the alleged crime. He had not eaten breakfast that morning and had had some trouble with his truck. He stopped at a store, Charlie Boy, after work to get a beer and some wine. He reported that he went to the house around 6:00 or 6:30. He stated that he went in the bedroom and watched T.V. while lying in bed.

During an interview on 5-18-89, with the patient, the patient's attorney, Ms. Taylor, and myself present, the patient denied knowing what he was charged with. He denied that Theresa and Hatie were dead. The patient was played a tape of his confession. He said that it was his voice, but he denied any memory of making the tape. The patient yawned while being shown the autospy report of Theresa. The patient's pulse was 112 while looking at the autopsy report. Later, we asked him about coming down to a conference. He did not agree to it, saying that he had to consult his attorney to see if it was all right.

In contact with the Pasquotank County Jail, it was described that the patient was quiet and stayed to himself. He took care of his needs. He never acted disoriented. They believed the patient knew where he was and knew what his charges were. He knew the staff members by name.

**HOSPITAL COURSE:**  The patient was admitted and placed on Sinequan-100 mg. q. hs.. It was increased to 150 mg. on 3-20-89. He continued on this until it was stopped on 5-11-89. The patient complained of insomnia, so the Sinequan was restarted on 5-15-89, at the dose of Sinequan-75 mg. q. hs.. During the periods when he was on and off of the medication, no change was noticed in the patient. During his hospitalization, he did not realize he was charged with murder. A note of mine on 3-8-89, states "The patient does not realize he has charges. He thinks it is Friday, when it is actually Thursday. He did not know what month it was." The patient interacted appropriately with the patients and staff during his hospitalization. There were no signs of psychosis. Another note of mine on 3-20-89, states, "The patient does not know what he is charged with. He is not sleeping. An increase the Sinequan." On 4-10-89, the patient said he had been

COLE, WADE LARRY
39-66-94

**PSYCHIATRIC HISTORY/EVALUATION AND
DISCHARGE SUMMARY/AFTERCARE PLAN
AND LEGAL ASSESSMENT**

May 22, 1989
page 3

here three weeks, and he did not know what he was charged with. At no point did he
ask me about leaving. On 5-11-89, a note of mine says, "The patient is sleeping
during the day, will stop Sinequan. The patient says he hears voices calling his
name. This is the first time we've heard of this." The patient was seen on 5-18-89,
with his attorney and Ms. Taylor, and during the initial part of the interview he
said that he did know how to get the bullet into the chamber of his gun. During this
interview, the attorney played the tape of the patient's confession, made in the
early morning of his arrest. The patient is discharged in essentially the same
condition as on admission.

| | | | |
|---|---|---|---|
| **PRINCIPAL/PRIMARY DIAGNOSIS:** | Axis II | Passive/Aggressive Personality. | 301.84 |
| **ADDITIONAL DIAGNOSES:** | Axis I | Alcohol Abuse. | 305.00 |
| | Axis II | Adjustment Disorder with Depressed Mood. | 309.00 |
| | | Mild Mental Retardation. | 317.00 |
| | Axis III | Obesity. | |

**OPINIONS AND ANALYSIS:**  It is difficult to tell whether or not the patient has an
actual memory loss, has extreme denial, or is malingering.
It is thought that the patient could be more helpful in his defense than he has been
to the present time.

The patient is competent to return to stand trial in that he understands the nature
of the charges, is able to cooperate with his attorney, and is able to help in
formulating a defense.

The patient is responsible for his actions at the time of the alleged crime and knew
right from wrong.

**MEDICATIONS:**  Sinequan-75 mg. q. hs., and he is given a 30 day supply.

**RECOMMENDATIONS:**  It is recommended that the patient be returned to Camden
County and is able to stand trial.

Dorothea Dix Hospital
Raleigh, North Carolina

COLE, WADE LARRY
39-66-94

**PSYCHIATRIC HISTORY/EVALUATION AND
DISCHARGE SUMMARY/AFTERCARE PLAN
AND LEGAL ASSESSMENT**

May 22, 1989
page 4

*[signature]* C. W. Lynn M.D.

Clabe W. Lynn, M.D. / 5-22-89
Forensic Psychiatrist

CWL/mpb
5-22-89

cc:  Presiding Judge
     District Attorney
     Defense Attorney
     Patient

*Dr. Lynn is not available for court on Wednesdays nor June 5, 6, and 7, 1989.

**ADDENDUM:**          This patient was presented to Dr. Lara, Dr. Rollins and
                       Dr. Versola on 5-22-89. (The patient was not present.)
They thought that it was hard to tell if it was actual memory loss or massive denial,
but they thought that Mr. Cole was competent to stand trial.

*[signature]* M. C. W. Lynn

Clabe W. Lynn, M.D./ 5-22-89
Forensic Psychiatrist

Case 5:05-hc-00461-D    Document 1    Filed 07/05/05    Page 201 of 368

# APPENDIX 3

## Dorothea Dix Psychological Report done by Dorothy Humprhey

## Affidavit of Dorothy Humphrey

NORTH CAROLINA DIVISION OF
MENTAL HEALTH/MENTAL RETARDATION/
SUBSTANCE ABUSE SERVICES

Dorothea Dix Hospital
Raleigh, North Carolina
**PSYCHOLOGICAL ASSESSMENT**

December 6, 1988

| DDH | SPR | FOR |
|---|---|---|
| 39-66-94 | COLE, WADE L. | |
| BAPT NSM | COO 10-21-88 | |
| 03-27-51 | CAMDEN | |

CF# 88-CRS-202

---

Date Requested: 10-21-88

Referred By: Dr. Lynn     to     Psychology Department

Referral Question: IQ, rule out organicity, personality disorder? (memory loss for period of crime)

---

Date of Evaluation: 10-28 & 31-88      Date of Report: 11-8-88

---

**TESTS ADMINISTERED:**     Wechsler Adult Intelligence Scale - Revised
Wide Range Achievement Test - Reading
Projective Drawings
Bender Visual Motor Gestalt Test
Incomplete Sentence Blank

Mr. Cole is a 37 year old, left-handed, single, black male charged with first degree murder. When seen for the first time on 10-31-88, he was pleasant but seemed unable to remember simple facts such as how far he went in school, whether or not he was married, and the name of the victim of the alleged crime. He did know that he was charged with murder. He admitted to drinking most every day and to smoking reefer. He described himself as easy going, a lot of times, but also as a person who holds things in until he starts drinking. Then, he said, he gets violent.

The Slosson Intelligence Test was begun with Mr. Cole, but it was unclear whether or not he was putting forth his best effort. He complained of a headache and of feeling dizzy. Since time was limited, the assessment was postponed until 10-31-88. At that time, Mr. Cole was administered the Wechsler Adult Intelligence Scale-Revised. With this test, he appeared to be really trying. He explained that he was not feeling well before and that was why he was not thinking. On the WAIS-R he earned Verbal, Performance, and Full Scale IQ's of 71, 67, and 68 respectively, placing him in the upper range of mild mental retardation. His reading score on the Wide Range Achievement Test and his written responses to the Incomplete Sentences appear consistent with this level of functioning. There are no obvious signs of organicity in his test data. (Although Mr. Cole did not appear to be malingering on the psychological tests, his claimed vagueness of memory for some of the events in his life seemed suspect.)

Mr. Cole was interviewed again on 11-4-88, at which time he was able to relate events in his life with more certainty and said that he was beginning to remember more about the alleged crime.

_____
Signature/Title

NORTH CAROLINA DIVISION OF
MENTAL HEALTH/MENTAL RETARDATION/
SUBSTANCE ABUSE SERVICES

Dorothea Dix Hospital
Raleigh, North Carolina

COLE, WADE LARRY
39-66-94

<u>PSYCHOLOGICAL ASSESSMENT</u> - Continued

December 6, 1988
page 2

By his own admission, Mr. Cole appears to be a person who holds his feelings in until he starts drinking at which time he may express his impulses quite directly. Test data suggests that he is functioning in the upper range of mild mental retardation. There are no obvious signs of organicity.

_Dorothy Humphrey_
Dorothy Humphrey
Staff Psychologist II
Forensic Services

DH/mpb
12-6-88

STATE OF NORTH CAROLINA    IN THE GENERAL COURT OF JUSTICE

COUNTY OF CAMDEN    SUPERIOR COURT DIVISION

FILE NO.:    88-CRS-202
        88-CRS-332

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| STATE OF NORTH CAROLINA | ) |
| | ) |
| v. | ) **AFFIDAVIT OF DOROTHY HUMPHREY** |
| | ) |
| WADE LARRY COLE | ) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I, **Dorothy Humphrey**, being duly sworn, do hereby depose and say:

1.    My name is Dorothy Humphrey. I live at 404 East College Street, Warsaw, North Carolina. I am retired from the Pretrial Evaluation Unit at Dorothea Dix Hospital in Raleigh, North Carolina, where I worked as a staff psychologist from 1975 until 1996. During my tenure there, I tested or supervised the testing of hundreds of patients.

2.    I was graduated from Boston University, earning a Master's degree in psychology with a concentration in clinical psychology. As part of my program of studies, I was trained in administering psychological tests, including intelligence tests.

3.    In 1988, I performed a psychological evaluation of Wade Larry Cole. As part of my evaluation, I administered the Wechsler Adult Intelligence Scale Revised (WAIS-R). Wade Cole's performance on this test indicated a full scale IQ of 68, placing him in the upper range of mild mental retardation. Mr. Cole performed consistently on all eleven sub-tests, with scaled scores ranging from two to seven points out of a possible nineteen.

4.    Wade Cole's reading score on the Wide-Range Achievement Test and his written responses of Incomplete Sentences appeared consistent with a level of functioning in the mild mental retardation range, as noted in my report. He did not write anything at all on over one-third of the sentence completion questions.

5.    Mr. Cole did not appear to be malingering on the psychological tests, as noted in my report. I wrote on the test itself that he "seems to be trying" and that he "completed some correctly after time was up".

6.    In addition to administering the WAIS-R, I conducted a clinical interview with Wade Cole and administered other psychological tests.

7.  Based on the results of the testing, I concluded that Wade Cole was mildly mentally retarded. Upon discharge, he was diagnosed with Axis II Mild Mental Retardation 317.00.

8.  During my evaluation and testing, Wade Cole was very cooperative. I noted in my report that "he appeared to be really trying."

9.  The WAIS-R is an individually administered, scientifically recognized, standardized intelligence test. I have been trained in the administration of this test. As noted, I found no evidence that Wade Cole was malingering when he took the WAIS-R. Based on all of these circumstances, I believe that the IQ testing that I administered in 1988 was valid and that Wade Cole's score of 68 accurately reflects his level of intellectual functioning.


FURTHER, AFFIANT SAYETH NAUGHT:

This, the _____ day of November, 2001.         _Dorothy Humphrey_
                                                Dorothy Humphrey


Sworn and subscribed to before me, a Notary Public for the County of _Gotham_ State of North Carolina on this, the ____19TH___ day of November, 2001.

_____
Notary Public

My commission expires: __2/7/2004_____

# APPENDIX 4

## Initial Psychological Report
## Central Prison

# DEPARTMENT OF CORRECTION

## *Psychological Assessment*

TO: **Diagnostic Center**     PLACE: **CP**     DATE: **28 SEP 89**

FROM: **Lew Robertson**
**Psychological Programs Manager**

SUBJECT: **COLE, Wade L.   20351-15**

**REFERRAL:** Wade was seen during routine CP Diagnostic Center processing for interview and review of test material.

**CURRENT PROBLEM:** Wade is expressing no problems at present, other than a continuing mild to moderate degree of depression, resulting from the fact that he is presently on Death Row for 1st-Degree Murder. Cole is a 38-year-old black male from Camden, NC, and was convicted of 1st-Degree Murder and sentenced to death. According to the record, this is the first serious trouble Wade has been in during his life. He did have a previous Assault & Battery charge, for which he received 4 months suspended; a Simple Assault charge, and Theft of Registration Plate. At the time of the murder, he also incurred an Involuntary Manslaughter charge, for which he received 10 years. The record indicates that he was sent to CP in August 1988 as a safekeeper. At that time, he was housed in CP MH Facility due to depression. Wade indicates that he was using both alcohol and, to a degree, marijuana; and feels that this was largely responsible for his violent act. He claims he has never been treated, however, for either.

**INTERVIEW:** On interview today, Wade presents as a very polite, congenial individual who indicates that he is attempting to adjust as best he can. He does seem remorseful for what he had done, but claims "temporary insanity" and the fact of overwhelming jealousy at the sight and thought of his girlfriend in bed with another man. He claims a 14-year relationship with this individual, and apparently was unable to contain his anger at his perceived betrayal. Mental status evaluation today reveals that Wade is depressed, but there does not appear to be evidence of a formal thought disorder. His speech is clear and articulate, and his mood appears appropriate to the situation. Wade knows he is being treated on the outpatient MH clinic by Dr. Strahl, and is presently on Sinequan.

**ASSESSMENT:** PSychological testing at the time of admission indicates that Wade is functioning at a mild level of mental retardation with a Beta IQ of 60. Due to the fact that he has received a death sentence, followup validation with the modified WAIS-R was waived. Wade claims to have completed the 9th grade, and educational achievement testing indicates a 2.8 grade level equivalent with reading at 2.0, spelling 3.3 and arithmetic 3.3., all substantially below his claimed amount of formal education. Personality assessment on admission indicates a generally valid profile, but one that indicates a strong tendency on his part to put his best foot forward and to deny personal problems. Test results also indicate a moderate to high degree of depression, worry, and alienation from others. This profile would be generally typical of those facing a death sentence. Additional psychometric evaluation indicates that Wade does consider himself alcoholic, a user of drugs, and in general, a nervous person. He indicates that he has tried suicide in the past, but on interview he indicates that this was an attempt while he was in jail following his conviction. He states he does not now feel suicidal. In summary, Wade is a mildly mentally retarded invididual who is presently facing death, and who is attempting to make as good an adjustment as he can. He is presently being treated by Dr. Strahl, M.D., Contractual Psychiatrist, for depression,

## CONFIDENTIAL

and has been placed on Sinequan.

   **PLAN**:   Routine processing may continue.   Wade will be followed by the outpatient MH clinic in order to treat his depression and monitor his ongoing medications.

SENSITIVE INFORMATION
WHEN REQUESTED 3

# APPENDIX 5

## School Records

NAME Cole
(Last)          (First)          (Middle)

SEX M        CITY UNIT*

PLACE OF BIRTH Elizabeth City, Pasquotank    Pasquotank Co., N.C.
(City)          (County)          (State)

SCHOOL*   No.     3 — 2 7   DATE OF ENTRANCE
OF BIRTH         1951                (Mo.) (Day)

ADDRESS

## PHOTOGRAPH



### III. FAMILY DATA

| Parents or Guardians | Name | Place of Birth | Educational Status | Church | Occupation* | Bus. Phone* |
|---|---|---|---|---|---|---|
| FATHER (STEPFATHER) | Alex Cole | Pasquotank Co. | 5 Grade | Methodist | | |
| MOTHER (STEPMOTHER) | Sarah Cole | Pasquotank Co. | 7 Grade | Methodist | farming | |
| GUARDIAN ___ (RELATIONSHIP) | | | | | | |
| OTHER ADULT WITH WHOM STUDENT LIVES | | | | | | |

ECONOMIC STATUS OF FAMILY*
GOOD ___  MODERATE ___  LOW ___  UNKNOWN ___

CHILDREN IN FAMILY*   TOTAL 7   BOYS 5   GIRLS 2

OLDER CHILDREN*:  BOYS ___  GIRLS ___
YOUNGER:  BOYS ___

GRADE 15

### IV. ELEMENTARY SCHOOL PROGRESS

| Subjects | Teachers |
|---|---|
| ENGLISH | Gilbert |
| ENGLISH | Hunter Moore |
| | Richard Bentley |

### V. STANDARD TEST RECORD

| Name of Test | Date Given | Form |
|---|---|---|
| ACADEMIC APTITUDE | | |
| | | |
| ACHIEVEMENT | | |

Code V: C.A.=Chronological Age; M.A.=Mental Age; I.Q.=Intelligence Quotient.

### VI. SECONDARY SCHOOL PROGRESS

| Subjects | Teachers |
|---|---|
| ENGLISH | Dunn |
| Constance | Jefferson |
| Bolen | Drye |

GRADE 10   SCHOOL North Eastern

| Subjects | Teachers |
|---|---|
| ENGLISH | |

UNIT SUMMARY

| Subjects | 1 | 2 | 3 | 4 | Years |
|---|---|---|---|---|---|
| ENGLISH | 1 | 0 | 0 | | |
| Math | 1 | 0 | 0 | | |
| Science | 1 | 0 | 0 | | |

Case 5:05-hc-00461-D   Document 1   Filed 07/05/05   Page 211 of 368

Case 5:05-hc-00461-D    Document 1    Filed 07/05/05    Page 212 of 368

RACE N    M

PLACE OF BIRTH: Elizabeth City, Pasquotank, N.C.
(First) (Middle) (City) (County) (State)

PRESENT ADDRESS:

**II. PHOTOGRAPH**

DATE OF ENTRANCE 1, 3 - 27
(Yr.) (Mo.) (Day)

`)` = OF BIRTH 1951 3 - 27
(Year) (Mo.) (Day)

AUTHORITY FOR BIRTH DATE: Birth Certificate ___ Family Bible ___
Parents' Statement ___ Church Certificate ___

**III. FAMILY DATA**

| | Parents or Guardians | Name | Place of Birth | Educational Status | Church | Occupation* | Bus. Phone* | Marital Status* | Living or Died | Date of Death |
|---|---|---|---|---|---|---|---|---|---|---|
| FATHER (STEPFATHER) | | Alex Cole | Pasquotank Co. | 5 Grade | Methodist | Carpenter | | Married | | |
| MOTHER (STEPMOTHER) | | Sarah Cole | Pasquotank Co. | 7 Grade | Methodist | housekeeping | | Married | | |
| GUARDIAN (RELATIONSHIP) | | | | | | | | | | |

OTHER ADULT WITH WHOM STUDENT LIVES:

ECONOMIC STATUS OF FAMILY* GOOD ___ MODERATE ___ LOW ___ UNKNOWN ✓

OLDER CHILDREN: BOYS ___ GIRLS ___

YOUNGER CHILDREN: BOYS ___ GIRLS ___

OTHERS IN HOME:

**V. STANDARD TEST RECORD — ELEMENTARY SCHOOL**

| Name of Test | Form | Date Given | Store | Norm | School Norm | %ile Rank | C.A. | M.A. | I.Q. |
|---|---|---|---|---|---|---|---|---|---|
| ACADEMIC APTITUDE | | | | | | | | | |
| California Reading | W | 9/6/61 | | 6-4 | | | 6-2 | 6-3 | 78 |
| Iowa Basic Skill | F | 5/60 #5 | | | | | | | |
| OTHER Alpha Shortform As | | 10/9 | 36 | | | | | 6-2 | |
| 3rd Readiness test | | 3/14/65 | 15 | | | | 4-2 | 9-2 | 22 |
| Otis Quick S. Mental | | 4/19/65 | | | | | | | |

Code V: C.A.—Chronological Age; M.A.—Mental Age; I.Q.—Intelligence Quotient.

**IV. ELEMENTARY SCHOOL PROGRESS**

| YEAR | SUBJECTS | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LANGUAGE | D | D | C | C | D | C | | D | D | D | | | | | | | | | | | | |
| READING | D | D | C | B | C | | D | D | D | | | | | | | | | | | | | |
| LANGUAGE | C | C | C | F | D | | D | D | | | | | | | | | | | | | | |
| SPELLING | C | C | C | | D | | D | D | | | | | | | | | | | | | | |
| WRITING | C | C | C | B | C | | C | C | | | | | | | | | | | | | | |
| SOCIAL STUDIES | C | C | D | | D | | D | | | | | | | | | | | | | | | |

**VI. SECONDARY SCHOOL PROGRESS**

| GRADE | SCHOOL | | | Wks. In Sem. | Length of Period | | | | Subjects | Teachers |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Periods Per Week | T | Av | Yr Av | ENGLISH | |

**UNIT SUMMARY**

| Subjects | Years | | | | | Total |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | |
| ENGLISH | 1 | 0 | 0 | | | |
| Math | 1 | 0 | 0 | | | |
| Science | | 0 | 0 | | | |
| Voc. Agri. | | 0 | 1 | | | |
| P.E. | 1 | 0 | | | | |
| | | | | | TOTAL | 4 |

20 2 /

Professional Football Player

Putting together Models

| | Grade |
|---|---|
| | 5, 6, 7. |
| | 8. |
| | 9. |
| | 10. |
| | 11. |
| | 12. |

## XIX. SIGNIFICANT NOTES

| Teacher or Counselor | |
|---|---|
| J.S. Backhouse | Wade was not ready for first grade work. Show very little interest in work |
| n.G. Fenty | Wade is more interested in his work but is very stubborn. |
| M.R. Heart | Wade is a good student but tries very hard to get his work. |
| H. Morgan | but did not try to do his work. |
| H. Petty | Wade is timid doubts himself, has difficulty forming some letters, left handed. Cannot express himself usually quiet slow worker, draws well, has could achieve higher level in work with greater effort. |
| " | Wade often and very stubborn at times. He tries very hard to get |
| Hudson | Wade's shows mild interest in his work. Sky and Jesse good friends will not clean when adjust just til will not to keep very well disciplined friendly |
| K. Peoples | Wade is quiet and has confidence and motivation |
| J. Winslow | Wade is quiet and lacks confidence and can do fair if pushed. |
| Robinson | slow ability but tries hard to do his school work. |
| M.M. Moore | Wade does not seem to be interested in school work |
| Bell | |

Case 5:05-hc-00461-D    Document 1    Filed 07/05/05    Page 214 of 368

## VIII. STANDARD TEST RECORD—HIGH SCH

| No. | Name of Test | Form | Date Given | Score | Norm | School Norm | %ile Rank | C.A. | I.Q. |
|---|---|---|---|---|---|---|---|---|---|
| 12 | ACADEMIC APTITUDE | | | | | | | | |
| A | Large Thorlike | A | 1-65 | | | | | | 83 |
| | OTHER | | | | | | | | |

Code VIII: C.A.=Chronological Age; M.A.=Mental Age; I.Q.=Intelligence Quotient.

## IX. EVALUATION OF SOCIAL AND CENSO

| Asset | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| COOPERATION | 5 | 3 | 3 | 4 | 2 | 3 | 3 | 3 | 1 | 3 | |
| COURTESY | 5 | 3 | 3 | 3 | 2 | 2 | 2 | 2 | 1 | 3 | |
| DEPENDABILITY | 5 | 3 | 3 | 3 | 2 | 4 | 4 | 3 | 3 | 3 | |
| INDUSTRIOUSNESS | 5 | 3 | 3 | 4 | 4 | 4 | 4 | 3 | 3 | 3 | |
| INITIATIVE | 5 | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 3 | 3 | |
| LEADERSHIP | 5 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 3 | |
| MATURITY | 5 | 3 | 2 | 5 | 2 | 3 | 3 | 3 | 2 | 3 | |
| PERSONAL APPEARANCE | 5 | 3 | 3 | 4 | 3 | 3 | 3 | 3 | 2 | 3 | |
| SELF-CONTROL | | | | | | | | | | | |
| TEACHER JUDGMENT | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| PUPIL-TEACHER JUDGMENT | | | | | | | | ✓ | | | |
| RATING SCALE | | | | | | | | | | | |

Code IX: 1=Superior; 2=Above average; 3=Average; 4=Below average; 5=Low.

## XI. WITHDRAWAL RECORD

| Year | Mo. | Day | Cause* | Transferred to |
|---|---|---|---|---|
| | | | | |

## XII. RE-ENTRY RECORD

| Year | Mo. | Day | Cause* | Retired From |
|---|---|---|---|---|
| | | | | |

## XIII. LIBRARY

| Grade | Ability To Use Materials* | Read-ing In-terest* | No. A Book Free |
|---|---|---|---|
| 1 | B | B | O |
| 1st | B | B | 2 |
| 2nd | B | B | 3 |
| 3rd | C | C | 3 |
| 4 | D | D | 2 |
| 5 | E | L | 2 |
| 6 | D | D | 1 |
| 7 | C | O | 7 |
| 8 | C | | |
| 10 | E | F | F |

## ATTENDANCE RECORD

| Days Present | Days Absent | Chief Cause* | Times Tardy | Chief Cause* |
|---|---|---|---|---|
| | 12 | | 1 | |
| 70 | 10 | 4 | | |
| 15 | 5 | 4 | | |
| 9 | | 1 | 1 | |
| 74 | 6 | | 1 | |
| 1 | 1 | | 2 | 5 |
| | 2 | 1 | 6 | 5 |
| 9 | 16 | 1 | | |
| 3 | 17 | | | |
| 2 | 44 | 145 | 1 | 1 |

# NORTH CAROLINA SCHOOL HEALTH RECORD
**(To be used in classroom during the year and filed with permanent records in Cumulative folder each spring.)**

Cole _____ Wade _____ Larry _____ 1951 March 27 ____ M ____ N ____
ne (Last)                    (First)            (Middle)              Birthdate (Year, Mo., Day)      Sex        Rac

Mr. Alex Cole   Mrs. Sarah Lunden Cole ____ 802 Martin St.
er and Mother (Maiden Name) or Guardian              Address and/or directions with phone number

nged address and/or directions with phone number    Changed address and/or directions with phone number

## MEDICAL RECORD

| Immunization | Date | Date | Date | Date | Date | Date | Date |
|---|---|---|---|---|---|---|---|
| ooping Cough | 1958 | | | | | | |
| ohtheria | 1958 | | | | | | |
| anus | 1958 | | | | | | |
| liomyelitis | 1964-1965 | | | | | | |
| iallpox | 1958 | | | | | | |
| her | | | | | | | |

dicate by a check mark (√) if pupil has had allergies ... chickenpox.... diabetes.... drug sensitivities ... epilepsy.... measles......
umps ... rheumatic fever ...tuberculosis ...whooping cough ...

| Date | Medical Examinations, Findings, Recommendations, Corrections | (Enter name and title of doctor, dentist, nurse, etc. whose entries are recorded.) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Case 5:05-hc-00461-D  Document 1  Filed 07/05/05  Page 215 of 368

e: If Pupil Tranfers to Another School, Card Should Be Sent to That School.

# APPENDIX 6

## Affidavit of Dr. Robert Brown

NORTH CAROLINA

CAMDEN COUNTY

GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

FILE NOS. 88-CRS-202,332

STATE OF NORTH CAROLINA )
                        )
        VS              )          AFFIDAVIT
                        )
WADE LARRY COLE,        )
            Defendant   )

Robert Stanley Brown, Jr., M.D., after being first duly sworn, deposes and says the following.

1.  I am a Doctor of Medicine and am board-certified in Internal Medicine, Psychiatry, and Forensic Psychiatry.

2.  I have served on the clinical faculty at the University of Virginia School of Medicine in both Internal Medicine and Psychiatry.

3.  I am licensed to practice Medicine in the State of North Carolina.

4.  I am a member of the American Academy of Psychiatry and Law, American Academy of Forensic Sciences, and the American Psychiatric Association.

5.  Approximately 80% of my practice time is now devoted to forensic evaluations.

Case 5:05-hc-00461-D    Document 1    Filed 07/05/05    Page 217 of 368

6.  I have been tendered and accepted as an expert in forensic psychiatry on numerous occasions in the courts of the State of North Carolina for both defendants and the state.

7.  During the second trial of Wade Larry Cole, which began on May 31, 1994, in Camden County, I was a witness for the defendant during the sentencing phase.

8.  In preparation for giving this testimony, I met with Wade Larry Cole on a number of occasions.

9.  Mr. Cole discussed with me the circumstances concerning the crimes charged and also furnished autobiographical information to me.

10. I administered the Minnesota Multiphasic Personality Inventory (MMPI) to Mr. Cole.

11. I reviewed crime scene photographs, autopsy reports, major sections of the transcript of defendant's first trial, including, among other things, the testimony of witnesses, police officers, Dr. Margaret Emmanuelson and Dr. John Butts.

12. I also examined the defendant's school records and a number of interviews with individuals conducted in the preparation of his defense.

13. My purposes were to evaluate the defendant's competency to stand trial, his mental state at the time of the offense and to look at any issues relevant to sentencing

Case 5:05-hc-00461-D    Document 1    Filed 07/05/05    Page 218 of 368

14. I concluded that Mr. Cole's intelligence "... would be said to be in the borderline range, not mentally retarded and also not average with regard to intelligence."

