IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:05-HC-461-D

FILED

SEP 2 0 2007

DENNIS P. IAVARONE, CLERK
US DISTRICT COURT, EDNC
BY _____
DEP CLK

| | | |
|---|---|---|
| WADE LARRY COLE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| GERALD BRANKER, Warden, | ) | |
| Central Prison | ) | |
| Raleigh, North Carolina,[1] | ) | |
| | ) | |
| Respondent. | ) | |

Petitioner Cole was sentenced to death for the first-degree murder of Theresa Graham, his girlfriend and the mother of his two children. Petitioner also was convicted of involuntary manslaughter for the death of Theresa's mother, Hattie Graham. Cole killed his victims in June 1988. Cole seeks a writ of habeas corpus. Respondent filed a motion to dismiss [D.E. 12] and a motion for summary judgment [D.E. 22]. Cole filed a motion for summary judgment [D.E. 16] and a renewed motion for summary judgment [D.E. 23]. As explained below, respondent's motion for summary judgment is granted, petitioner's motions are denied, and the petition for writ of habeas corpus is denied.

I.

The following facts are summarized from the opinion of the North Carolina Supreme Court affirming Cole's convictions and sentences. See State v. Cole, 343 N.C. 399, 471 S.E.2d 362 (1996). Theresa Graham lived in a house in Camden County, North Carolina, with petitioner, their

_____

[1] Marvin Polk, former Warden of Central Prison, was named as respondent in the petition. Since the petition was filed, Gerald Branker replaced Polk as Warden and will be substituted as the respondent. See Fed. R. Civ. P. 25(d).

two children, Rod and Assunta, and Theresa's mother, Hattie. At the time of the crimes Rod was eleven years old and Assunta was two years old. On the evening of June 22, 1988, petitioner came home from work at approximately 5:30 p.m. He asked where dinner was, punched Theresa, and then walked outside. Theresa followed him and asked why he had hit her. Petitioner again started to hit her. Hattie tried to intervene, but petitioner hit Hattie, knocking her against his car. William Bowser, Theresa's twelve-year-old cousin, was spending the night at the Graham residence. He and Rod helped Hattie inside, and Hattie called the police.

Deputy Lilly and Deputy Vick of the Camden County Sheriff's Department responded. When they arrived at the scene, Theresa and petitioner were arguing and Theresa had a black eye and a bruised face. Petitioner was taken to the magistrate's office and arrested for assaulting Hattie. Later that night he posted bond and was released. He was told he could not return to the Graham residence except to get his car. Police officers took petitioner to his car and stayed until he left a little before midnight.

Less than two hours later, at approximately 1:36 a.m., the police received an emergency call from Hattie. She said that petitioner had shot Theresa and when Hattie tried to stop him petitioner attacked her as well. The dispatcher contacted Deputy Vick who called Hattie. After speaking with her, Deputy Vick went to the Graham residence. When he arrived he found Theresa dead on the screened porch. Inside the house he found Hattie unconscious on the couch. She later died.

After other officers arrived at the house, Deputy Vick took Rod, Assunta, and William to the Sheriff's Department. William told Deputy Vick that he was asleep on the couch when petitioner broke through the back door armed with a .22-caliber rifle. William said petitioner pulled the telephone cord out of the wall and went to Theresa's bedroom. He pulled her from the bed and shot her. He then dragged Theresa into the dining room, retrieved a knife from the kitchen, and started

2

stabbing her. Hattie tried to stop him and petitioner stabbed her. He then dragged Theresa to the porch and started stabbing her again. William said that when petitioner stopped the attack he yelled, "I told you I was going to kill you," and left. William reconnected the phone, and Hattie called the police. Sometime after Hattie got off the phone she stopped breathing. William and Rod went to Rod's room and hid until they heard Deputy Vick.

At approximately 3:23 a.m. an officer saw petitioner in his car and stopped him. When the officer approached, petitioner asked, "Is she dead, man?" Petitioner was arrested.

At trial, the medical examiner testified Theresa was stabbed over 100 times. Twenty-eight of the stab wounds penetrated her internal body cavity and many of them could have been fatal. She was also shot once in the right cheek and once in the left leg. Neither wound was fatal, but the testimony indicated that when petitioner shot Theresa the gun was in close proximity to her face. The medical examiner testified that Hattie had a stab wound to the chest, a stab wound to her left arm, and scrapes and bruises on her chest and lips. She died of an abnormal heart rhythm precipitated by stress from the attack. Severe coronary disease was a major factor underlying her death.

Petitioner testified in his defense. He said that on the night of the murders he drank wine and smoked marijuana before going home after work. He said that he fought with Theresa because she told him to "kiss her a--" when he asked about dinner. After being released on bond he said he drank more wine. He called Theresa and thought he heard noise in the background which made him think she was having sex with a neighbor. He drove to the house and said that when he got there he thought he heard Theresa breathing heavily, a couch or bed squeaking, and a male voice. He went back to his truck and got his rifle. He said that when he entered the house he found Theresa in bed with William and he lost control. He admitted shooting and stabbing Theresa, but denied attacking

3

Hattie. He said that when he realized what he was doing he stopped and left. He drove to Elizabeth City where he slept for an hour. He denied having said, "I told you I was going to kill you." See id. at 408-10, 471 S.E.2d at 365-67.

II.

On June 27, 1988, Cole was indicted for one count of first-degree murder for the death of Theresa Graham. On October 17, 1988, he was indicted for one count of second-degree murder for the death of Hattie Graham. The case was tried at the July 17, 1989, Special Criminal Session of the Superior Court of Camden County. On July 26, 1989, petitioner was convicted of the first-degree murder of Theresa Graham and the involuntary manslaughter of Hattie Graham. After a sentencing trial, the jury found both of the aggravating circumstances submitted with respect to the first-degree murder conviction: that the murder was especially heinous, atrocious, or cruel and that the murder was part of a course of conduct in which petitioner committed crimes of violence against other persons. The jury returned a verdict of death. The court sentenced petitioner to death and also sentenced him to ten years imprisonment for involuntary manslaughter.

On direct appeal, the North Carolina Supreme Court reversed petitioner's convictions. State v. Cole, 331 N.C. 272, 415 S.E.2d 716 (1992). Neither petitioner nor his attorneys were present at unrecorded bench conferences at which some prospective jurors were excused from service. The North Carolina Supreme Court held that petitioner had an unwaivable right to be present at the bench conferences and reversed his convictions. See id. at 275, 415 S.E.2d at 717. The matter was re-tried at the May 31, 1994, Criminal Session of the Superior Court of Camden County. On June 9, 1994, petitioner was again convicted of the first-degree murder of Theresa Graham and the involuntary manslaughter of Hattie Graham. After the sentencing trial, the jurors again found both of the aggravating circumstances submitted: that the murder was especially heinous, atrocious, or

4

cruel and that the murder was part of a course of conduct in which petitioner committed crimes of violence against other persons. The jury returned a verdict of death. On June 13, 1994, the court sentenced petitioner to death and also sentenced him to a concurrent sentence of two years imprisonment for the involuntary manslaughter conviction.

On direct appeal, the North Carolina Supreme Court affirmed petitioner's convictions and sentences. Cole, 343 N.C. at 408, 471 S.E.2d at 365. The United States Supreme Court denied certiorari. Cole v. North Carolina, 519 U.S. 1064 (1997). Cole filed a motion for appropriate relief ("MAR") in Camden County Superior Court on December 2, 1997. On July 14, 1998, he filed an amended MAR. On September 1, 1998, he filed a second amendment to the MAR and on September 23, 1999, he filed a third amendment to the MAR. The MAR court held a hearing on petitioner's claims of ineffective assistance of counsel. On August 31, 2001, the MAR court entered an order ("MAR Order") denying all of petitioner's MAR claims.[2] He petitioned the North Carolina Supreme Court for certiorari review, and his petition was denied on February 27, 2003.[3] State v. Cole, 356 N.C. 683, 577 S.E.2d 900 (2003).

On January 18, 2002, Cole filed a motion for imposition of life sentence pursuant to N.C. Gen. Stat. § 15A-2006 in Camden County Superior Court.[4] The court held a hearing on the motion on May 22, 2003. On August 21, 2003, the motion was denied.[5] Cole petitioned the North Carolina Supreme Court for certiorari review. He subsequently filed a supplement to his petition.

---

[2] The order is located in the State Ct. R., Vol. 6 of 31, Tab 10.

[3] The order is located in the State Ct. R., Vol. 9 of 31, Tab 24.

[4] N.C. Gen. Stat. § 15A-2006 allowed a defendant convicted of first-degree murder and sentenced to death prior to October 1, 2001, to seek post-conviction relief from his death sentence on the ground he was mentally retarded as defined in Gen. Stat. § 15A-2005.

[5] The order is located in the State Ct. R., Vol. 6 of 31, Tab 12.

On August 12, 2004, the North Carolina Supreme denied the petition.[6] State v. Cole, 358 N.C. 734, 601 S.E.2d 866 (2004).

On September 10, 2004, Cole filed a successive MAR claiming he received ineffective assistance of trial counsel because his attorneys failed to investigate and present evidence that he suffered from organic brain damage. On February 7, 2005, the MAR court denied the successive MAR without an evidentiary hearing.[7] Petitioner petitioned the North Carolina Supreme Court for certiorari review. The petition was denied on June 30, 2005.[8] State v. Cole, 359 N.C. 637, 616 S.E.2d 922 (2005).

On July 5, 2005, Cole filed his petition for writ of habeas corpus with this court. After an initial review of the petition pursuant to Rule 4 of the Rules Governing Section 2254 Cases, the court dismissed Claim XVII and directed respondent to file a response to the remaining claims. On February 23, 2006, respondent filed an answer to the petition and brief in support and a motion to dismiss.[9] Petitioner filed an opposition to the motion and a motion for summary judgment. Respondent subsequently filed a motion for summary judgment, and petitioner filed a response and renewed motion for summary judgment.

III.

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty

---

[6] The order is located in the State Ct. R., Vol. 9 of 31, Tab 31.

[7] The order is located in the State Ct. R., Vol. 6 of 31, Tab 15.

[8] The order is located in the State Ct. R., Vol. 11 of 31, Tab 35.

[9] Respondent's motion to dismiss is supported by materials outside of the pleadings and therefore will be treated as a motion for summary judgment. See Fed. R. Civ. P. 12(b)(6).

6

Lobby, Inc., 477 U.S. 242, 247 (1986).

The court's review of the claims is governed by 28 U.S.C. § 2254(d), as modified by the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat.

1214 (1996). Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings unless the adjudication of
> the claim –
>
>> (1) resulted in a decision that was contrary to, or involved an
>> unreasonable application of, clearly established Federal law, as
>> determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented in the State
>> court proceeding.

28 U.S.C. § 2254(d).

The phrase "'clearly established Federal law, as determined by the Supreme Court of the

United States' . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions

as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a

conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court

decides a case differently than [the Supreme] Court has on a set of materially indistinguishable

facts." Id. at 412-13. A state court decision "involve[s] an unreasonable application of" clearly

established federal law "if the state court identifies the correct governing legal principle from [the

Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's

case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied clearly

established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Only after a petitioner establishes the state court's adjudication of his claims was "contrary to" or an "unreasonable application of" clearly established federal law, or was "based on an unreasonable determination of the facts in light of the evidence," may a federal court proceed to review a state court judgment independently to determine whether habeas relief is warranted. Rose v. Lee, 252 F.3d 676, 689-90 (4th Cir. 2001). If the state court did not articulate the rationale underlying its adjudication, a federal habeas court must examine the record and the clearly established Supreme Court precedent to determine whether the state court's adjudication was contrary to, or involved an unreasonable application of, clearly established federal law. Bell v. Jarvis, 236 F.3d 149, 158 (4th Cir. 2000) (en banc). Finally, the factual findings of the state court are presumed to be correct. 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of rebutting this presumption by clear and convincing evidence. Id.

IV.

In the petition, Cole argues he is entitled to habeas relief vacating his convictions and death sentence because of the following errors:[10]

Claim I - Petitioner's sentence of death violates the Eighth Amendment as interpreted in Atkins v. Virginia, 536 U.S. 304 (2002);

Claim II - The trial court erred by submitting the course of conduct aggravating factor to the jury;

Claim III - Ineffective assistance of counsel because trial counsel failed to move to dismiss the charge of involuntary manslaughter;

---

[10] As noted, after the initial review of the petition the court dismissed Claim XVII in an order filed on November 10, 2005.