15. I testified: "He's in that range between being mentally retarded, mildly mentally retarded and normal, what's called the borderline range."

16. When asked to express my opinion as to whether Mr. Cole had the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, my testimony was and my opinion remains the same to this very day that Wade Larry Cole is not mentally retarded but that his intelligence was within the borderline range.

17. Borderline intellectual functioning is noted when the IQ is in the 71-84 range.

Further the affiant sayeth not.

This is the _____19_____ day of May, 2003.


_____
Robert Stanley Brown, Jr., M.D.


Sworn to and subscribed before me this _19th_ day of May, 2003.


_____
Notary Public

Case 5:05-hc-00461-D    Document 1    Filed 07/05/05    Page 219 of 368

# APPENDIX 7

# Verdict Sheet

STATE OF NORTH CAROLINA

COUNTY OF CAMDEN

IN THE GENERAL COURT OF JU

SUPERIOR COURT DIVISION

FILE NUMBER  8~ CRS 332

*Filed - 7-26-89*
*6:10 P.M.*

State of North Carolina    )

vs.    )    VERDICT SHEET

Wade Larry Cole    )

We, the jury, unanimously find the defendant, Wade Larry Cole, to be:

1.  _____ Guilty of Second Degree Murder of Hattie Graham;

2.  ✓ Guilty of Involuntary Manslaughter of Hattie Graham;

3.  _____ Not guilty.

Dated this __26__ day of July, 1989.

_William C Sawyer_
Foreman's Signature

# APPENDIX 8

## Defendant's Brief, pp. 44-51

establish that the act of the accused was a proximate cause of the death.")

Causation is readily found in cases where the evidence shows an intentionally inflicted injury resulted in death and this Court has explained the rule as follows:

> "one who inflicts an injury on another and thereby accelerates his death shall be criminally responsible therefor." State v. Luther, 285 N.C. 570, 575, 206 S.E.2d 238, 241-42 (1974) . . . See also State v. Atkinson, 298 N.C. 673, 681-82, 259 S.E.2d 858, 863-64 (1979)(victim was a "walking bombshell" on account of preexisting heart disease); State v. Cummings, 46 N.C. App. 680, 685, 265 S.E.2d 923, 926, aff'd, 301 N.C. 374, 271 S.E.2d 277 (1980)(defendant must accept his victim in the condition he finds him).

State v. Yelverton, 334 N.C. 532, 547, 434 S.E.2d 183, 191 (1993) In Yelverton, the evidence showed the victim suffered from a badly diseased heart, emphysema, fibrosis of the lungs, a malignant lung tumor, and high blood pressure, and in the pathologist's opinion the cause of death was "acute heart failure induced or caused by multiple blunt impact injuries" to the hands and arms which could have been defensive wounds caused by a mop handle and which wounds would not be fatal to a healthy person; this Court found the victim's death was proximately caused by the defendant's actions in breaking into the victim's home and attacking the victim with a dust mop.

These principles relating to causation apply to all degrees of homicide resulting from intentional infliction of injury, including involuntary manslaughter. State v. Cummings, 46 N.C. App. 680,

685, 265 S.E.2d 923, 926, <u>aff'd</u>, 301 N.C. 374, 271 S.E.2d 277
(1980). In <u>Cummings</u> the Court of Appeals upheld defendant's
conviction of involuntary manslaughter and found the evidence was
sufficient to show the assault by defendants was a proximate cause
of the victim's death where the victim, who was intoxicated at the
time, died as a result of choking on his own vomitus after
defendants assaulted him with a board and knocked him down; the
Court of Appeals noted the defendant must take his victim as he
finds him, thus the defendants were responsible for the victim's
death which was partly caused by his intoxicated condition.
Defendant appealed from a dissenting opinion on this issue and this
Court affirmed the Court of Appeals. <u>State v. Cummings</u>, 301 N.C.
374, 271 S.E.2d 277 (1988).

Consistent with these principles this Court ruled in the first
appeal of the instant case that there was sufficient evidence of
causation to support a conviction of involuntary manslaughter based
on defendant's misdemeanor assault on Hattie Graham which caused
her abnormal heartbeat and death. <u>State v. Cole</u>, 331 N.C. at 277,
415 S.E.2d at 718.

**D. Foreseeability.**

Defendant erroneously contends foreseeability is an essential
element of proximate causation for involuntary manslaughter,
although he acknowledges foreseeability is not an element of
proximate causation for murder. This Court has expressly stated
that foreseeability is not applicable in homicide cases involving
an intentional assault resulting in death. In <u>State v. Woods</u>, 278

abnormal behavior by the dogs, that he had no knowledge of the dogs' dangerous propensities, therefore death was not foreseeable. This Court adopted the following test for foreseeability in connection with proximate cause on those facts: "that 'in the exercise of reasonable care, [defendant] might have foreseen that some injury would result' from his failure to abide by the ordinance." Id., at 772, 446 S.E.2d at 32.

Defendant erroneously contends that Powell applies to the instant case to require foreseeability as an essential component of proximate causation. Powell, which involved an issue of an intervening cause of death between the violation of the ordinance and the killing as a result of the abnormal behavior of animals, does not change the rule this Court stated in Woods that "[f]orseeability is not an element of proximate cause in a homicide case where an intentionally inflicted wound caused the victim's death." State v. Woods, 278 N.C. at 219, 179 S.E.2d at 264.

This Court has not held foreseeability is an element of probable cause when relying on the "culpable negligence" theory of involuntary manslaughter based on an assault causing an intentionally inflicted wound in violation of a safety statute or ordinance. In Cummings, where the defendants struck the victim with a board the trial court submitted involuntary manslaughter on both the unlawful act and the culpable negligence theories based on the assault; this Court approved the instructions which did not include a foreseeability instruction in connection with proximate cause. Id. 301 N.C. at 379-381, 271 S.E.2d at 280-81.

By finding in the first appeal that there was sufficient evidence that defendant assaulted Hattie Graham and that defendant's assaults on her daughter created stress on Hattie Graham and this evidence was sufficient to prove proximate cause of her death, a fortiori this Court has found there was sufficient evidence of proximate causation of death by defendant's commission of the same acts under a culpable negligence theory based on the intentional violation of a safety statute, and because the statute violated was a safety statute enacted for the protection of human life there is no requirement that this Court consider whether there was sufficient evidence of foreseeability of injury to Hattie Graham from defendant's intentional assault on her with a deadly weapon.

E. Evidence of Foreseeability.

Although there is no requirement of foreseeability for proximate causation the evidence in the instant case meets the test of foreseeability as stated in Powell: "in the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might have been expected." Powell, 336 N.C. at 772, 446 S.E.2d at 31, quoting Slaughter v. Slaughter, 264 N.C. 732, 142 S.E.2d 683 (1965).

Defendant knew Hattie Graham resided at the home with her daughter Theresa and knew she would be there when he burst in to begin his attack on Theresa; defendant knew Hattie Graham received Social Security (Tp 1956), which is only given for old age or

disability; defendant knew that Hattie would try to intervene to protect her daughter Theresa from his blows, since she had done so when he was beating Theresa earlier that evening; when defendant became aware Hattie was trying to get him to stop stabbing Theresa defendant turned on Hattie and stabbed her in the chest area (Tpp 1683-84); the evidence shows he intended to get Hattie to stop interfering with his assaults on Theresa and he intentionally struck Hattie and stabbed her twice with the knife causing her to fall down. (Tp 1650-51) After defendant finished stabbing Theresa until his arm could stab no more he left both victims and went off and fell asleep, but did not call for help for either victim. (Tp 1983) This evidence shows that injury to Hattie Graham was foreseeable from defendant's acts. The evidence also shows William Bowser, age 12, thought he was having a heart attack as a result of witnessing the crimes (Tp 1655), and told Deputy Vick when he arrived on the scene that he was having a heart attack (Tp 1895); if a child can foresee that a heart attack would result from fright and fear caused by defendant's acts it is not unreasonable to expect defendant to foresee the same.

Consistent with the law of this State the defendant must accept his victim in the condition he finds her and he is responsible for the death of Hattie Graham resulting from his intentional infliction of injury to her even though he may not have known about her heart condition.

This Court need not revisit this issue since it previously held the evidence of proximate cause of death to be sufficient in

reasonable juror could find beyond a reasonable doubt that the defendant's conduct actually did contribute to the victim's death.

As an analogy, consider a case in which three hunters standing together negligently mistake a person for a deer and fire at him. Only two bullets strike the victim, each inflicting a potentially fatal wound. The bullets are lost or misshapen by impact, thereby precluding identification of the rifles from which they were fired. Although the act of any one of the hunters could have been the sole cause or a contributing cause of death, it would be unreasonable for a juror to find beyond a reasonable doubt that any particular hunter actually caused or even contributed to the victim's death. As an example of a case involving a similar hunting accident, *see State v. Meadlock*, 95 N.C. App. 146, 381 S.E.2d 805, *rev. denied*, 325 N.C. 434, 384 S.E.2d 544 (1989). In this case as well, the evidence was not sufficient to find that Mr. Cole's assaults against Hattie Graham, rather than coronary heart disease alone or the stress from witnessing and trying to stop the attack against Theresa Graham, actually caused or contributed to Hattie Graham's fatal heart rhythm. Each of the three possible causes was analogous to a hunter in the hypothetical hunting accident case. Each might have, but was not actually shown to have, caused or contributed to the fatal heart rhythm. Although the issue in the hypothetical case might formally but superficially be categorized as one of "identity" rather than one of "proximate causation," the underlying issue is the same as in this case: whether designated conduct by a particular person can be identified as an actual contributing cause of death. Accordingly, the evidence was not sufficient to prove beyond a reasonable doubt that the assaults against Hattie Graham -- the only act the trial court authorized the jury to consider as a culpable cause -- were causes of her death.

This case is distinguishable from homicide cases in which this Court has found sufficient evidence of proximate causation of death from a heart attack suffered during or after an assault. For example, in *State v. Atkinson*, 298 N.C. 673, 259 S.E.2d 858 (1979), the Court found sufficient evidence of proximate causation where the medical examiner testified, without qualification, that the victim had a pre-existing condition of very severe hardening of the arteries and the victim's fatal heart attack resulted from stress caused by injuries inflicted during a robbery. As discussed above, Dr. Butts' testimony in this case about the causal role of the assault Hattie Graham was equivocal. In *State v. Luther*, 285 N.C. 570, 206 S.E.2d 238 (1974), the Court found sufficient evidence of proximate causation where the victim suffered from coronary heart disease, the defendant struck the victim three or four times in the head with an iron pipe so forcefully that the victim's eyes bulged out of their sockets, and no other possible cause was apparent. The brutality of the assault led the Court to rule that the causal connection between the brutal assault and the fatal heart attack was compelling, despite the medical examiner's equivocal testimony about that connection. In contrast, in this case, the assault against Hattie Graham although wrongful, was not forceful and does not create a compelling inference of causation.

**V. THE TRIAL COURT COMMITTED PLAIN ERROR IN FAILING TO INSTRUCT THE JURY THAT IT COULD FIND APPELLANT'S ASSAULTS TO BE A PROXIMATE CAUSE OF HATTIE GRAHAM'S DEATH IF IT FOUND THAT HER DEATH WAS A FORESEEABLE CONSEQUENCE OF THOSE ASSAULTS.**

Assignment of Error No. 35 (Rp. 179)

In its jury instructions on proximate causation with respect to the death of Hattie Graham, the trial court did not instruct the jury that it could find Mr. Cole's assaults to

# APPENDIX 9

**Defendant's Brief, pp. 53-57**

IV.    THE TRIAL COURT ERRED BY DENYING DEFENDANT'S MOTION TO DISMISS THE CHARGE OF INVOLUNTARY MANSLAUGHTER AND BY SUBMITTING THAT CHARGE TO THE JURY UNDER THE THEORY OF CULPABLE NEGLIGENCE, WHERE THAT THEORY WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

Assignment of Error No. 92 (Rp. 141
Assignment of Error No. 130 (Rp. 148)

In *State v. Pakulski*, 319 N.C. 562, 356 S.E.2d 319 (1987), this Court held that a conviction must be reversed when a trial court instructs the jury on two alternative theories of an alleged offense, one of which is supported by sufficient evidence and the other of which is not supported by sufficient evidence, and the record does not identify the theory on which the jury relied. As the Court explained, "this Court will not assume that the jury based its verdict on the theory for which it received a proper instruction. Instead, we resolve the ambiguity in favor of the defendant." *Id.* at 574, 356 S.E.2d at 326. In this case, the trial court instructed the jury on two different theories of involuntary manslaughter of Hattie Graham. Although defendant contends in this section that the evidence was not sufficient to support either theory of involuntary manslaughter, defendant's primary argument in this section is that one of the two theories, in particular -- involuntary manslaughter based upon culpable negligence -- lacked evidentiary support. Since the jury did not specify the theory or theories upon which it relied to find defendant guilty of involuntary manslaughter of Hattie Graham, defendant's conviction for involuntary manslaughter must be reversed.

The procedural background of this issue is straightforward. Defendant moved to dismiss both charges on the ground of insufficient evidence at the close of the state's case, at the close of all evidence, after the announcement of the guilt-innocence verdicts, and after the trial court pronounced the sentences. The trial court denied all four motions.

(Trial Tpp. 1931-32, 2154, 2276, and 2459) In its guilt-innocence phase jury instructions, the trial court instructed the jury on two different theories of involuntary manslaughter: (1) involuntary manslaughter on the basis of an unlawful act not amounting to a felony nor naturally dangerous to human life (in this case, the trial court specified the assault with a deadly weapon against Hattie Graham as the possible unlawful act), and (2) involuntary manslaughter on the basis of culpable negligence. (Trial Tpp. 2259-60) The jury rendered a verdict finding defendant guilty of involuntary manslaughter, but the jury did not specify the theory or theories upon which it relief in reaching that verdict. (Trial Tpp. 2273-74, Rp. 70)

At the outset, defendant submits that the evidence was insufficient to support a verdict of guilty of involuntary manslaughter on the basis of an unlawful act not amounting to a felony nor naturally dangerous to human life. In the first trial, the trial court presented *only* this theory of involuntary manslaughter to the jury (a copy of the relevant portion of the jury instructions from the first trial is included in the Appendix to this brief; the Court can take judicial notice of those instructions, which were included in the Record on Appeal in the first appeal). Defendant acknowledges that in the first appeal in this case, this Court ruled that the evidence presented during the first trial was sufficient to support a verdict of involuntary manslaughter on this theory. *State v. Cole*, 331 N.C. 272, 415 S.E.2d 716 (1992). The evidence presented by the state on this charge in this trial was virtually identical to the evidence presented by the state in the first trial. In both trials, Dr. Butts testified to his opinion that the two small cuts made by defendant's use of a knife against Hattie Graham was *not* fatal, that the two superficial knife wounds did *not* cause Hattie Graham's death. Rather, Dr. Butts testified that the cause of Hattie Graham's death was abnormal rhythm which, in turn, was caused by the stress resulting from defendant's assault with a knife against Hattie Graham. Although defendant maintains here, as in the

first appeal, that the evidence that the assault caused Hattie Graham's abnormal heartbeat and death was too speculative and, therefore, was not sufficient under North Carolina law and the Due Process Clause of the Fourteenth Amendment to support a guilty verdict under this theory, defendant will offer no new arguments on that particular point in this appeal. Defendant recognizes that this Court ruled against his position on this point in the first appeal, though defendant respectfully disagrees with the Court's ruling.

As noted above, defendant's primary argument in this section pertains to the second theory of involuntary manslaughter on which the trial court instructed the jury: involuntary manslaughter on the basis of culpable negligence. This Court has reviewed this theory of involuntary manslaughter recently in *State v. Powell*, 336 N.C. 762, 446 S.E.2d 26 (1994). In *Powell*, the Court explained that under this theory, involuntary manslaughter means the unintentional killing of a human being without malice, proximately caused by a culpably negligent act or omission. The Court further explained that culpable negligence is an "intentional, willful, or wanton violation of a statute or ordinance, which proximately results in injury or death. . . ." *Id.* at 767, 446 S.E.2d at 29. The Court also stated that to prove proximate cause, the state must prove foreseeability. This Court adopted the definition of foreseeability for criminal negligence used by the Court of Appeals in its own, earlier opinion in *Powell*: "'in the exercise of reasonable care, [defendant] might have foreseen that some injury would result' from his failure to abide by the ordinance." *State v. Powell*, 109 N.C. App. 1, 9, 426 S.E.2d 91, 96 (1993). *See State v. Powell, supra*, 336 N.C. at 772, 446 S.E.2d at 32.

Defendant acknowledges that his assault with a deadly weapon against Hattie Graham -- his inflicting a shallow wound on her when he pushed her away as she tried to stop him from attacking Theresa Graham -- was an intentional violation of the statute that prohibits assault with a deadly weapon (N.C. Gen. Stat. §14-33(B)(1)), and that this statute

is a statute designed for the protection of human life or limb. However, in this case, there was insufficient evidence -- indeed, no evidence -- to show that Mr. Cole might have foreseen that his assault against Hattie Graham would have caused her death or any injury other than the two small knife wounds he inflicted in the assault itself. Mr. Cole testified that before the deaths of Theresa and Hattie Graham, he did not know that Hattie Graham had heart trouble. He first learned about Hattie Graham's heart trouble after she died. (Trial Tpp. 1956-57) No evidence conflicted with his testimony. No evidence indicated that he knew or should have known that she had severe coronary atherosclerosis and that his assault against her -- his inflicting two otherwise nonfatal, shallow wounds on her -- would result in the additional harm to her of abnormal heart rhythm and death. Even if Hattie Graham's death from abnormal heartbeat was a consequence of his assault against her, her death from abnormal heartbeat was not a *foreseeable* consequence of his striking her with a knife and inflicting two shallow wounds as he pushed her away. The simple fact that her death might have resulted from the assault, as Dr. Butts testified, does not mean that her death was a foreseeable result of that assault. It is important to understand that defendant obviously does not seek to justify or excuse his assault against Hattie Graham. Rather, defendant simply maintains that death due to abnormal heart rhythm was not a foreseeable result of that assault.

Defendant notes that in *State v. Atkinson*, 298 N.C. 673, 259 S.E.2d 858 (1979) and *State v. Luther*, 285 N.C. 570, 206 S.E.2d 238 (1974), this Court found sufficient evidence of proximate causation to support first-degree and second-degree murder convictions, respectively, where the evidence showed that assaults against the victims caused stress that, in turn, caused the victims to suffer fatal heart attacks. However, those cases are distinguishable from this case because foreseeability is not an element of

proximate causation for murder, whereas, under *Powell*, foreseeability is an essential component of proximate causation for involuntary manslaughter.

In summary, the record did not contain sufficient evidence, under either North Carolina law or the Due Process Clause of the Fourteenth Amendment, to show that Mr. Cole did foresee or should have foreseen that his assault against Hattie Graham would cause any harm to her other than the two shallow knife wounds directly caused by the assault. Accordingly, there was insufficient evidence to support submission of involuntary manslaughter to the jury on the basis of culpable negligence. Since the jury did not identify the theory of involuntary negligence on which it relied in finding Mr. Cole guilty of that charge, this Court's holding in *Pakulski* requires reversal of Mr. Cole's conviction for involuntary manslaughter.

**V.  THE TRIAL COURT ERRED BY PROHIBITING A DEFENSE EXPERT FROM TESTIFYING ABOUT THE RANGE OF DEFENDANT'S POSSIBLE BLOOD ALCOHOL LEVEL AT THE TIME OF THE ALLEGED OFFENSES.**

Assignment of Error No. 102 (Rp. 143)

During the defense case in the guilt-innocence phase of the trial, the defense sought to introduce testimony of Dr. Brian V. Grover, an expert in clinical psychology and substance abuse, about the range of defendant's blood alcohol content at the time of the alleged offenses. After a *voir dire* examination of Dr. Grover, the trial court sustained the state's objection to that testimony. The trial court ruled that Dr. Grover could testify only about what Mr. Cole told him about the amount, type, and timing of his consumption of alcohol near the time of the alleged offenses and the effect of that consumption on Mr.

# APPENDIX 10

## Affidavit of James R. Glover

NORTH CAROLINA

COUNTY OF CAMDEN

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

Nos. 88 CrS 202, 232

STATE OF NORTH CAROLINA,    )
                            )
    v.                      )
                            )
WADE LARRY COLE             )
                            )

## AFFIDAVIT

STATE OF NORTH CAROLINA  )
                           ) ss
COUNTY OF ORANGE            )

James R. Glover, being first duly sworn, hereby deposes and says that:

1. I am an attorney licensed to practice law and am engaged in the private practice of law in the State of North Carolina. I was first licensed to practice law in the State of Wisconsin in 1970. I have been licensed to practice law in the State of North Carolina since 1984.

2. A considerable part of my practice of law, currently and over the past 29 years, has been in the area of criminal defense and appellate practice. I have taught courses as an adjunct at three law schools in the areas of criminal law and procedure and appellate practice. For several years, I was in charge of a criminal appellate clinical program at the University of North Carolina School of Law which operated in conjunction with the Office of the Appellate Defender.

3. Currently, and over the past 18 years, a considerable part of my practice of law has been as counsel for defendants in North Carolina in capital cases, at trial, on direct appeal, and in state and federal post–conviction proceedings. For several years, beginning in September 1984, I was an Assistant Appellate Defender; and my duties, in addition to the non–capital appeals that were assigned to me in conjunction with the appellate clinical program, related to direct appeals in capital murder cases. I have been involved as counsel for criminal defendants given death sentences on direct appeal in several dozen cases. I am familiar with the general standards of practice for attorneys representing defendants on direct appeal in criminal cases in general and in capital cases in particular.

4. At the request of the attorneys currently representing Defendant Wade Larry Cole, I have reviewed the materials relating to the claim of collateral estoppel and ineffective assistance of counsel on appeal, that the jury's verdict in Defendant Wade's first trial finding him guilty of involuntary manslaughter and not of second degree murder of Hattie Graham was based on a factual finding that Defendant Cole did not intentional assault Hattie Graham with a deadly weapon [a knife] which operated as a collateral estoppel bar to any claim in Defendant Wade's second trial that he intentionally assaulted and stabbed Hattie Graham with a knife.

5. It is the opinion of your affiant that the record of Defendant Wade's first trial, particularly in light of evidence, the instructions to the jury on the elements of second degree murder and involuntary manslaughter and the closing arguments of counsel to the jury, makes out a viable and compelling claim that the jury's verdict finding Defendant Wade not guilty of second degree murder and guilty of involuntary manslaughter of Hattie Graham could only have been based on the jury's finding that Defendant Wade did not intentionally stab Hattie Graham and that

this would operate as a collateral estoppel bar to any attempt by the State's to establish at Defendant Wade's second trial that he intentionally assaulted and stabbed Hattie Graham under the protections against double jeopardy and due process of law provided by the Fifth and Fourteenth Amendments to the Constitution of the United States.

6. It is the prevailing practice, and has long been the practice in the Office of the Appellate Defender, in all direct appeals in capital cases in North Carolina for counsel for the capital defendant to raise and present to the Supreme Court of North Carolina every viable claim of federal constitutional error and, unlike the occasional practice in non−capital appeals, not to choose to forego raising any viable claim of federal constitutional error for tactical reasons. It is the practice to raise such claims even when existing decisions of the Supreme Court of North Carolina have ruled against the claim, because the failure to raise a claim on federal constitutional error on direct appeal can operate as a bar to consideration of that claim in federal habeas corpus proceedings.

7. There does not appear to be any tactical or professional reason for Defendant Wade's appellate counsel not to have raised the collateral estoppel claim that the verdict of the jury at his first trial precluded any attempt by the State at his second trial to prove or claim that he intentionally stabbed Hattie Graham. The general principles of the collateral estoppel effects of a jury verdict in a prior trial under the federal constitution which are the legal basis for the claim are well established by decisions of the United States Supreme Court that are more than twenty years old. The factual basis for the claim appears on the face of the record of Defendant Wade's two trials. The claim is complementary to other claims which were raised on direct appeal; and, in fact, the claim undermines the very basis on which the Supreme Court of North Carolina held

—4—

that the jury in the second trial could have properly found in the penalty phase that the State had

established in the aggravating circumstance in N.C.G.S. § 15A−2000(e)(11), that the murder of

Theresa Graham was part of a course of conduct which included intentionally assaulting Hattie

Graham with a knife.

_James R. Glover_
James R. Glover

Subscribed and sworn to before me this

1st day of _December_, 1999.

_Kimberly P. Stein_
Notary Public

My commission expires: _June 13, 2004_

# APPENDIX 11

## Affidavit of Benjamin Dowling Sendor

STATE OF NORTH CAROLINA

COUNTY OF CAMDEN

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

NO. 88 CRS 202, 232

STATE OF NORTH CAROLINA )
)
v. )
)
WADE LARRY COLE )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## AFFIDAVIT OF BENJAMIN DOWLING-SENDOR

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

STATE OF NORTH CAROLINA   )

COUNTY OF DURHAM   )

Benjamin Dowling-Sendor, first being duly sworn, deposes and says the following:

1. I am a member of the North Carolina Bar and an Assistant Appellate Defender in the Office of the Appellate Defender in Durham, North Carolina. I was appellate counsel for Wade Larry Cole in *State v. Wade Larry Cole*, 331 N.C. 272, 415 S.E.2d 716 (1992), and 343 N.C. 399, 471 S.E.2d 372 (1996), *cert. denied*, 136 L.Ed.2d 624 (1997).

2. In the second appeal, I did not raise in my assignments of error, my brief, or my oral argument the contention that due to collateral estoppel, the jury's verdict in the first trial of guilty of involuntary manslaughter as to Hattie Graham precluded the trial court from submitting the course of conduct aggravating circumstance (N.C. Gen. Stat. §15A-2000(e)(11)) to the jury in the second trial.

3. My omission of that argument did not result from a strategic decision. Rather, I did not make that argument because it did not occur to me, because I did not think of that

argument, during the second appeal.

This the 29th day of November, 1999.

Benjamin Dowling-Sendor

Sworn and subscribed to before me
this the 2 9 day of November, 1999

Ann Marie DeLong
Notary Public

My commission expires: 10-28-2000

# APPENDIX 12

# Camden County Population Statistics



# Population Estimates by Age, Sex, and Race - Camden County, North Carolina

## Summary Report

| Summary Report ▼ |

| Get the above selected report |

### Population Data for 1991 Selected

[ 1990 ] [ 1991 ] [ 1992 ] [ 1993 ] [ 1994 ]

[ Population Estimates - North Carolina Home Page ]

```
Camden County, North Carolina -- SUMMARY REPORT -- 1991 Population Estimates

     Total population ..........................    6,038
SEX
     Male ..................................        3,031
     Female ................................        3,007
AGE
     Under 20 years ........................        1,608
          Percent of total population ..........    26.63
     65 years and over .....................          851
          Percent of total population ..........    14.09
RACE AND HISPANIC ORIGIN BY SEX
     White Non-Hispanic Male ...............        2,269
     White Non-Hispanic Female .............        2,196
     White Hispanic Male ...................            8
     White Hispanic Female .................           10
     Black Male ............................          745
     Black Female ..........................          774
     Amer. Indian, Eskimo, & Aleut Male .....           5
     Amer. Indian, Eskimo, & Aleut Female ....          16
     Asian and Pacific Islander Male .........           3
     Asian and Pacific Islander Female .......           6
     Hispanic (of any race) Male .............           9
     Hispanic (of any race) Female ..........           15
```



# Population Estimates by Age, Sex, and Race - Camden, North Carolina

## Summary Report

| Summary Report ▼ |

| Get the above selected report |

Case 5:05-hc-00461-D    Document 1    Filed 07/05/05    Page 245 of 368

# APPENDIX 13

## Pretrial Motion for Change of Venue
## July 1992

NORTH CAROLINA

CAMDEN COUNTY

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

FILE NOS.:  88-CRS-202
            88-CRS-332

FILM NO.:   _____

STATE OF NORTH CAROLINA  *
                         *
         vs.             *       **MOTION FOR CHANGE OF VENUE**
                         *
WADE LARRY COLE,         *
            Defendant    *

The Defendant, Wade Larry Cole, by and through his court-appointed attorneys, Lennie L. Hughes and O. C. Abbott, move the Court, pursuant to N.C.G.S. 15A-952 (b)(2) and N.C.G.S. 15A-957, for a change of venue from Camden County to another county outside of the First Judicial District, and in support motion show unto the Court:

1.   That Wade Larry Cole was tried before a Camden County jury in July and August of 1989.  That he was convicted of first degree murder in case no. 88-CRS-332, and a death sentence was imposed.  In case no. 88-CRS-202 the Defendant was found guilty of involuntary manslaughter and was sentenced to ten years in prison on that charge.