8

Claim IV - Petitioner was denied an impartial jury from a fair cross section of the community;

Claim V - Petitioner's due process rights were violated as a result of racial discrimination in the selection of the grand jury foreman;

Claim VI - Ineffective assistance of counsel because counsel failed to seek funds for a neuropsychologist to present evidence petitioner suffered brain damage;

Claim VII - Ineffective assistance of counsel because counsel failed to present all of the available mitigating evidence;

Claim VIII - Ineffective assistance of counsel because counsel failed to properly present a diminished capacity defense;

Claim IX - The trial court erred by failing to excuse prospective juror Etheridge for cause;

Claim X - The trial court violated petitioner's Eighth and Fourteenth Amendment rights by giving the jury an unconstitutionally vague instruction on course of conduct;

Claim XI - The trial court violated petitioner's Eighth and Fourteenth Amendment rights by limiting the basis upon which the jury could find his capacity to appreciate the criminality of his conduct was impaired;

Claim XII - The trial court's instruction on the aggravating circumstance that the murder was "especially heinous, atrocious, or cruel" was unconstitutionally vague;

Claim XIII - The trial court's instruction on the burden of persuasion as to mitigating factors was unconstitutionally vague;

Claim XIV - The trial court's instruction allowed the jurors to ignore nonstatutory mitigating evidence;

Claim XV - The trial court's instruction on the consideration of mitigating factors was unconstitutional;

Claim XVI - The trial court lacked jurisdiction to adjudicate petitioner guilty of first-degree murder because the indictment was insufficient to charge capital murder.

Respondent contends that Claims II, III, IV, V, VI, VIII, and XVI are procedurally defaulted.

The court is precluded from reviewing procedurally defaulted claims. See Coleman v. Thompson, 501 U.S. 722, 731-32 (1991). Therefore, the court will first consider respondent's claims of procedural default.

9

V.

A federal court is precluded from reviewing the merits of any claim found to be procedurally barred by the state court on independent and adequate state grounds. Id. A state rule is "adequate" if it is firmly established and regularly and consistently applied by the state court. Johnson v. Mississippi, 486 U.S. 578, 587 (1988); McCarver v. Lee, 221 F.3d 583, 588 (4th Cir. 2000). A state rule is "independent" if it does not depend upon a federal constitutional ruling. Fisher v. Lee, 215 F.3d 438, 455 (4th Cir. 2000) (citing Ake v. Oklahoma, 470 U.S. 68, 74-75 (1985)).

Procedurally defaulted claims can be reviewed by a federal habeas court if the petitioner demonstrates cause and prejudice, or that the failure to consider the claim will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750. To show cause, a petitioner must show something external prevented him from complying with the state procedural rule. Id. at 753. To show prejudice, a petitioner must show he was actually prejudiced as a result of the alleged violation of federal law. United States v. Frady, 456 U.S. 152, 167-69 (1982). To establish a "fundamental miscarriage of justice," a petitioner must show he is actually innocent of the charges. See Reid v. True, 349 F.3d 788, 806 (4th Cir. 2003); Matthews v. Evatt, 105 F.3d 907, 916 (4th Cir. 1997). In the context of an alleged default at sentencing in a case where the death penalty is imposed, a petitioner must show he is "actually innocent" of the death penalty. Sawyer v. Whitley, 505 U.S. 333, 336 (1992). To be "actually innocent" of the death penalty, a petitioner must show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found him eligible for the death penalty under applicable state law. Id.

Applying these standards the court will determine whether Claims II, III, IV, V, VI, VIII, and XVI are procedurally defaulted.

10

A.

In Claim II, petitioner argues that because the jurors at the first trial found he was guilty of the involuntary manslaughter of Hattie Graham, the State should have been precluded from submitting the course of conduct aggravator at the second trial.[11] He reasons that the course of conduct aggravator required a finding that he intentionally stabbed Hattie. He argues, however, that if he had intentionally stabbed her the facts would have supported a finding that he acted with malice and thus, would have established second-degree murder. He contends that because he was not convicted of second-degree murder the jury must not have believed he acted intentionally and therefore, double jeopardy should have barred the jurors at the second trial from considering whether he acted intentionally with regard to the course of conduct aggravator.

Petitioner first raised this argument in his MAR. The MAR court held that the claim was procedurally barred pursuant to N.C. Gen. Stat. § 15A-1419(a)(3) because it could have been, but was not, raised on direct appeal.[12] MAR Order at 28.

Subsection 15A-1419(a)(3) provides that a motion for appropriate relief must be denied where "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so." N.C. Gen. Stat. § 15A-1419(a)(3). Subsection 1419(a)(3) has been found to be an adequate and independent state law ground to support

---

[11] The jurors were asked to consider whether "[t]he murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons." See N.C. Gen. Stat. § 15A-2000(e)(11).

[12] The MAR court alternatively denied the claim on the merits. MAR Order at 28. However, a court's alternative treatment of the merits of a claim does not waive the procedural default. See Daniels v. Lee, 316 F.3d 477, 487 (4th Cir. 2003); Davis v. Allsbrooks, 778 F.2d 168, 175 (4th Cir. 1985).

11

a procedural default of a claim relating to the submission of an aggravating factor.[13]  See Fisher, 215

F.3d at 456 (finding the state court's procedural bar of the petitioner's claim that the instruction on

an aggravating factor was unconstitutionally vague was sufficient to support a procedural default).

Therefore, the court is precluded from reviewing Claim II unless petitioner can establish cause and

prejudice or a fundamental miscarriage of justice to excuse the procedural default.  In his reply to

the motion to dismiss, petitioner argues that ineffective assistance of counsel on appeal and actual

innocence of the death penalty constitute grounds to excuse the procedural default of this claim.

Ineffective assistance of counsel may constitute cause to excuse a procedural default.

Murray v. Carrier, 477 U.S. 478, 488 (1986).  To rely upon ineffective assistance of counsel as

grounds for cause, a petitioner must have first raised the argument as an independent claim in state

court.  Id. at 489.  To establish cause based on ineffective assistance of counsel, a petitioner must

demonstrate he received ineffective assistance in violation of his Sixth Amendment rights.  Id. at

488.

Petitioner raised ineffective assistance of appellate counsel as a separate claim in his MAR.[14]

See MAR at 46.  Therefore, the court will consider whether ineffective assistance of counsel will

excuse the default.  To establish ineffective assistance of appellate counsel in violation of the Sixth

Amendment a petitioner must show that counsel's representation was objectively unreasonable and

that a reasonable probability exists that, but for the attorney's error, he would have prevailed on his

appeal.  Smith v. Robbins, 528 U.S. 259, 285 (2000) (citing Strickland v. Washington, 466 U.S.

668, 687-88 (1984)).  Appellate counsel is not required to raise every nonfrivolous issue "but rather

---

[13]Petitioner does not argue that the state bar is not an independent and adequate state ground
to support a procedural default.

[14] The MAR court denied the claim on the merits.  MAR Order at 101.

12

may select from among them in order to maximize the likelihood of success on appeal." Id. at 288. The court must presume that in deciding which issues to raise, counsel selected those issues most likely to afford relief. Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993).

Petitioner contends that because the jurors at the first trial found him guilty of involuntary manslaughter they decided he had not acted intentionally in stabbing Ms. Graham. He argues, therefore, that the issue of his intent was decided between the parties and could not be re-litigated at the second trial by submitting facts that he acted intentionally to support the course of conduct aggravator. Relying on Ashe v. Swenson, 397 U.S. 436 (1970), and Schiro v. Farley, 510 U.S. 222 (1994), he asserts that collateral estoppel barred the State from pursuing the course of conduct aggravator at the second trial.

"When an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Ashe, 397 U.S. at 443. "[W]here a previous judgment of acquittal was based upon a general verdict . . . a court [must] examine the record of a prior proceeding . . . and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." Id. at 444 (internal quotation omitted). The burden is on the party seeking to foreclose subsequent re-litigation to demonstrate the issue was actually decided. Schiro, 510 U.S. at 233.[15]

At petitioner's first trial the jury found the course of conduct aggravating factor, as well as

---

[15] In Schiro, the Court concluded that the petitioner could not carry his burden of showing the jury had decided he did not act with intent on the basis they failed to return a verdict on the count of intentional murder. The Court emphasized that "[t]he failure to return a verdict does not have collateral estoppel effect, however, unless the record establishes that the issue was actually and necessarily decided in the defendant's favor." Schiro, 510 U.S. at 236.

13

the other aggravating factor submitted by the State, and recommended a sentence of death. Under these circumstances, the trial court was not precluded by federal or state law from submitting the course of conduct aggravating circumstance, or any other aggravating circumstance supported by the evidence, at the second trial. The double jeopardy clause would have precluded submission of the aggravating circumstances at the second trial only if the first jury had found no aggravating circumstances. See Poland v. Arizona, 476 U.S. 147, 156 (1986); State v. Sanderson, 346 N.C. 669, 488 S.E.2d 133 (1997). Further, while involuntary manslaughter is an "unintentional killing" the jury was asked to consider whether petitioner intentionally committed an assault and battery against Hattie Graham.[16] Therefore, petitioner is unable to show the factual issue was actually decided in his favor at the first trial so as to preclude subsequent litigation of the facts supporting the course of conduct aggravator.

Petitioner cannot show there was a reasonable probability of success on appeal had counsel raised the double jeopardy claim and cannot show ineffective assistance of appellate counsel in violation of the Sixth Amendment.[17] Strickland, 466 U.S. at 687-88. Nor can petitioner show the "course of conduct" aggravating factor was improperly submitted so as to show actual innocence of the death penalty. Petitioner fails to establish cause to overcome the procedural default and the court is precluded from reviewing this claim. See Coleman, 501 U.S. at 750. Respondent's motion for summary judgment as to Claim II is granted.

---

[16] At the first trial, the court instructed the jury with respect to the death of Hattie Graham that involuntary manslaughter was "the unintentional killing of a human being by the commission of an unlawful act not amounting to a felony, which act proximately causes the victim's death." State Ct. R., Vol. 28 of 31 at 143. The court further instructed that the State must prove "the defendant acted unlawfully by intentionally committing an assault and battery upon Hattie Graham which caused physical injury to Hattie Graham." Id.

[17] Having found petitioner cannot satisfy the prejudice prong of Strickland the court need not address the performance prong. Strickland, 466 U.S. at 697.

B.

In Claim III, petitioner argues he received ineffective assistance of counsel because trial counsel did not move to dismiss the charge of involuntary manslaughter. Petitioner first raised this argument in his third amendment to the MAR. The MAR court held the claim was procedurally barred pursuant to N.C. Gen. Stat. § 15A-1419(a)(3) because it could have been, but was not, raised on direct appeal. MAR Order at 130. Subsection 15A-1419(a)(3) is an independent and adequate basis for procedural default of a claim of ineffective assistance of counsel. See McCarver, 221 F.3d at 589; Williams v. French, 146 F.3d 203, 217-18 (4th Cir. 1998). Therefore, the court is precluded from reviewing the claim unless petitioner can establish cause and prejudice or a fundamental miscarriage of justice. Coleman, 501 U.S. at 750.

To establish cause and prejudice to overcome the procedural default, petitioner argues that he received ineffective assistance of appellate counsel because counsel did not raise this issue on appeal. Petitioner raised ineffective assistance of appellate counsel as an independent claim in his MAR.[18] Third Am. to MAR at 14. Therefore, the court will consider whether ineffective assistance of appellate counsel will excuse the procedural default. Petitioner also argues he can overcome the procedural bar because he is actually innocent of the death penalty. He argues that the involuntary manslaughter charge which was improperly submitted to the jury was an element of the course of conduct aggravating factor.

To establish ineffective assistance of counsel, a petitioner must show that counsel's representation "fell below an objective standard of reasonableness" and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

_____

[18] The MAR court denied the claim on the merits. MAR Order at 137.

different." Strickland, 466 U.S. at 694. To establish ineffective assistance of appellate counsel a petitioner must show that a reasonable probability exists that, but for the attorney's error he would have prevailed on his appeal. Smith, 528 U.S. at 285 (citing Strickland, 466 U.S. at 687-88).

The record shows that trial counsel, in fact, moved to dismiss the charge of involuntary manslaughter. At trial, counsel made motions at the close of the State's evidence, at the close of all of the evidence, and upon the reading of the sentence. State Ct. R., Vol. 18 of 31 at 1931-32; Vol. 19 of 31 at 2154; 2156-59; 2276; 2459-60. In each case, the trial court denied the motions. Petitioner does not disagree that counsel moved to prevent the submission of the charge of involuntary manslaughter, but contends the motion could have been more persuasively presented in written form before trial.

Petitioner is unable to show trial counsel acted objectively unreasonable merely because they waited to raise an objection to the submission of the involuntary manslaughter charge until after the State presented its evidence at trial. Nor can petitioner show he was prejudiced by trial counsel's failure to object pre-trial to the submission of the charge of involuntary manslaughter when it was properly submitted for the jury's consideration. He reasons that for the jury to have acquitted him of second-degree murder it could not have found he intentionally stabbed Hattie because that would have been the intentional use of deadly force. Resp. at 38. However, on direct appeal, the North Carolina Supreme Court ruled that the trial court did not err by failing to dismiss the charge of involuntary manslaughter. Cole, 343 N.C. at 416, 471 S.E.2d at 370.

Under North Carolina law, involuntary manslaughter is the unlawful killing of another human being without malice, without premeditation and deliberation, and without intention to kill or inflict serious bodily injury. See State v. Greene, 314 N.C. 649, 651, 336 S.E.2d 87, 88 (1985). "Unlawfulness" may be an unlawful act not amounting to a felony or culpably negligent conduct.