2.   In State v Cole 331 N.C. 272, (1992) our Supreme Court has ordered that a new trial be held in both cases.

3.   There was extensive publicity in the first trial, both by newspaper, radio and television and for that reason there is so great a prejudice against the Defendant that he can not obtain a

fair and impartial trial in either Camden County, North Carolina or the First Judicial District.

This _____21st_____ day of July, 1992.

_____
Lennie L. Hughes
Counsel for Defendant
412 East Colonial Avenue
P.O. Box 561
Elizabeth City, NC 27909
Tel. (919) 335-5471

_____
O. C. Abbott
Co-Counsel for Defendant
101 East Elizabeth Street
P.O. Box 69
Elizabeth City, NC 27909
Tel. (919) 335-5442

# APPENDIX 14

## Order on Change of Venue
## Judge Sumner

STATE OF NORTH CAROLINA

FILED

1993 MAY 24 PH 4: 33

CAMDEN COUNTY. C.S.C.

BY_____

GENERAL COURT OF JUSTICE

CHOWAN COUNTY (FOR CAMDEN COUNTY)   SUPERIOR COURT DIVISION

FILE NO:  88-CRS-202
          88-CRS-332

STATE OF NORTH CAROLINA   )
                          )
          VS.             )               ORDER
                          )
WADE LARRY COLE,          )
     DEFENDANT            )


     This cause, coming on to be heard and being heard before the undersigned judge presiding over the May 17, 1993 criminal term of Chowan County Superior Court upon defendant's motion for change of venue, and the court having considered the record proper, evidence and exhibits submitted by both parties, and the arguments of counsel for each party, the court makes the following:

                         FINDINGS OF FACT


     (1)  Defendant was present in court with both of his attorneys, Lennie L. Hughes and O.C. Abbott.

     (2)  The state was represented by Frank R. Parrish, assistant district attorney for the First Judicial District.

     (3)  The court made inquiries and both attorneys for the defendant as well as the Defendant consented and agreed to have this motion heard in Chowan County before this judge.

     (4)  The defendant was indicted on June 27, 1988 for the murder of Theresa Graham in File Number 88-CRS-202 and was indicted October 17, 1988, for the murder of Hattie Brumsey Graham in File Number 88-CRS-332.

     (5)  The trial of the defendant upon these charges began July 17, 1989 in Camden County.

     (6)  The jury returned verdicts July 26, 1989 finding the defendant guilty of the first degree murder of Theresa Graham and guilty of involuntary manslaughter in connection with the death of Hattie Brumsey Graham.

     (7)  On August 2, 1989, after a sentencing hearing, the jury recommended a sentence of death in connection with the death of Theresa Graham.

     (8)  On August 2, 1989, Judge Donald Stephens, the judge presiding, imposed a sentence of death in connection with the death of

Theresa Graham and a sentence of ten years upon the involuntary manslaughter conviction related to the death of Hattie Brumsey Graham.

(9)  Thereafter, the defendant noted his appeal.

(10)  In a decision filed April 22, 1992, the North Carolina Supreme Court reversed the convictions of the defendant and awarded him a new trial.

(11)  As the basis for a change of venue, defendant assigned "extensive publicity" as the reason.

(12)  Defendant submitted affidavits of Camden County residents, who stated that they had strongly held opinions about the Cole case and could not set them aside.

(13)  The State submitted affidavits of Camden County residents who stated that, in their opinions, defendant could receive a fair trial from a Camden County jury.

(14)  The defendant submitted an affidavit from the Camden County Clerk of Superior Court's office indicating that there were 1,591 Camden County residents available in the jury pool.

(15)  Defendant submitted newspaper articles, published in either the Elizabeth City Daily Advance or the Norfolk *Virginian-Pilot* in 1988 and 1989, concerning the arrest, trial and sentencing of Wade Larry Cole.

(16)  These newspaper accounts were factual and non-inflammatory.

Now, therefore, the court makes the following:

CONCLUSIONS OF LAW

(1)  The movant has not shown that there is a reasonable likelihood that the defendant will not receive a fair trial.

(2)  The movant has not shown that there exists so great a prejudice against the Defendant in Camden County that he cannot receive a fair, impartial trial.

NOW, THEREFORE, in the court's discretion, it is ORDERED, ADJUDGED and DECREED that jurors for the trial of this cause be selected from Camden County and that the trial be conducted in Chowan County.

This the _19th_ day of May, 1993.

_____
Judge Presiding

# APPENDIX 15

**List of Grand Jury Foremen
April 1972 to February 1989**

## GRAND JURY FOREMAN
### CAMDEN COUNTY
### APRIL 4, 1972 THROUGH FEBRUARY 27, 1989

| Date | Grand Jury Foreman | Race |
|------|-------------------|------|
| February 27, 1989 | Henry Godfrey Sharber | white |
| October 17, 1988 | Edward J. Winkler | white |
| June 27, 1988 | Martha Seymour | white |
| March 7, 1988 | Martha Seymour | white |
| November 2, 1987 | Martha Seymour | white |
| July 13, 1987 | Martha Seymour | white |
| March 23, 1987 | Andrew Sears | white |
| November 17, 1986 | Geneva Forehand | white |
| July 7, 1986 | Geneva Forehand | white |
| March 17, 1986 | Geneva Forehand | white |
| October 28, 1985 | Harry McPherson | white |
| July 8, 1985 | Harry McPherson | whte |
| March 25, 1985 | Kathryn K. West | white |
| October 22, 1984 | Kathryn K. West | white |
| July 9, 1984 | Kathryn K. West | white |
| April 2, 1984 | Travis W. Twiford | white |
| October 24, 1983 | Anne Bright Harrell | white |
| July 18, 1983 | Anne Bright Harrell | white |
| March 21, 1983 | Samuel Leary | white |
| November 8, 1982 | Brenda Harris Creecy | black |
| July 19, 1982 | Brenda Harris Creecy | black |
| April 5, 1982 | Lloyd George Williams | white |
| November 16, 1981 | Ronald Howell Pippen | white |

| | | |
|---|---|---|
| July 27, 1981 | Ronald Howell Pippen | white |
| April 6, 1981 | Franklin Delano Harrison | white |
| November 17, 1980 | Joyce Sawyer Medlin | white |
| August 4, 1980 | Joyce Sawyer Medlin | white |
| April 9, 1980 | Elsie G. Hollowell | white |
| January 7, 1980 | Elsie G. Hollowell | white |
| November 19, 1979 | Floyd Dean Pierce | white |
| August 6, 1979 | Floyd Dean Pierce | white |
| March 26, 1979 | George T. White, Jr. | white |
| November 20, 1978 | George T. White, Jr. | white |
| August 21, 1978 | Aiko Williams | white |
| March 28, 1978 | Winfred Brian Forehand | white |
| November 21, 1977 | Glenn E. Robert | white |
| August 22, 1977 | Glenn E. Robert | white |
| November 22, 1976 | Forrest Pugh | white |
| August 23, 1976 | Forrest Pugh | white |
| March 8, 1976 | June B. Forehand | white |
| October 13, 1975 | Durwood P. Medlin | white |
| March 17, 1975 | Carl S. Brinkley | white |
| October 14, 1974 | Lydia O. Hale | white |
| April 1, 1974 | Lydia O. Hale | white |
| January 7, 1974 | Lydia O. Hale | white |
| October 8, 1973 | W. B. Mieggs | white |
| April 2, 1973 | W. B. Mieggs | white |
| October 3, 1972 | William A. Jones | white |
| April 4, 1972 | Reginald Whitehurst | white |

# APPENDIX 16

## Affidavit of Ann D. Spivey

STATE OF NORTH CAROLINA
CAMDEN COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
88 CRS 202, 332

STATE OF NORTH CAROLINA )
)
v. )          AFFIDAVIT
)
WADE LARRY COLE, )
          Defendant )

**************************************************

Ann D. Spivey, after first being duly sworn, deposes and says the following:

1. I have personal knowledge of the facts in this affidavit.

2. On October 1, 1997, I was sworn in as Clerk of Court in Camden County. I have been employed in the clerk's office in Camden County since August 1, 1976.

3. I have reviewed the attached list of grand jury foreman in Camden County from April 1972 until February 1989, said list compiled by Nicole Warmack, Nicole Becton and Kevin Zolat after reviewing court records maintained in the Camden County courthouse.

4. I identified the race of the named jury foreman, except for William Jones and Reginald Whitehurst whose races were identified by the Board of Elections.

5. According to my knowledge of the grand jury foremen, whose names appear on the attached list, there was only one black Grand Jury foreperson, Brenda Creecy (1982), from April 1972 until February 1989.

6. The foreperson of the Grand Jury in October 1988, which indicted Wade Larry Cole for first degree murder, was Edward G. Winkler, a white male.

Further the affiant sayeth not.

This is the _7th_ day of November, 1997.

_Ann D. Spivey_
Ann D. Spivey

Sworn to and subscribed
before me this _7_ th day of November, 1997.

_Elaine S. Pritchard_
~~Notary Public~~ Deputy Clerk of Superior Court
My Commission Expires: _N/A_

# APPENDIX 17

## Motion for a Mental Health Expert, May 12, 1997

STATE OF NORTH CAROLINA        IN THE GENERAL COURT OF JUSTICE
CAMDEN COUNTY        FILED   SUPERIOR COURT DIVISION
                                        88 CRS 202, 332
                1997 MAY 12  PM 5: 00

STATE OF NORTH CAROLINA CAMDEN COUNTY, C.S.C.
                                )        MOTION FOR FUNDS
        v.              BY_____)____ FOR MENTAL HEALTH EXPERT
                                )
WADE LARRY COLE,                )
        Defendant               )

        *****************************************************

        NOW COMES the Defendant, Wade Larry Cole, through counsel, respectfully

moving the Court to enter an order requiring the State of North Carolina to provide funds

with which the Defendant may employ Geoffrey R. McKee, an expert in forensic

psychology. In support of this motion, the Defendant states the following:

1.      In 1989 a capital trial was held in which a jury convicted Wade Larry Cole of the

first-degree murder of Theresa Graham and involuntary manslaughter of Hattie Graham.

Petitioner was sentenced to death for the first-degree murder. The Supreme Court of North

Carolina reversed the convictions and ordered a new trial on both charges. *State v. Cole*,

331 N.C. 272, 415 S.E.2d 716 (1992).

2.      A judgment of death was entered against defendant at the retrial at the May 31, 1993

Criminal Session of the Superior Court for Camden County, the Honorable James A.

Beaty, Jr., presiding.

3.      The judgment was affirmed by the Supreme Court of North Carolina on June 13,

1996. The North Carolina Supreme Court's opinion is published at *State v. Cole*, 343

N.C. 399, 471 S.E.2d 362 (1996)

4.      The United States Supreme Court denied *certiorari* review on January 6, 1997.

*Cole v. North Carolina*, ___ U.S. ___, 117 S.Ct. 703 (1997).

5.      Defendant alleges that his conviction and judgment of death were imposed in

violation of the law, and defendant, through appointed counsel, intends to file a Motion for

Appropriate Relief, pursuant to North Carolina General Statutes §§ 15A-1411 *et. seq.* in order to remedy the constitutional and procedural flaws in the proceedings which resulted in his death sentence.

6.     It is well established that any evidence regarding the mental impairments or limitations of an accused are constitutionally indispensable to the capital sentencing determination.

> [E]vidence about the defendant's background and character is relevant [to an individualized appropriateness of the death penalty] because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.

California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring).   Accord Woodson v. North Carolina, 428 U.S. 280, 304 (1976) (any of the "diverse frailties of humankind" regarding the accused must be taken into consideration); Lockett v. Ohio, 438 U.S. 586, 604 (1978) (sentencer must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character of record...as a basis for a sentence less than death"); Eddings v. Oklahoma, 455 U.S. 104 (1982) (childhood trauma must be considered by the sentencer); People v. Marsh, 36 Cal.3d 134 (1984) (evidence of unhappy childhood and neglect found to be mitigating factor); Moody v. State, 418 So.2d 989 (Fla. 1982) (personality change following service in Vietnam a mitigating factor).

7.     Retesting a defendant is approved of by the North Carolina Supreme Court in that: "[t]he conclusions of any mental health expert, his diagnoses and postdictions, are only as reliable as the data on which those conclusions are based. . . .Although the underlying condition may always be present, the mental illness may over time manifest itself with symptoms of varying intensity.  Knowing the parameters of the illness may increase the reliability of an expert's postdictions about a defendant's mental condition." *State v. Huff,* 325 N.C. 1, 46, 381 S.E.2d 635, 661 (1989), *sentence vacated on other grounds,* 497 U.S. 1021, 110 S.Ct. 3266, 111 L.Ed.2d 777 (1990).

8.    That undersigned counsel have contacted Geoffrey R. McKee, Chief of Forensic Psychology Services, Wm. S. Hall Psychiatric Institute, and have provided this psychologist with significant information regarding Mr. Cole's background and testimony in the two trials. This psychologist has considered the reports of Dix Hospital, the sentencing testimony of Drs. Brown and Emanuelson and he has given undersigned counsel an opinion that significant aspects of Defendant's mental condition merit further evaluation.

9.    That based on conversations with this psychologist, undersigned counsel believe it necessary for purposes of filing a Motion for Appropriate Relief in this case to retain the services of this psychologist. The reasons include:

   a)  The psychiatrists retained by trial counsel at the two trials disagree on the Defendant's diagnosis, including the statutory mitigator of whether defendant had the capacity to conform his conduct to the requirements of the law;

   b)  As the question of Defendant's capacity is central to capital sentencing, all of Defendant's mental health records must be reviewed. Counsel are not trained to analyze mental health records and require the assistance of an expert to review the mental health records of Defendant and examine Defendant.

   c)  Defendant was committed to Dorothea Dix twice before his first trial. The medical records from Dorothea Dix hospital indicate that for a period during his second commitment Defendant was incompetent, but was found competent before his release. Questions surrounding Defendant's fluctuating mental health status have not been answered;

   c)  Defendant has not been assessed in accordance with the Rogers Criminal Responsibility Assessment Scale, which is pertinent to the facts of this case;

   d)  Defendant's aunt was committed for a lengthy period to Cherry Hospital. She died institutionalized. The records of her institutionalization have not been analyzed, even to minimal extent of learning the diagnosis. As some mental

illnesses are genetic, her diagnosis could be relevant to determining Defendant's correct diagnosis. This is especially crucial in light of the disagreement between Dr. Emanuelson and Dr. Brown on the existence of the statutory mitigator.

e) Defendant has been seen on a monthly basis by mental health professionals at Central Prison since he was transferred to Death Row. These extensive medical records need to be reviewed.

10. That Sections 7A-450(b), 7A-454, and 15A-1421 of the North Carolina General Statutes provide that indigent capital defendants in state post-conviction proceedings are entitled to expert assistance at state expense once a threshold showing of specific necessity has been made.

11. Undersigned counsel, therefore, desire to retain the services of Geoffrey R. McKee. His resume is appended to this motion and hereby incorporated by reference.

ACCORDINGLY, Defendant requests that this court order that he be allowed to expend up to $3,000.00 to retain Geoffrey R. McKee as a mental health expert..

Respectfully submitted, this 5th day of May 1997.

MASSENGALE & OZER

William F. W. Massengale
N.C. State Bar No. 12191

Marilyn G. Ozer
N.C. State Bar No. 18360

Attorneys for Defendant
211 North Columbia Street
Chapel Hill, North Carolina 27514
(919) 967-8555

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing Motion upon Assistant District Attorney Robert Trivette, 202 East Colonial Avenue, Elizabeth City, North Carolina, 27909, by placing same in a postage prepaid and properly addressed envelope and mailing it from Chapel Hill, North Carolina on this the _2_ day of May 1997.

Marilyn G. Ozer

# Geoffrey R. McKee, PhD, ABPP

Forensic Psychological Services
P.O. Box 7471 • Columbia, SC 29202
Voice Mail (803) 749-9065

## CURRICULUM VITA

GEOFFREY R. McKEE, Ph.D., ABPP
Diplomate in Forensic Psychology

**CURRENT STATUS:**    Forensic Psychological Services
P.O. Box 7471
Columbia, SC 29202
(803) 749-9065

Chief, Forensic Psychology Services
Wm. S. Hall Psychiatric Institute
1800 Colonial Drive
Columbia, SC 29202
(803) 734-7246

**EDUCATION:**    Diplomate (1985) American Board of Forensic
Psychology-American Board of Professional
Psychology
Ph.D. (1969) Counseling psychology, University
of Missouri-Columbia (APA approved program)
M.Ed. (1967) Counseling, University of
Illinois-Champaign-Urbana
B.A. (1965) Coe College Cedar Rapids, Iowa

## CLINICAL EXPERIENCE:

1986-    Chief, Forensic Psychology Services
Wm. S. Hall Psychiatric Institute
SC State Hospital (July, 1985-1986)

Adult and juvenile competency to stand trial and criminal
responsibility evaluations.  Extensive expert testimony on
insanity and civil commitment in General Sessions, Family, and
Probate Courts.

1986-    Private Practice; Clinical Practice
Forensic evaluation and case consultation to private
attorneys, public defenders, district attorneys, state attorneys
general, and South Carolina Death Penalty Resource Center on
issues of trial competency, criminal responsibility, juvenile
waiver, testimonial capacity, death penalty mitigation,
competency to confess, diminished capacity, competency to be
executed, psychological trauma, amenability for treatment,
probation risk, child custody, parental competence, termination

Case 5:05-hc-00461-D    Document 1    Filed 07/05/05    Page 264 of 368

CLINICAL EXPERIENCE (Cont'd):

of parental rights, domestic violence, sex offenders, and trauma
resulting from sexual assault. Consultation and development of
questions (for plaintiff or defendant) for cross-examination of
psychological and psychiatric expert witnesses regarding above
issues and special defenses such as Battered Woman's Syndrome,
multiple personality disorder, and pathological gambling.

Expert testimony in over 200 cases in General Sessions Court,
Family Court, Tribal Court, Federal District Court, and the South
Carolina State Supreme Court including over 30 capital murder
cases at trial, sentencing, and post-conviction relief stages.

1980-1985        Chief Psychologist
                 Lake Region Human Service Center
                 Devils Lake, ND 58301

Outpatient psychotherapy; clinical supervision of staff;
forensic and general psychological evaluations; case consultations
in emergency, outpatient, transitional living, protective
services, probation, and corrections. Inservice trainer in
clinical psychology; evaluations and expert testimony for
District, County, and Tribal Courts in civil, probate, criminal,
juvenile, and family legal proceedings; inpatient evaluations and
consulting staff privileges at three regional hospitals

1980             Behavior Evaluation Specialist Teams
                 Group private practice
                 733 Monterey Way, Suite 12
                 Scottsdale, AZ 85251

Individual, marital, family therapy of incest and sexual
assault cases referred by County Protective Services.
Psychological evaluations of family members including
perpetrators. Case consultation with County case workers
regarding parental competence, severance, and reunion issues.
Expert testimony in Family Court.

CLINICAL EXPERIENCE (Cont'd.):

1976-1980       Chief Psychologist
                Coconino Community Guidance Center
                Flagstaff, AZ  86001

    Individual, marital, and group therapy; Supervision of
professional staff and programs in emergency, outpatient,
substance abuse, and consultation/education services to community,
university, hospitals, and professional groups.  Clinical,
forensic, and civil commitment evaluations.  Case consultations to
County Protective Services regarding family and parental
competence issues.  Expert testimony in Superior and Family
Courts.

CONSULTING EXPERIENCE:

1985 - 1995     Consulting Psychologist
                South Carolina Department of Corrections
                Adult Sex Offender Program

    Technical program assistance, development of psychological
evaluation methods for treatment amenability, interpretation of
MMPI and MSI test data of all referrals (>1100 inmates), direct
evaluation and case consultation of problematic sex offenders.
Videotaped demonstrations of clinical interviewing of sex
offenders and numerous inservice training and workshop
presentations on rape and child molester typologies/profiles to
SCDC social work treatment staff.

1983-1985       Consulting Psychologist
                Northwest Regional Corrections Center
                Crookston, MN

    Case consultations, evaluations, individual therapy of
inmates; assessments for suicide risk, adjustment to
incarceration, amenability for treatment, work release, competency
to stand trial and criminal responsibility.

**CONSULTING EXPERIENCE (Cont'd):**

1980-1985        Consulting Psychologist
                 U.S. District Court of North Dakota
                 Eastern and Western Divisions

    Psychological evaluations and case consultations of
defendants on issues of pre-sentence disposition, adjustment to
incarceration, amenability for treatment, competency to stand
trial, and criminal responsibility.

**ACADEMIC EXPERIENCE:**

1992-1996        HPI Associate Professor
                 Fellowship in Forensic Psychiatry (AAPL)
                 Department of Neuropsychiatry and Behavioral
                 Science-USC School of Medicine

    Instruction of psychiatric fellows, residents, and medical
students regarding general forensic issues and forensic
psychological methods; supervision of WSHPI clinical psychology
interns during forensic rotation; Coordinator and frequent
lecturer in Psychiatry and Law seminar to psychiatrists,
psychologists, social workers, nurses, attorneys, and other
professionals from the community.

1986             Instructor
                 South Carolina State Hospital
                 Columbia, SC 29202

    Development and instructor of 12 week course in forensic
psychology covering evaluation, ethics, patient rights, privilege,
report writing, expert testimony, trial consultation.

1982             Lecturer
                 Department of Psychology
                 University of North Dakota
                 Grand Forks, ND

    Taught graduate core clinical psychology course in Theories
of Personality.

ACADEMIC EXPERIENCE (Cont'd):

1969-1976      Assistant Professor
               Department of Psychology
               Northern Arizona University
               Flagstaff, AZ  86001

     Graduate courses: Theories of Personality, Behavior
Modification, Statistics, Practicum.  Undergraduate courses:
personality, principles of learning, introductory.  Chairman of
M.A.  students with clinical/counseling emphasis.

PROFESSIONAL AFFILIATIONS:

   Licenses:     Diplomate, American Board of Professional
                    Psychology (ABPP) #082
                 Licensed Counseling Psychologist, South
                    Carolina  #370
                 Licensed Psychologist, North Carolina TMP #9701

   Previous licenses now inactive:
                 Licensed Consulting Psychologist, MN #C1116
                 Licensed Psychologist, North Dakota #118
                 Certified Psychologist, Arizona  #389

   Organizations: Fellow, American Academy of Forensic Psychology.
                    President, 1992-94, Vice-President, 1990-92
                 Member, American Psychological Association
                    Charter Member, Div. 41, Psychology-Law
                 Member, SC Psychological Association (inactive)
                    Representative-at-large, 1989-91
                 Member, SC Academy of Professional Psychologists,
                    President, 1993-94; (inactive)
                 American Board of Forensic Psychology,
                    Oral Examiner, Chair
                 American Board of Forensic Psychology,
                    Chair, Board of Appeals

RECENT  PUBLICATIONS:

         McKee, G.R. (in press). Accepting legal referrals. In
G.P. Koocher, J.C. Norcross, & S.S. Hill (Eds.), The
psychologist's desk reference. Oxford: Oxford University Press.

         McKee, G.R. (in press). Expert testimony: Deposition vs.
courtroom. In G.P. Koocher, J.C. Norcross, & S.S. Hill (Eds.), The
psychologist's desk reference. Oxford: Oxford University Press.

RECENT   PUBLICATIONS (Cont'd):

McKee, G. R. & Shea, S.J. (in press). Maternal filicide: A cross-national comparison. Journal of Clinical Psychology.

Shea, S.J. & McKee, G.R. (1996) MMPI-2 profiles of men charged with murder or other offenses. Psychological Reports, 78, 1039-1042.

Shea, S.J., McKee, G.R., Shea, M.E.C., and Cook-Culley, D.C. (1996). MMPI-2 profiles of male pre-trial defendants. Behavioral Sciences & the Law, 14, 331-338.

Cowden, V. and McKee, G. (1995). Competency to stand trial in juvenile delinquency proceedings: Cognitive maturity and the attorney-client relationship. Journal of Family Law, 33, (3), 629-660.

Rogers, R. and McKee, G. (1995). MMPI-2 and criminal responsibility evaluations. In Ben-Porath, Y, Graham, J., Hall, G., Hirschmann, R., & Zaragoza, M. Forensic Uses of the MMPI-2. Sage Publications, Thousand Oaks, CA.

McKee, G. (1995). Insanity and adultery: forensic implications of a divorce case. Psychological Reports. 76, 427-434.

McKee, G. and Klohn, L. (1994). MCMI profiles of pretrial defendants. Psychological Reports, 74, 1346.

McKee, G. (1994). Taxonomy of psycholegal issues. Bulletin of the American Academy of Forensic Psychology, 15, 1, 2-4.

Shealy, L., Kalichman, S., Henderson, M., Szymanowski, D., and McKee, G. (1991) MMPI profile subtypes of incarcerated sex offenders against children. Violence and Victims, 6, 201-212.

Kalichman, S., Szymanowski,D., McKee, G., Taylor, J., Craig, M. (1989) Cluster analytically derived MMPI profile subgroups of incarcerated male rapists. Journal of Clinical Psychology, 45, 149-155.

Kalichman, S., Craig, M., Shealy, L., Taylor, J., Szymanowski, D., McKee, G. (1989) An empirically derived typology of adult rapists based on the MMPI: A cross-validation study. Journal of Psychology and Human Sexuality, 2, 165-182.

RECENT PUBLICATIONS (Cont'd):

Szymanowski, D. and McKee, G. (1988) Computer profiles guide sex offender therapy. Corrections Today, 12, 150-156.

MANUSCRIPTS CURRENTLY UNDER EDITORIAL REVIEW IN 1997

McKee, G.R. Competency to stand trial in pre-adjudicatory juveniles and adults.

RECENT PRESENTATIONS:

McKee, G.R. Suicide in South Carolina jails: 1985-1994. Presented at the Fifth Biennial Forensic Forum. Columbia, SC October 10, 1996.

McKee, G.R. & Shea, S.J. Homicidal women: Characteristics of filicide, spouse, and non-family murder defendants. Presented at the meeting of the American Psychological Association, Toronto, August, 1996.

McKee, G.R. Infanticide: Why parents kill their children. Invited lecture to mental health professional staff, Florence, SC April 30, 1996.

Shea, S.J., Shea, M.E.C., & McKee, G.R. Empirically derived profile subgroups of pretrial felony offenders. Presented at the meeting of the Southeastern Psychological Association, Norfolk, VA, 1996.

Shea, S.J., McKee, G.R., Foster, A.M. & Bostdorff, C. Characteristics of women who kill their children. Presented at the meeting of the American Psychological Association, New York, August, 1995.

McKee, G. Competency of Juveniles. Family Court JCLE: "Juvenile Crime". South Carolina Bar Continuing Legal Education Division, August 19, 1994, Columbia, SC.

Shea, S., McKee, G., Craig, M. MMPI-2 Profiles of Female Pre-trial Defendants. Paper presented at meeting of the American Psychological Association, Los Angeles, August, 1994.

Shea, S., Cook-Culley D., McKee, G. and Rush, C. MMPI-2 Profiles of Male Pre-trial Defendants. Paper presented at the meeting of the American Psychological Association, Toronto, August, 1993.

RECENT PRESENTATIONS (Cont'd.):

Ccok-Culley, D. Shea, S., McKee, G. and Rush, C. Racial Differences in MMPI-2 Profiles of Male Pre-trial Defendants. Paper presented at the meeting of the American Psychological Association Toronto, August, 1993.

McKee, G. "Mentally ill defendants" Continuing Legal Education lecture for SC Summary Court Judges Association, Columbia, SC, March 8, 1995.

McKee, G. "Competency to Stand Trial Evaluations". Continuing Legal Education lecture to defense attorneys. Columbia, SC. Dec, 1991.

McKee, G. "Psychological Aspects cf Youthful Offenders". One day workshop to SC Probation/parole officers. Columbia, SC. Dec, 1991.

McKee, G. "Forensic Psychological Evaluations". Lecture to SC Public Defenders Association Annual Convention, North Myrtle Beach, Oct, 1991.

McKee, G. (Chair), Golding, S., Shapiro, D., Skidmore, S. "Specialty Guidelines for Forensic Psychologists: Clinical Implications". Invited symposium at the meeting of the American Psychological Association, San Francisco, August, 1991.