Id. at 652, 336 S.E.2d at 89. Petitioner argued on direct appeal that there was insufficient evidence to support a finding of culpable negligence because there was no evidence of foreseeability. The state court rejected the argument, noting that although foreseeability is an essential element of culpable negligence:

> [t]his does not mean that the defendant must have foreseen the injury in the exact form in which it occurred, but that, in the exercise of reasonable care, the defendant might have foreseen that some injury would result from his act . . . or that consequences of a generally injurious nature might have been expected.

Cole, 343 N.C. at 416, 471 S.E.2d at 370 (quoting State v. Powell, 336 N.C. 762, 772, 446 S.E.2d 26, 31 (1994)). The court found that because petitioner had been living with Hattie and was aware of her age and medical condition it was reasonable that he "would have foreseen that two stab wounds . . . would be injurious to her." Id. at 417, 471 S.E.2d at 370.

Further, as noted in Claim II, at the first trial the court instructed the jury with respect to the death of Hattie that involuntary manslaughter was "the unintentional killing of a human being by the commission of an unlawful act not amounting to a felony, which act proximately causes the victim's death." State Ct. R., Vol. 28 of 31 at 143. The court further instructed the jury that the State must prove "the defendant acted unlawfully by intentionally committing an assault and battery upon Hattie Graham which caused physical injury to Hattie Graham." Id. Therefore, petitioner cannot show a reasonable probability of success had appellate counsel raised ineffective assistance of trial counsel and cannot establish ineffective assistance of appellate counsel in violation of the Sixth Amendment to excuse the procedural default. Further, he cannot show that the death of Hattie Graham was improperly used to support the course of conduct aggravator so as to establish actual innocence of the death penalty.

Petitioner fails to establish cause and prejudice or a fundamental miscarriage of justice to

overcome the procedural default and the court is precluded from reviewing this claim. See Coleman, 501 U.S. at 750. Respondent's motion for summary judgment as to Claim III is granted.

C.

In Claim IV, petitioner argues he was denied due process of law because it was not possible to draw an impartial jury from a fair cross section of the community in Camden County. Respondent asserts the claim is procedurally defaulted because the MAR court held the claim was procedurally barred under either N.C. Gen. Stat. § 15A-1419(a)(2) or 15A-1419(a)(3).

On direct appeal, petitioner argued that the trial court erred by denying his motion for a change of venue and his motion for a mistrial where it was likely he could not receive a fair trial with a Camden County jury because many African-American residents knew the victims or petitioner and therefore, it would be difficult to select a jury including any African-American jurors. Direct Appeal Brief at 39. The North Carolina Supreme Court rejected the argument on the merits. Cole, 343 N.C. at 413, 471 S.E.2d at 368.

In his MAR, petitioner argued that "[t]he totality of the circumstances raises such a probability of prejudice that the trial of the case in Camden County should be deemed inherently lacking in due process." MAR at 32. Petitioner reasoned that in the small county many members of the African-American population knew the victims and/or petitioner. He argued that under such circumstances, holding the second trial in Camden County before a jury which the trial court should have known would exclude almost every African-American person in the county violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the constitution. Id. at 40-41. The MAR court held that petitioner's claim was procedurally barred because it was raised on direct appeal. See N.C. Gen. Stat. § 15A-1419(a)(2); MAR Order at 19-20. Alternatively, the MAR court stated that if Cole were raising a different argument than he raised on direct appeal, it was procedurally barred under

18

N.C. Gen. Stat. § 15A-1419(a)(3) because it could have been, but was not, raised on direct appeal. Id.

Given the MAR court's treatment, it appears that the arguments before the court were procedurally barred on the basis of subsection 15A-1419(a)(2). Subsection 1419(a)(2) is not a proper ground upon which to base a procedural default for purposes of federal habeas review. See Brown v. Lee, 319 F.3d 162, 170 n.2 (4th Cir. 2003). Therefore, the court will address Claim IV on the merits.

Petitioner contends that because Camden County is a small county with a tight-knit African-American population it was foreseeable that many potential African-American jurors would know either the victims and/or petitioner, and it would be difficult to select a jury that included African-American jurors. Petitioner argues that these circumstances lead to a pattern of exclusion of African-American prospective jurors and therefore, he was denied due process when the trial court failed to change the venue. He acknowledges a defendant does not have the right to have even one African-American person on the jury, but reasons a defendant has a right under "the United States Constitution to a jury selection process that is free of built-in, systematic, and arbitrary procedures that are reasonably likely to prevent any black people from serving on the jury." Pet. at 108-09.

Before trial, petitioner moved for a change of venue. He argued that because there was significant publicity in the small county he could not receive a fair trial. He also argued that because so many African-American residents knew one another, it would be difficult to select a jury which included any African-American jurors. He noted that at the first trial no African-American jurors were seated. The trial court denied the motion.[19] Subsequently, during voir dire, petitioner moved

---

[19] The court ruled that while the jurors would be selected from Camden County, the trial would move to the Chowan County courthouse because its courtroom was more spacious. Later, when petitioner's trial date conflicted with a high-profile Chowan County case, petitioner's trial was

for a mistrial. See State Ct. R., Vol. 16 of 31 at 803. Petitioner argued there was systematic exclusion of African-Americans from the jury and a fair cross-section of the community was not being represented. Id. at 803-05. At that point, seventeen African-American prospective jurors had been questioned.[20] Twelve of the prospective jurors knew the victims and/or petitioner and ten of the seventeen prospective jurors were removed for cause because of their stated inability to be impartial because of knowing the victims and/or petitioner or because of their knowledge of the case. Four others were removed for cause because of their view of the death penalty, two were removed for health issues, and one was struck peremptorily. The court denied the motion. Id. at 806. Before the jury was impaneled, three more prospective African-American jurors were questioned.[21] Two of the three knew petitioner and/or the victims, but none were removed for cause on that basis. The State excused one with a peremptory challenge and petitioner excused the other two prospective jurors with peremptory challenges. State Ct. R., Vol. 17 of 31 at 953, 1108, 1207.

In considering petitioner's claim on direct review, the North Carolina Supreme Court, citing state law, noted that the test for determining whether venue should be changed is "whether it is reasonably likely that prospective jurors would base their decision in the case upon pre-trial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they might have formed." Cole, 343 N.C. at 412, 471 S.E.2d

---

moved back to the Camden County courthouse. Tr. of Mot. to Change Venue, State Ct. R., Vol. 12 of 31 at 281.

[20] Earl Christainsen, State Ct. R., Vol. 16 of 31 at 11; Delores Harris at 168; Wildred Abbott at 276; Yolanda White at 309, 313; Melvin Harris at 311, 313; Johnny Jennings at 314; Calvin Whitehurst at 496; Minnie Lamp at 528-29; Amanda Eason at 530; Maggie Whitehurst at 561; Calvin Harris at 594; Winfred Poole at 615; Johnny Butts at 647; Marguerite Harris at 664; Evelyn Harris at 678; Rhudine Turner at 730; Earl Christian at 771.

[21] Marsette Gregory, State Ct. R., Vol. 17 of 31 at 914; Leslie Etheridge at 1072; Alvin Aydlett at 1189.

at 368 (citing State v. Jerrett, 309 N.C. 239, 255, 307 S.E.2d 339, 347 (1983)). The state court determined that petitioner had not shown a reasonable likelihood he could not receive a fair trial because of prejudice against him in the county. Id. at 413, 471 S.E.2d at 368. The court noted that the news articles petitioner submitted in support of his motion related to the first trial (which took place in 1989) and were factual, noninflammatory accounts. Id. The court further noted that approximately 1,600 potential jurors remained for the jury pool for the second trial. Id. The North Carolina Supreme Court also addressed petitioner's Sixth Amendment arguments. The court recognized that "[t]he Sixth Amendment to the United States Constitution prohibits the arbitrary exclusion of certain groups or classes of citizens from the jury in federal and state cases." Id. at 414, 471 S.E.2d at 369. However, the court determined there was no indication African-Americans were excluded from the jury pool or that any potential juror was excused on the basis of race. Id. at 415, 471 S.E.2d at 369.

The Sixth Amendment requires venire members to be drawn from a fair cross section of the community and jurors may not be excluded on the basis of race. See Powers v. Ohio, 499 U.S. 400, 404 (1991); Taylor v. Louisiana, 419 U.S. 522, 527-29 (1975). However, petitioner does not assert that African-American citizens were excluded from the jury pool or that African-American prospective jurors were not seated on the basis of race. Rather, petitioner argues that because venue was not changed, African-Americans in the close-knit community were excluded as if they had been removed on the basis of race.

A change of venue is constitutionally required when the jury pool is tainted "by so huge a wave of public passion" that the impaneling of an impartial jury is impossible. Irvin v. Dowd, 366 U.S. 717, 728 (1961). Petitioner does not contend that the community as a whole was tainted by extensive pre-trial knowledge of the case or that any of the jurors seated at trial were not impartial.

21

Further, impartial African-American prospective jurors were part of the jury pool. Of the more than 90 jurors who were called and questioned during voir dire, 25 were African-American.[22] At least six of the 25 African-American prospective jurors did not know either the victims or petitioner.[23] Six of the African-American prospective jurors were not removed for cause but were peremptorily challenged by the parties. See State Ct. R., Vol. 16 of 31 at 663; Vol. 17 of 31 at 953, 1108, 1207, 1384, 1422. The defense exercised two of the six peremptory challenges to remove African-American prospective jurors. State Ct. R., Vol. 17 of 31 at 953, 1108. In addition, two potential African-American jurors were excused based on health reasons and six were excused based on their inability to consider the death penalty. See State Ct. R., Vol. 16 of 31 at 536, 737, 187, 321, 575, 677; Vol. 17 of 31 at 1356, 1440. It was not the failure to change venue which worked to eliminate African-American prospective jurors from serving, but rather non-racial and individual circumstances elicited during voir dire. Despite petitioner's use of phrases like "systematic exclusion" and "pattern of exclusion," he essentially asserts that his constitutional rights were denied because non-racial factors made it difficult to seat African-American jurors and no African-American jurors served on the jury. However, the ultimate racial makeup of the jury does not establish a constitutional basis for relief. There is "no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition." Taylor, 419 U.S. at 538. Accordingly, petitioner is unable to show that the rulings of the state courts denying this claim are contrary to, or

---

[22] Twenty prospective African-American jurors were questioned during voir dire for the jury and five were questioned during voir dire for the alternates.

[23] Delores Harris, State Ct. R., Vol. 16 of 31 at 167, 171; Amanda Eason at 533; Marguerite Harris at 665; Rhudine Turner at 732; Alvin Aydlett, State Ct. R., Vol. 17 of 31 at 1189-90; Ernest Ferebee at 1334-35.

an unreasonable application of, clearly established federal law.

Alternatively, petitioner argues he is entitled to a new trial based on ineffective assistance of counsel of trial and appellate counsel. He argues that trial counsel were ineffective in the manner in which they presented the motion to change venue. Pet. at 111-12. He contends that in support of the motion to change venue, counsel should have provided the voir dire transcripts from the first trial as well as testimony and affidavits from African-American residents of Camden County. He argues that trial counsel's failure to present this evidence, which allegedly would have demonstrated the extensive kinship and cohesive ties in the African-American community in Camden County, was deficient and prejudicial. With respect to his claim of ineffective assistance of appellate counsel, he summarily states that except for the deficient performance of appellate counsel he would have been granted a new trial. Id. at 112.

Petitioner first raised these arguments in his MAR. MAR at 41. The MAR court held that his claim of ineffective assistance of trial counsel was procedurally barred pursuant to N.C. Gen. Stat. § 15A-1419(a)(3) because it could have been, but was not, raised on direct appeal. MAR Order at 89. Subsection 15A-1419(a)(3) is an independent and adequate basis for procedural default of a claim of ineffective assistance of counsel. See McCarver, 221 F.3d at 589; Williams, 146 F.3d at 217-18. Petitioner does not assert grounds to overcome the default. Therefore, the court is precluded from reviewing the claim of ineffective assistance of trial counsel. See Coleman, 501 U.S. at 750.

Petitioner asserted ineffective assistance of appellate counsel in a single sentence in his MAR. The MAR court did not address the claim in its order; therefore, the AEDPA standard does not apply and the court will undertake *de novo* review. See Fisher, 215 F.3d at 445. Petitioner argues that except for the deficient performance of appellate counsel he would have been granted

23

a new trial. Pet. at 112. He does not explain in what respect appellate counsel was deficient. Insofar as he is asserting counsel was ineffective for failing to argue ineffective assistance of trial counsel, petitioner is not entitled to relief. In support of the pre-trial motion to change venue, trial counsel argued that extensive publicity and knowledge of the case made it impossible for petitioner to get a fair and impartial trial in Camden County. Tr. of Mot. to Change Venue, State Ct. R., Vol. 12 of 31 at 6-12. Although petitioner now argues that his trial counsel should have offered additional evidence concerning the closeness of the African-American community in Camden County, petitioner is unable to show counsel was deficient or that he was prejudiced by trial counsel's failure to produce evidence that many African-American citizens of Camden County had close ties to other African-American citizens. As discussed, close ties among members of the African-American community in Camden County provided insufficient grounds to require a change of venue where there was no evidence that impartial jurors could not be selected and African-American citizens were not excluded from the jury pool. As trial counsel did not provide ineffective assistance, petitioner is unable to demonstrate he was prejudiced by appellate counsel's failure to raise a claim of ineffective assistance of trial counsel on appeal.