McKee, G. "Psychological Assessment of Sex Offenders" Half-day and Full day Workshops to SC Dept of Corrections Social Work staff 1986, 1987, 1988, 1989, 1990, 1991.

McKee, G. "Accepting Legal Referrals" Half-day workshop. Sixth Annual Treatment Conference on Sexual Abuse. Aiken-Barnwell Mental Health Center, Hilton Head, SC. March 1, 1991.

McKee, G. "Prediction of Dangerousness" Half-day workshop to SC State House Security Staff. Columbia, SC. December 10, 1990.

McKee, G. Invited Address: "Criminal Forensic Assessment" meeting of the American Psychological Association Los Angeles, August, 1985.

# APPENDIX 18

## Motion for Funds for Neuropsychologist
## August 27, 1997

STATE OF NORTH CAROLINA
CAMDEN COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
88 CRS 202, 332

FILED

1997 AUG 27 PM 1: 39

CAMDEN COUNTY, C.S.C.

STATE OF NORTH CAROLINA

v.

WADE LARRY COLE,
Defendant

BY ado

)
)
)
)
)
)
)

MOTION FOR FUNDS
FOR NEUROPSYCHOLOGIST

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NOW COMES the Defendant, Wade Larry Cole, through counsel, respectfully moving the Court to enter an order requiring the State of North Carolina to provide funds with which the Defendant may employ Helen Johnson Rogers, an expert in neuropsychology. In support of this motion, the Defendant states the following:

1.      In 1989 a capital trial was held in which a jury convicted Wade Larry Cole of the first-degree murder of Theresa Graham and involuntary manslaughter of Hattie Graham. Petitioner was sentenced to death for the first-degree murder. The Supreme Court of North Carolina reversed the convictions and ordered a new trial on both charges. *State v. Cole*, 331 N.C. 272, 415 S.E.2d 716 (1992).

2.      A judgment of death was entered against defendant at the retrial at the May 31, 1993 Criminal Session of the Superior Court for Camden County, the Honorable James A. Beaty, Jr., presiding.

3.      The judgment was affirmed by the Supreme Court of North Carolina on June 13, 1996. The North Carolina Supreme Court's opinion is published at *State v. Cole*, 343 N.C. 399, 471 S.E.2d 362 (1996)

4.      The United States Supreme Court denied *certiorari* review on January 6, 1997. *Cole v. North Carolina*, ___ U.S. ___, 117 S.Ct. 703 (1997).

5.      Defendant alleges that his conviction and judgment of death were imposed in violation of the law, and defendant, through appointed counsel, intends to file a Motion for

Appropriate Relief, pursuant to North Carolina General Statutes §§ 15A-1411 *et. seq.* in order to remedy the constitutional and procedural flaws in the proceedings which resulted in his death sentence.

6. On May 9, 1997, defendant filed a motion requesting funds for a mental health expert. This motion was heard in open court on May 27, 1997. Superior Court Judge J. Richard Parker denied the motion in an order dated June 23, 1997.

7. Judge Parker stated in his order: "[T]his Court finds and concludes that Cole has failed to make an adequate showing of a particularized need" for assistance.

8. Defendant has since that time contacted Seymour L. Halleck, M.D. an expert in forensic psychiatry and Helen Johnson Rogers, Ph.D., an expert in neuropsychology. Both experts reviewed all of Wade Larry Cole's Dix records, trial transcripts, and investigative reports conducted before the second trial in order to ascertain whether a need for further testing was indicated.

9. Both Dr. Halleck and Dr. Rogers concluded that Wade Larry Cole's records contained evidence of possible brain damage. (see attached letter of Dr. Halleck and affidavit of Dr. Rogers)

10. Wade Larry Cole has not previously been evaluated specifically for brain damage.

11. It is well established that any evidence regarding the mental impairments or limitations of an accused are constitutionally indispensable to the capital sentencing determination.

> [E]vidence about the defendant's background and character is relevant [to an individualized appropriateness of the death penalty] because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.

California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring). Accord Woodson v. North Carolina, 428 U.S. 280, 304 (1976) (any of the "diverse frailties of humankind" regarding the accused must be taken into consideration); Lockett v. Ohio, 438

U.S. 586, 604 (1978) (sentencer must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character of record...as a basis for a sentence less than death"); Eddings v. Oklahoma, 455 U.S. 104 (1982) (childhood trauma must be considered by the sentencer); People v. Marsh, 36 Cal.3d 134 (1984) (evidence of unhappy childhood and neglect found to be mitigating factor); Moody v. State, 418 So.2d 989 (Fla. 1982) (personality change following service in Vietnam a mitigating factor).

12.     Retesting a defendant is approved of by the North Carolina Supreme Court in that: "[t]he conclusions of any mental health expert, his diagnoses and postdictions, are only as reliable as the data on which those conclusions are based. . . .Although the underlying condition may always be present, the mental illness may over time manifest itself with symptoms of varying intensity. Knowing the parameters of the illness may increase the reliability of an expert's postdictions about a defendant's mental condition." *State v. Huff*, 325 N.C. 1, 46, 381 S.E.2d 635, 661 (1989), *sentence vacated on other grounds*, 497 U.S. 1021, 110 S.Ct. 3266, 111 L.Ed.2d 777 (1990).

13.     That in May 1997 defendant listed the following factors as supporting a particularized need for expert assistance:

a)  The psychiatrists retained by trial counsel at the two trials disagree on the Defendant's diagnosis, including the statutory mitigator of whether defendant had the capacity to conform his conduct to the requirements of the law;

b)  As the question of Defendant's capacity is central to capital sentencing, all of Defendant's mental health records must be reviewed. Counsel are not trained to analyze mental health records and require the assistance of an expert to review the mental health records of Defendant and examine Defendant.

c)  Defendant was committed to Dorothea Dix twice before his first trial. The medical records from Dorothea Dix hospital indicate that for a period during his second commitment Defendant was incompetent, but was found competent

before his release. Questions surrounding Defendant's fluctuating mental health status have not been answered;

c) Defendant has not been assessed in accordance with the Rogers Criminal Responsibility Assessment Scale, which is pertinent to the facts of this case;

d) Defendant's aunt was committed for a lengthy period to Cherry Hospital. She died institutionalized. The records of her institutionalization have not been analyzed, even to minimal extent of learning the diagnosis. As some mental illnesses are genetic, her diagnosis could be relevant to determining Defendant's correct diagnosis. This is especially crucial in light of the disagreement between Dr. Emanuelson and Dr. Brown on the existence of the statutory mitigator.

e) Defendant has been seen on a monthly basis by mental health professionals at Central Prison since he was transferred to Death Row. These extensive medical records need to be reviewed.

14.     That in addition to the above factors, defendant's records have now been reviewed by two experts. Both Dr. Halleck and Dr. Rogers have find that Wade Larry Cole's records indicate the possibility of an organic disorder. Ascertaining whether the brain damage exists and the extent of the damage requires testing which has not previously been performed.

15.     That Sections 7A-450(b), 7A-454, and 15A-1421 of the North Carolina General Statutes provide that indigent capital defendants in state post-conviction proceedings are entitled to expert assistance at state expense once a threshold showing of specific necessity has been made.

16.     Undersigned counsel, therefore, desire to retain the services of Helen Johnson Rogers, Ph.D. Her resume is appended to this motion and hereby incorporated by reference.

ACCORDINGLY, Defendant requests that this court order that he be allowed to expend up to $3,000.00 to retain Helen Johnson Rogers as a neuropsychologist.

Respectfully submitted, this _25_ day of August 1997.

MASSENGALE & OZER

William F. W. Massengale
N.C. State Bar No. 12191

Marilyn G. Ozer
N.C. State Bar No. 18360

Attorneys for Defendant
211 North Columbia Street
Chapel Hill, North Carolina 27514
(919) 967-8555

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing Motion upon Assistant District Attorney Robert Trivette, 202 East Colonial Avenue, Elizabeth City, North Carolina, 27909, by fax and by placing same in a postage prepaid and properly addressed envelope and mailing it from Chapel Hill, North Carolina on this the _25_ day of August 1997.

Marilyn G. Ozer

### SEYMOUR L. HALLECK, M.D.
500 Laurel Hill Road
Chapel Hill, NC 27514

Forensic Psychiatry　　　Phone: (919) 967-7999
Fax: (919) 929-0709

August 1, 1997

Mr. William F. W. Massengale
Massengale & Ozer
Attorneys at Law
211 North Columbia Street
Chapel Hill, NC 27514

Re: Wade Larry Cole
　　Post-Conviction

Dear Bill:

　　In reviewing Wade Larry Cole's medical records I noted that the Dix Hospital physicians recorded a history of a head injury during his childhood. They were also concerned about his memory loss. They did an electroencephalogram and a Bender-Gestalt test, both of which were normal.

　　I believe that more extensive testing, including a brain MRI and more sophisticated neuropsychological testing could uncover an organic disorder that was not previously detected. Evidence of an organic brain disorder could have helped Mr. Cole's defense.

Sincerely,

Seymour L. Halleck, M.D.

STATE OF NORTH CAROLINA
CAMDEN COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
88 CRS 202, 332

STATE OF NORTH CAROLINA      )
                             )
              v.             )      AFFIDAVIT
                             )
WADE LARRY COLE,             )
              Defendant      )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Helen Johnson Rogers, Ph.D., after first being duly sworn, deposes and says the following:

1. I have personal knowledge of the facts in this affidavit.

2. I am a clinical psychologist with a specialty in clinical neuropsychology, licensed as a Practicing Psychologist and Health Services Provider by the North Carolina Psychology Board.

3. I practice psychology at the offices of Triangle Psychology Services, 5425 Turkey Farm Road, Durham, NC 27705.

4. My practice involves evaluation and treatment of psychological disorders. I have been consulted and appeared as an expert witness in the area of neuropsychology in approximately eight capital murder cases.

5. I was asked by defendant's attorney, Marilyn Ozer, to review records of the case of Wade Larry Cole to render an opinion concerning the particularized need for neuropsychological evaluation of Wade Larry Cole.

6. I have reviewed interviews with Larry Wade Cole, his family members, friends, and teachers, along with medical records from Dorothea Dix Hospital; a transcript of testimony given by Dorothea Dix personnel evaluating defendant's competency; the defendant's statement; trial testimony of Robert Brown, M.D. and Margaret

Emanuelson, Ph.D.; and correspondence concerning Wade Larry Cole's mental condition while he was confined at Dix Hospital.

7. After reviewing the above material, I have formed the opinion that Wade Larry Cole's history supports the possibility of brain damage, specifically: Wade Larry Cole's history of childhood "spells"; history of impulsivity; lack of comprehension concerning his actions; a head injury which included loss of consciousness, residual dizziness and headaches; alcohol abuse since childhood; and memory disturbance.

8. A neuropsychological evaluation is necessary to ascertain whether brain damage should have been submitted as a mitigating factor in the capital trials of Wade Larry Cole.

Further the affiant sayeth not.

This is the 25th day of August, 1997.

Helen Johnson Rogers, Ph.D.

Sworn to and subscribed
before me this 25th day of August, 1997.

Notary Public
My Commission Expires: _O2 -O5-O2_

## CURRICULUM VITAE

Helen Johnson Rogers, Ph.D.           Triangle Psychology Services, P.A.
3222 Tipi Lane                        5425 Turkey Farm Road
Durham, North Carolina  27705         Durham, North Carolina  27705

(919) 942-8064                        (919) 968-8070

Birthdate:  10/15/51                  Tax I.D. # (EIN) 56-1215132
S.S.# 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

**EDUCATION:**

University of North Carolina at Chapel Hill        A.B. 1973, Zoology and
Chapel Hill, North Carolina                       Psychology with honors in
                                                  Psychology

University of North Carolina at Chapel Hill        Ph.D. 1980, Experimental
                                                  Psychology: Neurobiology minor

**PROFESSIONAL LICENSURE:**                        Practicing Psychologist
                                                  North Carolina  #1685

**PROFESSIONAL EXPERIENCE:**

6/89 - Present          Private Practice in Clinical Psychology with specialty
                        in Clinical Neuropsychology

5/90 - 11/92            Consultant in Neuropsychology,
                        Department of Psychiatry,
                        University of North Carolina School of Medicine,
                        Chapel Hill, North Carolina

6/87 - 5/89             Research Associate, Duke University Medical Center,
                        Durham, NC
                        Neuropsychology Coordinator for the Consortium to
                        Establish a Registry for Alzheimer's Disease (CERAD)

04/84 - 06/87           Consultant in Neuropsychology

                            Alzheimer's Disease Research Center
                            Duke University Medical Center, Durham, NC  27710

                            American Innovisions, Inc.,
                            7750 Dagget Street, Suite 210, San Diego, CA  92111

10/80 - 09/84           Research Associate, Department of Psychiatry
                        Duke University Medical Center, Durham, North Carolina

05/80 - 09/80           Research Analyst, Department of Psychology,
                        University of North Carolina at Chapel Hill,
                        Chapel Hill, North Carolina

05/79 - 05/80           Predoctoral Fellow, Administration of Aging
                        Center for the Study of Aging and Human Development
                        Duke University Medical Center, Durham, North Carolina

| | |
|---|---|
| 09/78 - 08/79 | Instructor for Introductory Psychology, Department of Psychology, University of North Carolina at Chapel Hill, Chapel Hill, North Carolina |
| 09/77 - 09/78 | Clinical Psychology Intern: Neuropsychiatric VA Hospital, Highland Drive Pittsburgh, Pennsylvania and Arsenal Children's Center, Pittsburgh, Pennsylvania |
| 05/76 - 06/77 | Predoctoral Traineeship Clinical Studies Division, Environmental Protection Agency, Chapel Hill, NC |
| 09/73 - 05/75 | NIMH Predoctoral Traineeship, Department of Psychology University of North Carolina at Chapel Hill, Chapel Hill, North Carolina |
| 09/72 - 05/73 | Honors research:  Projection from superior colliculus and visual cortex to pons in the rat |

PROFESSIONAL MEMBERSHIP & SERVICE:

North Carolina Psychological Association
  Serving as Chair of Medicare Subcommittee, Insurance
  Committee

American Psychological Association
  Member of Divisions of Clinical Neuropsychology
  and Independent Practice

North Carolina Head Injury Foundation

Orange County Alliance for the Mentally Ill

Human Rights Advisory Committee
  Learning Services, Inc., Carolina Community
  Re-Entry Program

HONORS AND AWARDS:

| | |
|---|---|
| 1979 | Administration on Aging Predoctoral Dissertation Support Award |
| 1973 | Sigma Xi Award for Undergraduate Research |

PUBLICATIONS:

*Vreeland RG and Johnson HE.  Youthful firesetters and their families:  A framework for conducting interviews.  Report prepared for the U.S. Forest Service, U.S. Department of Agriculture, August, 1980.

*Johnson HE.   Enhancing recognition memory in older adults.   Dissertation, Department of Psychology, UNC-Chapel Hill, May 1980.

Weiner RD, Rogers HJ, Davidson J, Miller RD.  Evaluation of the central nervous system risks of ECT.  Psychopharmacology Bulletin 18:29-31, 1982.

Welch, CA, Weiner RD, Weir D, Cahill, JF, Rogers HJ, Davidson J, Miller RD, Mandel MR.  Efficacy of ECT in the treatment of depression.  Waveform and electrode placement considerations.Psychopharmacology Bulletin 18:31-32, 1982.

Daniel WF, Crovitz HF, Weiner RD, Rogers HJ.  The effects of ECT modifications on autobiographical and verbal memory.  Biological Psychiatry 17:919-924, 1982.

Weiner RD, Rogers HJ, Welch CA, Davidson JRT, Miller RD, Weir D, Cahill JF, Squire LR.  ECT stimulus parameters and electrode placement:  Relevance to therapeutic and adverse effects.  IN:  Lerer B, Weiner RD, Belmaker RH. (Eds.),ECT:  Basic Mechanisms, London:  John Libbey and Co., Ltd., 1983, pp. 139-147.

Weiner RD, Rogers HJ, Davidson, JRT, Kahn EM.  Effects of ECT upon brain electrical activity.  (Malitz S, Sackeim HA, Eds.), IN:  Electroconvulsive Therapy:  Clinical and Basic Research Issues, New York, Annals of the New York Academy of Sciences 462:270-281, 1986.

Weiner RD, Rogers HJ, Davidson, JRT, Squire LR.  Effects of stimulus parameters on cognitive side effects.  (Malitz S., Sackeim HA, Eds.), IN: Electroconvulsive Therapy:  Clinical and Basic Research Issues, New York, Annals of the New York Academy of Sciences 462:315-325, 1986.

Heyman A, Schmechel D, Wilkinson W, Rogers HJ, Krishnan R, Holloway D, Schultz K, Gwyther L. Peoples R, Utley C, Haynes C.  Failure of long term high-dose lecithin to retard progression of early-onset Alzheimer's disease.  Journal of Neural Transmission (Suppl 1) 24:279-286, 1987.

Horner J, Heyman A, Dawson D, Rogers H.  The relationship of agraphia to the severity of dementia in Alzheimer's disease.   Archives of Neurology 45:760-763, 1988.

Krishnan R, Heyman A, Ritchie J, Utley C, Dawson D, Rogers H. Depression in early onset Alzheimer's disease: clinical and neuroendocrine correlates. Biological Psychiatry, 24:937-940.

Morris J, Mohs, Rogers H, Fillenbaum G, Heyman A. CERAD clinical and neuropsychological assessment of Alzheimer's disease. Psychopharmacology Bulletin. Vol. 24, No.4:641-652, 1988.

Rogers, HJ, (Editor) CERAD UPDATE for the Consortium to Establish a Registry for Alzheimer's Disease, May 1988-May 1989.

Stern R, Singer W, Silva S, Rogers H, et al. Neurobehavioral functioning in a nonconfounded group of asymptomatic HIV-seropositive homosexual men, American Journal of Psychiatry, 149:1099-1102, 1992.

*Last name changed from Johnson to Rogers, 1981.

# APPENDIX 19


# Renewed Motion for Neuropsychologist
# November 15, 1999

STATE OF NORTH CAROLINA
CAMDEN COUNTY

FILED
IN THE GENERAL COURT OF JUSTICE
1999 NOV 15 AM 9:58 SUPERIOR COURT DIVISION
88 CRS 202, 232
CAMDEN COUNTY, C.S.C.

BY_____  _____

STATE OF NORTH CAROLINA,

vs.

WADE LARRY COLE,
            Defendant-Petitioner

RENEWED MOTION FOR
NEUROPSYCHOLOGIST
IN REPLY TO THE STATE'S
RESPONSE TO PETITIONER'S MAR

        NOW COMES the Defendant, Wade Larry Cole, through counsel, respectfully moving the Court to enter an order requiring the State of North Carolina to provide funds with which the Defendant may employ an expert in neuropsychology. In support of this motion, the Defendant states the following:

1.   That on August 25, 1997, defendant-petitioner filed a Motion For Funds for Neuropsychologist.

2.   That on September 15, 1997, a hearing was held in open court before the Honorable James R. Strickland. The Court heard argument from both defendant and the State and denied the motion for funds.

3.   That since that time defendant-petitioner has filed an *ex parte* motion for funds, which was also denied. The motion and order are under seal.

4.   That on September 23, 1999, defendant-petitioner filed a Third Amendment to his Motion for Appropriate Relief which included a claim that trial counsel were ineffective for failing to request funds to hire an expert to perform neuropsychological testing.

5. That on November 9, 1999 the State mailed a response to defendant-petitioner's motion to the Superior Court in Camden County and served a copy on defendant-petitioner. Defendant-petitioner received his copy of the response on November 10, 1999, five days before the hearing was scheduled to begin.

6. That in part the State's response alleges that defendant-petitioner has "failed to come forward with sufficient facts to justify an evidentiary hearing" on the claim involving neuropsychological testing. (State' response, p. 3)

7. In fact defendant-petitioner has motioned the court on two separate occasions for funds for a neuropsychologist. At the motion hearing heard on September 15, 1999, defendant-petitioner supplied the court with an affidavit of a neuropsychologist who had examined defendant's mental health records on a pro bono basis. This neurpsychologist wrote: "After reviewing the above material, I have formed the opinion that Wade Larry Cole's history supports the possibility of brain damage, specifically: Wade Larry Cole's history of childhood "spells"; history of impulsivity; lack of comprehension concerning his actions; a head injury which included loss of consciousness, residual dizziness and headaches; alcohol abuse since childhood; and memory disturbance." (attached hereto)

8. Dr. Seymour L. Halleck, M.D., an expert in forensic psychiatry, also reviewed the records and wrote: "I believe that more extensive testing, including a brain MRI and more sophisticated neuropsychological testing could uncover an organic disorder that was not previously detected." (attached hereto)

9. At the hearing held on September 15, 1997, defendant-petitioner argued that the tests done by previous mental health experts were not specific enough to uncover brain

damage: "Dr. Rogers has told me that the tests that Dr. Lynn did were very preliminary. They would only find ten percent (10%) of possible types of brain damage. So the test which is mentioned in Mr Parrish's motion shows visual and motor difficulties which would only indicate duress brain damage. There was some general physical screens. She said the metabolic test of the blood might show some sort of an abnormality in the brain, but that would be fairly rare. The x-rays would only show a fracture of the skull. The EEG indicates a problem if there's an active seizure going on. It's her opinion that the type of brain damage that she suspects Mr. Cole might be suffering from is the kind caused by a mild head injury. He was in a car accident and he was unconscious for a period of time and he has been a chronic substance abuser. That type of brain damage only shows up in a battery of comprehensive tests. None of which have been performed to date." (September 15, 1997, pp. 12-13)

10. The State opposed defendant-petitioner's motion and it was denied.

11. On October 28, 1999 the United States Supreme Court granted certiorari in *Williams v. Taylor*, 99-6615 (case below, *Williams v. Taylor,* 189 F.3d 421 (1999)) Part of the question to be argued before the Court is whether a petitioner can be denied an evidentiary hearing in federal court based on his failure to develop facts in the state court when the state court denied all funding requests for experts.) Every federal circuit which has interpreted this question has found that an evidentiary hearing cannot be denied "where an applicant has diligently sought to develop the factual basis of a claim for habeas relief, but has been denied the opportunity to do so by the state court. . ..." *Cardwell v. Greene*, 152 F.3d 331, 337 (4th Cir. 1998) *cert. denied,*

119 S.Ct. 587 (1998); *Miller v. Champion*, 161 F.3d 1249, 1253 (10th Cir. 1998) (where a petitioner has diligently sought to develop the factual basis underlying his habeas petition, but a state court has prevented him from doing so, sec. 2254(e)(2) does not apply); *McDonald v. Johnson*, 129 F.3d 1056, 1059 (5th Cir. 1998) (a petitioner cannot be said to have 'failed to develop' a factual basis for his claim unless the undeveloped record is a result of his own decision or omission); *Burris v. Parke*, 116 F.3d 256, 258-59 (7th Cir.) ("To be attributable to a 'failure' under federal law, the deficiency in the record must reflect something the petitioner did or omitted."}, *cert denied*, 118 S.Ct. 462 (1997); *Jones v. Wood*, 114 F.3d 1002, 1013-14 (9th Cir. 1997) (Petitioner did not 'fail to develop' where the state court denied a hearing*); Love v. Morton*, 112 F.3d 131, 16 (3rd Cir. 1997) (petitioner did not fail to develop basis of claim where trial court's actions precluded development of record).

12. While a state may elect to deny all resources it cannot then argue that the indigent petitioner, who requested the necessary resources for claim discovery and development, is responsible for the failure to develop the state court record. See, *Correll v. Stewart*, 137 F.3d 1404, 1414 (9th Cir. 1998); *Burris*, 116 F.3d at 359.

13. Thus the State's allegation that defendant-petitioner's claim should be precluded because he has "failed to come forward with sufficient facts to justify an evidentiary hearing" on the claim involving neuropsychological testing is contrary to federal law. The United States Supreme Court has not issued an opinion on this issue, but will consider the question this term. There will be a United States Supreme Court decision on this issue while the instant case is pending in either state or federal court.

14. The assessment of a neurologist is essential to defendant-petitioner's allegation of ineffective assistance of counsel because the sentencing jury did not find the submitted statutory mitigating factor of diminished capacity. A finding of organic brain damage would have provided substantial evidence to support this statutory mitigating factor.

Accordingly, as: a) the State has alleged that defendant-petitioner has failed to come forward with sufficient facts on the issue involving a neuropsychologist; b) federal circuit law finds that habeas petitioners cannot be precluded by failure to develop a claim when the state has denied resources, and c) the United States Court will decide this issue this term and its decision will be precedential, defendant-petitioner respectfully requests:

1. This Court order the State of North Carolina provide defendant-petitioner with funds to hire a neuropsychologist to assess defendant-petitioner for organic brain damage;

2. Continue the hearing on defendant-petitioner's Claim Six until the above assessment has been completed.

STATE OF NORTH CAROLINA      IN THE GENERAL COURT OF JUSTICE
CAMDEN COUNTY                       SUPERIOR COURT DIVISION
                                              88 CRS 202, 332

STATE OF NORTH CAROLINA          )
                                                       )
                    v.                              )        AFFIDAVIT
                                                       )
WADE LARRY COLE,                       )
              Defendant                     )

*******************************************************

      Helen Johnson Rogers, Ph.D., after first being duly sworn, deposes and says the following:

1. I have personal knowledge of the facts in this affidavit.

2. I am a clinical psychologist with a specialty in clinical neuropsychology, licensed as a Practicing Psychologist and Health Services Provider by the North Carolina Psychology Board.

3. I practice psychology at the offices of Triangle Psychology Services, 5425 Turkey Farm Road, Durham, NC 27705.

4. My practice involves evaluation and treatment of psychological disorders. I have been consulted and appeared as an expert witness in the area of neuropsychology in approximately eight capital murder cases.

5. I was asked by defendant's attorney, Marilyn Ozer, to review records of the case of Wade Larry Cole to render an opinion concerning the particularized need for neuropsychological evaluation of Wade Larry Cole.

6. I have reviewed interviews with Larry Wade Cole, his family members, friends, and teachers, along with medical records from Dorothea Dix Hospital; a transcript of testimony given by Dorothea Dix personnel evaluating defendant's competency; the defendant's statement; trial testimony of Robert Brown, M.D. and Margaret

Emanuelson, Ph.D.; and correspondence concerning Wade Larry Cole's mental condition while he was confined at Dix Hospital.

7. After reviewing the above material, I have formed the opinion that Wade Larry Cole's history supports the possibility of brain damage, specifically: Wade Larry Cole's history of childhood "spells"; history of impulsivity; lack of comprehension concerning his actions; a head injury which included loss of consciousness, residual dizziness and headaches; alcohol abuse since childhood; and memory disturbance.

8. A neuropsychological evaluation is necessary to ascertain whether brain damage should have been submitted as a mitigating factor in the capital trials of Wade Larry Cole.

Further the affiant sayeth not.

This is the 25th day of August, 1997.

Helen Johnson Rogers, Ph.D.

Sworn to and subscribed
before me this 25th day of August, 1997.

Notary Public
My Commission Expires: 02-05-02

# SEYMOUR L. HALLECK, M.D.
### 500 Laurel Hill Road
### Chapel Hill, NC 27514

Forensic Psychiatry       Phone: (919) 967-7999
                          Fax: (919) 929-0709

August 1, 1997


Mr. William F. W. Massengale
Massengale & Ozer
Attorneys at Law
211 North Columbia Street
Chapel Hill, NC 27514

Re:  Wade Larry Cole
     Post-Conviction

Dear Bill:

    In reviewing Wade Larry Cole's medical records I noted that the Dix Hospital physicians recorded a history of a head injury during his childhood. They were also concerned about his memory loss. They did an electroencephalogram and a Bender-Gestalt test, both of which were normal.

    I believe that more extensive testing, including a brain MRI and more sophisticated neuropsychological testing could uncover an organic disorder that was not previously detected. Evidence of an organic brain disorder could have helped Mr. Cole's defense.

                          Sincerely,

                          Seymour L. Halleck, M.D.

# APPENDIX 20

**Affidavit of Dr. Claudia Coleman**

STATE OF NORTH CAROLINA
CAMDEN COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 88-CRS-202; 88-CRS-332

STATE OF NORTH CAROLINA    )
                            )
        v.                  )
                            )
WADE LARRY COLE,            )
        Defendant           )
                            )

**AFFIDAVIT OF**
**CLAUDIA R. COLEMAN, PH.D.**

Claudia R. Coleman, Ph.D., having been duly sworn, deposes and says:

1.      I am a clinical psychologist in private practice in Raleigh, North Carolina, and I am licensed to practice in the State of North Carolina. I have been licensed to practice since 1982 and my license number is 1026. My practice includes forensic evaluations and consultations, neuropsychological assessments and psychodiagnostic evaluations.