Petitioner has failed to show he is entitled to relief on the basis of these arguments. Respondent's motion for summary judgment as to Claim IV is granted.

D.

In Claim V, petitioner asserts that his rights to due process and equal protection were violated because of racial discrimination in the selection of grand jury foremen in Camden County. In support, petitioner states that in the 16 years before and during the period the indictments were returned against him, only 1 out of 28 grand jury foremen was African-American and all of the other foremen were white.

24

Petitioner first raised this claim in his MAR. The MAR court held the claim was procedurally barred pursuant to N.C. Gen. Stat. § 15A-1419(a)(3) because it could have been, but was not, raised on direct appeal. MAR Order at 13. Respondent asserts the claim is procedurally defaulted and also argues the claim is Teague-barred. See Teague v. Lane, 489 U.S. 288 (1989).[24]

In accordance with Teague, new rules of constitutional law may not be applied on collateral review.[25] A new rule is one which breaks new ground, imposes a new obligation on the State, or was not dictated under existing law at the time the petitioner's conviction became final. See id. at 301. A claim grounded in existing case law presents a new rule unless a court considering the claim at the time the petitioner's conviction became final "would have felt compelled by existing precedent to conclude that the rule [the petitioner] seeks was required by the Constitution." Saffle v. Parks, 494 U.S. 484, 488 (1990).

Petitioner argues that his claim does not present a "new rule" under Teague because it arises from long-standing United States Supreme Court precedent, such as Strauder v. West Virginia, 100 U.S. 303 (1880). Reply at 40-41. Petitioner also argues that under State v. Cofield, 320 N.C. 297, 305-06, 357 S.E.2d 622, 627-28 (1987), a case decided two years before his trial, the North Carolina Supreme Court held that racial discrimination in the selection of grand jury foremen not only violates the North Carolina Constitution, but also would violate the Fourteenth Amendment of the United States Constitution. Id. (discussing Rose v. Mitchell, 443 U.S. 545 (1979)).

---

[24] Although questions of procedural-bar are usually addressed first, the court exercises its discretion and proceeds directly to the Teague argument. See Lambrix v. Singletary, 520 U.S. 518, 525 (1997).

[25] Teague recognizes two narrow exceptions. A new rule applies retroactively if the rule 1) protects behavior or prohibits certain punishment or 2) is a "watershed" rule of criminal procedure such as those implicating the accurate determination of guilt or innocence. Teague, 489 U.S. at 311-12. Cole does not argue that his claim falls within either exception and neither applies to Cole's case. He argues only that his claim is not based on a new rule of constitutional law. Reply at 41.

Contrary to petitioner's assertion, his claim relies upon new rules of law which may not be applied retroactively to his case on habeas review. In Nickerson v. Lee, 971 F.2d 1125, 1131 (4th Cir. 1992), abrogated on other grounds by Yeatts v. Angelone, 166 F.3d 255 (4th Cir. 1999), the petitioner, like Cole, argued that the North Carolina courts were compelled under Cofield and Rose v. Mitchell to find that discrimination in the selection of the grand jury foreman violated the Equal Protection Clause.[26] The Fourth Circuit rejected this argument and held that "a rule barring discrimination in the selection of North Carolina grand jury foreman as violative of the Equal Protection Clause would be a new rule of law . . . not cognizable in federal habeas corpus." Nickerson, 971 F.2d at 1134. Cole has not shown any grounds which would make the holding in Nickerson inapplicable to his case.[27] Further, the various Supreme Court cases that petitioner cites in support of his claim do not dictate the rule petitioner seeks to apply. See Vasquez v. Hillery, 474 U.S. 254 (1986); Taylor v. Louisiana, 419 U.S. 522, 527 (1975); Strauder, 100 U.S. at 310-12, abrogated on other grounds by Taylor, 419 U.S. at 536. Accordingly, petitioner's claim is Teague-barred.

Alternatively within Claim V, petitioner argues that trial counsel's failure to challenge the grand jury based on discrimination in the selection of the foreman amounts to ineffective assistance

---

[26] State v. Cofield was decided before Nickerson's conviction became final. See Nickerson, 971 F.2d at 1131 n.8.

[27] Although his argument in support of the claim focuses on the Equal Protection Clause, petitioner also summarily states that racial discrimination in the selection of the grand jury violated his right to due process and equal protection. Petitioner has failed to show that discrimination in the selection of North Carolina's grand jury foremen, who serve a ministerial function, violates due process. See Hobby v. United States, 468 U.S. 339, 346 (1984) (holding that because the federal grand jury foreman serves a ministerial function, discrimination in the selection of the federal grand jury foreman from an otherwise constitutionally selected jury does not violate the Due Process Clause); Nickerson, 971 F.2d at 1131 (likening North Carolina grand jury foremen to federal foremen in their responsibilities); State v. Gary, 78 N.C. App. 29, 33, 337 S.E.2d 70, 73 (1985) (finding duties of North Carolina grand jury foremen ministerial).

of counsel. Petitioner first raised this claim of ineffective assistance of counsel in his MAR. The MAR court denied the claim on the merits finding that petitioner could not show counsel were deficient by failing to raise a meritless claim. MAR Order at 87-88.

Petitioner is unable to show the MAR court's ruling is contrary to, or an unreasonable application of, clearly established federal law. The Fourth Circuit has considered this argument and rejected it. See, e.g., Felton v. Barnett, 912 F.2d 92, 97 (4th Cir. 1990) (finding counsel's alleged error in failing to challenge the grand jury did not work to "actual and substantial disadvantage" of the petitioner); see also Peele v. Barnett, 935 F.2d 1287, at *2 (4th Cir. 1991) (unpublished) (finding no prejudice under Strickland where success on claim of discrimination in the selection of the grand jury foreman would merely delay trial). Accordingly, respondent's motion for summary judgment as to Claim V is granted.

E.

In Claim VI, petitioner asserts he received ineffective assistance of counsel because his trial counsel failed to seek funds for a neuropsychologist to examine him to show brain damage. Respondent contends the claim is procedurally defaulted.

In his third amendment to the MAR, petitioner argued that trial counsel were ineffective for failing to seek funds to hire an expert to undertake neuropsychological testing. The MAR court considered the claim, allowing petitioner to present evidence at a hearing, and denied the claim on the merits. MAR Order at 126. The MAR court reasoned that petitioner failed to show a particularized need for such testing or that he was prejudiced by the failure to conduct such testing. Id. After his State post-conviction review was final, petitioner filed a subsequent MAR in which he claimed he received ineffective assistance of counsel because his attorneys failed to hire an expert in neuropsychology to evaluate him for organic brain damage. Sept. 10, 2004 MAR at 7. In an

27

order dated February 2, 2005, the MAR court held the claim was procedurally barred under subsection 15A-1419(a)(2) because it previously had been raised and determined on the merits. 2005 MAR Order at 12. The court alternatively found that even if subsection 1419(a)(2) did not bar the claim, then it was barred under subsection 1419(a)(1) because petitioner failed to raise it in his previous MAR. Id. In addition to the procedural bars, the MAR court also summarily held that petitioner could not satisfy either prong of Strickland. Id.

The claim raised in the petition appears to present the arguments first raised in petitioner's third amendment to the MAR which were procedurally barred in the 2005 MAR order under subsection 1419(a)(2). As noted, however, subsection 1419(a)(2) is not a proper ground upon which to base a procedural default. See Brown, 319 F.3d at 170 n.2. Therefore, the court will address the claim on the merits.

In denying the claim, the MAR court held that petitioner was not able to show counsel's performance was deficient. MAR Order at 127. The court reasoned that none of the information available to trial counsel indicated a particularized need to have petitioner tested for neurological functioning. Id. The court noted that trial counsel Hughes testified that after petitioner was arrested the defense requested a mental evaluation and petitioner was admitted to Dorothea Dix Hospital for that purpose. Dr. Lynn, a forensic psychiatrist, evaluated petitioner and found no evidence of organic brain damage. Id. The MAR court recognized that petitioner argued counsel should have requested funds for neurological testing because petitioner was allegedly knocked unconscious during a car accident as a teenager. Id. at 128. However, the court noted that Ms. Engel, an investigator from the Center for Death Penalty Litigation, testified at the evidentiary hearing that she was never able to find records from the State Highway Patrol, the insurance company, or a hospital to confirm the accident. Id. The court found that a review of petitioner's employment records after

28

the alleged accident indicated petitioner did not suffer any brain or nervous system dysfunction. Id. Further, the court noted that none of petitioner's retained mental health experts, Dr. Emmanuelson for the first trial and Drs. Brown and Grover for the second trial, found a reason to request additional neurological testing or expressed concern about petitioner's neurological functioning. Id. at 127-28.

The MAR court held that Cole's unsubstantiated claim that he suffered damage from an unconfirmed car accident was insufficient to show a particularized need for neurological testing; therefore, petitioner could not show counsel were deficient for failing to request neurological testing on that basis. Id. at 128. The court also found that petitioner's claim that he suffered auditory hallucinations did not put counsel on notice that testing was needed. Id. The court noted that petitioner's attorney Hughes testified he did not request testing on that basis because petitioner told him that he was falsely claiming to have memory problems and to hearing voices in an attempt to delay trial. Id. at 128-29.

In making this claim in the petition, petitioner relies upon expert testing done on September 2, 2004, by Dr. Coleman, a clinical psychologist, to show that trial counsel were deficient in failing to request funds and present evidence of organic brain damage at trial. Petitioner explains that sometime after the North Carolina Supreme Court denied certiorari on his motion for imposition of life sentence in August 2004, counsel requested funding for neurological testing through the Indigent Defense Services ("IDS"). IDS granted the request and counsel retained the services of Dr. Coleman. After conducting various tests, Dr. Coleman concluded that petitioner showed impairment in several areas of the testing that indicated "compromise in the frontal and pre-frontal areas of the cerebral cortex." Dr. Coleman Aff. ¶ 21. She further concluded that his dysfunction was a "critical factor impairing his ability to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law." Id. at ¶ 24.

Petitioner argues that the jury was not presented with evidence of his brain defects because counsel failed to properly investigate the possibility of neurological dysfunction. Petitioner asserts he was prejudiced because the jury did not find the statutory mitigating factor that his capacity to appreciate the criminality of his conduct or conform his conduct with the requirements of the law was impaired. Petitioner asserts that the MAR court's ruling on this claim is contrary to, or an unreasonable application of Strickland, Rompilla v. Beard, 545 U.S. 374 (2005), and Wiggins v. Smith, 539 U.S. 510 (2003). He contends that his case is analogous to the circumstances in Rompilla.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. A particular decision not to investigate must be evaluated giving a "heavy measure of deference to counsel's judgments." Id. In Wiggins, the Supreme Court found that petitioner had received ineffective assistance of counsel because his trial attorneys failed to conduct a reasonable investigation into mitigating evidence that would have produced substantial evidence of severe abuse and mental health issues that likely would have been persuasive to the jury at sentencing. Considering the facts of the case, the Court found that "counsel chose to abandon their investigation at an unreasonable juncture." Wiggins, 539 U.S. at 527-28.

In Rompilla, the Supreme Court held that counsel were deficient because they failed to review a court file on Rompilla's prior rape conviction. The Court found that counsel's decision not to look at the file was objectively unreasonable given that counsel were aware the prior conviction would likely be used by the State in aggravation. Rompilla, 545 U.S. at 383-84. The Court held that the deficient representation was prejudicial because if counsel had examined the file they would have discovered an abundance of evidence to be used in mitigation, and there was a

reasonable probability of a different result at sentencing had the evidence been presented to the jury. Id. at 390-91.

In contrast to the attorneys in Wiggins and Rompilla, Cole's trial attorneys' decision to forego neurological testing to investigate evidence of organic brain damage was a reasonable decision made after reasonable investigation. According to the factual findings of the MAR court, no defense expert who examined petitioner at the time of the first or second trial raised concerns that he might suffer from organic brain damage or suggested additional testing might be beneficial. MAR Order at 128. Nor was there other information which would have put counsel on notice that additional investigation or testing was necessary or might be fruitful. As the MAR court noted in reaching its decision, petitioner's trial counsel Hughes testified at the hearing that petitioner told him he was faking memory loss and hearing voices in an attempt to delay trial. Tr. of MAR Hr'g, State Ct. R., Vol. 7 of 31 at 118. With respect to petitioner's claim that he suffered a head injury when he was in a car accident as a teenager, the information at the hearing indicated that counsel, with the assistance of Ms. Engel, investigated petitioner's claim but found little to substantiate the injury. Id. at 80, 251. Further, evidence was elicited that medical records from a job petitioner held after the alleged accident indicated he had not ever been treated for any serious accident or head injury. Id. at 81.

Petitioner now comes forward with evidence developed five years after the MAR hearing from Dr. Coleman who offers her expert opinion that petitioner suffers from organic brain damage. However, in assessing whether counsel were ineffective, the court must judge the reasonableness of counsel's performance based upon the specific facts of the case, viewed as of the time of counsel's conduct. Strickland, 466 U.S. at 690. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances

of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. Given the information counsel had at the time of trial, including reports from several mental health experts, petitioner is unable to show trial counsel were deficient in their performance because they did not seek neurological testing or funding for a neuropsychologist. Accordingly, petitioner is unable to show the MAR court's ruling is contrary to, or an unreasonable application of, Strickland, Rompilla, Wiggins, or any other clearly established federal law.