2.      I was retained by current defense counsel to perform a neuropsychological evaluation of Wade Larry Cole in order to assess whether or not Mr. Cole has neurocognitive and/or neurobehavioral deficits that would have been relevant to psychological defense and mitigation issues at the time of his trial.

3.      In preparation for the direct evaluation I reviewed the following legal, medical and psychosocial documentation relative to Mr. Cole:

> Transcript of Statement of Larry Wade Cole to Investigators dated 06-23-88
> Medical Records from Dorothea Dix Hospital (DDH), 10-21-88 to 11-11-88
> Forensic Report from 10-21-88 DDH Admission
> Medical Records from DDH, 03-01-89 to 05-22-89
> Forensic Report from 03-01-89 DDH Admission
> Psychological Evaluation Report from DDH, dated October, 1988
> Raw Psychological Test Data from Psychological Evaluation in October, 1988
> Affidavit of Dorothy Humphrey, dated 11-19-01
> Copy of Defense Motion to Extend Recommitment, dated 05-22-89
> Partial Transcript of Dr. Cabe Lynn's Testimony at 1989 Competency Hearing
> Transcript of 1989 Trial Testimony of Margaret Emmanuelson, Ph.D.
> Raw Data from Intelligence and Academic Testing by Dr. Emmanuelson in 1989

Letter and Report of 1993 Evaluation of Brian Grover, Psy.D.
Raw Data from Intelligence Testing by Dr. Grover in 1993
Transcript of 1994 Trial Testimony of Brian Grover, Psy.D.
Forensic Report of Robert Brown, Jr., M.D., dated 09-14-93
Transcript of 1994 Trial Testimony of Robert Brown, Jr., M.D.
Partial Transcript of 1994 Trial Testimony of Wade Larry Cole
1995 Adaptive Behavior Test Results/Report of Gregory Olley, Ph.D.
Transcript Dr. Gregory Olley's Testimony from 2003 Mental Retardation Hearing
Partial Transcript of Testimony of Attorney Lennie Hughes
Defendant's School Records
Affidavit of Ms. Helen Sutton, retired schoolteacher, dated 11-06-01
Affidavit of Ms. Shirley Simpson, neighbor/community leader, dated 11-06-02
Affidavit of Ms. Jane Brickhouse, retired schoolteacher, dated 11-05-01
Affidavit of Mr. Paul Winslow, retired schoolteacher and coach, dated 11-05-01
Affidavit of Mr. Ernest Cole, brother, dated 11-03-01
Affidavit of Mr. Rufus Cole, brother, dated 11-03-01

4.      I also was provided some psychosocial history and case background information by Marilyn Ozer, Defense Counsel.

5.      Information contained in the above records that was highly relevant to neuropsychological issues consisted of Mr. Cole's history of substantial alcohol and drug use, his significantly below average intellectual functioning and poor academic achievement, and his report of head injury as a teenager (first noted in the records of Dorothea Dix Hospital in October of 1988).

6.      With regard to drug and alcohol use, the records reflected that Mr. Cole had a long history of alcohol and drug use that began at an early age. He drank wine on a daily basis and also smoked marijuana several days per week. The alcohol and marijuana usage was documented in the Dorothea Dix Hospital Records and in the records and/or testimony of Dr. Margaret Emmanuelson, Dr. Brian Grover, and Dr. Robert Brown, Jr. Mr. Cole was given diagnoses of substance abuse and dependence.

7.      Mr. Cole's school records indicated poor academic skills throughout school and reflected three grade failures before quitting school at age twenty. Standardized achievement test scores during his school years reflected significantly below average abilities. Information obtained from Mr. Cole's teachers revealed that he was a very slow learner and would have been placed in special education classes had such classes been available at that time. Family members further confirmed that Mr. Cole was mentally slow. The first record of an individually administered intelligence test being administered to Mr. Cole was during his pre-trial forensic evaluation at Dorothea Dix Hospital in 1988. The results of the Wechsler Adult Intelligence Scale-Revised (WAIS-R) administered by Dorothy Humphrey, M.A., at that time indicated a Full Scale IQ of 68. This score fell within the range of Mild Mental Retardation and Mr. Cole was given that diagnosis by Dr. Cabe Lynn. The adaptive behavior assessment conducted by Dr. Olley in 2003 revealed lifelong serious limitations that fall in the range of mental retardation. A

later WAIS-R was administered to Mr. Cole by Dr. Margaret Emmanuelson in July of 1989. It is noteworthy that this testing was conducted only nine months after the first WAIS-R had been given to Mr. Cole despite standard agreement by test experts that such close administration is confounded by practice effects. Additionally, Dr. Emmanuelson did not administer the entire test and the resulting scores were not absolute, rather they were based upon only nine of the eleven subtests. Expectedly, the scores were higher and reflected an estimated (prorated) Full Scale IQ of 79 in the Borderline range. A final WAIS-R was administered in 1993 and again reflected Mr. Cole's experience with the test items as he obtained a Full Scale score of 81. Finally, intelligence screening conducted by the Department of Corrections when Mr. Cole was first convicted revealed an IQ score of 60 on the Beta.

      8.      Upon admission to Dorothea Dix Hospital as part of a Court-ordered pre-trial forensic evaluation in October of 1988, Mr. Cole reported during a routine physical and history examination that he had sustained a head injury from an accident when younger. The hospital record reveals that he noted that he had been "knocked unconscious". Dr. Emmanuelson testified that Mr. Cole also reported that accident to her when she performed an independent pre-trial psychological examination.

      9.      It is noteworthy that there was apparently much questioning by Dr. Lynn and the other clinical staff at Dorothea Dix Hospital regarding whether or not Mr. Cole's poor memory for events, including events surrounding the offenses, had some type of organic basis. It was noted that he had a history of head injury when younger. An EEG was conducted despite the fact that there was no noted evidence of prior or current seizure. Rather, Dr. Lynn's report and testimony reflected that he was unsure of the cause of this specific area of poor memory and that possible causes in addition to organicity were massive denial and malingering. Dr. Lynn did testify that the other forensic psychiatrists at Dorothea Dix Hospital with whom he had consulted thought "...that it was massive denial or possibly actual memory loss." He then testified that he thought another opinion on this matter would be helpful. Despite these concerns, there is no evidence from the record or history that further psychiatric, medical or neuropsychological assessment of possible organic brain impairment was conducted.

      10.     Prior psychiatric findings were also reviewed and considered as part of the current evaluation. Specifically, it is noted that pre-trial diagnoses from Dorothea Dix Hospital were for Passive-Aggressive Personality; Adjustment Disorder with Depressed Mood; Alcohol Abuse and Mild Mental Retardation. Dr. Emmanuelson in her 1989 testimony diagnosed Schizophrenia; Alcohol Dependence, Cannabis Dependence, Borderline Retardation, and Paranoid Personality Disorder. As a result of his evaluation in 1993 Dr. Grover also found alcohol and cannabis abuse. Dr. Brown testified in 1994 that the results of his forensic psychiatric evaluation showed Mr. Cole suffered from a Delusional Disorder, Jealous Type at the time of the offenses and that he had not shown on-going evidence supportive of Dr. Emmanuelson's previous diagnosis of Schizophrenia. It was also Dr. Brown's opinion that Mr. Cole suffered from symptoms of Posttraumatic Stress Disorder (PTSD) after the offenses. Dr. Brown specifically mentioned in his testimony the recurring nightmares Mr. Cole was having at that time as being one of the PTSD symptoms.

11.     The current examination of Mr. Cole was conducted at Central Prison in Raleigh, North Carolina on September 2, 2004. In addition to clinical interview, the following formal assessment procedures were administered:

Wechsler Memory Scale, Third Edition (WMS-III),
    Logical Memory
    Visual Reproductions
    Digit Span
    Letter Number Sequencing
California Verbal Learning Test, Second Edition (CVLT-II)
Trails A and B
Stroop Color and Word Test
Spatial Relations Test
Controlled Oral Word Association Test (COWA)
Boston Naming Test
Wisconsin Card Sort Test (WCST)
Short Form Booklet Category Test
Rey 15-Item Test
Test of Memory Malingering (TOMM)

12.     Upon presentation, Mr. Cole was pleasant and cooperative. Speech was soft, modulated, and unpressured. Mr. Cole was noted to be left-handed. He openly discussed his history of academic learning problems in school consistent with his poor grades, low achievement test scores during school years, and the substandard intellectual functioning revealed by testing after his arrest. In discussing memory problems, Mr. Cole reported "always" having difficulty learning and recalling new information. He noted some forgetfulness that had been present "for years". He also admitted memory gaps for remote historical information, and he attributed these to his drinking over the years, describing frequent alcoholic blackouts during adulthood.

13.     When questioned as to pre-trial memory problems, Mr. Cole reported that it had been difficult for him to clearly recall many events, including circumstances surrounding the offenses, for some time after his arrest. Over time he recalled more information. He attributed memory problems at that time to his stressful situation.

14.     In describing his history of substance abuse, Mr. Cole stated that he had drank alcohol and smoked "reefer". When asked specifically what he meant by the term "reefer" he replied "mixed reefer". Since this is a standard street slang term for a specific kind of marijuana cigarette, this examiner questioned Mr. Cole as to his own meaning of the term "reefer". He indicated that he meant a marijuana cigarette mixed with cocaine, a common street combination. There is mention in the records of Mr. Cole having smoked "reefer" and "joints", but no specific mention of a marijuana-cocaine combination. Nevertheless, inspection of Mr. Cole's own trial testimony from years ago showed that he himself used the term "mixed reefer" at that time.

15.     Mr. Cole also discussed the head injury he sustained during his teenage years, reporting that it resulted from an automobile accident. He indicated that he was injured in the

right frontal-parietal area of the head, consistent with his description to Dr. Emmanuelson in 1989. Mr. Cole recalled having frequent intense headaches for a long period after the injury. The headaches decreased in intensity and frequency over time, but he continues to have them intermittently.

16. As part of the neuropsychological test administration, two measures designed to detect exaggeration or malingering of deficits were administered. Mr. Cole obtained a score of twelve out of fifteen points on the 15-Item test, well above the cutoff for possible dissimulation. Mr. Cole's performance on the TOMM also reflected good effort without exaggeration or faking of memory difficulties. These findings indicated that the neuropsychological test results were valid and were reflective of Mr. Cole's actual cognitive abilities.

17. Mr. Cole's scores on a test of simple rote recall fell within the low average range for his age group; however, on a more difficult task of complex attention, his score fell within the mildly impaired range. On the immediate recall portion of a test of auditory memory (verbal episodic memory), Mr. Cole obtained a score in the significantly impaired range at the 1st percentile. His delayed recall score on this task was at the 2nd percentile. Mr. Cole's scores on a visual memory task were much higher; his immediate recall was at the 5th percentile and his delayed recall score fell at the 16th percentile in the low average range. Overall, these results reflected severe deficits in auditory verbal episodic memory and no significant deficits in visual memory.

18. On another test of memory and verbal learning Mr. Cole was able to achieve a learning curve over successive trials despite again displaying poor initial encoding. Nevertheless, subsequent recall scores for both immediate and delayed conditions were in the impaired range, approximately two standard deviations below the mean. Even more important were the findings that Mr. Cole made a significant number of intrusion errors in the delayed and cued recall conditions. His scores on these indices were 3.5 and 2.5 standard deviations below the mean, respectively.

19. As noted previously, Mr. Cole's speech was modulated and non-pressured. Speech was fairly concrete and general vocabulary clinically appeared to be below average. Mr. Cole was observed to have some minor word-finding difficulties during the session, although he was not viewed as having any actual aphasic symptoms. On a test of verbal fluency he scored approximately two standard deviations below the mean for his age group. On a confrontational naming test he performed in the significantly impaired range. These latter findings represented significant deficits in specific language abilities.

20. There was no evidence of significant gross visual-spatial deficits on a design copying task. Mr. Cole's performance on a simple visual-motor sequencing task was within the low average range. His score on a similar, but more complex task fell in the borderline range of impairment. On tests associated with higher level executive functions such as problem-solving and mental flexibility, Mr. Cole performed within the range of moderate impairment across several indices.

21.     The overall neuropsychological test results showed impairment in several areas of neurocognitive functioning. Specifically, deficits were found in complex attention, some language abilities, auditory verbal memory and learning, and executive functions. The deficits in attention, vocabulary, verbal fluency, and simple verbal learning that were found highly consistent with below average intellectual functioning in the borderline-to-mildly retarded range. Nevertheless, the deficits in auditory verbal memory, naming abilities, and executive functions were greater than would be predicted solely by limited intelligence at or above the upper range of mild mental retardation. This pattern supported superimposed acquired brain impairment and clearly indicated compromise in the frontal and pre-frontal areas of the cerebral cortex.

22.     There was nothing in Mr. Cole's medical records or his reported history during incarceration that indicates a neurological insult, trauma, or disease. He has remained relatively healthy although he currently does take antihypertensive medication. Thus, the brain impairment shown by the evaluation is viewed as pre-existing incarceration. The psychosocial history revealed two major possible exogenous causes of the permanent brain deficits: alcohol and drug abuse and head injury. The pattern of deficits was much more consistent with Mr. Cole's description of head injury to the frontal area rather than to alcohol and drug use, but specific attribution cannot now be made given that much is not known about Mr. Cole's early medical history.

23.     The current neuropsychological evaluation revealed that long-standing brain impairment with frontal lobe dysfunction was also present at the time of the offenses. Neuropsychology in general refers to brain-behavior relationships, and neuropsychological testing assesses brain functions by measuring related behavioral functions such as memory, learning, language abilities, motor skills, visual-motor and visual-spatial skills, and higher level executive abilities. Thus, neuropsychological deficits reflect actual brain dysfunction and impairment, not mental illness. These organically-based problems can and often do exacerbate psychological and psychiatric disturbance and the effects of drugs and alcohol, particularly when there is damage to the frontal lobes of the brain that underlie functions such as judgment, decision-making, problem-solving and inhibitory controls.

24.     Given all the findings of the current assessment, it is clear there was a combination of intellectual and psychological factors present at the time of the offenses in addition to the brain impairment. The records indicated that Mr. Cole has intellectual limitations that have been present since at least early childhood and were present at that time. The case history also supports that Mr. Cole had been drinking alcohol and using marijuana, probably laced with cocaine, at the time of the offenses. Further, as found by the trial jury, Mr. Cole was suffering from a mental disorder at that time, specifically a Delusional Disorder, Jealous Type. Thus, it is my opinion that Mr. Cole's frontal lobe dysfunction was a critical factor impairing his ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law at the time of the offenses.

25.     The trial jury was aware of some of Mr. Cole's intellectual limitations, his delusional disorder and his substance use. The jury was not told of his organic brain impairment

and its significant negative impact on Mr. Cole's reasoning and behavioral controls, particularly in combination with his mental disorders.

26. Lastly, it seems appropriate to address Mr. Cole's pre-trial memory problems that concerned the evaluators at Dorothea Dix in 1989. The specific type of memory dysfunction uncovered by the current evaluation does impair an individual's ability to recall episodic information such as prior events and history and Mr. Cole does have chronic limitations in this area of memory. Nevertheless, the impairment would not totally account for the gross memory problems seen on the hospital admission in 1989. Rather, it is my opinion, based upon the history and records that those problems were largely due to denial and avoidance associated with Mr. Cole's posttraumatic symptomatology and on-going anxiety as testified to by Dr. Brown in 1994. It is a hallmark characteristic of individual's with symptoms of Posttraumatic Stress Disorder to strongly and persistently attempt to avoid thinking about and talking about the stressor as well as avoid any outside cues associated with the stressor. Thus, it is my opinion that Mr. Cole's psychological disturbance significantly exacerbated his already existing memory difficulties.

_Claudia R. Coleman, PhD_
Claudia R. Coleman, Ph.D.

Sworn to and subscribed before me
This the _1st_ day of _September_, 2004

(SEAL) _____ Notary Public

My commission expires:

# APPENDIX 21

## Issues and Recommendations

ORIGINAL

STATE OF NORTH CAROLINA

CAMDEN    COUNTY

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

88 CRS 202

*filed
11:42 A.M.
6-13-94
Cwm*

STATE OF NORTH CAROLINA

vs.

ISSUES AND RECOMMENDATIONS
AS TO PUNISHMENT

WADE LARRY COLE, Defendant

Issue One:

Do you unanimously find from the evidence beyond a reasonable doubt the existence of one or more of the following aggravating circumstances?

ANSWER:    *YES*

BEFORE YOU ANSWER ISSUE ONE, CONSIDER EACH OF THE FOLLOWING AGGRAVATING CIRCUMSTANCES. IN THE SPACE AFTER EACH AGGRAVATING CIRCUMSTANCE WRITE "YES" IF YOU UNANIMOUSLY FIND THAT AGGRAVATING CIRCUMSTANCE FROM THE EVIDENCE BEYOND A REASONABLE DOUBT.

IF YOU WRITE "YES" IN ONE OR MORE OF THE SPACES AFTER THE FOLLOWING AGGRAVATING CIRCUMSTANCES, WRITE "YES" IN THE SPACE AFTER ISSUE ONE AS WELL. IF YOU WRITE "NO" IN ALL OF THE SPACES AFTER THE FOLLOWING AGGRAVATING CIRCUMSTANCES, WRITE "NO" IN THE SPACE AFTER ISSUE ONE.

(1) Was this murder especially heinous, atrocious, or cruel?

ANSWER: *YES*

(2) Was this murder part of a course of conduct in which the defendant engaged and did that course of conduct include the commission by the defendant of other crimes of violence against other persons?

ANSWER: *YES*

Case 5:05-hc-00461-D    Document 1    Filed 07/05/05    Page 304 of 368

IF YOU ANSWERED ISSUE ONE "NO" SKIP ISSUES TWO, THREE AND FOUR, AND INDICATE LIFE IMPRISONMENT UNDER "RECOMMENDATION AS TO PUNISHMENT" ON THE LAST PAGE OF THIS FORM. IF YOU ANSWERED ISSUE ONE "YES", PROCEED TO ISSUE TWO.

Issue Two:

Do you find from the evidence the existence of one or more of the following mitigating circumstances?

ANSWER: _____ YES _____

BEFORE YOU ANSWER ISSUE TWO, CONSIDER EACH OF THE FOLLOWING MITIGATING CIRCUMSTANCES. IN THE SPACE AFTER EACH MITIGATING CIRCUMSTANCE, WRITE "YES" IF ONE OR MORE OF YOU FINDS THAT MITIGATING CIRCUMSTANCE BY A PREPONDERANCE OF THE EVIDENCE. WRITE "NO" IF NONE OF YOU FINDS THAT MITIGATING CIRCUMSTANCE.

IF YOU WRITE "YES" IN ONE OR MORE OF THE FOLLOWING SPACES, WRITE "YES" IN THE SPACE AFTER ISSUE TWO AS WELL. IF YOU WRITE "NO" IN ALL OF THE FOLLOWING SPACES, WRITE "NO" IN THE SPACE AFTER ISSUE TWO.

(1) The defendant has no significant history of prior criminal activity.

ANSWER _____ YES _____

(2) The murder was committed while the defendant was under the influence of mental or emotional disturbance, the mental illness being delusional paranoia disorder/jealousy type.

ANSWER _____ YES _____

(3) The murder was committed while the defendant was under the influence of mental or emotional disturbance as a result of the belief that Theresa Graham was engaged in sexual activity with another person.

ANSWER _____ YES _____

(4) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct with the requirements of the law was impaired by either alcohol or drugs or both.

ANSWER _____ NO _____

(5) The defendant was a person of good character and reputation in the community in which he lives.

ANSWER _____ YES _____

(6) The defendant does not have a history of violent activity and is normally a peaceful person.

ANSWER ___YES___

(7) The defendant is remorseful.

ANSWER ___YES___

(8) The defendant was gainfully employed, a good worker, and had a reputation of being a good and dependable worker at the time of the incident in question.

___ANSWER___ YES___

(9) Since his incarceration, the defendant has appreciated the severity and the error of his conduct.

ANSWER ___YES___

(10) The acts of the defendant in the commission of the incident in question are out of character for him.

ANSWER ___YES___

(11) At an early stage of the criminal process, the defendant voluntarily acknowledged his wrongdoing in connection with this offense to a law enforcement officer.

ANSWER ___YES___

(12) Any other circumstance or circumstances arising from the evidence which you, the jury, deem to have mitigating value.

ANSWER ___NO___
_____
_____
_____

ANSWER ISSUE THREE IF YOU ANSWERED ISSUE TWO "YES". IF YOU ANSWERED ISSUE TWO "NO", SKIP ISSUE THREE AND ANSWER ISSUE FOUR.

**Issue Three:**

Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is, or are, insufficient to outweigh the aggravating circumstance or circumstances found?

ANSWER: _YES_

IF YOU ANSWERED ISSUE THREE "NO", INDICATE LIFE IMPRISONMENT UNDER "RECOMMENDATION AT TO PUNISHMENT". IF YOU ANSWERED ISSUE THREE "YES", PROCEED TO ISSUE FOUR.

**Issue Four:**

Do you unanimously find beyond a reasonable doubt that the aggravating circumstance or circumstances you found is, or are, sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by one or more of you?

ANSWER: _YES_

IF YOU ANSWERED ISSUE FOUR "YES", INDICATE DEATH UNDER "RECOMMENDATION AS TO PUNISHMENT". IF YOU ANSWERED ISSUE FOUR "NO" INDICATE LIFE IMPRISONMENT UNDER "RECOMMENDATION AS TO PUNISHMENT" ON THE LAST PAGE OF THIS FORM.

_See Over - Recommendation As To Punishment_

111

*filed*
*11:42 A.M.*
*6-13-94*
*Clerk*

RECOMMENDATION AS TO PUNISHMENT

INDICATE YOUR RECOMMENDATION AS TO PUNISHMENT BY WRITING "DEATH" OR "LIFE IMPRISONMENT" IN THE BLANK IN THE FOLLOWING SENTENCE:

We, the jury, unanimously recommend that the defendant, MARK LARRY COLE, be sentenced to ___DEATH_____

This the __13 TH__ day of June 1994.

_Thomas A Cole_

Jury Foreperson

.

# APPENDIX 22

# Motion To Extend Recommitment
# to State Hospital

NORTH CAROLINA

CAMDEN COUNTY

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | : | |
| | : | |
| vs. | : | **MOTION TO EXTEND RECOMMITMENT** |
| | : | **TO STATE HOSPITAL FOR MENTAL** |
| | : | **EXAMINATION** |
| WADE LARRY COLE, | : | |
| Defendant | : | |

**COMES NOW,** the undersigned lead counsel for the Defendant, Wade Larry Cole, in the above-captioned criminal action, who pursuant to N.C.G.S. 15A-1002, moves the Court for an Order extending the Defendant's stay at Dorothea Dix Hospital beyond the extension date granted in the Order of April 12, 1989, signed by the Hon. T. S. Watts, Superior Court Judge, and for cause, shows unto the Court as follows:

1. That the Defendant is charged with two counts of First Degree Murder, which is a capital crime under the law of the State of North Carolina.

2. That the undersigned attorney is the duly appointed lead counsel for the above-named indigent Defendant.

3. That the above-named Defendant is presently in Dorothea Dix Hospital in Raleigh, North Carolina, having been recommitted by an Order of this Court on the 22nd day of February, 1989, for re-evaluation.

4. That the nearest relative of the Defendant is his mother who resides in Pasquotank County, North Carolina.

5. That on the 12th day of April, 1989, the undersigned lead counsel filed a Motion to Extend the Recommitment to State Hospital for Mental Examination for the Defendant, which said motion was granted by Order of this Court, dated the same day, and extending the commitment of the Defendant to the 28th day of May, 1989.

6. On the 18th day of May, 1989, a conference was held in Raleigh, North Carolina with the undersigned lead counsel, the Defendant, Amy Taylor, the psychiatric social worker in this matter, and Dr. C. W. Lynn, the forensic psychiatrist examining the Defendant, all being present. Dr. Lynn found that the Defendant was incapable of assisting counsel in defense of his case.

7. That because of this finding, Dr. Lynn has requested additional time in order that his findings can be reviewed and in order that the Defendant can be further examined by other psychiatrists on the staff at Dorothea Dix Hospital.

8. That Dr. Lynn has requested the undersigned lead counsel to obtain a Court Order extending the Defendant's stay at Dorothea Dix Hospital for an additional thirty (30) day period of time, not to exceed the 28th day of June, 1989.

**WHEREFORE**, the undersigned moves the Court that an Order be issued pursuant to N.C.G.S. 15A-1002, extending the previous extension of recommitment of the Defendant to the State Mental Health Facility at Dorothea Dix Hospital in

Raleigh, North Carolina for continued observation, examination and treatment for a period of time not exceeding thirty (30) days from the 28th day of May, 1989, which said period of time is necessary to determine the Defendant's capacity to assist his court appointed counsel in the defense of his case; that the Court further order the Superintendent of the Mental Health Facility to provide counsel for the Defendant, the Clerk of Superior Court of Camden County and the District Attorney of the First Prosecutorial District with a copy of their evaluation and report; and that the Court order that a hearing be held as soon as practical following the return of the evaluation by the officials at Dorothea Dix Hospital.

This 22nd day of May, 1989.

LAW OFFICES OF LENNIE L. HUGHES

BY: _____
Lennie L. Hughes
Lead Counsel for Defendant
412 East Colonial Avenue
Post Office Box 561
Elizabeth City, NC 27907-561
Tel. (919) 335-5471

# APPENDIX 23

## Timeline

WADE LARRY COLE -- CHRONOLOGICAL HISTORY -- Last edited on 8/17/1993

1902   Cole's father Alex  Cole is born in Pasquotank County.  Mr. Cole obtains a fifth grade education, but never learns to read and write.  He works most of his life on an assembly line at Prescott, a lawn mower manufacturer.  Alex is remembered for riding his bicycle all about town.

1908   Cole's mother Sarah is born in Pasquotank County.  She obtains a seventh grade education and works in potato and cucumber fields owned by Rev. Freshwater.  Sarah is remembered as very quiet and religious, a homebody.

1930   Cole's half-sister Albleacher Overton is born.  Albleacher had already left home by the time of Cole's birth.

1931   Cole's half-brother James "J.B." Barrimore Lumsden is born on August 16.  J.B. had already married and left home by the time of Cole's birth.

       Alex Cole and Sarah meet and marry.

1940   Cole's oldest brother Rufus is born.

1945   Cole's brother Ernest is born.

1947   Cole's sister Rosemary is born.

1948   Cole's brother Prince is born.

1950   Cole's nephew Connie Lumbsden is born.

1951   Cole is born at home on March 27; he is born with a caul over his face.  His family rents a two story, three bedroom house on Tatum Lane, a pleasant, well kept neighborhood.  Cole's parents sleep in one room, Rose in another, and all the boys in the other.  At times, until Cole was eight or nine years old, Cole and Rose slept in the same bed.

       As a child, Cole's mother awakes and goes to work in the fields around 6:00 a.m. and does not return until 6:00-7:00 p.m.  His father works from 7:30 a.m. until 4:30 p.m.

       Unable to make the payments on Tatum Lane, the family moves to a smaller rented house at 802 Martin Street, a decidedly more rundown section of town.  This house, a one story two bedroom, is owned by Cole's aunt Lennie Sylvester.  Here Cole's parents sleep in one room with Rose in the other.  All the boys sleep in the front room, on the couches and chairs.

1

1952   Cole's niece Carolyn Lumbsden Johnson is born.

1955   Ernest notices the first of Cole's "spells."

1957   In September, at the age of six, Cole starts school at Trigg Elementary in
       Elizabeth City. Cole's cumulative record indicates that Cole's family was
       comprised of seven children, and that the economic status of the family was low.

       Growing up Cole saw his father physically abuse his mother on a number of
       occasions.

       The children are also subjected to physical abuse, from both parents. Cole's
       worst memory is of awaking to beatings.[1]

       The family attends a Baptist church in Elizabeth City.

1958   Cole fails first grade; his teacher notes that Wade was "not ready for first grade
       work" and that he showed "very little interest" in his work. He receives the
       lowest ranking in all social and personal assets, with the exception of a "below
       average" in physical appearance. His teacher recalls that he came to school with
       a limited fund of knowledge; he did not know his colors, for example.

       Cole's brother Ernest, who is 13 at the time, is sent to training school as a result
       of disobeying his parents. He is gone for two years.