Finally, the court considers petitioner's request to this court for funds for additional neurological testing such as a computerized tomography ("CT") scan to locate tumors and hemorrhages, a positron emission tomography ("PET") scan to measure blood flow, a magnetic resonance imaging ("MRI") scan to investigate tumors or tissue pathology, and an electroencephalogram ("EEG"). The court may authorize counsel to obtain expert or other services upon a showing that the expert or services are "reasonably necessary." 18 U.S.C. § 3599(f);[28] see also Wright v. Angelone, 151 F.3d 151, 163 (4th Cir. 1998). Petitioner is unable to show that funds for the testing are reasonably necessary. Numerous mental health experts, including Dr. Coleman who was retained to conduct neurological testing, have examined petitioner. The results of additional neurological tests done at this time will not help petitioner show that trial counsel acted objectively unreasonable in deciding not to pursue neurological testing at the time of trial. See Burris v. Parke, 130 F.3d 782, 784 (7th Cir. 1997) (finding that because performance of counsel is judged by what was known at time of trial, a current neuropsychological exam was irrelevant to claim of ineffective assistance of trial counsel). Similarly, petitioner is unable to show that the court should grant an evidentiary hearing on this claim. A federal habeas court must allow an evidentiary

---

[28] The language providing for such assistance was previously codified in 21 U.S.C. § 848 (q)(9). Section 848(q)(9) was repealed in March 2006 and the language was recodified in 18 U.S.C. § 3599(f).

hearing only where a factual dispute, if resolved in petitioner's favor, would entitle him to relief and the state court has not afforded the petitioner a full and fair evidentiary hearing. Rector v. Johnson, 120 F.3d 551, 562-63 (5th Cir. 1997) (internal citations and quotations omitted). Petitioner was granted an evidentiary hearing on this claim in state court. He argues that this court should grant him a hearing to allow him to present the testimony of Dr. Coleman who did not examine petitioner until after the MAR was denied. However, as discussed, Dr. Coleman's 2004 opinion has not created a factual dispute, that if resolved in petitioner's favor, would entitle him to relief on his claim of ineffective assistance of trial counsel. Respondent's motion for summary judgment as to Claim VI is granted.

F.

In Claim VIII, petitioner argues that he received ineffective assistance of counsel because his attorneys failed to properly prepare and present a diminished capacity defense. Petitioner argues that counsel could have argued diminished capacity based on his lack of mental ability as well as voluntary intoxication. He argues that Dr. Emmanuelson, who testified for the defense at the first trial, was available to present evidence at the second trial of petitioner's inability to form the requisite specific intent based upon his mental disability. He also argues that counsel failed to adequately prepare the expert they did call, Dr. Grover, by failing to give him information necessary to determine petitioner's level of intoxication. In his answer, respondent asserts that the court lacks jurisdiction to review the merits of the claim because the claim was procedurally barred in state court. Answer at 151-52.

Petitioner first raised this claim in his MAR. The MAR court held the claim was procedurally barred pursuant to N.C. Gen. Stat. § 15A-1419(a)(3) because it could have been, but was not, raised on direct appeal. MAR Order at 108. Subsection 15A-1419(a)(3) is an independent

and adequate basis for procedural default of a claim of ineffective assistance of counsel. See McCarver, 221 F.3d at 589; Williams, 146 F.3d at 217-18. Therefore, the court is precluded from reviewing the claim unless petitioner can establish cause and prejudice or a fundamental miscarriage of justice. See Coleman, 501 U.S. at 750. Petitioner does not acknowledge respondent's argument that the claim is procedurally defaulted and does not assert grounds to excuse the procedural default. The claim is procedurally defaulted and respondent's motion for summary judgment as to Claim VIII is granted.

G.

In Claim XVI, petitioner argues that because the indictment was insufficient to charge first-degree capital murder, the trial court lacked jurisdiction to impose judgment or a sentence of death. Petitioner first raised this claim in his third amendment to the MAR. The MAR court held the claim was procedurally barred pursuant to N.C. Gen. Stat. § 15A-1419(a)(3) because it could have been, but was not, raised on direct appeal. MAR Order at 137.

Respondent argues the court lacks jurisdiction to consider the merits of the claim because it is procedurally barred. Petitioner does not acknowledge respondent's argument that the claim is procedurally defaulted and does not assert grounds to excuse the procedural default. Therefore, the court is precluded from reviewing this claim. See Coleman, 501 U.S. at 750.

Moreover, petitioner would be unable to demonstrate he is entitled to relief on the merits. Petitioner relies upon the holdings in Ring v. Arizona, 536 U.S. 584 (2002), Harris v. United States, 536 U.S. 545 (2002), Apprendi v. New Jersey, 530 U.S. 466 (2000), and Jones v. United States, 526 U.S. 227 (1999), to support his claim. Petitioner's case became final on direct review in 1997. See Cole, 519 U.S. at 1064. Jones, Apprendi, and Ring were all decided after petitioner's case became final and present new rules of law that do not apply retroactively to cases on collateral review. See,

e.g., Schriro v. Summerlin, 542 U.S. 348, 358 (2004) (finding that Ring announced a new rule not retroactive to cases already final on direct review); Basden v. Lee, 290 F.3d 602, 619 (4th Cir. 2002) (Apprendi and Jones do not apply retroactively to cases on collateral review). Accordingly, respondent's motion for summary judgment as to Claim XVI is granted.

VI.

Having considered those claims which respondent asserts are procedurally defaulted, the court now turns to the remaining claims, all of which respondent concedes were adjudicated on the merits in state court. For these claims, the court must determine whether the state court's adjudication was contrary to, or involved an unreasonable application of, clearly established federal law.

A.

In Claim I, petitioner argues he is mentally retarded and therefore, his sentence of death violates the Eighth Amendment as interpreted in Atkins v. Virginia, 536 U.S. 304 (2002). Petitioner first raised this claim in a motion for imposition of life sentence filed in state court pursuant to N.C. Gen. Stat. § 15A-2006. After holding an evidentiary hearing on the matter, the state court denied relief.

In Atkins, the Court held that executing a mentally retarded person violates the Eighth Amendment. Id. at 321. The Court indicated that mental retardation is generally characterized by subaverage intellectual functioning and significant adaptive limitations, but ultimately left it to each State to define mental retardation in a manner to satisfy the Eighth Amendment. Id. at 317. Before Atkins, North Carolina enacted N.C. Gen. Stat. § 15A-2005, which prohibits the execution of a mentally retarded individual. See id. at 315. Section 15A-2005 defines mental retardation as: 1) significantly subaverage general intellectual functioning which is defined as an I.Q. of 70 or below

35

and 2) significant limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure skills, and work skills. N.C. Gen. Stat. § 15A-2005(a)(1) (West Supp. 2006). Both significantly subaverage general intellectual functioning and the significant limitations in adaptive skills must have manifested before age 18. Id. Petitioner has the burden of proof to show mental retardation. Id. § 15A-2005(a)(2).

In denying petitioner's claim, the state court held that petitioner failed to satisfy the statutory definition of mental retardation set forth in N.C. Gen. Stat. § 15A-2005. See Aug. 21, 2003 Order at 9. The state court order summarized the evidence presented by the parties and concluded that petitioner failed to show significant subaverage general intellectual functioning, significant limitations in adaptive functioning, or that mental retardation was manifested before age 18. Id.[29]

Petitioner extensively re-argues the facts and contends the evidence shows he is mentally retarded. He attacks the state court order, arguing it is an unreasonable decision because the court did not expressly resolve conflicts in the evidence and did not make specific findings of fact for each of the ten areas of adaptive functioning. Pet. at 14. He also criticizes the state court's failure to recognize or address certain various evidence that he finds favorable to his position. For example, he argues that the order does not acknowledge that petitioner, as part of a competency examination, "was given extensive psychological testing at Dorothea Dix, within weeks of the crime, after which four State-employed psychiatrists signed off on a diagnosis of mental retardation." Id. He also argues the order fails to acknowledge that "Dr. Brown's testimony is based solely on an I.Q. test

---

[29]An I.Q. score of "70 or below on an individually administered, scientifically recognized standardized intelligence quotient test administered by a licensed psychiatrist or psychologist is evidence of significantly subaverage general intellectual functioning." N.C. Gen. Stat. § 15A-2005(a)(2).

done six years after the crime and does not include any evaluation of adaptive function." Id. He contends the state court's factual determination was unreasonable by clear and convincing evidence. Id. at 15. He argues that because the state court failed to make any findings that relate to three of the adaptive skills areas, this court must review the claim de novo. Id. at 39.[30]

The state court issued its order after a full presentation of the Atkins claim at an evidentiary hearing. See Aug. 21, 2003 Order at 4. Despite petitioner's assertion that the order is incomplete and unreasonable, the state court thoroughly recounts the evidence and relies on the applicable standard set forth in N.C. Gen. Stat. § 15A-2005. The state court's failure to detail its reasoning for each of the ten adaptive skills areas or its consideration of any particular piece of evidence does not render the AEDPA standard inapplicable to petitioner's claim. Cf. Wright, 151 F.3d at 156-57 (rejecting argument that summary dismissal by state court is not an adjudication subject to AEDPA standard on habeas review). Simply because a state court fails to discuss every piece of evidence does not indicate "a cursory or haphazard review of a petitioner's claims." Id. at 157.

In reaching its decision, the state court recognized that petitioner had been given three I.Q. tests which were individually administered to petitioner by licensed professionals. See Aug. 21, 2003 Order at 5. Petitioner received a full-scale score of 68 when he was administered the Wechsler Adult Intelligence Scale-Revised ("WAIS-R") at Dorothea Dix in October 1988, approximately four months after he killed Theresa Graham and Hattie Graham. Id. Petitioner received a full-scale score of 79 when he was administered the WAIS-R in 1989 by Dr. Emmanuelson, a clinical psychologist hired by the defense as an expert for the first trial. Petitioner received a full-scale score of 81 when he was administered the WAIS-R in 1994 by Dr. Grover, a clinical psychologist hired by the defense as an expert for the second trial. Id. The state court found that petitioner was not administered any

---

[30] The three areas are self-care, self-direction, and health and safety. Pet. at 39.

standardized intelligence test before the age of 18, but recognized that he was administered types of intelligence tests twice during his school years. Id. at 6. When petitioner was tested in 1965 he scored 82 on the Otis Quick Score Mental test and when he was tested in 1968 he scored 83 on the Lorge-Thorndike test.[31] Id. The state court also found that Dr. Brown, who testified as a defense expert at the sentencing phase of petitioner's second trial, stated that he did not believe petitioner was mentally retarded, but characterized petitioner as being borderline. Id. at 5-6.

The state court noted that Dr. Olley, a psychologist specializing in mental retardation, evaluated petitioner using the Scales of Independent Behavior-Revised and opined that petitioner was impaired in all ten of the adaptive skills areas. Id. at 6-7. The state court found, however, that "Dr. Olley produced no written records reflecting how the test was administered or scored. There was no evidence that Dr. Olley's evaluation was subjected to peer review." Id. at 7. The state court found that petitioner's first grade teacher described him as a slow learner, but also stated that he communicated well and interacted similarly to most six-year olds. Id. Petitioner's sixth grade teacher described petitioner as "stubborn" and "rebellious" and had difficulty distinguishing whether he was incapable of doing the work or was refusing to do the work. Id. Shirley Simpson, a neighbor of petitioner's when he was growing up, testified he was "shy" and a "loner." Id. She also testified that petitioner at times would help care for her son. Id. at 8. The state court found that from 1985 until his arrest, petitioner was employed driving eighteen-wheel trucks for Meiggs Logging Company. Id. The state court found that petitioner had a steady relationship with the victim, Theresa Graham, they had two children together, and petitioner had purchased a car for Theresa. Id. Petitioner would sometimes drive Theresa and other family members to Virginia to go

---

[31] Petitioner was born in 1951; therefore, these tests were administered when he was approximately fourteen and seventeen years old.

shopping. Id. at 9. When petitioner's mother was alive, she would give him a list and petitioner would grocery shop for her. Id. at 8. The state court further found that petitioner taught the son of Barbara Lamb to drive and had helped his own son with homework.[32] Id. at 8-9. The state court found petitioner would sometimes spend leisure time fixing cars. Id. at 9. Based upon these factual findings, the state court concluded petitioner failed to show he was mentally retarded as defined under North Carolina law. Id.