       In the fall, Cole attempts first grade for the second time. His teacher notes that
       he "is more interested in his work but is very stubborn." He receives marks of
       "average" in all social and personal assets.

       From the age of seven on, Cole remembers that the family's utilities were
       frequently cut off, sometimes for long periods.

1959   Cole begins second grade at the age of eight; his teacher notes that he "tries very
       hard."

       Cole receives a particularly serious beating from his father, first at Cole's
       grandfather's house where Cole had hidden himself; the beating continues at
       home after Cole's grandfather protests the beating.

-------------------------------------------------------------------------------

[1] Rufus, Ernest, and Rose, as well as neighbors report the use of whips and switches
and belts in the Cole household, although there is conflict over who used these implements,
Sarah or Alex. Only Cole reports this severity of punishment.

Case 5:05-hc-00461-D     Document 1     Filed 07/05/05     Page 315 of 368

Around this time, Cole's brother, J.B., separates from his wife, and as a result his children are disbursed to various family members; Cole's nephew Connie comes to live with Sarah and Alex. J.B. goes to Florida, and no one hears from him for the next two decades.

1960 Cole begins third grade at the age of nine. He receives mostly Cs and Ds, with a few Fs in spelling and arithmetic and Bs in conduct.

Ernest returns for a few months, before leaving home again, not to return for 13 years.[2]

1961 In September, Cole starts fourth grade; his teacher notes that he "did not try to do his work."

Around this time, after his brothers offer him alcohol for the first time, Cole starts to drink.

Cole's brother Rufus leaves home to get married; his wife's name is Patsy.

1962 In September, at the age of 11, Cole starts fifth grade. His teacher notes that Cole is "timid" and "doubts himself." He "usually [is a] quiet slow worker."

Rose leaves marries and leaves home at the age of 17. She goes to New York with her husband Ely Briggs.

Around this time, Cole and his siblings begin to receive free lunch tickets from the county. Cole remembers being teased about this, and also about his clothes, which his father obtained from the Salvation Army.

1963 Cole works with his mother in the potato fields for the summer; this is the first of five summers in the fields.

Cole begins sixth grade. His teacher notes that he tries very hard but is very stubborn at times.

Around this time, Cole's brother Prince encounters trouble with the law for the first time when he is caught stealing.

---

[2] Cole recalls that when a physical altercation between Ernest and his father in which Ernest throws his father to the floor. Sarah intervenes and stops the fight. Cole remembers feeling that he wanted to protect his father, but he was too frightened to do anything. Ernest denied this, and Rufus recounted an incident in which Prince hit his father. ONe or both of these events may have occurred.

3

About six months after Prince's arrest, Cole's friend Noel Brooks comes to live with the family "off and on" for the next two years.

In the summer, Cole works in the potato and cucumber fields with his mother.

1964    Cole begins seventh grade at P.W. Moore Junior High in September. His teacher notes that he is showing more interest in his work. At the beginning of the year he was shy and kept to himself, but over the course of the year learned to mix with the other children and was "likeable."

Around this time Cole's father receives a cash settlement from workers' compensation for an on-the-job injury. For the next year Cole's father spends the money partying, drinking, and purchasing women. On one or two occasions Cole's father enlists Cole's assistance in finding women. Cole does not fully understand at first, but when he realizes that he has aided his father in betraying his mother, he feels great remorse.[3]

1965    In January, Coles takes an I.Q. test at school; his score is 83.

At the age of 14, Cole begins eighth grade in September. His teacher notes that Wade is "quiet and lacks confidence."

Cole's "educational and vocational plan" at this time was to become a professional football player. Outside of school he likes to put together models.

Around this time, Cole's brother Prince is really out of control: stealing, drinking, cursing, and fighting. Eventually he gets locked up for six months.

1966    Cole fails eighth grade; in September he begins eighth grade for the second time. Again, his teacher notes that he is quiet and lacks confidence, but that he can "do fair if pushed."

1967    Cole begins ninth grade. His teacher notes that he is a slow student who tries hard.

Around this time Cole stops attending church.

1968    Cole begins tenth grade in September. His teacher notes that he does not seem to be interested in school work.

---

[3] Cole reports this as well as the physical abuse; Ernest and Rose both painted a loving relationship between their parents. Ms. Brickhouse discerned signs of alienation between the parents.

4

1969    Cole fails tenth grade; in September, Cole begins tenth grade for the second time, this time at Northeastern High School. This is Cole's last year in school; however, his records provide no information on the date of his withdrawal.

Despite having started school in 1957, Cole never attended an integrated school.

Cole obtains his first well-paying with Gardner Construction. He works on the construction of a new wing on the Elizabeth City Hospital.

Around this time Cole begins seeing Linda Johnson, who lives across the street with her grandmother and aunt. They are together for the next five or six years, although much of their relationship involves sneaking around behind Linda's grandmother's back.

While working at Gardner and seeing Linda, the only grandparent Cole ever knew, his paternal grandfather, dies.

1970    Cole works for a few weeks sorting metal at R.D. Lacy's junk yard.

Cole works one spring and the good part of the summer as a truck driver with Albemarle Asphalt.

1971    Shirley Simpson moves next door to the Cole's. She remembers seeing Cole sneaking back from Linda's house across the street.

1974    Cole works for Dodson Brothers as an exterminator.

Cole works for about two years at Dixon Construction as a truck driver on a road crew. He wa employed by Dixon on two occasions in the early to mid 70s when Dixon had a contract with the state.

Linda becomes pregnant with Cole's child. Her grandmother is outraged and prohibits Cole from seeing her daughter. Ernest recalls that this had a great impact on Cole and that he was extremely sad.

Ernest introduces Cole to Theresa Graham. Ernest, who is dating Theresa's sister, Ernestine, double dates with his younger brother.

1975    Linda has a child by Cole, Danielle. Cole occasionally gives money to Linda for Danielle, but never acts as a father to her. Shortly after her birth, Linda and Cole split up. Linda subsequently remarries and her new husband adopts Danielle.

Cole and Theresa begin to date.

5

1976    After seeing Theresa for seven or eight months, Cole moves in with Theresa; the two live together with Theresa's mother, Hattie Graham, who lives in a rented house without indoor plumbing in Camden.

1977    From January 26 to April 6, Cole agains works for Dodson Brothers as an exterminator. He is dismissed from the job for lack of dependability.

On October 9, Cole's son Rodriquez is born.

1979    Cole's father dies. At the funeral, Cole has his first and only significant conversation with his half-brother J.B.

1985    Cole secures a job with Ray Meiggs Logging Company, driving a logging truck.

1987    Around this time Cole begins to drink heavily: a case of beer or a couple of gallons of wine each day. He continues to drink heavily until the killings of Theresa and Hattie Graham.

1988    Cole's daughter Assunta Soleil is born near the beginning of the year.

On June 23, Cole is arrested for the murders of Theresa Graham and her mother, Hattie Graham.

Four months after his arrest, Cole signs custody of his children Rodriquez and Soleil over to his brother Ernest and his wife Ernestine. (Ernestine is Theresa's sister and Hattie's daughter.)

1989    Cole is tried during the July 17 session of court; he is convicted and sentenced for the murder of Theresa Graham. He is incarcerated in Central Prison.

1992    On April 22, a new trial is ordered for Cole.

Cole's half-sister Albleacher dies of a heart attack.

1993    Cole's mother dies on February 13. While Central Prison officials were willing to permit Cole to attend the funeral, Pasquotank County authorities were unwilling to take the responsibility for Cole's custody.

On the occasion of the funeral, Cole speaks to members of his family by telephone; this is the first contact he has had with them since being incarcerated.

Also at the funeral, Ernest and Rose learn of Cole's sentence for the first time.

6

# APPENDIX 24

## Interview with Ernest Cole
## August 1993

**WADE LARRY COLE**

TO:   Penalty Phase File
FR:   Gretchen
RE:   Telephone interview with **Ernest Cole** on August 16, 1993
DT:   August 16, 1993

Cole's older brother and I were supposed to meet at the Public Library on Saturday afternoon. I was waiting inside from 12-1:30, while Ernest was outside from 12:44 until 1:30. I called his work this morning and he called me back. I called him back to save him the long distance charges and we must have talked for a half hour.

Ernest is married to Ernestine Graham, Theresa's sister, and they have custody of Wade's two children, Assunta and Rod. Ernest and Ernestine have been married for 23 years. As Ernest puts it, "I'm between the witch and the broom." He says that Miss Hattie's family doesn't like him and originally blamed him for Theresa's death -- for some reason they thought he had killed her. Even now when he meets them on the street, they turn and go the other way, rather than speak to him.

According to Ernest, Ernestine has not been in on the sessions with the DA, and in fact was angry at her uncle for bypassing them. Following the last trial Ernest and Ernestine took Rod to the local mental health clinic for 8-16 months, to see a psychiatrist to help him deal with the trauma of the killing and the trial. Neither Ernest nor Ernestine want to put Rod, who is about to be a senior in high school and is doing well now, through the experience of testifying again. Last time was "pure hell."

The topic of the killing is "taboo" around the house. Ernest says he never expected this and it's still a shock. He can't figure out what went wrong, but he says he is not angry with Wade. He remembers speaking to Wade shortly after it happened and that Wade was "full of remorse," so much so that he couldn't even talk about what happened.

Ernest would be willing to testify for his brother.

<u>Memories of Wade</u>

As a child, Wade kept mostly to himself and was kind of quiet. He was mechanically inclined, often building things under the house, and later working on cars when he was older. Sometimes Wade would "take an inkling to be off by himself." Ernest thinks he showed signs of mental retardation but that he later "grew out of that." I asked what he meant and he said that Wade sometimes had poor judgment; he would do things on the spur of the moment, without thinking.

I asked Ernest to provide some examples. He said that Wade had "spells" where he would do something and then seem to not realize what he had done.

He remembers first noticing this when Wade was about four years old. Prince and Wade

"Daddy." Ernest has come to love Rod as a son, and treats these children no differently from his own.

Ernest points to the instructions of the DSS social worker as his reasons for not having contact with Wade. He says that he is not angry with Wade and that it hurts him not to have contact with his brother. However, sometimes "you have to make decisions...and these children deserve a chance." He did say that he would be happy to write to Wade and that Wade could write to him at work. I told him that Wade really wanted a picture of his children. Ernest paused, and said he had been "working on that" but he would redouble his efforts.

# APPENDIX 25

## Notes of Interview
## with Rufus and Patsy Cole

WADE LARRY COLE

TO:   Penalty Phase File
FR:   Gretchen
RE:   Interview with **Rufus & Patsy Cole** on August 13, 1993
DT:   August 16, 1993

I met Wade's older brother at his house, where he was cutting grass. He stopped mowing and invited me in. After calming his seven grandsons down, we sat at the dining room table and talked. After a half hour or so, his wife, Patsy, came home from work.

Rufus is 53 years old, a fervent Jehovah's witness, and he runs his own logging business. He and Patsy have been married for 32 years. She works as a domestic for Diane St. Claire of the Centura Bank family.

Rufus said immediately that "Wade's problem" was drugs. Wade was always "so easy" and his crime was just unbelievable. Wade was quiet like his mother, he was easy and didn't talk much. He never saw Theresa and Wade arguing, and thinks that Wade "snapped" because he is not a violent person.

Like many others, Rufus compared Wade to Prince. Prince once hit his father, and then "went down hill ever since." Wade was very different.

Patsy concurred, saying that Wade was "not the type." He was always kind, and "easy type person" who wouldn't hurt anyone. He would help, would give you his last. She remembers him taking his mother to the store and buying necessities for her. She remembered Wade as a jolly child who loved to play  Patsy was shocked and couldn't believe Wade did that.

Wade loved Theresa, Patsy said. She remembers once that Theresa fixed Wade up in a tux and they went to a prom. Later Wade shyly, but with a little pride, told Patsy about the event, saying that she wouldn't have believed it was him all dressed up. She thinks this was the same summer as the killing.

Patsy encouraged Wade to marry Theresa as they had been "shacking up too long." They planned to get married after the baby was born.

Theresa and Wade used to meet every Friday at the bank and then go riding together. Wade bought Theresa a car.

She remembered him drinking, but said he "held his liquor" and the only thing that gave away the fact that he was high was that he laughed more.

Sarah used to talk about Wade a lot before she died and wanted to go see her, but Rufus and Patsy were reluctant to take her to Central, afraid that she would have a heart attack. According to Rufus and Patsy, Wade was Sarah's "eyeball.

# APPENDIX 26

## Notes of Interview
## Carolyn Johnson and Connie Lumbsden

## WADE LARRY COLE

TO:   Penalty Phase File
FR:   Gretchen
RE:   Interview with **Connie Lumbsden** on August 13, 1993
DT:   August 16, 1993

I spoke with Wade's nephew at his home on Friday afternoon, after his shift at the Albemarle Hospital. Connie is 42 years old and lives in Elizabeth Manor. He dropped out of high school in the 11th grade and then went to Job Corps in Morganfield, Kentucky where he studied welding.

When he was 9 years old he went to live with Sarah and Alex, his grandparents. His mother went to Virginia, and his father went to Florida. Connie lived with his grandparents for eight years.

Connie described Wade as ordinary, nice. They played a lot as children, and later went to clubs together in Cambden. They used to play house in a wooden house that Prince built. They didn't have a lot of toys, but made their own. For example, once Prince built a go-cart. I asked if Wade ever had any creative ideas like Prince obviously did; Connie said yes, but couldn't think what they were. Wade had a good sense of humour and told jokes, sometimes he played practical jokes, but Connie couldn't remember any of them specifically.

The only "funny" thing he remembered was once when they were coming home from a store and climbed over a fence. Wade was the first one over and he landed in a wasp's nest. He got stung several times and his face swelled up. They apparently had lots of laughs over this, although when I suggested it wasn't that funny, Connie agreed. (Notably, Wade laughed when he recalled this incident.)

Connie and Wade used to go to prayer meetings twice a week. There Wade met Linda Johnson.

Sarah treated Connie just as she treated her own children, as a son. Her old age didn't impair her ability as a parent.

The family seldom ate together. Connie does not remember times without enough to eat or utility cut offs. He did remember free meal tickets at school.

Sarah and Alex had their ups and downs. Downs involved shouting, but no physical violence. He was unaware of any affairs Alex may have had.

When it came to discipline, Sarah would use her hand, a broom, whatever was available; sometimes she made you get your own switch. She resorted to these implements when you did things like come home intoxicated, which Connie said happened when he and Wade were in their teens. Alex just talked, but didn't hit them.

Connie thought Wade was closest to Rose.

Connie was shocked by the news and couldn't believe Wade had done such a thing.

He doesn't know anyone that Wade was close to that he could have discussed problems with.

Connie's favorite memory of Wade is one time when they were about 22 they went riding bikes at 2 or 3 AM. It was exceedingly hot and they wanted to get outside to escape the heat. They rode all around town and no one else was around. Suddenly they saw a white dog, and both of them thought it was a ghost.

# WADE LARRY COLE

12/21 Telephone interview with **Carolyn Johnson**, by Gretchen

I spoke with Ms. Johnson for 1015 minutes, calling primarily to introduce myself, and to obtain phone numbers for other relatives. Ms. Johnson was a little stiff at first, but warmed up; I think perhaps she didn't realize at first that I was on the defense side (even though I said so).

Ms. Johnson is J.B.'s daughter; Wade is her uncle. However, they are nearly the same age; Ms. Johnson is 40. She spent a good deal of time with Wade's family growing up, going over to Grandma Sarah's house nearly every day.

Ms. Johnson said she was shocked by the crime. Wade was always quiet and had never been in trouble. She later said that when she first heard the news, she thought there must be some mistake, that it must be Prince who had committed this. Ms. Johnson says she thinks Wade is afraid to face her, and that in her heart she feels he truly regrets what he did. I indicated to her that I thought she was on the mark.

Ms. Johnson knew that Wade was getting a new trial; however she didn't know when it would be. She seemed to grasp the idea of talking to family members in preparing for the sentencing phase, and also for the need for the family to support Wade at trial.

Ms. Johnson looks after Sarah, and once a month Sarah writes to Wade. Sometimes Ms. Johnson adds a few lines to these letters.

She was concerned that he hadn't had any visitors while in Raleigh, and said her vacation was coming up, and that she might make it down here. She has a friend who lives here. I promised to check Wade's visiting list and get back to her on whether she's on it. She will definitely visit him in Camden County, and asked me to inform her when Wade is transferred.

Ms. Johnson said she has not heard from her father J.B. in over a year. They tried to reach him at the time of Albleacher's funeral and were unsuccessful. He is often out of touch for long periods like this. She seldom sees Rufus, and knew that Prince was back in jail. Sarah has Rosemary's address and number. Ms. Johnson will likely see Sarah over the weekend, and she agreed to ask Wade's mother for the numbers and addresses Sara has.

Ms. Johnson works as a cook at Ablemarle Hospital. Her number there is (919) 335-0531, ext. 5101/5102. She also works parttime at a local pancake house.

Ms. Johnson should be cultivated as a witness. She no doubt knows a great deal about the family, and may, as a bit of an outsider, have a broader perspective. She clearly cares about Wade also. I do think it better if Ms. Johnson is approached in person.

# APPENDIX 27

## Notes of Interview
## Shireley Simpson

# WADE LARRY COLE

TO:  Penalty Phase File
FR:  Gretchen
RE:  Interview with **Shirley Simpson** on August 13, 1993
DT:  August 16, 1993

I caught Cole's neighbor just as she was leaving her house on Thursday evening. We agreed to meet the next day at her office, which is the headquarters of the Opportunity Industrialization Center (OIC) located in the big pink church on Shepherd Street.

Ms. Simpson has lived at 804 S. Martin Street for 23 years, since 1971, when she got married. Miss Sarah used to babysit for Shirley, and other families too.

She remembers Wade as a "swell guy" who was very close to his mother. The killing was completely out of character for him and came as a total shock to Simpson. Wade was always quiet, humble, submissive, not forward or outgoing, but would smile. In many ways Wade was quite similar to his mother, who Shirley described as "a little, old, submissive lady [who] never raised her voice."

When Simpson first lived to Martin Street, Ernest, Wade and Prince all lived there. Rose was gone, as was Rufus.

She remembers how Wade used to sneak back and forth to Linda Johnson's house. If she caught him and teased him about his little girlfriend, he would just smile.

Later, she used to be able to "set the clock by him." Theresa dropped him off every morning on her way to work. Wade would take care of his mother; the two of them often sat out on the porch in the late afternoon. Other times she saw him in one of the many broken down cars that sat out in the front of the house.

Wade also played with Shirley's kids, and when Sarah went out anyplace, Wade would watch them. Shirley says she was (and is) very particular about who takes care of her children, and she never had any problem with Wade watching them. Once, in 1972, Shirley was in the hospital for 30 days, and Wade and Sarah took care of her son, Junior.

Wade often went shopping for Sarah or would take her to grocery shop and pay bills.

Prior to the killing, Wade was extremely sad. He confided in his mother about problems with Theresa. He thought he should break up with her but didn't know how.

Simpson thinks that he finally "snapped" from the pressures, having no job, and difficulties with Theresa. "This was not him," she said. She added that Wade "loved the girl." And in a normal state of mind he wouldn't have done it; it was completely out of character.

Simpson was subpoenaed for the first trial but did not testify. She was told she was not

needed; however, she did not remember being interviewed by anyone. She spoke to Wade briefly before leaving the courthouse. She remembers a very emotional moment when Wade told her, "Miss Shirley, I didn't mean to do it."

Shirley used to visit Sarah when she lived on Shepherd Street. (She moved from Martin Street when the dilapidated house was condemned and torn down six years ago.) Sarah never talked that much, but did say that Wade used to confide in her about his problems. Appropos of Ms. Brickhouse's assessment of Sarah, Simpson said that most of her conversations with Sarah were of a general nature, and not of the level that she could figure out anything about Sarah's mental ability.

Alex was "a quiet, little, old man who rode a bicycle." He was more outgoing than Sarah.

# APPENDIX 28

## Affidavit of Rufus Cole

STATE OF NORTH CAROLINA    IN THE GENERAL COURT OF JUSTICE

COUNTY OF CAMDEN    SUPERIOR COURT DIVISION

FILE NO.:    88-CRS-202
88-CRS-332

*******************************************

STATE OF NORTH CAROLINA    )
)
v.    )    **AFFIDAVIT OF RUFUS COLE**
)
WADE LARRY COLE    )

*******************************************

**Rufus Cole**, first being duly sworn, deposes and says the following:

1.    I am the older brother of the Defendant in this case, **Wade Larry Cole.**  I am eleven years older than Wade. My date of birth is  4 / 5 / , **1940**. This affidavit is based on what I saw and experienced while growing up with Wade before he was 18 years old, and while working with him at Ray Meiggs Logging Company.  I now own my own trucking company in Elizabeth City. I live at 400 Everett Drive, Elizabeth City, North Carolina.

2.    Wade was slow growing up as a child.  He was just born like that. Everybody knew he was slow.

3.    When we were growing up, Wade always had a hard time understanding things. You had to tell him the same thing over and over again.  He had to think awhile before he would comprehend what you were saying.  You always had to explain things to him in simple words.

4.    Wade pretended to understand things when he actually didn't.  He wouldn't ask questions if he didn't understand.

5.    Mental retardation runs through our family.  We had an aunt, Sue Johnson, who was committed to Cherry Hill in Goldsboro. Another aunt, Lennie Sylvester, was also committed.  They were both my mother's sisters.  My mother's mind would come and go, too.

6.    Wade was different from the other children.  He was "off." His mind was bad.  We would send him to the store, but he couldn't remember what he was supposed to buy.  I remember one time he came home with sweet potatoes.

7.    Wade never learned to tie his shoes.  Either he wouldn't tie them at all, or he wouldn't tie them tight enough.

8.  Wade could not keep a job, because his mind was bad. He worked for an exterminating company, but they got rid of him because he couldn't perform. He couldn't do the job. He wasn't dependable.

9.  Wade couldn't pass the driver's test. He had to keep going back over and over again. He had to go back at least four times. Before that, he drove without a license.

10. In 1985, I got Wade a job at Ray Meiggs Logging Company. I showed him what to do. I had to teach him how to drive a truck. I let him drive with me for at least a month before he could drive on his own. He had an accident coming from Williamstown. We met another truck, and their mirrors hit. The mirror had damaged our truck, so I had to chase down the other truck to get his insurance information. The owner of our truck gave me a bonus for chasing down the other truck.

11. Even after driving with me for a month, Wade could only go on short trips. He could not read a map or follow signs. He only kept the job because he was my brother, and because Mr. Meiggs liked me.

12. Both before and after the age of 18, Wade did not understand how much his money would buy. He would give me his money to pay for things because he didn't know how much things cost or how much money he had left. People used him to get his money and he didn't know any better. He would let people take advantage of him. When Wade was grown, he turned his paychecks over to his girlfriend, Theresa, and let her handle his money. She would meet him at the bank on payday and he would hand over all of his money to her. He paid for a washer and a new living room set at her mother's house, and he didn't even live there. He still lived with our mother. By the middle of the week, he didn't even have enough money to buy cigarettes, and he would come to me for money.

This is the 3rd of November, 2001.

**Rufus Cole**

Sworn and subscribed before me
this the 3rd of November, 2001.

Notary Public
My commission expires on 6-15-02

Witness
This witness swears to the identity of this affiant.

Date   11/03/01

# APPENDIX 29

# Statement of Ernest Cole

STATE OF NORTH CAROLINA    IN THE GENERAL COURT OF JUSTICE

COUNTY OF CAMDEN    SUPERIOR COURT DIVISION

                      FILE NO.:    88-CRS-202
                                      88-CRS-332

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | ) | |
| | ) | |
| v. | ) | **AFFIDAVIT OF ERNEST COLE** |
| | ) | |
| WADE LARRY COLE | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Ernest Cole**, first being duly sworn, deposes and says the following:

1.     I am the older brother of the Defendant in this case, **Wade Larry Cole**. I am six years older than Wade. My date of birth is _June_, **1945**. This affidavit is based on what I saw and experienced while growing up with Wade before he was 18 years old, and while he was living in Elizabeth City as an adult. I work as an interstate truck driver. I live at 203 East Cypress Street, Elizabeth City, North Carolina. I have custody of Wade's daughter, Soleil.

2.     Wade was slow growing up as a child. His mental capacity was not equivalent to that of other children his age.

3.     Wade could read, but he didn't actually understand what he was reading unless someone would explain it to him. He couldn't bring words together, especially if they had more than one syllable.

4.     Our parents had very little education, menial jobs, and a large family to support. Our mother had an eighth grade education and she came from a large family. Her sisters went to school to become teachers.

5.     I left home at age twelve, but I stayed in Elizabeth City. I was in and out of the house after that, visiting the family.

6.     Mental illness runs through our family. Aunt Susan was committed to Cherry Hill in her mid-thirties. I think she was mentally retarded, too. Aunt Lennie was also committed. She was a retired schoolteacher. We also had cousins with mental problems.

7.   Wade had the capacity of being in special education, but we didn't have those kind of resources in schools back then.

8.   I told close family members that Wade was mentally retarded, but they didn't want to hear it. I would say, "Did you notice what Wade just did?" They knew it, but they didn't want to accept it. I mentioned it several times to our mother, but he was her baby. Mom's got something, too. It's in the blood, and the genes were transferred to Wade.

9.   Wade didn't play like other children. He would take a toy and throw it away, in the garbage. He didn't know what to do with it. Sometimes he would just go underneath the house by himself. I don't know anyone he was close to as a child.

10.  I knew that Wade was mentally retarded as a child because queer things would happen, quirky things that would catch your eye. We would be sitting at the kitchen table eating dinner, and Wade would all of a sudden put his silverware down and start using his fingers. Then after awhile, he would just start using his silverware again.

11.  Wade didn't know how to dress. He would want to wear wing tips and big baggy pants when he was a child, and it would make him look funny. He didn't want to dress in style like the other kids. He wouldn't wear the new clothes that mom would buy for him. He was real slouchy.

12.  Our father would whip us sometimes, but if you got a whipping, you deserved it. When he would whip you, he would hang you upside down by your legs and pull your pants down. It's possible that Wade was dropped on his head during one of these beatings.

13.  Wade failed the driver's test several times. I know that because I had to go over the driver's education booklet with him over and over again. I don't think he could really comprehend what the questions were asking, but he finally memorized enough answers to pass the test.

14.  Even when Wade was driving the logging truck, he would get home every night. In order to make longer trips like I do, you have to learn how to navigate the highways. You have to know what you're doing. Wade couldn't handle this. If they send you out once and they have to go find you, they won't send you out again. Wade could only drive the same route, from Elizabeth City to Plymouth or Edenton, and then back to Elizabeth City.

2

15. I've never seen Wade pick up a book or a magazine. When you can't comprehend what you're reading, there isn't much need to. I'm quite sure he couldn't do that.

This is the **3rd of November, 2001**.

_Ernest 2. Cole_
**Ernest Cole**

Sworn and subscribed before me
this the **3rd of November, 2001.**

_____
Notary Public
My commission expires on _____

_Earline Le. Cole_
Witness

_Nov. 3, 2001_
Date

This witness swears to the identity of this affiant.

3

# APPENDIX 30

## Statement of Dr. Emmanuelson

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
CAMDEN COUNTY                         SUPERIOR COURT DIVISION
                                                  88 CRS 202, 332


STATE OF NORTH CAROLINA          )
                                                  )
                    v.                             )     AFFIDAVIT
                                                  )
WADE LARRY COLE,                     )
                    Defendant             )


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

     Margaret Sells Emanuelson, Ph.D., after first being duly sworn, deposes and says the following:

1. I have personal knowledge of the facts in this affidavit.

2. I am a clinical psychologist with extensive experience in forensic psychology, licensed by the State of North Carolina and the State of Virginia. I am a board certified forensic examiner.

3. I am now living in Virginia, but in 1989 I was in private practice in Point Harbor, North Carolina.

4. On July 21, 1989, the Honorable Donald W. Stephens allowed defendant's motion to appoint me to perform a psychological evaluation and examination of Wade Larry Cole.

5. I was appointed after the trial was already underway and the time for examination and evaluation was extremely limited. I did not have time to interview relatives or do other investigation. Defendant's trial counsel did not supply me with investigation reports concerning defendant's family, his school records, or his early medical records. I learned from defendant that his aunt had been confined for a number of years in a mental institution and had died in this institution. If defendant's trial counsel had supplied me with the aunt's medical records, it would have added support to my diagnosis of the defendant. A history of severe mental illness in the family is highly significant.