Petitioner obviously disagrees with the state court's ruling, but he fails to show it is based upon an unreasonable determination of the facts or is contrary to, or an unreasonable application of, clearly established federal law. This court cannot substitute its judgment or reconsider the evidence de novo absent a showing the state court acted unreasonably. Cf. Thorn v. Jefferson-Pilot Ins. Co., 445 F.3d 311, 324 (4th Cir. 2006) ("[B]urdens of proof and standards of review matter."). The record is replete with evidence that supports the state court's finding that petitioner is not mentally retarded under the statute. Moreover, petitioner was not required to show an I.Q. score of 70 or less before he turned 18. See Walker v. True, 399 F.3d 315, 323 n.7 (4th Cir. 2005). However, petitioner was required to show that any mental retardation was manifested before the age of 18. See N.C. Gen. Stat. § 15A-2005(a)(1). The three individually administered I.Q. tests were all given to petitioner when he was well beyond age 18. It was the state court's role to consider the evidence and determine whether petitioner had demonstrated significantly subaverage general intellectual functioning before age 18. See id. The scores of 79 and 81 were not only consistent with one another, but also were consistent with petitioner's scores from group testing as a child. Further, Dr. Brown, a mental health expert who testified on behalf of the defense at petitioner's second trial,

---

[32] Ms. Lamb was the State's witness and related to the victims. She testified petitioner taught her son Carlos to drive. Mot. Hr'g at 258.

affirmed that his testimony had been and his opinion remained the same that petitioner was not mentally retarded, but was in the borderline range of intellectual functioning. Brown Aff. ¶ 16.

Petitioner now argues that Dr. Brown failed to consider the Flynn Effect, which posits that I.Q. scores rise over time and that I.Q. tests that are not "re-normed" to adjust for rising I.Q. levels will overstate a testee's I.Q. See Walker, 399 F.3d at 322. Petitioner does not, however, explain to what extent the Flynn Effect would reduce one of petitioner's later I.Q. scores to 70 or less or otherwise show manifestation of mental retardation before age 18. Petitioner's speculative allegations do not preclude rejecting his claim. See Walton v. Johnson, 440 F.3d 160, 178 (4th Cir. 2006) (en banc) (concluding that speculative allegations regarding Flynn Effect or other statistical standard errors of measurement do not require further evidentiary review); see also Hedrick v. True, 443 F.3d 342, 368 (4th Cir. 2006).

Next, petitioner likens his case to Walker v. True, where the Fourth Circuit indicated that the petitioner could show mental retardation under Virginia law if all alleged facts were true. See Walker, 339 F.3d at 321 (describing the petitioner's need for special education, inability to handle money, low frustration tolerance, and deficiencies in language, reading, and writing). However, Walker arose in Virginia and involved a different procedural posture. In Walker, the petitioner presented his Atkins claim for the first time to the federal district court. Id. at 319. "Accordingly, that claim [was] not subject to deference under 28 U.S.C. § 2254(d) because it ha[d] never been adjudicated on the merits" in Virginia state court. Thus, the Fourth Circuit reviewed the Atkins claim de novo and remanded for a full evidentiary hearing as to whether the petitioner was mentally retarded under the Virginia statute. Id.

Unlike Walker, petitioner received a full evidentiary hearing in North Carolina state court on his Atkins claim. Hence, the standard of review is whether the state court's adjudication of his

Atkins claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2). As stated above, the record is replete with evidence that supports the state court's finding that petitioner is not mentally retarded under North Carolina's statutory definition. Cf. Walker, 399 F.3d at 319 ("While [petitioner's] claim ultimately derives from his rights under the Eighth Amendment, whether he is mentally retarded is governed by Virginia law.")

Although petitioner seeks to rely on Walker, the Fourth Circuit's decision in Conaway v. Polk, 453 F.3d 567 (4th Cir. 2006), more closely fits the facts of this case. In Conaway, the Fourth Circuit found the MAR Court's application of law and determination of facts reasonable and affirmed the district court's denial of the Atkins claim. Id. at 591-92. Petitioner Conaway submitted an I.Q. test score of 68 received at age 34, an affidavit from his doctor indicating mental retardation, and a lifetime record of major impairment in academics, employment, and life skills. Id. at 591. The MAR Court considered all of the evidence and rejected the petitioner's Atkins claim, concluding that Conaway had received I.Q. scores of 79 and 80 on tests administered before age 18 and failed to present compelling evidence that mental retardation manifested before age 18. Id. at 592. Further, Conaway failed to allege facts to support the conclusion that any of his childhood I.Q. tests were unreliable at the time the tests were administered. Id. at 592 n.27.

Unlike Conaway, petitioner was not administered any standardized intelligence tests before age 18, but did receive scores of 82 and 83 on group testing performed during his school years. Nevertheless, as in Conaway, the state court considered these scores, his later I.Q. scores, and all other evidence presented at the hearing. The state court then found that petitioner failed to show that he was mentally retarded under North Carolina law. In light of the standard of review under 28 U.S.C. § 2254(d)(2), petitioner's Atkins claim fails.

41

In sum, petitioner has not established that the state court acted unreasonably by finding that he failed to show he had significant subaverage general intellectual functioning before age 18. Because North Carolina law requires petitioner to show such subaverage general intellectual functioning and significant limitations in adaptive functioning, the court need not address his arguments with respect to adaptive functioning. Respondent's motion for summary judgment as to Claim I is granted.

B.

In Claim VII, petitioner argues that he received ineffective assistance of counsel because trial counsel failed to interview potential mitigating witnesses and failed to present numerous available mitigating witnesses at trial. Petitioner first raised this claim in his MAR. After an evidentiary hearing, the MAR court denied the claim on the merits.

Petitioner asserts that counsel must be found ineffective under Strickland v. Washington, Williams v. Taylor, Wiggins v. Smith, and Rompilla v. Beard because they failed to call any of his family members and other witnesses who could have provided positive character testimony and explained his family relationships and mental disabilities. Specifically, petitioner complains that trial counsel did not pursue mitigating evidence from his brother Ernest Cole, his brother Rufus Cole, Rufus' wife Patsy Cole, his sister Rose Cole, former neighbor Shirley Simpson, and A.C. Robinson, a member of the Elizabeth City Town Council. With respect to petitioner's brothers, sister, and sister-in-law, he argues that they could have provided evidence of his mental disabilities from childhood, that he was good to his mother, that he bought things for Theresa and his son, and that their first cousin is the Honorable Carlton Cole, a district court judge for Perquimans County.[33]

_____

[33] In support of this claim, petitioner cites to testimony that Rufus and Patsy Cole and Shirley Simpson gave at the hearing on the motion for imposition of life sentence in 2003. Because this evidence was not presented to the MAR court in support of the claim, it will not be considered by

42

Petitioner asserts Shirley Simpson could have presented testimony about his background and that he snapped, and he says A.C. Robinson knew his history. Pet. at 136.

In denying the claim, the MAR court found that trial counsel were not deficient in their investigation or presentation of mitigating evidence. MAR Order at 119. The MAR court noted that trial counsel consulted with the Center for Death Penalty Litigation and had the assistance of Ms. Engel, from the Center, who acted as an investigator for the defense. The MAR court noted that Ms. Engel summarized interviews with potential witnesses, investigated petitioner's records, produced a chronology of petitioner's life, and offered possible legal arguments for counsel relating to proposed mitigating circumstances, closing arguments, and aggravating circumstances. Id. at 119-20. The MAR court found that counsel had petitioner's school, employment, and Department of Correction records and used the information to prepare the case. Id. at 120. The MAR court determined that petitioner was unable to show that counsel were deficient in securing witnesses to testify on his behalf. Id. The MAR court noted that attorney Hughes testified at the hearing that he issued subpoenas for all the witnesses he believed would be helpful to the case and issued subpoenas for all the potential witnesses Ms. Engel suggested. Id. Mr. Hughes testified that he spoke with the witnesses or had someone else on the defense team do so before trial. Id. The court noted that Mr. Hughes testified that although Ms. Engel provided extensive witness interview summaries. Mr. Hughes found that many of the witnesses expressed to him that they were not interested or were opposed to testifying for petitioner. Thus, Mr. Hughes concluded they would not be good witnesses. Id. at 121. The MAR court found that "witnesses which Cole now complains were not called to testify would not have been as effective, and some may even have hurt Cole's

this court in assessing the merits of the claim of ineffective assistance of counsel. See Wilson v. Moore, 178 F.3d 266, 272-73 (4th Cir. 1999) (holding that federal court should not take into consideration evidence not presented to state court on habeas review); Bell, 236 F.3d at 171 n.13.

43

case." Id.

The MAR court found that the record reflected trial counsel were diligent and presented a substantial case in mitigation. Id. at124. The MAR court noted that counsel began presenting the case in mitigation at the guilt phase of trial by eliciting testimony from police officers that petitioner was intoxicated on the night of the murders. Id. at 122. One of the officers also testified that he had known Cole for years and said that Cole was not violent and had a good character. Id. At sentencing, the defense called various witnesses to present favorable evidence. Petitioner's employer, Mr. Meiggs, testified that Cole was honest and dependable. Id. at 123. An employee from the jail testified about petitioner's good behavior while incarcerated and said that petitioner had expressed remorse for his crime. Id. at 123. The Reverend Wade Staten testified that he had known petitioner since they were children. He testified about Cole's family, childhood, schooling, and personality. Id. The defense also presented testimony from a forensic psychiatrist, Dr. Brown, through whom counsel offered evidence of Cole's remorse and that he loved Theresa and their children. Id. The MAR court noted that, at the hearing on the ineffective assistance of counsel claim, Mr. Hughes testified that counsel presented such witnesses to show that Cole was generally considered a decent person. Id.

The MAR court concluded that "[i]n its entirety, the evidence adduced at the evidentiary hearing reveals that Mr. Hughes and Mr. Abbott made every reasonable effort to secure favorable witnesses to testify on Cole's behalf and to present the best mitigating evidence available." Id. at 124-25. The court found that with the exception of Rufus and Patsy Cole, petitioner failed to present any specific testimony that could have been elicited by the additional witnesses. Id. at 125. The court also concluded that petitioner could not show prejudice because further information from family members regarding his family and background would have been cumulative to the evidence

44

presented at trial and there was not a reasonable probability of a different result had the additional evidence been presented. Id. at 125-26.

To establish ineffective assistance of counsel, a petitioner must show that counsel's representation "fell below an objective standard of reasonableness" and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694. As noted above, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. Counsel are not required "to investigate every conceivable line of mitigating evidence." Wiggins, 539 U.S. at 533. In the context of a capital sentencing proceeding, the question with respect to prejudice is "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695. In making the determination, a court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534.

Petitioner disagrees with the MAR court's finding, but fails to show it is contrary to, or an unreasonable application of, clearly established federal law. Petitioner has not rebutted the MAR court's finding that counsel conducted a thorough investigation into potential mitigating witnesses and decided which testimony would present the best case in mitigation. For example, as the MAR court noted, trial counsel contacted Ernest Cole, but because Ernest was married to the victim's sister he indicated he did not want to testify for the sake of family harmony. MAR Order at 121. Similarly, the evidence indicates that trial counsel attempted to contact Rufus Cole during the preparation of the case and Rufus' wife, Patsy Cole, said that she did not want to get involved. Id.

Further, petitioner is unable to show the MAR court's ruling is contrary to, or an

45

unreasonable application of, clearly established federal law with respect to the prejudice prong of Strickland. The evidence petitioner now argues should have been presented about his childhood, family upbringing, mental disability, and character was substantially cumulative of evidence presented through other witnesses at trial. The jury heard mitigating testimony from various witnesses including the forensic psychiatrist Dr. Brown, Reverend Staten who was a friend from Cole's youth, Cole's first grade teacher, and Mr. Meiggs who was petitioner's boss for three years. Petitioner is unable to show that if counsel had called family members or others who could have presented testimony, cumulative to that already presented, there is a reasonable probability of a different result at sentencing, especially given the brutal nature of the offense.

The jury heard evidence that petitioner dragged Theresa from her bed, shot her, and stabbed her more than 100 times all in the presence of a twelve-year-old child. When Hattie tried to help her daughter, petitioner stabbed her and then continued his vicious attack on Theresa. There was also evidence that when he finished, before fleeing the scene, petitioner expressed that Theresa had gotten what she deserved. Petitioner is unable to show that because trial counsel failed to call family members or others to present additional evidence about his childhood, mental disabilities, and typically good nature that there was a reasonable likelihood of a different outcome. Accordingly, respondent's motion for summary judgment as to Claim VII is granted.

C.

In Claim IX, petitioner argues that prospective juror Etheridge should have been removed for cause during voir dire because he stated he had formed an opinion that petitioner committed the alleged crimes. Petitioner argues that a prospective juror who has expressed an opinion as to a defendant's guilt "should be dismissed for cause in accordance with a defendant's right to a fair trial before an impartial jury, a right secured by the Sixth Amendment and by the Due Process Clause

of the Fourteenth Amendment." Pet. at 149. After the court denied the challenge for cause, the defense used a peremptory challenge to excuse Mr. Etheridge and ultimately exhausted all of their peremptory challenges. See State Ct. R., Vol. 17 of 31 at 1259.

Petitioner first raised this argument on direct appeal. The North Carolina Supreme Court denied it on the merits. Cole, 343 N.C. at 415-16, 471 S.E.2d at 370. The state court found that although Mr. Etheridge initially said he thought petitioner was guilty, he subsequently indicated he could put aside his knowledge of the case and base his verdict on evidence presented at trial. Id. The state court concluded that the trial court had not abused its discretion in denying the challenge for cause. Id.