6. After examining defendant I arrived at the following diagnosis: borderline mentally retarded with an average mental age of seven or eight; schizophrenia paranoid type; paranoid personality disorder; alcohol dependence; cannabis dependence.

7. If I had been asked, I would have testified that the summary report from Dix was inconsistent with the detailed medical records of defendant's stay at Dix. For example, the summary report states that defendant was not psychotic. However, the medical records note that he was experiencing hallucinations.

8. During the sentencing phase of the trial, I testified: "At the time of the killing . . . [defendant] just lost it. He went completely out of control. He lost all contact with reality. And then he became completely psychotic, that he was not able to control his actions and that he was not really aware of what was going on." (STp. 71)

9. If I had been called to testify during the guilt phase of defendant's second trial I could have, consistent with the results of my examination, rendered an opinion in lay terms that tended to show that the time of the murder of Theresa Graham, defendant had a mental condition which could have been found to negate the capacity to premeditate and deliberate. Specifically, consistent with my opinion, I would have testified, if asked, that defendant did not have the capacity to make or carry out plans; defendant was under the influence of a mental or emotional disturbance; and that the defendant lacked the capacity to form the specific intent to kill.

10. My opinion would have been based on defendant's mental retardation, his limited ability to understand and reason, his degree of intoxication and his pronounced mental and emotional disturbance at the time.

11. After I had been appointed by the Court to examine Wade Larry Cole, his trial attorneys did not supply me with information concerning the amount or type of alcohol consumed by defendant before the murder. The attorneys did not tell me that the "reefer" that defendant was smoking that night was marijuana mixed with powdered cocaine. If I had known the exact amount and proof of alcohol that defendant consumed and that he

had smoked a mixed marijuana/cocaine reefer, it would have reinforced my opinion that defendant was not capable of forming the specific intent to kill at the time of the murder.

12. The trial counsel did not instruct me as to whether I was to examine defendant for diminished capacity, mitigation or competency. The did not go over my testimony with me before I testified.

Further the affiant sayeth not.

This is the 14th day of November, 1997.

_Dr. Margaret Sells Emanuelson, BCFE_

Sworn to and subscribed
before me this 14th day of November, 1997.

_Notary Public_

My Commission Expires: _7-30-2000_

# APPENDIX 31

# IOG Treatise
# Diminished Capacity Defense

Published by the
Institute of Government,
The University
of North Carolina
at Chapel Hill

No. 92/01
September 1992
©1992

# Administration of Justice

Judges, Public
Defenders, Appellate
Defenders, and Distri
Attorneys

# The Diminished Capacity Defense

## John Rubin

## Contents

A. Introduction _____ 1

B. Nature of Defense _____ 2
   1. Definition _____ 2
   2. Relation to Insanity _____ 2

C. Applicability to Different Offenses _____ 3
   1. First-Degree Murder _____ 3
   2. Other Offenses _____ 3
      a. Offenses Not Requiring Specific Intent ___ 3
      b. Offenses Requiring Specific Intent _____ 4

D. Evidentiary Issues _____ 4
   1. Opinion _____ 4
   2. Basis of Opinion _____ 5

E. Burden of Production _____ 6
   1. Standard _____ 6
   2. Sufficiency of Evidence _____ 6

F. Burden of Persuasion _____ 7

G. Instructions _____ 7
   1. Diminished Capacity Instructions for First-Degree
      Murder _____ 7
      a. Instructions Reviewed by the Court _____ 7
      b. Pattern Instructions _____ 8
   2. Other Instructions _____ 8

## A. Introduction

The term "diminished capacity" often carries the stigma of the so-called "Twinkie" defense, a phrase coined by the press in connection with the 1978 killings of the mayor of San Francisco and another city official. The defendant in that case, Dan White, claimed that he killed in a fit of depression—a depression both evidenced and aggravated by his excessive consumption of Twinkies and other junk food. Tried for first-degree murder, White was convicted only of voluntary manslaughter.[1]

White's trial brought national attention to California's interpretation of the diminished capacity defense. Like many other states, California divided murder into two degrees, first and second, and recognized the lesser offense of voluntary manslaughter. Also as in other states, a defendant ordinarily could be convicted of first-degree murder in California only if he or she acted with a particular state of mind—namely, premeditation, deliberation, and malice.

Unlike other jurisdictions, however, California allowed the defendant to defend on the ground of diminished mental capacity even if he or she possessed the state of mind ordinarily required for conviction of first-degree murder. Thus, even if the prosecution proved premeditation, deliberation, and malice, as those elements are normally understood for purposes of first-degree murder, the defendant could still claim that his or her faculties were "diminished" at the time of the offense. If the defendant could not maturely and meaningfully reflect upon the gravity of his or her actions or comprehend his or her duty to act in accordance with law,

This publication is issued by the Institute of Government. An issue is distributed to public officials, listed in the upper righthand corner, to whom its subject is of interest. Copies of this publication may not be reproduced without permission of the Institute of Government, except that criminal justice officials may reproduce copies in full, including the letterhead, for use by their own employees. Comments, suggestions for further issues, and additions or changes to the mailing lists should be sent to: Editor, Administration of Justice Memorandum, Institute of Government. CB# 3330 Knapp Building, UNC–CH, Chapel Hill, NC 27599-3330.

which was how California defined diminished capacity, he or she could at most be held liable for second-degree murder or voluntary manslaughter.[2]

This brand of diminished capacity has not been accepted elsewhere. Indeed, California has abolished the diminished capacity defense, at least in its above formulation. However, most jurisdictions have recognized (and California continues to recognize) a distinct type of the diminished capacity defense—one more limited and more in keeping with traditional criminal law concepts.[3]

In this latter form, the diminished capacity defense is a way of suggesting that the defendant did not act with the state of mind required for conviction. This form of diminished capacity acts as a "negating" defense, meaning that it prevents the state from proving its case. For example, if the defendant lacks the capacity to premeditate, or at least raises a reasonable doubt about his or her capacity to premeditate, the prosecution cannot establish an element of first-degree murder. On the other hand, if the prosecution proves that the defendant acted with the state of mind required for conviction of first-degree murder, the defendant cannot use the diminished capacity defense as a basis for avoiding liability.[4]

For many years, North Carolina rejected even this construction of the diminished capacity defense.[5] In a string of recent cases, however, the North Carolina Supreme Court reversed course and allowed evidence of diminished capacity to "negate" state of mind elements, at least in cases of first-degree murder. This paper is intended to serve as a reference source on the major issues that have arisen in diminished capacity cases in North Carolina. The paper discusses the following subjects: (1) the nature of the defense recognized in North Carolina; (2) the applicability of the defense to different offenses; (3) evidentiary problems in raising the defense; (4) the defendant's burden of presenting evidence; (5) the prosecution's burden of persuasion; and (6) jury instructions.

## B. Nature of Defense

### 1. Definition

There is a small but growing body of case law on diminished capacity in North Carolina. To date, all of the cases have involved first-degree murder charges.[6]

The North Carolina Supreme Court first recognized the diminished capacity defense in *State v. Shank*,[7] overruling some of its earlier decisions and distinguishing others. There, the defendant was charged with deliberate and premeditated murder, a form of first-degree murder requiring proof of premeditation, deliberation, and malice. (North Carolina recognizes different forms of first-degree murder;[8] unless

otherwise stated, all references to first-degree murder are to premeditated and deliberate murder.) The defendant sought to elicit testimony that he was suffering from a mental disorder and was incapable of premeditating and deliberating at the time of the offense. The trial court refused to allow the evidence, and the defendant was convicted of first-degree murder. The North Carolina Supreme Court awarded the defendant a new trial, finding that the trial court had erroneously excluded the defendant's evidence of his "diminished capacity."

The supreme court grounded its decision on basic principles of relevance. Relying on Rule 402 of the North Carolina Rules of Evidence, the court stated that generally all relevant evidence is admissible. The court further recognized that, under Evidence Rule 401, evidence is relevant if it tends to prove or disprove any fact of consequence in the case.[9]

In the supreme court's view, the evidence offered by the defendant easily met the test of relevance. The defendant sought only to show that he lacked the mental capacity to form the state of mind for first-degree murder, a claim in keeping with the traditional form of diminished capacity discussed above in the introduction. The court found that such evidence was directly relevant in determining "the presence or absence of an element of the offense with which [the defendant] was charged."[10] Further, the particular kind of diminished capacity evidence offered by the defendant, the testimony of a medical expert, was admissible under the rules relating to expert opinions. The court's analysis of expert testimony in diminished capacity cases is discussed in detail below under Evidentiary Issues: Opinion.

Although the defendant in *Shank* based his diminished capacity defense on a mental disorder, subsequent cases show that physical and emotional problems may also be relevant in determining whether the defendant lacked the capacity to form the state of mind required for conviction. In *State v. Rose*,[11] the defendant presented evidence that an earlier head injury was a contributing cause of a psychotic episode, during which he was incapable of forming the state of mind for first-degree murder; in *State v. Weeks*,[12] the defendant claimed that his incapacity flowed from a chronic emotional disturbance and inability to deal with stress.

### 2. Relation to Insanity

The *Shank* court recognized that, by definition, diminished capacity differs from insanity. Defendants may be found insane in North Carolina if, at the time of the offense, they were incapable of knowing the nature and quality of their actions or that their actions were wrong.[13] In contrast, diminished capacity means only that the defendant lacked the capacity to form the state of mind necessary for conviction.[14]

The specific evidence allowed in *Shank* reflects the court's differentiation of diminished capacity from insanity. The defendant offered evidence that at the time of the offense he was suffering from psychogenic amnesia, a disorder that rendered him incapable of premeditating or deliberating. The court allowed the evidence even though it fell short of insanity.[15]

Despite their differences, the insanity and diminished capacity defenses may be presented in the same case along with other defenses related to the defendant's state of mind. The supreme court has recognized that state of mind defenses, such as insanity and voluntary intoxication, "are not mutually exclusive. They may coexist in the same case and be considered, jointly and severally, by the jury."[16] The court has, therefore, allowed a combination of voluntary intoxication, insanity, and diminished capacity evidence all in the same case.[17]

## C. Applicability to Different Offenses

### 1. First-Degree Murder

For both first-degree and second-degree murder, the prosecution must prove beyond a reasonable doubt that the defendant acted with malice. First-degree murder differs from second-degree murder in that the prosecution has the added burden of proving beyond a reasonable doubt that the defendant acted with premeditation and deliberation. The North Carolina courts have long held that premeditation and deliberation are distinct mental elements.[18] Therefore, if the defendant lacked the capacity either to premeditate or to deliberate at the time of the offense, an essential element of first-degree murder cannot be proven and the defendant cannot be convicted of the offense.

The North Carolina courts have also recognized that specific intent to kill is an essential component of premeditation and deliberation and, therefore, a necessary element of first-degree murder. In *State v. Holder*,[19] in which the defendant claimed diminished capacity as a defense, the supreme court reaffirmed that specific intent to kill is an "essential constituent of the elements of premeditation and deliberation." Thus, to prove premeditation and deliberation, the prosecution must prove that the defendant acted with the specific intent to kill. Conversely, if the defendant lacked the capacity to form the specific intent to kill, the prosecution cannot establish premeditation and deliberation and cannot obtain a conviction for first-degree murder.

If the evidence negates only premeditation and deliberation, or the constituent element of specific intent to kill, the defendant does not avoid all criminal liability. The defendant's conduct may still constitute second-degree murder, which the supreme court has held requires proof only of malice.[20]

### 2. Other Offenses

The question remains whether evidence of diminished capacity is admissible to negate states of mind other than those required for conviction of first-degree murder. If so, the diminished capacity defense could preclude conviction of other offenses. For example, as discussed above, second-degree murder requires proof of malice; burglary, meanwhile, requires proof that the defendant broke into a dwelling with the specific intent to commit a felony or larceny. The North Carolina courts have not yet addressed whether diminished capacity is available as a defense in these instances.

The issue has arisen, however, in cases involving the defense of voluntary intoxication, which is similar in certain respects to the diminished capacity defense. Like a defendant suffering from diminished capacity, a defendant who is voluntarily intoxicated at the time of the offense may lack the capacity to form the state of mind required for conviction.[21] The North Carolina courts have held that the availability of voluntary intoxication as a defense depends on whether the offense in question requires proof of specific intent. The two categories of offenses—those that do not require proof of specific intent and those that do—are discussed separately below.

#### a. Offenses Not Requiring Specific Intent

The North Carolina courts have repeatedly held that voluntary intoxication is not available as a defense to offenses that do not require proof of specific intent. The courts have not articulated a generally applicable principle, however, for identifying specific intent crimes. Proceeding instead on a case-by-case basis, the courts have held that a number of offenses, including second-degree murder, rape, and arson, do not require proof of specific intent. In such cases, voluntary intoxication is not a defense as a matter of law.[22]

This approach derives from a distinction developed at common law between specific intent and general intent crimes. LaFave distinguishes the two types of intent by defining general intent as "an intent to do the physical act . . . which the crime requires" and specific intent as "some intent in addition to the intent to do the physical act which the crime requires."[23] By this definition, assault with a deadly weapon would likely be considered a general intent crime because it depends on the intent to do the physical act of using a deadly weapon against another; and assault with a deadly weapon with intent to kill would be a specific intent crime because it requires the additional purpose of trying to kill another.

LaFave and other commentators have been critical, however, of classifying offenses in terms of specific or general

intent.[34] The mental elements for many offenses do not fit neatly within either category. For example, second-degree murder requires proof of malice, of which the supreme court has recognized at least three different kinds,[35] while arson requires proof that the defendant acted willfully and maliciously.[36] Commentators have also criticized the specific intent/general intent approach as an artifice, without logical coherence or empirical support, which courts have used to exclude relevant state of mind evidence in "general intent" cases.[37]

The North Carolina courts have not yet decided whether to apply the limitations developed in voluntary intoxication cases to the diminished capacity defense—that is, they have not decided whether to allow the diminished capacity defense in cases that do not involve specific intent. In its only opportunity to date, the supreme court withheld deciding the issue. In *State v. Baldwin*,[38] the supreme court stated that, unlike first-degree murder involving premeditation and deliberation, first-degree murder perpetrated by lying in wait does not require proof of a specific intent to kill. Indeed, according to the court, the crime does not even require an intent to lie in wait.[39] Although the court concluded that voluntary intoxication could not be used as a defense, it noted that it was unnecessary to decide whether diminished capacity would have been cognizable as a defense.[40]

The supreme court has indicated in other respects, however, that it may be more favorably disposed toward the diminished capacity defense than toward the voluntary intoxication defense. In *State v. Clark*,[31] the court compared the two for purposes of deciding when the trial court should submit a jury instruction on diminished capacity. The court held that a defendant seeking such an instruction should have a less rigorous burden of producing evidence than a defendant relying on voluntary intoxication. In the court's view, the policy reasons for imposing a heavy burden of production in a case of voluntary intoxication, where the defendant's condition is self induced, do not apply in a case of diminished capacity, where the defendant's mental defect is beyond his or her control.[32] The specific standard of producing evidence established by the court for diminished capacity cases is discussed below under Burden of Production: Standard.

**b. Offenses Requiring Specific Intent**

In contrast to their treatment of offenses that do not require proof of specific intent, the North Carolina courts have allowed voluntary intoxication as a defense whenever specific intent has been a component of the charged offense. Many offenses other than first-degree murder require proof of specific intent, including burglary (intent to commit felony or larceny), attempt crimes (intent to commit crime), and assault with a deadly weapon with intent to kill (intent

to kill).[33] In those cases, the courts have acknowledged that voluntary intoxication may negate the specific intent required for conviction.[34] The courts have also held that when the predicate for felony murder is a specific intent crime, such as robbery, voluntary intoxication may negate the specific intent required for robbery and thereby preclude conviction for felony murder.[35]

Diminished capacity seems no less applicable than voluntary intoxication in cases where proof of specific intent is required. Both defenses serve the same function—that is, both negate the state of mind required for conviction of the offense. Also, as discussed above, the current supreme court appears to be less resistant to diminished capacity as a defense than to voluntary intoxication.[36] It therefore seems likely that the North Carolina courts will allow diminished capacity as a defense at least to the same extent as they allow voluntary intoxication.

## D. Evidentiary Issues

### 1. Opinion

Because expert testimony plays such a prominent role in diminished capacity cases, the supreme court has focused on the permissible scope of expert opinion about the defendant's state of mind. In *State v. Shank*,[37] the court recognized that Evidence Rule 704 expressly allows an expert to give an opinion even on an issue ultimately to be decided by the jury. Finding no other rule barring admissibility, the court held that an expert could give testimony tending to show that the defendant did not have the capacity to premeditate or deliberate, an issue ultimately for the jury to decide.

In *State v. Weeks*,[38] issued the same day as *Shank*, the court refined this approach. The court held that even though an expert is permitted to give his opinion on an ultimate issue, he may not testify to a "legal conclusion" that he is "not qualified to make."[39] Under this rule, the trial court could bar an expert from testifying specifically that the defendant did, or did not, have the capacity to premeditate and deliberate.

Although *Weeks* and *Shank* may appear to conflict with each other, they are reconcilable. Under *Weeks*, an expert ordinarily may not use the terms "premeditation" or "deliberation" in testifying about the defendant's mental capacity. Nor may an expert say whether the defendant acted in a "cool state of mind" or under a "suddenly aroused violent passion," terms which the North Carolina courts often use to explain "deliberation" to the jury.[40] Such testimony is ordinarily impermissible on the ground that it embraces precise legal terms, the "definitions of which are not readily apparent to medical experts."[41] Arguably, an expert

with sufficient legal expertise might be allowed to give an opinion in legal terms even under *Weeks.*

Whether or not experts would be permitted to use the words "premeditate" and "deliberate" in their testimony, they can still render an opinion in lay terms tending to show that the defendant did not have the capacity to premeditate or deliberate. *Shank* specifically approved questions about the defendant's ability to "make or carry out plans" and "to plan his activities."[42] *Shank* also found it permissible for an expert to testify whether the defendant was "under the influence of mental or emotional disturbance" at the time of the offense, terminology drawn from the sentencing field.[43]

Unlike its treatment of testimony about premeditation and deliberation, the supreme court's position on "specific intent" is that an expert may explicitly state whether the defendant had the capacity to form the specific intent to kill.[44] The term "specific intent" is apparently not considered a legal conclusion beyond the qualifications of a medical expert. In light of the court's preference for lay terminology, it should also be permissible for an expert to use other terms, more understandable to a jury, in describing whether the defendant could form the specific intent to kill.

An opinion offered by an expert is subject to the additional qualification that the expert must be reasonably certain of the opinion. Under Rule 702 of the Rules of Evidence, an expert may testify in the form of an opinion if the testimony would help the jury understand the evidence or determine a fact in issue. In the court's view, an equivocal or speculative opinion about the defendant's capacity does not assist the jury and may be excluded under Rule 702.[45]

These restrictions on opinion testimony apply equally to the prosecution and the defense. Either side may ask an expert about the defendant's capacity to form the specific intent to kill and to make and carry out plans.[46] Similarly, neither may elicit expert testimony that uses the words "premeditate" or "deliberate."[47]

Laypersons may also give opinions about the defendant's state of mind. Although the North Carolina courts have not specifically decided the issue in diminished capacity cases, they have allowed lay opinion in cases involving voluntary intoxication and insanity.[48]

## 2. Basis of Opinion

In insanity cases, the supreme court has developed rules liberally allowing experts to give the bases of their opinions about the defendant's mental state. In *State v. Wade,* the court held that if an expert's opinion is admissible, the expert may testify to the "information he relied on in forming it for the purpose of showing the basis of the opinion."[49] The court said that if the expert were not allowed to explain his opinion, the testimony " 'would impart a meaningless conclusion to the jury.' "[50]

The *Wade* court further ruled that conversations between a medical expert and the defendant, whether held for treatment or diagnostic purposes, are part of the basis of the expert's opinion and are also admissible. The court reasoned that "[c]onversation, and its interpretation and analysis by a trained professional, is undoubtedly superior to any other method the courts have for gaining access to an allegedly insane defendant's mind."[51] The court also recognized that since such testimony is not offered as substantive evidence, but only to explain the basis of the expert's opinion, it does not violate hearsay proscriptions.

Although *Wade* was decided before adoption of the North Carolina Evidence Code, the court reaffirmed its position after the Code's enactment. In *State v. Allison,*[52] another insanity case, the court interpreted Section 8-58.14 of the North Carolina General Statutes, which was later renumbered without material change as Rule 705 of the current Rules of Evidence. In the court's view, "the statute assumes that, at the very least, the expert is *allowed* to disclose the basis [of his opinion] on direct examination" (emphasis in original).[53] The court held that excluding the expert's testimony about his conversations with the defendant constituted prejudicial error and warranted a new trial.

Only one case to date, *State v. Baldwin,*[54] has addressed whether the basis of an expert's opinion is likewise admissible in a diminished capacity case. In *Baldwin,* the trial court allowed the defense's expert to give his opinion that the defendant was incapable of functioning independently in planning or carrying out a plan of murder. The expert was not permitted, however, to recite any "self-serving, exculpatory statements" made by the defendant to the expert unless the defendant first testified about the "matters related to those statements."[55]

The supreme court upheld the exclusion of the evidence, but not on the ground that the defendant first had to testify before the expert could recount his conversations with the defendant. The supreme court began with Evidence Rule 705, finding that the rule does not always require the trial court to admit the basis of an expert's opinion. According to the court, "[o]nly if an adverse party requests disclosure must the trial court require the expert to disclose" the facts underlying his or her opinion.[56] On the other hand, if the proponent of the testimony seeks to have the expert disclose the basis of his or her opinion, the trial court retains discretion to exclude the testimony under Evidence Rule 403. That rule states that the trial court may exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." The supreme court concluded that the trial court did not abuse its discretion on the facts presented.

Although the result in *Baldwin* appears to depart from previous decisions in the insanity area, the court's reasoning

suggests that the basis of expert opinion will continue to be generally admissible in diminished capacity and insanity cases alike. First, the court found that the defendant's statements to the expert in *Baldwin* were of limited probative value on the issue of diminished capacity. In the court's view, the statements related to several other defenses, including self-defense and duress.[57] This concern is reminiscent of a limitation the supreme court placed on expert testimony in older insanity cases. In its 1920 decision in *State v. Alexander*, the court held that an expert's testimony about the defendant's statements to the expert were inadmissible to the extent that the statements did not "throw any light upon the present condition or the past condition of the [defendant's] mind."[58] *Baldwin* can be read as reviving this concept and incorporating it into the balancing process under Evidence Rule 403. Thus, an expert's testimony about the defendant's statements to the expert should be admissible if (a) the defendant's statements serve to explain the basis of the expert's opinion, pursuant to *Wade* and *Allison* and (b) the statements shed some light on the defendant's claimed lack of capacity and do not merely relate to other defenses.

Second, the *Baldwin* court was concerned about the possibility of prejudice. At the time the expert sought to testify about his conversations with the defendant, no substantive evidence had been presented about self-defense, duress, or any of the other defenses raised in the conversations. If the jury had heard the expert's testimony and considered it as substantive proof of the defendant's other defenses—when no substantive evidence had actually been presented—the state's case could have been prejudiced.[59] The court's analysis suggests that even if an expert's testimony concerns defenses other than the defendant's lack of capacity, the testimony may still be admissible if it serves only to corroborate other, substantive evidence already in the record.

## E. Burden of Production

### 1. Standard

In *State v. Clark*,[60] the supreme court identified two different burdens of production on the defendant in diminished capacity cases. The defendant must meet one standard to warrant submission of a specific instruction to the jury on diminished capacity; and must satisfy a related, but separate, standard to warrant the submission of an instruction to the jury on a lesser included offense—which, in the case of *Clark*, was second-degree murder.

The court set the burden of production for a diminished capacity instruction somewhere between the standards applied in self-defense and voluntary intoxication cases. The

court recognized that the defendant is entitled to a specific instruction on self-defense when there is "any evidence" showing that it was necessary or that it reasonably appeared to be necessary for the defendant to kill to protect himself or herself against death or great bodily harm. In voluntary intoxication cases, the defendant must meet a higher evidentiary threshold; the evidence must show that the defendant's mind and reason were so completely intoxicated and overthrown that he or she was "utterly incapable" of forming the state of mind required for first-degree murder.[61]

The court found that neither the "any evidence" nor the "utterly incapable" standards struck the right balance in diminished capacity cases, and fashioned the following, intermediate burden of production:

> [W]hen a defendant requests the trial court to instruct the jury that it may consider the mental condition of the defendant in deciding whether she formed a premeditated and deliberate specific intent to kill the victim, there must be sufficient evidence "reasonably to warrant inference of the fact at issue." [citation omitted]. The proper test is whether the evidence of defendant's mental condition is sufficient to cause a reasonable doubt in the mind of a rational trier of fact as to whether the defendant was capable of forming the specific intent to kill the victim at the time of the killing.[62]

While setting a new burden of production for instructions on diminished capacity, the *Clark* court adhered to preexisting standards for the submission of lesser included offenses to the jury. The court said that an instruction on a lesser included offense is mandated whenever there is " 'any evidence in the record which might convince a rational trier of fact to convict the defendant of a less grievous offense.' "[63]

In certain cases, these different burdens of production will have no practical effect. If the defendant in a first-degree murder case produces sufficient evidence to warrant a diminished capacity instruction, he or she would automatically be entitled to an instruction on the lesser included offense of second-degree murder.[64] It also follows that if the defendant fails to meet the burden of production for diminished capacity, and there is no other evidence to support a verdict of second-degree murder, he or she would not be entitled to an instruction on a lesser included offense.[65] There could be instances, however, when the defendant produces evidence apart from diminished capacity tending to show the commission of a crime of lesser degree. Such other evidence would warrant an instruction on a lesser included offense whether or not the defendant met the burden of production for diminished capacity.

### 2. Sufficiency of Evidence

The *Clark* case also provides examples of evidence that did and evidence that did not warrant a specific jury instruction

on diminished capacity. The court found that the defendant in *Clark* had failed to meet her burden of production. It reached this result by comparing the evidence in the case before it with the evidence presented in *Rose I*. Although the *Rose I* court did not explicitly consider the defendant's burden of production, it did find that the defendant was entitled to an instruction on diminished capacity.

The *Clark* court focused first on the strength of the expert testimony in each case. In *Rose I*, an expert had testified that the defendant was experiencing a psychotic episode at the time of the offense and could not have formed the specific intent to kill. In contrast, the testimony was unfocused and speculative in *Clark*. One expert testified to the defendant's mental condition without giving an opinion on whether the condition affected the defendant's ability to form the specific intent to kill; and although a second expert testified about the defendant's capacity to form the specific intent to kill, his opinion was so equivocal and laced with disclaimer that the trial court excluded it as speculation.[66]

The *Clark* court next compared the nature of the defendants' disorders in the two cases. In *Rose I*, a physical injury contributed to the change in the defendant's personality that rendered him incapable of forming the specific intent to kill. In *Clark*, the defendant had a personality disorder consistent with "battered woman syndrome"; but, the court found that the disorder had affected the defendant since childhood, that she had been able to cope with it in the past, and that her behavior at the time of the offense was inconsistent with her claimed incapacity based on the disorder.[67]

The *Clark* court did not announce strict rules, however, regarding the disorders that may qualify as diminished capacity. Although *Clark* found some significance in the physical origin of the defendant's condition in *Rose I*, it did not make physical injury a prerequisite for submission of a diminished capacity instruction to the jury. Nor did the *Clark* court rule out battered woman syndrome as a basis for obtaining a diminished capacity instruction in an appropriate case.

## F. Burden of Persuasion

Although the defendant has the burden of producing enough evidence to warrant placing the issue of diminished capacity before the jury, the prosecution bears the ultimate burden of persuading the jury of all elements of the offense, including the defendant's state of mind. This is necessarily so because the diminished capacity defense merely negates an element of the offense. A defendant is under no obligation to prove that he or she did not possess the state of mind necessary for conviction; rather, the prosecution must

establish beyond a reasonable doubt that the defendant acted with that state of mind, notwithstanding any claim of diminished capacity. In the case of first-degree murder, the prosecution must prove beyond a reasonable doubt that the defendant had the specific intent to kill, formed after premeditation and deliberation.[68]

## G. Instructions

### 1. Diminished Capacity Instructions for First-Degree Murder

#### a. Instructions Reviewed by the Courts

The North Carolina Supreme Court has examined only a few instructions on diminished capacity for first-degree murder. The cases have concerned the extent to which diminished capacity instructions must address each of the mental elements of first-degree murder. With each new situation the court has refined its analysis.