Petitioner is unable to show he is entitled to federal habeas relief on the basis of this claim. In making the claim, petitioner does not assert that any juror who served was not impartial. The loss of a peremptory challenge, without more, does not violate a defendant's right to an impartial trial. See Ross v. Oklahoma, 487 U.S. 81, 88 (1988). "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." Id. The Supreme Court has also rejected arguments that a defendant's use of a peremptory challenge to remove a juror who should have been excused for cause is a violation of a defendant's due process rights. See United States v. Martinez-Salazar, 528 U.S. 304, 317 (2000); Ross, 487 U.S. at 89. Accordingly, petitioner is unable to show the state court acted contrary to clearly established federal law by denying this claim. Respondent's motion for summary judgment as to Claim IX is granted.

D.

In Claim X, petitioner asserts that the trial court violated his Eighth and Fourteenth Amendment rights by giving the jury an unconstitutionally vague instruction on the course of conduct

aggravator found in N.C. Gen. Stat. § 15A-2000(e)(11). Petitioner first raised this claim on direct

appeal and the North Carolina Supreme Court denied it on the merits. Cole, 343 N.C. at 421, 471

S.E.2d at 373. The state court concluded the instruction was not unconstitutionally vague. Id.

> The trial court instructed the jury in pertinent part:

> Finally, as to aggravating circumstances, you are to consider, was this murder part of a course of conduct in which the defendant engaged and did that course of conduct include the commission by the defendant of other crimes of violence against another person or persons? A murder is part of a course of conduct, if you find from the evidence beyond a reasonable doubt that in addition to killing the victim, Theresa Graham, the defendant on or about June 23rd, 1988 was engaged in a course of conduct which involved the commission of another crime of violence against another person and that this other crime was included in the same course of conduct in which the killing of the victim. Theresa Graham, was also a part. If you so find, then you would find this aggravating circumstance and would indicate so by having your foreperson write yes in the space after this aggravating circumstance on the issues and recommendation form.

> If you do not so find or have a reasonable doubt as to one of more of these things then you will not find this aggravating circumstance and would so indicate by having your foreperson write no in that blank space provided.

State Ct. R., Vol. 19 of 31 at 2422-23.

Petitioner argues that the instruction did not give the jury guidance in understanding the

meaning of the course of conduct factor by identifying specific criteria. Citing Jurek v. Texas, 428

U.S. 262, 279 (1976) (White, J., concurring), he contends that even when an aggravating factor has

a common-sense core meaning, "the Eighth and Fourteenth Amendment require trial courts to give

jury instructions that provide clear definitions of aggravating circumstances in order to avoid arbitrary

and capricious capital sentencing verdicts." Pet. at 154-55. Petitioner contends that this instruction

is distinguishable from instructions that the North Carolina Supreme Court approved in State v.

Williams, 305 N.C. 656, 292 S.E.2d 243 (1982), and State v. Cummings, 332 N.C. 487, 422 S.E.2d

692 (1992). He states that in Williams the instruction defined a course of conduct as a "pattern of

intentional acts" showing a "plan, scheme, or design" involving the first-degree murder and a crime

of violence against another victim. Pet. at 154. He states that in Cummings the court noted that in addition to a "plan, scheme, or design" the pattern of acts could show a "common modus operandi or motive." Id.

In reviewing an allegedly vague instruction, the court must consider whether there is a reasonable likelihood the jury applied the instruction in a way that is unconstitutional. Estelle v. McGuire, 502 U.S. 62, 72 (1991). In Zant v. Stephens, 462 U.S. 862, 876 (1983), the Supreme Court emphasized that in designing a constitutional capital punishment system, the state is required to provide a meaningful basis for distinguishing between those trials resulting in a penalty of death and those in which a penalty of life imprisonment is imposed. To do so, the state must identify aggravating circumstances and require that one or more of them be found. Id. An aggravating factor is not unconstitutionally vague as long as it has a "common-sense core of meaning . . . that criminal juries should be capable of understanding." Tuilaepa v. California, 512 U.S. 967, 973 (1994) (quoting Jurek, 428 U.S. at 279 (White, J., concurring)). In considering whether an aggravating circumstance is unconstitutionally vague, the court's review is "quite deferential." Id. at 973 (citing Walton v. Arizona, 497 U.S. 639, 655 (1990)).

Petitioner generally asserts that the instruction told the jury "nothing at all about the meaning of the circumstance," but fails to show the instruction did not adequately guide the jury in its consideration of the aggravating factor. Pet. at 154. The trial court's instruction directed the jurors to consider whether in the course of murdering Theresa Graham petitioner also engaged in other criminal conduct which involved the use of violence against another person. This instruction had a "common-sense core of meaning" the jurors could understand and there is not a reasonable likelihood the jurors applied the instruction in violation of the constitution. Further, petitioner cannot show he is entitled to relief merely because the language that the trial court used in his case differed from

instructions given in Williams or Cummings. See, e.g., Estelle, 502 U.S. at 72. Petitioner fails to show that the MAR court's ruling was contrary to, or an unreasonable application of, clearly established federal law. Respondent's motion for summary judgment as to Claim X is granted.

E.

In Claim XI, petitioner argues the trial court violated his constitutional rights by refusing to instruct the jury to consider whether his capacity to appreciate the criminality of his conduct or conform his conduct to the law was impaired by delusional paranoid disorder. The court instructed the jurors to consider whether his capacity to appreciate the criminality of his conduct or conform his conduct to the law was impaired by alcohol, drugs, or both. State Ct. R., Vol. 19 of 31 at 2429. However, petitioner argues that jurors should have also been instructed to consider whether his mental disorder served as a basis for impairing his capacity. He argues that the court's failure to give the instruction prevented the jury from considering the full scope of the mitigating evidence in violation of the Eighth and Fourteenth Amendments.

Petitioner first raised this claim on direct appeal and the North Carolina Supreme Court denied the claim on the merits. Cole, 343 N.C. at 422, 471 S.E.2d at 374. Relying upon state law the court said that it had previously considered the argument and held that "a trial judge's mention of only some of the evidence supporting a mitigating circumstance does not preclude jurors from considering other evidence that might support such a circumstance." Id.

Petitioner does not address the state court's reasoning, but argues that the instruction should have included language on delusional paranoid disorder and contends he was prejudiced by the court's failure to do so. Respondent alleges the trial court gave the instruction on capacity that the defense requested and argues petitioner may not be granted relief based on an instruction which he requested. Respondent also argues that the instruction did not prevent the jury from considering any

mitigating evidence.

At the charge conference, the court asked defense counsel which mitigating factors they

wanted submitted to the jury. Thereafter, the following occurred:

Mr. Hughes: This murder was committed while the defendant was under the influence of a mental or emotional disturbance being delusional [sic] paranoid disorder-jealous type.

The Court: All right, sir.

Mr. Hughes: Number three would be, the murder was committed while the defendant was under the influence of a mental or emotional disturbance as a result of his belief that Theresa Graham was engaged in sexual activity with another person.

The Court: Isn't that the same thing as the one you just submitted?

Mr. Hughes: Probably it would work out the same way. I think we can delete that one after I stated it. Number three then would be the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired by his delusional [sic] disorder.

The Court: What distinction is to be made?

Mr. Hughes: Well, first of all, it was committed while he was under the influence of and the second one is that his ability to appreciate the criminality of his act was impaired by it.

The Court: All right, sir. Assume you're suggesting he was impaired by his delusional paranoid disorder-jealousy type?

Mr. Hughes: Yes, sir. The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired by alcohol or drugs or both.

The Court: All right, sir.

State Ct. R., Vol. 19 of 31 at 2363-64. The defense offered additional mitigating factors and the

following then occurred:

The Court: Are there any other specific ones? The Court will includes[] as part of that, the catch-all phrase of any other circumstances that the jury or one or more of them may find exists and feel that it has mitigating value.

51

Mr. Hughes: That's number nine in the statutory – the catch-all?

The Court: Yes, sir.

Mr. Hughes: I think that's it unless Mr. Abbott comes up with something else here, he's got my notes. I think that's it, Your Honor.

The Court: Anything further?

Mr. Hughes: No, sir.

The Court: State wish to be heard further?

Mr. Trivette: Just so I'm clear, Your Honor, the second one, this murder was committed while the defendant was under the influence of a mental or emotional disturbance, that being delusional – paranoid delusional/jealousy – is that –

Mr. Hughes: Delusional paranoid disorder-jealous type.

Mr. Trivette: And then you're not submitting the one that – that had the same initial language and then ended with as a result of the belief that Theresa Graham was engaging in sexual activity –

Mr. Hughes: We're submitting both of those.

The Court: The first one he's submitting was that he was under the influence of an emotional or mental disturbance as a result of – some language like that, as a result of a delusional paranoid disorder-jealousy type. And the second on that's different talks about the criminality, not being able to appreciate the criminality of his conduct. I thought Mr. Hughes indicated he was not submitting specific language as to the under the influence of emotional or mental disturbance relating to [a] specific nature of what he thought Theresa Graham was doing. That's encompassed within whatever the definition of delusional paranoid disorder-jealousy type is.

Mr. Hughes: I believe in my actual statement to the Court was relating to the appreciating the criminality of his conduct on the second one Mr. Trivette had a question about, his belief that Theresa was involved with someone else, not the one – on the first one, that he was under the influence of mental and emotional disturbance which would be the delusional paranoid disorder, and the second one, if I understand it, where we were under [], the capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired by his belief that Theresa was involved.

The Court: So then you're submitting it in that fashion rather than –

52

Mr. Hughes: I was thinking that's how he had submitted it originally and when you explained it to him I thought you said that's what I had done. I'm not sure exactly —

The Court: Let me just make this statement, Mr. Hughes. I thought you had indicated that you were submitting in terms of capacity to appreciate the criminality of his conduct, I thought you were submitting it in this fashion, defendant's capacity to appreciate the criminality of his conduct was impaired because of a delusional paranoid-jealousy disorder – or paranoid disorder-jealousy type. And that [] by your argument, would encompass the specific statement that he believed that Theresa Graham was having an affair, or something to that effect. Are you asking now that it be submitted separately with reference to the general notion of delusional paranoid disorder-jealousy type, and also he was impaired because he felt Theresa Graham was having an affair?

Mr. Hughes: Give me just a minute, Your Honor. Your Honor, maybe I need to rephrase – this is the third one, is this correct, that we're talking about now, is the third one I gave you? The first one was no significant history of prior criminal activity, second is committed while under influence of mental or emotional disturbance, mental illness being delusional paranoid disorder-jealousy type, the third would then be murder was committed while defendant was under the influence of a mental or emotional disturbance as a result of his belief that Theresa Graham was engaged in sexual activity with another person.

The Court: All right, sir. What's your next one?

Mr. Hughes: Would be the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct with the requirements of the law was impaired by alcohol, drugs or both.

The Court: All right. What's your next one?

Mr. Hughes: The next one was the defendant was a person of good character and reputation in the community in which he lives.

The Court: All right. What's the next one?

Mr. Hughes: Defendant does not have a history of violent activity and is normally a peaceful person.

The Court: All right, sir. What's the next one?

Mr. Hughes: The defendant is remorseful.

The Court: Just keep going until you get to the end of what you offer.

53

Mr. Hughes: Number eight, I believe is this one, defendant was gainfully employed, was a good worker, had a reputation of being a good and dependable employee at the time of the incident in question. Number nine, since his incarceration, the defendant has appreciated the severity and the error of his conduct. Number ten, would be the acts of the defendant in the commission of the incident in question are out of character for him. And number 11 would be your catch-all.

The Court: Is that all the defendant intends to offer as mitigating factors?

Mr. Abbott: I have one, if Your Honor please.

Mr. Hughes: Your Honor, under the standard felony judgment findings of fact form we would contend that at an early stage of the criminal process the defendant voluntarily acknowledged wrongdoing in connection with the offense to a law enforcement officer, which would fall under –

The Court: Are you offering that as number –

Mr. Hughes: That would be number ten and then the catch-all would be number 11.

The Court: All right, sir. Anything further?

Mr. Hughes: Not that I'm aware of.

The Court: Court will submit the mitigating factors that are offered by the defendant as you just recently did . . . .

Id. at 2366-71.

Under the invited error doctrine a defendant is not entitled to relief from an error which he invited. See, e.g., United States v. Herrera, 23 F.3d 74, 75 (4th Cir. 1994); Wilson v. Lindler, 8 F.3d 173, 175 (4th Cir. 1993). Mr. Hughes initially indicated he wanted the jury to consider whether petitioner's capacity to appreciate the criminality of his conduct or conform his conduct to the law was impaired by delusional paranoid disorder and the court was prepared to instruct the jury on that mitigating factor. State Ct. R., Vol. 19 of 31 at 2364. However, upon further discussion at the charge conference, Mr. Hughes did not include that language when explaining the mitigating factors the defense was requesting. Id. at 2368-69. The trial court attempted to clarify the defense's request and ultimately had defense counsel list all of the mitigating factors the defense wanted included in

the jury charge. Id. at 2369, 2370-71. At that time, Mr. Hughes only requested the court to instruct the jury to consider whether petitioner's capacity was impaired by alcohol or drugs. He did not ask the judge to include language asking the jury to consider whether petitioner's capacity was impaired due to delusional paranoid disorder. Id. at 2369-70. The transcript shows the court agreed to instruct the jury on the mitigating factors exactly as requested by the defense and did so at trial. Id. at 2371, 2425-37.[34] Therefore, because the court gave the instruction that the defense requested, petitioner may not now attack the instruction as error.