In *Rose I*, the defendant requested two diminished capacity instructions—one on specific intent to kill and the other on premeditation and deliberation—but the court found that only the first was supported by the evidence. The court held that since the defendant had introduced expert testimony that he was unable to form the specific intent to kill, he was entitled to an instruction directing the jury to consider his "mental condition in connection with his ability to form the specific intent to kill."[69] In contrast, the court found that the instruction requested by the defendant on premeditation and deliberation was unsupported by any evidence. The instruction would have directed the jury to consider the "opinions rendered by expert witnesses" regarding the elements of premeditation and deliberation.[70] The trial court had properly excluded such testimony, however, as an impermissible legal conclusion.

In the next case, *State v. Hedgepeth*,[71] the evidence apparently supported a diminished capacity instruction on specific intent to kill, premeditation, and deliberation, but the defendant did not request any particular instructions. In the absence of any request, the trial court instructed the jury to consider the mental and emotional condition of the defendant concerning whether he acted with premeditation and deliberation. The trial court failed, however, to direct the jury to consider the defendant's mental and emotional state concerning whether he formed the specific intent to kill. The supreme court held that since the defendant had not requested a particular instruction or objected to the instructions given, the trial court's instructions were subject to the "plain error" standard of review—that is, whether the alleged error was fundamental to the fairness of the trial or had a probable impact on the jury's verdict. The supreme

court concluded that, on the facts presented, the omission of specific intent to kill from the diminished capacity instruction did not amount to plain error.[72]

In *State v. Holder*,[73] the supreme court faced the issue left open in *Rose I* and *Hedgepeth*. In *Holder*, the defendant requested diminished capacity instructions on both specific intent to kill and premeditation and deliberation, and the evidence supported both of the requested instructions. The trial court gave a single instruction only, drawn largely from the pattern jury instruction on diminished capacity. The instruction strung together the mental elements for first-degree murder, directing the jury to consider whether the defendant had "the specific intent to kill the deceased formed after premeditation and deliberation."[74]

The supreme court held that the trial court's instruction was sufficient. The instruction referred to all of the mental elements of first-degree murder, and separate instructions—one on specific intent to kill and the other on premeditation and deliberation—were not required. The court's ruling rested on the premise that specific intent, although necessary for conviction of first-degree murder, is a not an independent element; rather, it is a component of the elements of premeditation and deliberation. The court did not address whether separate instructions on premeditation and deliberation, which are independent elements, would be appropriate if requested.

### b. *Pattern Instructions*

Except to the extent reviewed in *Holder*, discussed in the preceding section, the pattern instruction on diminished capacity has not been reviewed by the North Carolina appellate courts. The pattern instructions were revised in 1989 to add diminished capacity to the voluntary intoxication instruction for first-degree murder. The revised pattern instruction directs the jury to consider whether the defendant was intoxicated, drugged, *or* lacked mental capacity:

> If you find that the defendant was [intoxicated] [drugged], [lacked mental capacity], you should consider whether this condition affected his ability to formulate the specific intent which is required for conviction of first degree murder. In order for you to find the defendant guilty of first degree murder, you must find, beyond a reasonable doubt, that he killed the deceased with malice and in the execution of an actual, specific intent to kill, formed after premeditation and deliberation. If as a result of [intoxication] [a drugged condition], [lack of mental capacity] the defendant did not have the specific intent to kill the deceased, formed after premeditation and deliberation, he is not guilty of first degree murder.

> Therefore, I charge that if, upon considering the evidence with respect to the defendant's [intoxication] [drugged condition] [lack of mental capacity], you have

a reasonable doubt as to whether the defendant formulated the specific intent required for conviction of first degree murder, you will not return a verdict of first degree murder.[75]

The pattern instruction is, as its name suggests, a generic instruction designed for use in a range of settings. Instructions geared specifically to the case at hand may be appropriate when warranted by the evidence and requested by a party.[76] For example, the pattern instruction refers generally to lack of mental capacity. Defendants may, however, present evidence of emotional and physical conditions, as well as mental disorders, to show they lacked the state of mind required for the offense.[77] When warranted by the evidence and requested by a party, it may be appropriate for the court to instruct the jury to consider the defendant's mental, emotional and physical condition, as well as other pertinent circumstances, in connection with whether he or she acted with the requisite state of mind.[78]

### 2. Other Instructions

As discussed previously, the North Carolina appellate courts have not addressed diminished capacity except in first-degree murder cases. Nor has the committee responsible for drafting pattern instructions issued a diminished capacity instruction for any offense other than first-degree murder. The appropriateness of diminished capacity instructions for other offenses must, therefore, be resolved on a case-by-case basis.

The supreme court has considered, however, the impact of diminished capacity evidence on instructions for other defenses. In *State v. Hudson*,[79] the court reviewed, but did not rule definitively on, the jury instructions given in a case involving claims of both diminished capacity and insanity. There, the trial court instructed the jury to consider evidence of the defendant's sanity only if it first found that the state had proven beyond a reasonable doubt the elements of the offense. The supreme court rejected the defendant's initial contention that in insanity cases the jury should proceed in the reverse order—that is, the jury should determine the defendant's sanity before considering whether the state had proven the elements of the offense. Adhering to its previous decisions, the court held that the option requested by the defendant was the "better procedure" in insanity cases but was not required.[80]

The defendant argued further that the insanity instruction given by the trial court precluded the jury from considering evidence of his diminished capacity on the issues of premeditation, deliberation, specific intent to kill, and malice. The defendant also claimed that the trial court's instructions relieved the state of its burden of proof because the instructions effectively required the defendant to prove lack of capacity, along with insanity, to the satisfaction of the

jury. The supreme court left these issues open by rejecting the defendant's argument on procedural grounds. The court found that the defendant had not requested a diminished capacity instruction at trial and so had waived any argument that the trial court's instructions prevented the jury from properly considering his claim of diminished capacity.[81]

## Notes

1. Greil Marcus, *San Francisco's Days of Rage*, ROLLING STONE, July 12, 1979, at 50; Melinda Beck & Michael Reese, *Night of Gay Rage*, NEWSWEEK, June 4, 1979, at 30–31.

2. *See* 1 PAUL ROBINSON, CRIMINAL LAW DEFENSES 475–78 & accompanying footnotes (1984).

3. *Id.* at 474–78 & accompanying footnotes.

4. *Id.* at 474–75 & accompanying footnotes.

5. *See* cases cited in State v. Shank, 322 N.C. 243, 249–51 & n.1, 367 S.E.2d 639, 643–44 & n.1 (1988).

6. State v. Holder, 331 N.C. 462, 418 S.E.2d 197 (1992); State v. Hudson, 331 N.C. 122, 415 S.E.2d 732 (1992); State v. Baldwin, 330 N.C. 446, 412 S.E.2d 31 (1992); State v. Hedgepeth, 330 N.C. 38, 409 S.E.2d 309 (1991); State v. Rose (hereinafter *Rose II*), 327 N.C. 599, 398 S.E.2d 314 (1990); State v. Clark, 324 N.C. 146, 377 S.E.2d 54 (1989); State v. Rose (hereinafter *Rose I*), 323 N.C. 455, 373 S.E.2d 426 (1988); State v. Weeks, 322 N.C. 152, 367 S.E.2d 895 (1988); State v. Shank, 322 N.C. 243, 367 S.E.2d 639 (1988).

7. 322 N.C. 243, 367 S.E.2d 639 (1988).

8. *See* N.C. GEN. STAT. § 14–17.

9. *Shank*, 322 N.C. at 248, 367 S.E.2d at 643.

10. *Id.* at 249, 367 S.E.2d at 643.

11. 323 N.C. 455, 456–57, 373 S.E.2d 426, 427–28 (1988).

12. 322 N.C. 152, 165, 367 S.E.2d 895, 903 (1988).

13. State v. Silvers, 323 N.C. 646, 655, 374 S.E.2d 858, 864 (1989).

14. *Shank*, 322 N.C. at 250, 367 S.E.2d at 644.

15. *Id.* at 245, 367 S.E.2d at 641.

16. *Silvers*, 323 N.C. at 658, 374 S.E.2d at 866.

17. *Baldwin*, 330 N.C. at 452, 457, 461, 412 S.E.2d at 35, 38, 40 (duress, voluntary intoxication, and diminished capacity defenses presented); *Hedgepeth*, 330 N.C. at 43–44, 409 S.E.2d at 313 (voluntary intoxication and diminished capacity); *Silvers*, 323 N.C. at 657–58, 374 S.E.2d at 865–66 (insanity and voluntary intoxication); *Rose I*, 323 N.C. at 456, 373 S.E.2d at 427 (insanity and diminished capacity).

18. *See, e.g.*, State v. Ruof, 296 N.C. 623, 636, 252 S.E.2d 720, 728 (1979).

19. 331 N.C. 462, 418 S.E.2d 197 (1992). *Holder* →

20. *Rose I*, 323 N.C. at 458–59, 373 S.E.2d at 429.

21. *See* State v. Mash, 323 N.C. 339, 372 S.E.2d 532 (1988).

22. State v. Boone, 307 N.C. 198, 209, 297 S.E.2d 585, 592 (1982) (rape and first-degree sexual offense); State v. McLaughlin, 286 N.C. 597, 606, 213 S.E.2d 238, 244 (1975) (arson), *vacated on other grounds*, 428 U.S. 903, 96 S. Ct. 3206, 49 L.Ed.2d 1208 (1976); State v. Bunn, 283 N.C. 444, 458–59, 196 S.E.2d 777, 786 (1973) (second-degree murder).

23. WAYNE LAFAVE, HANDBOOK ON CRIMINAL LAW 343–44 (1972).

24. *Id.* at 344; 1 PAUL ROBINSON, *supra* note 2, at 280–83, 297–301 (1984).

25. State v. Reynolds, 307 N.C. 184, 191, 297 S.E.2d 532, 536 (1982).

26. State v. White, 288 N.C. 44, 50, 215 S.E.2d 557, 560–61 (1975).

27. LAFAVE, *supra* note 23, at 344; 1 ROBINSON, *supra* note 2, at 280–83, 297–301.

28. 330 N.C. 446, 412 S.E.2d 31 (1992).

29. *Id.* at 461–62, 412 S.E.2d at 40–41.

30. *Id.* at 461 n.2, 412 S.E.2d at 40 n.2.

31. 324 N.C. 146, 377 S.E.2d 54 (1989).

32. *Id.* at 161–63, 377 S.E.2d at 64.

33. *See* BENJAMIN SENDOR, NORTH CAROLINA CRIMES 22–23, 49, 106–07 (3d ed. 1985).

34. State v. Peacock, 313 N.C. 554, 560, 330 S.E.2d 190, 194 (1985) (burglary); State v. Boone, 307 N.C. 198, 210, 297 S.E.2d 585, 592 (1982) (attempted rape); State v. Gerald, 304 N.C. 511, 521, 284 S.E.2d 312, 318–19 (1981) (assault with a deadly weapon with intent to kill inflicting serious bodily injury).

35. State v. Brower, 289 N.C. 644, 658, 224 S.E.2d 551, 561 (1976).

36. *Clark*, 324 N.C. at 161–63, 377 S.E.2d at 63–64 (less evidence required to warrant jury instruction on diminished capacity than on voluntary intoxication).

37. 322 N.C. 243, 367 S.E.2d 639 (1988).

38. 322 N.C. 152, 367 S.E.2d 895 (1988).

39. *Id.* at 164, 367 S.E.2d at 903.

40. NORTH CAROLINA PATTERN JURY INSTRUCTIONS FOR CRIMINAL CASES § 206.11 at 5 (Feb. 1989).

41. *Weeks*, 322 N.C. at 166, 367 S.E.2d at 166; *see also Rose I*, 323 N.C. at 459–60, 373 S.E.2d at 429–30 (medical expert may not give opinion on whether legal standards of premeditation and deliberation have been met).

42. 322 N.C. at 248, 367 S.E.2d at 643.

43. N.C. GEN. STAT. § 15A-2000(f)(2).

44. *Rose I*, 323 N.C. at 458, 373 S.E.2d at 428.

45. *Clark*, 324 N.C. at 160, 377 S.E.2d at 62–63.

46. *Hedgepeth*, 330 N.C. at 46–47, 409 S.E.2d at 314 (prosecution allowed to ask own expert whether defendant had capacity to form specific intent to kill).

47. *Compare Rose I*, 323 N.C. at 459–60, 373 S.E.2d at 429–30 (testimony of defendant's expert barred) *with Rose II*, 327 N.C. at 604–05, 398 S.E.2d at 316–17 (testimony of prosecution's expert barred and new trial ordered).

48. State v. Strickland, 321 N.C. 31, 35–39, 361 S.E.2d 882, 884–86 (1987).

49. 296 N.C. 454, 462, 251 S.E.2d 407, 412 (1979).

50. *Id.* at 463, 251 S.E.2d at 412, *quoting* State v. Griffin, 99 Ariz. 43, 49, 406 P.2d 397, 401 (1965).

51. *Wade*, 296 N.C. at 463, 251 S.E.2d at 412.

52. 307 N.C. 411, 298 S.E.2d 365 (1983).

53. *Id.* at 416, 298 S.E.2d at 368.

54. 330 N.C. 446, 412 S.E.2d 31 (1992).

55. *Id.* at 455–56, 412 S.E.2d at 37.

56. *Id.* at 456, 412 S.E.2d at 37.

57. *Id.* at 457, 412 S.E.2d at 38.

58. 179 N.C. 759, 765, 103 S.E. 383, 386 (1920).

59. *Baldwin*, 330 N.C. at 457, 412 S.E.2d at 38.

60. 324 N.C. 146, 377 S.E.2d 54 (1989).

61. *Id.* at 161–62, 377 S.E.2d 63–64.

62. *Id.* at 163. 377 S.E.2d at 64.

63. *Id.* at 162. 377 S.E.2d at 64, *quoting* State v. Peacock, 313 N.C. 554, 558, 330 S.E.2d 190, 193 (1985).

64. This result necessarily flows from the operation of the diminished capacity defense. If the jury is instructed on diminished capacity and has a reasonable doubt about the defendant's capacity to form the state of mind for first-degree murder, the defendant can be convicted of no more than second-degree murder.

65. *See Clark*, 324 N.C. at 164–65, 377 S.E.2d at 65–66 (since the defendant was relying primarily on diminished capacity and there was no other evidence sufficient to cause a rational trier of fact to doubt the state's proof of premeditation, deliberation, and specific intent, the defendant was not entitled to an instruction on second-degree murder).

66. *Id.* at 157–60, 163–64, 377 S.E.2d at 61–65.

67. *Id.*

68. *See* State v. Mash, 323 N.C. 339, 345–46, 372 S.E.2d 532, 536–37 (1988) (burden of persuasion on prosecution in voluntary intoxication cases; instruction to jury impermissibly shifted burden of persuasion to defendant by suggesting that defendant bore burden of proving he was so intoxicated as to be unable to form deliberate and premeditated intent to kill).

69. 323 N.C. at 457, 373 S.E.2d at 428.

70. *Id.* at 459, 373 S.E.2d at 429.

71. 330 N.C. 38, 409 S.E.2d 309 (1991).

72. *Id.* at 51–52, 409 S.E.2d at 317.

73. 331 N.C. 462, 418 S.E.2d 197 (1992).

74. *Id.*

75. NORTH CAROLINA PATTERN JURY INSTRUCTIONS FOR CRIMINAL CASES § 305.11 (Mar. 1989).

76. *See Rose I*, 323 N.C. at 458, 373 S.E.2d at 428 (when instruction is requested by party and is supported by evidence, "it is error for the trial court not to instruct in substantial conformity with the requested instruction").

77. *Id.* at 456–57, 373 S.E.2d at 427–28 (previous head injury was contributing cause of psychotic episode); *Weeks*, 322 N.C. at 165, 367 S.E.2d at 903 (chronic emotional disturbance).

78. *Compare* State v. Johnson, 298 N.C. 47, 68–70, 257 S.E.2d 597, 613–14 (1979) (in capital case, supreme court held that trial court should have explained the mitigating factor of impaired capacity in more detail in sentencing instructions; in supreme court's view, mental disorders are not as well understood by the average juror as intoxication and, in appropriate case, greater explanation is required).

79. 331 N.C. 122, 415 S.E.2d 732 (1992).

80. *Id.* at 146, 415 S.E.2d at 745.

81. *Id.*

The Institute of Government of The University of North Carolina at Chapel Hill has printed a total of 885 copies of this public document at a cost of $369.49, or $0.42 per copy. These figures include only the direct costs of reproduction. They do not include preparation, handling, or distribution costs.

♻ This publication is printed on permanent, acid-free paper in compliance with the North Carolina General Statutes.

# APPENDIX 32

# Affidavit of Lennie Hughes

NORTH CAROLINA

CAMDEN COUNTY

IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

FILE NO: 88-CRS-202,332

FILM NO: _____

```
* * * * * * * * * * * * * *
STATE OF NORTH CAROLINA,      *
                              *
                              *
          vs.                 *            AFFIDAVIT
                              *       LENNIE L. HUGHES, ESQ.
WADE LARRY COLE,              *
              Defendant       *
* * * * * * * * * * * * * *
```

Lennie L. Hughes, first duly sworn, says:

1.  I am a solo practitioner in Elizabeth City, North Carolina, and was licensed to practice law in 1974. My practice is a general practice. I was on the capital appointed list in Camden County in 1988.

2.  On June 24, 1988, I was appointed to represent Wade Larry Cole on a murder charge arising out of the June 23, 1988 death of Theresa Graham, Cole's common law wife. Mr. O. C. Abbott of Elizabeth City was appointed as co-counsel on September 19, 1988 after the district attorney decided to try our client capitally.

3.  A second murder indictment was returned on October 17, 1988 for the death of Hattie Graham, Theresa Graham's mother. The second murder was alleged to have occurred at the time of the first murder. The indictments were joined for trial.

4.  The cases came to trial in July, 1989 in Camden County before The Honorable Donald Stephens. The jury found

Cole guilty of one count of first degree murder and one count of involuntary manslaughter. The Defendant was sentenced to death and ten years imprisonment. On appeal the North Carolina Supreme Court awarded Defendant a new trial. _State v. Cole_, 331 N.C. 272, 415 S.E.2d 716 (1992).

5. During the years I practiced law in the Elizabeth City area, I became acquainted with the means used to select Grand Jury foremen in Camden County. When a new foreman needed to be selected, the presiding judge would ask a committee--usually made up of the sheriff, a clerk and a local attorney-- to meet and recommend one of the grand jurors as the foreman. The judge would then appoint that person. I took part in this selection process on occasion. I can never remember the Trial Court instructing the Grand Jury to select its own foreman.

6. I was unaware of the _Cofield_ decision at the first or second Cole trials. I did not learn of this ruling until November, 1997.

7. When the above-captioned case was remanded for a new trial, both O. C. Abbott and I tried to have new counsel appointed. We were not on the appointed list at the time and neither of us had any enthusiasm for retrying this case. We felt we had given it our best shot the first time.

8. After the first trial, both Abbott and I believed that any Camden County jury would return a death verdict in this case. We had learned in the first trial that all the prospective black jurors either knew and were sympathetic to

the victims, Hattie Graham and Theresa Graham, or knew Wade Cole. The prospective jurors who knew the victims, had no sympathy for Wade Cole, whom they viewed as an outsider from Elizabeth City.

9. The critical moment in the trial came when our change of venue motion failed. We alleged prejudicial publicity and supported our motion by articles and by affidavits but we failed to allege the effect of the insular and cohesive nature of this black community on jury selection. In hindsight, I believe we could have shown by affidavits that no potential black jurors in Camden would have been available to sit on the jury in this case, because of the closeness of the black community. We were unable to seal a black juror during the second trial.

10. In the second trial, with the help of the North Carolina Resource Center, we employed two mental health experts. Dr. Grover, a substance abuse expert, was employed to testify as to Cole's voluntary intoxication and Dr. Robert Brown, a psychiatrist, to testify as to mitigation. I procured a treatise from the Institute of Government on diminished capacity, but did not prepare a defense based on mental condition. We did prepare for a diminished capacity defense, based on Mr. Cole's voluntary intoxication.

11. Dr. Grover testified about Cole's impairment. After the State objected, The Honorable James Beatty ruled that Dr. Grover was not allowed to estimate his approximate blood level because Dr. Grover had not been told what Cole weighed at the

time of the crime and because Dr. Grover had not been told the size of the wine bottles and the percentage of alcohol in the wine.

12. In the second trial Cole testified he was smoking "mixed refer". At no point did we inquire as to what drugs were contained in a mixed reefer.

13. The officers from Elizabeth City seemed to believe Cole was substantially impaired, while the Camden deputies all testified he was not impaired. Neither the State nor the Defense called Sheriff Berry, who took the confession from Wade Cole. I believed Sheriff Berry would have testified that Cole was substantially impaired.

14. Gretchen Engle of the North Carolina Resource Center had interviewed Wade Cole's relatives, school teachers, employers, friends and neighbors. Ms. Engle had also searched found school and prison records. She discussed these interviews with us and sent us copies of her reports and documents. During the penalty phase, we put on two jailers that testified about Cole's ability to adapt to custody. We put on three members of the black community that knew Cole by having taught him first grade, having worked with him as an older teenager or by being his employer at the time of the crime. Finally, we put on Dr. Brown, who I believe harmed the case by casting Cole as a delusional jealous man, not substantially impaired either by intoxication or by a mental condition. We did not call any of Cole's family members because we did not think they would want to testify.

15. I have believed since my first appointment to this case that the tragic homicides of Theresa and Hattie Graham were crimes of passion and that he lacked the capability to premeditate and deliberate as to the crime of first degree murder on the night of the deaths.

I give this statement of my own free will under oath this 24th day of November, 1997.

_____
Lennie L. Hughes

NORTH CAROLINA

PASQUOTANK COUNTY

I, Barbara S. Stevens, a Notary Public of the County and State aforesaid, certify that Lennie L. Hughes, personally appeared before me this day and acknowledged the execution of the foregoing instrument.

Witness my hand and official seal, this 24th day of November, 1997.

_____
Notary Public

My Commission Expires: 7/28/2002

3000xxx

# APPENDIX 33

## Interview Notes With
## Wade Cole

WADE LARRY COLE

TO: Penalty Phase File
FR: Gretchen
RE: Interview with **Wade** on August 13, 1993
DT: August 26, 1993

I discussed with Wade his alcohol and substance use on the night of the killing.

Wade worked for Meigg's logging that day; he thinks it was a Tuesday, and he got off around 6PM. He hadn't eaten since breakfast. He went to the Po'Boy store and bought a bottle of Wild Irish Rose.

He went to the Graham's and parked near the house. There he drank the pint of wine he bought and then drank another half pint of warm wine which was on the floor of the car. He also smoked reefer.

Then he went into the house and had a disagreement with Theresa. The disagreement became physical and Hattie intervened. Wade was subsequently arrested and bailed out of jail.

He was taken by Deputy Vick to the Graham's to retrieve his car. He drove back to Elizabeth City and went to a bank, where he withdrew $50.00. He then went to a convenience store and bought gas, cigarettes, and another bottle of Wild Irish Rose. He started drinking immediately.

He went back across the bridge to Camden and called Theresa from the intersection with 343. He heard the couch squeaking and heavy breathing. He was convinced that Theresa was having sex.

Tears came into his eyes.

He took off in the car and by the time he reached Turner's Lane he had drunk the entire bottle of wine.

# APPENDIX 34

# Statement of Nicole Becton and Kevin Zola

STATE OF NORTH CAROLINA
COUNTY OF CAMDEN

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

STATE OF NORTH CAROLINA )
)
)  AFFIDAVIT OF NICOLE BECTON
v. )  and KEVIN ZOLOT
)
)
WADE LARRY COLE )
   Defendant )

Nicole Becton and Zevin Zolot, appearing before the undersigned notary and being duly sworn say that:

1. We are third year law students at Duke University School of Law, Durham, North Carolina.

2. We are enrolled in a death penalty class and clinic at Duke Law School.

3. As part of this class, we are assigned to work with attorneys Bill Massengale and Marilyn Ozer on post conviction matters for their client, Wade Larry Cole.

4. On September 25, 1997, we went to Camden County, North Carolina, in part to locate the alcohol bottle from which Wade Cole was allegedly drinking, and the bb gun which was allegedly fired at Wade Cole the night of the murder.

5. We first talked to Frank Parrish, Elizabeth City District Attorney. He stated that he remembered the alcohol bottle. He agreed to look through his files on this case to see if there was any record of either the alcohol bottle or the bb gun. He was unable to locate any record in his files. Mr. Parrish also called the Elizabeth City Police to see if they had custody of the bb gun or the alcohol bottle.

6. We went to the Camden County Sheriff's Department and spoke with Chief Deputy Tony Perry. He looked through the Sheriff Department file and found no mention of the bottle or the bb gun. Mr. Perry also looked through the evidence locker and did not find any evidence related to the Cole case. He signed a statement confirming all of this.

7. We visited Bill Lilly, a retired police officer for the Elizabeth City Police. Mr Lilly remembers the bb gun and the alcohol bottle. He stated that the bb gun was never taken from Wade Cole's house because it was not considered evidence. He thought that if the alcohol bottle still existed, then it should be in the custody of the Elizabeth City Police since they were the ones who arrested Wade Cole.

8.    Although Mr. Parrish had already called the Elizabeth City Police, we went to the Police Department to double check. The officer in charge of the evidence, Sgt. Terry Greganus was not there, and thus we were unable to confirm that the Elizabeth City Police did not have custody of the bottle or bb gun.

9.    We tried to locate John Simpson, the Elizabeth City Police officer who arrested Wade Cole. He presently works for the Elizabeth City State University Campus Police. He was not on duty, and we were unable to find his home phone number or address.

10.   We spoke with Frank Parrish again to tell him we were unable to locate the alcohol bottle or the bb gun. He stated that he would check again with Terry Greganus at the Elizabeth City Police Department, and if he was unable to locate the bottle or gun, he would send an affidavit stating that these items were either missing or destroyed.


_____
Nicole J. Becton


_____
Kevin Zolot

Sworn to and subscribed before me this the ___ day of November, 1997


Notary Public:
My Commission expires:

# APPENDIX 35


# Statement of
# Chief Deputy Sheriff Tony E. Perry



**JOE G. JONES, Sheriff**
P.O. Box 57
Camden, NC 27921

Telephone: (919) 338-4176

09-27-97

STATE OF NORTH CAROLINA       IN THE GENERAL COURT OF JUSTICE

COUNTY OF CAMDEN              SUPERIOR COURT DIVISION

STATE OF NORTH CAROLINA       )
                              )
          V.                  )
                              )
                              )
WADE LARRY COLE               )
          Defendant

1.  I am the Chief Deputy Sheriff of the Camden County
Sheriff's Department.

2.  I have checked the records of the Camden County
Sheriff's Department, and there is no record or mention of
an alcohol bottle or a BB gun.

3.  I have also checked the evidence locker at the Camden
County Sheriff's Department.  I found no evidence relating
to the Wade Larry Cole case.  There is no alcohol bottle or
BB gun in the evidence locker.

*Tony E. Perry C/D*
Tony E. Perry

# APPENDIX 36

## Short Form Murder Indictment

# STATE OF NORTH CAROLINA
### In the General Court of Justice
### Superior Court Division

CAMDEN _____ County

File No.

88 CRS 202

Film No.

89-2-194

### STATE VERSUS

Defendant
WADE LARRY COLE

| Date of Offense | Offense in Violation of G.S. |
|---|---|
| June 23, 1988 | 14-17 |

# INDICTMENT
# MURDER

The jurors for the State upon their oath present that on or about the date of offense shown and in the county named above the defendant named above unlawfully, willfully and feloniously and of malice aforethought did kill and murder

Theresa Graham

[Note: This indictment is sufficient to charge both First and Second Degree Murder. G.S. 15-144; G.S. 15-155. A prosecutor who only intends to prosecute for Second Degree Murder may want "Second Degree" typed before "Murder" in the offense block.]

Signature of Prosecutor

## WITNESSES

| | |
|---|---|
| ☒ R. F. Berry | ☐ |
| ☐ | ☐ |
| ☐ | ☐ |
| ☐ | ☐ |

The witnesses marked "X" were sworn by the undersigned Foreman of the Grand Jury and, after hearing testimony, this bill was found to be:

☒ A TRUE BILL by twelve or more grand jurors, and I the undersigned Foreman of the Grand Jury, attest the concurrence of twelve or more grand jurors in this Bill of Indictment.

☐ NOT A TRUE BILL

Date
June 27, 1988

Signature of Grand Jury Foreman

JC-CR-124