---

[34] The trial court instructed the jurors in pertinent part:

It is your duty to consider the following mitigating circumstances and any others which you find from the evidence. As listed on the form, first, consider whether the defendant, Wade Larry Cole, has no significant history of prior criminal activity . . . .

Number two, consider whether this murder was committed while [] defendant was under the influence of mental or emotional disturbance, the mental illness being delusional paranoia disorder-jealousy type. The defendant is under such influence if he is in any way affected or influenced by a mental or emotional disturbance at the time he kills. Being under the influence of a mental or emotional disturbance is similar to but not the same as being in a heat of passion upon adequate provocation. A person may be under the influence of mental, emotional disturbance even if he had no adequate provocation and even if his disturbance was not so strong as to constitute heat of passion or to preclude deliberation. For this mitigating circumstance to exist, it is enough that the defendant's mind or emotion were disturbed from any cause and that he was under the influence of a disturbance or the disturbance when he killed the victim, Theresa Graham.

You will find this mitigating circumstance if you find that the defendant suffered from delusional paranoia disorder-jealousy type, and that as a result the defendant was under the influence of mental or emotional disturbance when he killed the victim, Theresa Graham . . . .

Number three, you're to consider whether this murder was committed while the defendant was under the influence of mental or emotional disturbance as a result of the belief that Theresa Graham was engaged in sexual activity with another person . . . .

Number four, you're to consider whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired by either alcohol or drugs or both.

State Ct. R., Vol. 19 of 31 at 2425-29.

55

Case 5:05-hc-00461-D   Document 24   Filed 09/20/07   Page 55 of 62

In any event, petitioner cannot show the jury was prevented from considering mitigating evidence (including any alleged delusional paranoid disorder) based on the instruction. Jurors in a capital case may not be prevented from considering "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v Ohio, 438 U.S. 586, 604 (1978). When a petitioner argues that an instruction prevented a jury from considering mitigating evidence, the court must determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde v. California, 494 U.S. 370, 380 (1990). The alleged error in the instruction must be reviewed in the context of the overall charge. Cupp v. Naughten, 414 U.S. 141, 146-47 (1973).

At trial, the defense presented evidence to show that petitioner suffered from paranoid delusional disorder. Although the jury was not instructed to specifically consider whether his paranoid delusional disorder impaired his ability to appreciate the criminality of his conduct or conform his conduct, the jury was allowed to consider the evidence in any manner it wanted under the catch-all mitigating factor. State Ct. R., Vol. 19 of 31 at 2436. The jury was also asked to consider whether petitioner committed the murder while under the influence of mental or emotional disturbance specifically, paranoid disorder-jealousy type. Id. at 2427-28. Therefore, there is not a reasonable likelihood the challenged instruction precluded the jury from considering mitigating evidence. Petitioner has failed to show that the North Carolina Supreme Court's ruling is contrary to, or an unreasonable application of, clearly established federal law and respondent's motion for summary judgment as to Clam XI is granted.

F.

In Claim XII, petitioner argues that the trial court's instruction on the N.C. Gen. Stat. § 15A-2000(e)(9) aggravating factor that "[t]he capital felony was especially heinous, atrocious, or cruel" was unconstitutionally vague. Petitioner first raised this claim on direct appeal as a preservation issue conceding that the North Carolina Supreme Court had previously rejected the argument. The North Carolina Supreme Court denied the claim finding there was no reason to depart from its prior holdings. Cole, 343 N.C. at 422, 471 S.E.2d at 374.

The trial court instructed the jurors:

> As to number one which reads, was this murder especially heinous, atrocious or cruel, I instruct you as follows: In the context of this aggravating circumstance, heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and violent, and cruel means, designed to inflict a high degree of pain with utter indifference to or even the enjoyment of the suffering of others. However, I instruct you that it is not enough that this murder be heinous, atrocious or cruel, as those terms have been defined. The murder must have been especially heinous, atrocious or cruel and not every murder is especially so.
> For this murder to have been especially heinous, atrocious or cruel, any brutality which was involved in it must have exceeded that which is normally present in any killing or this murder must have been a conscienceless or pitiless crime which was unnecessarily torturous to the victim.

State Ct. R., Vol. 19 of 31 at 2421.

As petitioner recognizes, the trial court's instruction conforms to the North Carolina Pattern Jury Instruction on this aggravating circumstance. See N.C.P.I.-Crim. 150.10(9) (May 2004). The Fourth Circuit has repeatedly rejected claims that this instruction is unconstitutionally vague in violation of the Eighth Amendment. See, e.g., Bates v. Lee, 308 F.3d 411, 424 (4th Cir. 2002); Fullwood v. Lee, 290 F.3d 663, 695 (4th Cir. 2002); Frye v. Lee, 235 F.3d 897, 907-08 (4th Cir. 2000); Fisher, 215 F.3d at 459. Accordingly, petitioner cannot show the North Carolina Supreme Court's ruling is contrary to, or an unreasonable application of, clearly established federal law. Respondent's motion for summary judgment as to Claim XII is granted.

G.

In Claim XIII, petitioner argues that the trial court's use of the word "satisfy" to explain the burden of proof on mitigating factors was unconstitutionally vague. Petitioner first raised this claim on direct appeal as a preservation issue conceding that the North Carolina Supreme Court had previously rejected the argument. The North Carolina Supreme Court denied the claim, finding there was no reason to depart from its prior holdings. Cole, 343 N.C. at 422, 471 S.E.2d at 374.

The trial court instructed the jurors:

> I instruct you that the defendant has the burden of persuading you that a given mitigating circumstance exist[s]. The existence of any mitigating circumstance must be established by a preponderance of the evidence. That is, the evidence, taken as a whole, must satisfy you not beyond a reasonable doubt but simply must satisfy you that any mitigating circumstance exists. If the evidence satisfies any of you that a mitigating circumstance exists, you would indicate that finding on the issues and recommendation form. An individual juror may find that any mitigating circumstance exists by a preponderance of the evidence whether or not that circumstance was found by all of the jurors.

State Ct. R., Vol. 19 of 31 at 2425. Petitioner contends that the use of the word "satisfy" to describe the burden of persuasion was a "standardless standard" that was unconstitutionally vague and did not provide adequate guidance to the jurors in violation of the Eighth and Fourteenth Amendments. Pet. at 168.

The court must determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Boyde, 494 U.S. at 380. The allegedly inadequate instruction must be reviewed in the context of the overall charge. See Cupp, 414 U.S. at 146-47 ("[A] single instruction to a jury may not be judged in artificial isolation. . . ."). Considering the entire instruction on the burden of persuasion for mitigating circumstances, petitioner is unable to show a reasonable likelihood that the jurors applied an unconstitutional burden of proof or that the jurors were not adequately guided in

58

their consideration of the evidence in mitigation. The term "satisfy" was used in conjunction with language that "the existence of any mitigating circumstance must be established by a preponderance of the evidence." State Ct. R., Vol. 19 of 31 at 2425. Petitioner fails to show that in this context the instruction was unconstitutionally vague. Accordingly, the state court ruling is not contrary to, or an unreasonable application of, clearly established federal law. Respondent's motion for summary judgment as to Claim XIII is granted.

H.

In Claim XIV, petitioner argues that the trial court's instruction allowed the jurors to ignore the nonstatutory mitigating factors. Petitioner first raised this claim on direct appeal as a preservation issue conceding that the North Carolina Supreme Court had previously rejected the argument. The North Carolina Supreme Court denied the claim finding there was no reason to depart from its prior holdings. Cole, 343 N.C. at 422, 471 S.E.2d at 374.

For each of the seven nonstatutory mitigating circumstance the trial court instructed the jurors to consider the factor and consider:

> [W]hether you deem this to have mitigating value. You will find this mitigating circumstance if you find [description of factor] . . . and that this circumstance has mitigating value. That is, if one or more of you finds by a preponderance of the evidence that this circumstance exists, and also as deemed mitigating, you will so indicate by having your foreperson write yes in the space provided after this mitigating circumstance on the issues and recommendation form. If none of you find this circumstance to exist or if none of you deem it to have mitigating value, you should so indicate by having your foreperson write no . . . .

State Ct. R., Vol. 19 of 31 at 2431-33.

Petitioner contends that because the trial court determined there was sufficient evidence to submit the factors to the jury, then as a matter of law, they had some mitigating value. He, therefore, argues that while the jurors could decide what weight to give the factors, the jurors could not constitutionally reject them and remove them from consideration. He argues that the instruction

allowed jurors to ignore and reject mitigating evidence. He asserts that the instruction is contrary to Penry v. Lynaugh, 492 U.S. 302 (1989), Eddings v. Oklahoma, 455 U.S. 104 (1982), and Lockett v. Ohio, 438 U.S. 586 (1978).

In Lockett, the Supreme Court addressed the consideration of mitigating factors and held that a jury cannot be precluded from considering any mitigating factor. Lockett, 438 U.S. at 604. In Eddings, the Court, relying upon its earlier decision in Lockett, held that as a matter of law a sentencer cannot refuse to consider a mitigating factor. Eddings, 455 U.S. at 114-15. The Court ruled that a sentencer can choose what weight to give the factor, but cannot give it no weight by refusing to consider it. Id. In Penry, the Court stated that "[t]he sentencer must also be able to consider and give effect to [mitigating] evidence in imposing sentence." Penry, 492 U.S. at 319.

There is not a reasonable likelihood that the instruction violated Lockett, Eddings, Penry, or any other clearly established federal law. The instruction did not preclude the jury from considering any mitigating evidence, but gave the jury freedom to determine what weight to give the factors, including no weight at all. While the Constitution requires the jury to consider all of the mitigating factors, "[t]here is simply no constitutional requirement that a sentencing jury must give effect or value to any evidence offered in mitigation." Williams, 146 F.3d at 216 n.15. As long as the mitigating evidence is within "the effective reach of the sentencer," the Constitution is satisfied. Graham v. Collins, 506 U.S. 461, 475 (1993). Petitioner has failed to show the state court's ruling is contrary to, or an unreasonable application of, clearly established federal law. Respondent's motion for summary judgment as to Claim XIV is granted.

I.

In Claim XV, petitioner argues the trial court gave an unconstitutional jury charge on the consideration of mitigating circumstances in Issues Three and Four by including the word "may."

He contends there is a reasonable likelihood the jurors understood the instruction to mean that they could ignore or not consider mitigating factors in the weighing process in violation of Eddings v. Oklahoma and Penry v. Lynaugh. Petitioner first raised this claim on direct appeal as a preservation issue conceding that the North Carolina Supreme Court had previously rejected the argument. The North Carolina Supreme Court denied the claim finding there was no reason to depart from its prior holdings. Cole, 343 N.C. at 422, 471 S.E.2d at 374.

The trial court instructed the jurors with respect to Issue Three:

> If you find from the evidence one or more mitigating circumstances, you must weigh the aggravating circumstances against the mitigating circumstances. When deciding this issue, that is issue number three, each individual juror may consider any mitigating circumstance or circumstances that the juror determine[d] to exist by a preponderance of the evidence in issue number two. In so doing, you are the judges of the weight to be given to any individual circumstance which you find, whether aggravating or mitigating.

State Ct. R., Vol. 19 of 31 at 2438. With respect to Issue Four the trial court instructed:

> In deciding this issue, you are not to consider the aggravating circumstances standing alone. You must consider them in connection with any mitigating circumstance found by one or more of you. When making this comparison, each individual juror may consider any mitigating circumstance or circumstances that the juror determines to exist by a preponderance of the evidence.

Id. at 2439-40.

Petitioner is unable to show that the North Carolina Supreme Court acted contrary to clearly established federal law by denying this claim. A challenged instruction must be reviewed in the context of the overall charge. Cupp, 414 U.S. at 146-47. Considering the challenged language in the context of the entire instruction, there is not a reasonable likelihood the jury believed they could disregard or not consider the mitigating factors. See, e.g., Carter v. Lee, 1999 WL 1267353, at *8 (4th Cir. Dec. 29, 1999) (unpublished) (rejecting challenge to instruction on Issue Three finding no reasonable likelihood that jury misinterpreted instruction which used the word "may"). The

instructions were clear that in resolving Issues Three and Four, the jurors were to weigh any and all mitigating factors they individually found to exist. Respondent's motion for summary judgment as to Claim XV is granted.

## VII.

For the reasons stated above, the court finds that Cole fails to establish he is in custody in violation of the Constitution or laws of the United States. He is not entitled to the relief requested and respondent is entitled to judgment as a matter of law. Accordingly, respondent's motion for summary judgment [D.E. 22] is GRANTED, respondent's motion to dismiss [D.E. 12] is DENIED as moot, petitioner's motion for summary judgment [D.E. 16] and renewed motion for summary judgment [D.E. 23] are DENIED, and the petition for writ of habeas corpus is DISMISSED. It is further ordered that Cole's request for an evidentiary hearing with respect to Claim VI is DENIED.

SO ORDERED. This **20** day of September 2007.

JAMES C. DEVER III
United States District Judge